# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 23-2598

CORECIVIC, INC.,
*Plaintiff-Appellee,*

v.

GOVERNOR OF NEW JERSEY, et al.,
*Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (No. 3:23-cv-00967)

## BRIEF OF APPELLANTS

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

MICHAEL L. ZUCKERMAN
*Deputy Solicitor General*

PETER WINT
*Assistant Attorney General*

NATHANIEL I. LEVY
DANIEL RESLER
ASHLEIGH B. SHELTON
*Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(862) 350-5800
Nathaniel.Levy@njoag.gov

*Attorneys for Appellants*

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION...................................................................4

STATEMENT OF ISSUES PRESENTED...........................................................4

RELATED CASES AND PROCEEDINGS.........................................................4

STATEMENT OF THE CASE............................................................................5

    A.  Private Detention. ..............................................................................5

    B.  Immigration Detention In New Jersey. ..............................................9

    C.  AB 5207 And This Case.....................................................................11

SUMMARY OF ARGUMENT .........................................................................13

STANDARD OF REVIEW ..............................................................................16

ARGUMENT ...................................................................................................16

  I.  CORECIVIC IS NOT IMMUNE FROM AB 5207. ....................................17

    A.  The District Court Adopted The Incorrect Legal Standard.....................17

    B.  AB 5207 Withstands Intergovernmental Immunity Scrutiny. .................30

  II. THE INA DOES NOT IMPLIEDLY PREEMPT NEW JERSEY LAW.......34

    A.  The Federal Laws On Which The Challengers And The District Court Rely Lack Preemptive Effect....................................................................35

    B.  The Federal Laws On Which The Challengers And The District Court Rely Do Not Otherwise Preempt AB 5207. ............................................40

CONCLUSION ..................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

1225 ................................................................................................ 37, 44

1226 ................................................................................................ 37, 44

8 U.S.C. § 1231 ................................................................................ passim

Aleynikov v. Goldman Sachs Grp., Inc., 765 F.3d 350 (3d Cir. 2014)................... 16

Arizona v. Bowsher, 935 F.2d 332 (D.C. Cir. 1991) ............................................. 26

Arizona v. United States, 567 U.S. 387 (2012) ............................................... passim

Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320 (2015) ...................... 36

Camfield v. United States, 167 U.S. 518 (1897) ................................................... 21

Chamber of Com. of United States v. Whiting, 563 U.S. 582 (2011) ........ 22, 41, 50

County of Ocean v. Grewal, 475 F.Supp.3d 355 (D.N.J. 2020) ............................ 37

Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000) ......................... 51, 52

CSX Transp., Inc. v. Easterwood, 507 U.S. 658 (1993) ........................................ 41

Davis v. Mich. Dep't of the Treas., 489 U.S. 803 (1989) ................................. 31, 33

DeCanas v. Bica, 424 U.S. 351 (1976) ................................................................. 47

Geo Grp., Inc. v. Newsom, 50 F.4th 745 (9th Cir. 2022) ............................... passim

Hancock v. Train, 426 U.S. 167 (1976) ........................................................... 19, 26

Haywood v. Drown, 556 U.S. 729 (2009) ............................................................. 21

Helvering v. Gerhardt, 304 U.S. 405 (1938) ............................................................22

Holk v. Snapple Beverage Corp., 575 F.3d 329 (3d Cir. 2009) ..............................46

Kansas v. Garcia, 140 S.Ct. 791 (2020)............................................................ passim

Klotz v. Celentano Stadtmauer and Walentowicz LLP, 991 F.3d 458 (3d Cir. 2021)

..................................................................................................................................41

Leslie Miller, Inc. v. Arkansas, 352 U.S. 187 (1956)....................................... 28, 46

Lozano v. City of Hazleton, 620 F.3d 170 (3d Cir. 2010).......................................49

Lozano v. City of Hazleton, 724 F.3d 297 (3d Cir. 2013).......................................49

McCulloch v. Maryland, 17 U.S. 316 (1819) ................................................... 20, 21

McHenry Cty. v. Raoul, 44 F.4th 581 (7th Cir. 2022) .................................... passim

McKnett v. St. Louis & S.F. Ry. Co., 292 U.S. 230 (1934)....................................21

MD Mall Assocs. LLC v. CSX Transp., Inc., 715 F.3d 479 (3d Cir. 2013) ..........41

Me. Forest Prod. Council v. Cormier, 51 F.4th 1 (1st Cir. 2022)...........................35

Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996) ........................................ 1, 15, 47, 49

Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S.Ct. 1461 (2018)............... passim

Mutual Pharmaceutical Co. v. Bartlett, 570 U.S. 472 (2013)..................................36

North Dakota v. United States, 495 U.S. 423 (1990) ...................................... passim

Novoa v. GEO Grp., Inc., No. 17-2514, 2022 WL 2189626 (C.D. Cal. Jan. 25, 2022)

..................................................................................................................................25

Nwauzor v. GEO Grp., No. 17-5769, 2020 WL 1689728 (W.D. Wash. Apr. 7, 2020) ................................................................................................25

Ocean Cty Bd. of Commissioners., 8 F.4th 176 (3rd Cir. 2021).......... 35, 37, 38, 39

Penn Dairies v. Milk Control Comm'n of Pennsylvania, 318 U.S. 261 (1943) ........................................................................................... passim

Portview Properties, LLC v. CoreCivic, Inc., No. 22-3220, 2023 WL 372857 (D.N.J. Jan. 24, 2023) ..................................................................................11

Public Utilities Comm'n of Cal. v. United States, 355 U.S. 534 (1958).... 28, 29, 46

S. Carolina v. Baker, 485 U.S. 505 (1988) .............................................................19

Sikkelee v. Precision Airmotive Corp., 822 F.3d 680 (3d Cir. 2016) .....................46

Treasurer of New Jersey v. U.S. Department of Treasury, 684 F.3d 382 (3d Cir. 2012) .................................................................................... 26, 35

United States v. Boyd, 378 U.S. 39 (1964).............................................................31

United States v. California, 921 F.3d 865 (9th Cir. 2019).....................................47

United States v. Cty. of Fresno, 429 U.S. 452 (1977) ..................................... 20, 27

United States v. New Mexico, 455 U.S. 720 (1982) ....................................... 23, 31

United States v. Pa. Env't Hearing Bd., 584 F.2d 1273 (3d Cir. 1978) ................29

United States v. Washington, 596 U.S. 832 (2022)........................................ passim

Va. Uranium v. Warren, 139 S.Ct. 1894 (2019)....................................................42

## Constitutional Provisions

U.S. Const. art. VI, cl. 2 .......................................................................... 2, 17, 22, 41

## Statutes

6 U.S.C. § 112 ...........................................................................................44

8 U.S.C. §1225 ...................................................................................... 37, 44

8 U.S.C. §1226 ...................................................................................... 37, 44

8 U.S.C. §1231 ..................................................................................... passim

28 U.S.C. §1291 ..........................................................................................4

N.J. Stat. Ann. § 30:4-27 ........................................................................6, 32

N.J. Stat. Ann. § 30:4-8.15 .................................................................. passim

N.J. Stat. Ann. § 30:4-8.16 .................................................................. 11, 33

N.J. Stat. Ann. §§ 30:4-91.9 to -.10 .....................................................6, 32

P.L. 2021, c.199 ..........................................................................................1

## Regulations

48 C.F.R. § 3017.204-90 ...........................................................................45

8 C.F.R. § 235.3 .........................................................................................46

## Regulations

Clyde Haberman, For Private Prisons, Detaining Immigrants Is Big Business, N.Y.

Times (Oct. 1, 2018), https://nyti.ms/3vkiZxH .......................................9

Concerns about ICE Detainee Treatment & Care at Four Detention Facilities (June 3, 2019), https://bit.ly/3phz0lt..................................................................8

Exec. Order No. 14006, 86 Fed. Reg. 7483 (Jan. 26, 2021) (Biden) .................7, 47

Giulia McDonnel Nieto Del Rio, There Are No Immigrants Left in N.J. Cty. Jails. Where is ICE Sending Them?, (Nov. 18, 2021), https://bit.ly/3Q8irTJ..............12

ICE Health Service Corps Medical/Mental Health Care & Oversight (Mar. 20, 2019), https://bit.ly/3H5hyWk ...........................................................................8, 9

ICE, FY2024 Congressional Justification, (Mar. 13, 2023), https://bit.ly/3N73mQS ...........................................................................................................................10

ICE, ICE detainee passes away at N.J. hospital (Sept. 26, 2011), https://bit.ly/3q3sIpN ..............................................................................................10

INS, Interim Assessment Report concerning the Elizabeth, New Jersey, contract detention facility, (July 21, 1995), https://bit.ly/46kVi6q ...................................10

K. Elengold & J. Glater, The Sovereign Shield, 73 Stan. L. Rev. 969 (2021). 25, 45

Mariana Alfaro, Democrats Battle Over a N.J. Jail's Contract With ICE, N.Y. Times (Aug. 31, 2018), https://bit.ly/3XN67u3..............................................................10

Mgmt. Alert—Immediate Removal of All Detainees from the Torrance County Detention Facility  (Mar. 16, 2022), https://bit.ly/43XPWMU ............................7

Monsy Alvarado, Essex Cty. will end contract to house ICE detainees at Newark jail, NorthJersey.com (Apr. 29, 2021), https://bit.ly/44A3DBh ..........................10

Nina Bernstein, Few Details on Immigrants Who Died in Custody, N.Y. Times (May 5, 2008), https://nyti.ms/3O1rXW9 ..................................................................10

Preiser v. Rodriguez, 411 U.S. 475 (1973)..............................................................48

Sally Q. Yates, Memorandum: Reducing our Use of Private Prisons (Aug. 18, 2016) ...........................................................................................................................7

Sharon Dolovich, State Punishment & Private Prisons, 55 Duke L.J. 437 (2005) ...5

Steve Janoski, Bergen Cty. will collect $12M for housing immigrant detainees, NorthJersey.com (July 2, 2018), https://bit.ly/3XDJb08.....................................10

U.S. Gov't Accountability Office, Immigration Detention, https://www.gao.gov/assets/gao-21-149.pdf.........................................................48

U.S. House of Reps., Comm. On Homeland Sec., Majority Staff Report, ICE Detention Facilities: Failing to Meet Basic Standards of Care (Sept. 21, 2020), https://bit.ly/3S1AiMG ......................................................................................9

U.S. House of Reps., Comm. on Oversight & Reform & Subcomm. on Civ. Rts. & Civ. Liberties, Staff Report, The Trump Admin.'s Mistreatment of Detained Immigrants: Deaths & Deficient Medical Care by For-Profit Detention Contractors (Sept. 2020), https://bit.ly/3NOqUJQ ................................................8

Violations of Detention Stds. amid COVID-19 Outbreak at La Palma Correctional Ctr. in Eloy, AZ  (Mar. 30, 2021), https://bit.ly/44ljrrs.........................................8

Violations of ICE Detention Standards at Adams County Corr. Ctr. (July 14, 2021),

   https://bit.ly/3PykccS ............................................................................7

Violations of ICE Detention Standards at Folkston ICE Processing Ctr. & Folkston

   Annex (June 30, 2022, https://bit.ly/3XH17ax ..................................................7, 9

## INTRODUCTION

Our Constitution's federalist system "presupposes the continued existence of the states functioning in coordination with the national government." *Penn Dairies v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261, 270-71 (1943). States thus retain "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons," including to regulate the sale of goods and services within their borders. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). States have consequently long regulated or restricted companies from selling goods and services within their borders—even services that federal agencies otherwise wish to purchase. That is to be expected; "[w]hatever burdens are imposed on the Federal Government by a neutral state law regulating its suppliers 'are but normal incidents of the organization within the same territory of two governments.'" *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.).

That is precisely what happened here. For decades, New Jersey has recognized the harms inherent in private, for-profit businesses providing detention services, and the State has long prohibited their use for general criminal corrections. Troubled by reports of deplorable conditions at private immigration detention facilities, including the facilities' "inadequate medical and mental health care," the Legislature extended this general prohibition to private immigration detention. *See* P.L. 2021, c.199 (AB 5207). Signed into law in 2021, AB 5207 prohibited private companies in the State

1

from contracting to provide private immigration detention, but it did not interfere with contracts already in effect. It meant CoreCivic—a private detention company—could not renew its contract with U.S. Immigration and Customs Enforcement (ICE) to detain noncitizens at the Elizabeth Detention Center (EDC) in New Jersey.

Although the district court concluded that this state law may not validly apply to CoreCivic, that conclusion is wrong. First, the district court erred in declaring that the Supremacy Clause grants CoreCivic a freestanding constitutional immunity from complying with AB 5207. Citing a doctrine known as intergovernmental immunity, the district court declared that private federal contractors need not comply with state laws that unduly interfere with or disrupt federal operations, including (as relevant here) immigration detention. But the Constitution establishes a different method for resolving disputes between state laws and federal interests: it empowers Congress to enact statutes that "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Because Congress could pass a federal law that frees private detention contractors from compliance with measures like AB 5207, there is no basis for a court to step in where Congress has not done so. Instead, granting private contractors constitutional immunity from state law undermines Congress's primary role in resolving federal-state disputes, improperly bars States from enforcing health-and-safety laws that are not inconsistent with federal laws, lacks administrable rules, and risks providing a roadmap for private contractors to avoid compliance with other measures.

Second, the district court erred in concluding that Congress had freed private detention contractors from compliance with measures like AB 5207, and therefore that New Jersey law is impliedly preempted. The central question is whether the text, history, and structure of the Immigration and Nationality Act (INA) grants rights to detention companies, or places any restrictions on them, that are inconsistent with the terms of New Jersey law. It does not. Importantly, the relevant INA provisions are directed only at federal officials; they do not regulate private companies at all. The INA requires federal officials to consider "appropriate" places of detention from the "available" options, or to build facilities if insufficient capacity is available. 8 U.S.C. §1231(g). But it says nothing about what must *be* available on the market— a question that turns, in part, on state laws. In short, a bare "congressional instruction to 'consider' available facilities and agreements … before building new ones does not preempt a [State's] choice to make certain facilities unavailable," *McHenry Cty. v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022), let alone clearly enough to overcome the presumption against preemption.

The Supremacy Clause does place important limits on state authority. While States enjoy plenary powers over the private entities operating within their domain, they do not have the same powers over the Federal Government itself, and thus States may not "directly regulate" the United States. *United States v. Washington,* 596 U.S. 832, 835 (2022)*. Similarly*, States may adopt evenhanded laws governing private

3

citizens and companies but cannot "discriminate against" the Federal Government, just as States generally are not free to disfavor federal laws. *Id.* Finally, if Congress concludes that the United States must regulate particular private contractors instead of the States, it may preempt state laws that regulate those private actors too. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S.Ct. 1461, 1479 (2018) (*NCAA*). But if Congress does not do so, courts cannot imply a freestanding constitutional immunity for private contractors to avoid the State's health-and-safety judgments, or effectuate their own ideas of Congress's purpose when no such evidence appears in the relevant statutory text or structure. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

I.    Whether CoreCivic maintains immunity from AB 5207. JA18-31.

II.   Whether AB 5207 is impliedly preempted by federal law. JA31-43.

## RELATED CASES AND PROCEEDINGS

Appellants are unaware of any related challenges to the Act.

## STATEMENT OF THE CASE

A.    Private Detention.

Although incarceration predates the Founding, governments in the United States did not start contracting with private companies to operate for-profit detention facilities until recent decades. In the 1980s, States for the first time began contracting with private companies "to take over the day-to-day management of entire penal facilities"—relying on a mix of public and private prisons to manage ballooning state offender populations. Sharon Dolovich, *State Punishment & Private Prisons*, 55 Duke L.J. 437, 457 (2005) (discussing the history of private detention). CoreCivic—which was founded in 1983 as the Corrections Corporation of America—was "the first private entity" to enter this market. *Id.* at 459.

The use of private, for-profit immigration detention began in the same period. "[I]n the late 1970s," federal officials "beg[a]n contracting with private firms for the building and operation of holding facilities" for their noncitizen detainees "awaiting hearings or deportation." *Id.* at 457. Today, ICE primarily relies on four categories of facilities to detain removable noncitizens: "(1) Service Processing Centers; (2) Contract Detention Facilities; (3) Intergovernmental Service Agreement facilities; and (4) riders on U.S. Marshals Service ... or Federal Bureau of Prisons (BOP) contracts." JA91 ¶8. "Intergovernmental Service Agreement facilities"—often known as IGSA facilities—rely on agreements between ICE and state or local

governments. JA91 ¶9. "Service Processing Centers are owned by ICE and staffed by a combination of federal employees (who mainly provide medical care) and contract employees (who provide detention services)." *Id.* Riders are inter-agency agreements between ICE and federal agencies that directly manage detention facilities, including BOP. *Id.* "Contract Detention Facilities are owned by private companies that contract directly with the government and are predominantly staffed by contract employees." *Id.*

In recent years, however, numerous governments, including New Jersey, have found that private detention is inconsistent with their "responsibility … to protect the health and safety, including the physical and mental health, of individuals" in custody in their State. N.J. Stat. Ann. § 30:4-8.15(b). As a result, no New Jersey law authorizes the New Jersey Department of Corrections (DOC) to hire private, for-profit companies for general criminal detention. JA108 ¶3. While New Jersey statutes allow DOC to work with *nonprofit* residential community centers to provide special reentry services to low-risk individuals near the end of a criminal sentence, *see* N.J. Stat. Ann. §§ 30:4-91.9 to -.10; JA110 ¶¶7-10, and while the State separately permits detention at facilities that provide specialized medical or mental health care, *see, e.g.*, N.J. Stat. Ann. § 30:4-27.2 (special psychiatric hospitals), DOC has never hired private companies to provide general criminal detention, JA108 ¶3.

The Federal Government has likewise acknowledged concerns with for-profit detention. The President, along with senior officials, has recognized that "privately operated criminal detention facilities do not maintain the same levels of safety and security for people in the Federal criminal justice system or for correctional staff." Exec. Order No. 14006, 86 Fed. Reg. 7483, 7483 (Jan. 26, 2021) (Biden); *see also* Sally Q. Yates, *Memorandum: Reducing our Use of Private Prisons* at 1 (Aug. 18, 2016), https://bit.ly/3NRsSt1. As a result, in January 2021, the President ordered the U.S. Department of Justice not to renew any "contracts with privately operated criminal detention facilities." Exec. Order No. 14006, 86 Fed. Reg. at 7483.

Concerns about the health and safety of detainees at private detention centers are particularly well-founded in the immigration context. In the last five years alone, federal inspectors have documented a host of health- and safety-related violations at for-profit Contract Detention Facilities. *See, e.g.*, Office of the Inspector Gen. (OIG), U.S. Dep't of Homeland Sec. (DHS), OIG-22-47, *Violations of ICE Detention Standards at Folkston ICE Processing Ctr. & Folkston Annex* at 6, 11-12 (June 30, 2022), https://bit.ly/3XH17ax; OIG-22-31, *Mgmt. Alert—Immediate Removal of All Detainees from the Torrance County Detention Facility* at 1, 3, 5 (Mar. 16, 2022), https://bit.ly/43XPWMU; OIG-21-46, *Violations of ICE Detention Standards at Adams County Corr. Ctr.* at 4 (July 14, 2021), https://bit.ly/3PykccS; OIG-21-30, *Violations of Detention Stds. amid COVID-19 Outbreak at La Palma Correctional*

*Ctr. in Eloy, AZ* at 4-6, 9 (Mar. 30, 2021), https://bit.ly/44ljrrs; OIG-19-47, *Concerns about ICE Detainee Treatment & Care at Four Detention Facilities* at 4, 6 (June 3, 2019), https://bit.ly/3phz0lt. These inspections have identified inadequate medical care, including a lack of available emergency medications; security risks from severe understaffing; unsanitary conditions from spoiled food, pervasive mold, or insect infestations; psychiatric mistreatment; and abusive practices from use of chemical agents on detainees to prolonged solitary confinement.

These do not represent isolated incidents. The DHS Office for Civil Rights and Civil Liberties opened an investigation regarding the failure to provide medical and mental health care, citing allegations at the Eloy Federal Contract Facility as part of the impetus for the broader investigation. *See* Memorandum from Cameron P. Quinn ("Quinn Memo"), *ICE Health Service Corps Medical/Mental Health Care & Oversight* at 2 (Mar. 20, 2019), https://bit.ly/3H5hyWk. A House report identified "a disturbing pattern of immigrants receiving inadequate and delayed medical care at facilities operated by for-profit contractors, resulting in poor medical outcomes and in some cases, death." U.S. House of Reps., Comm. on Oversight & Reform & Subcomm. on Civ. Rts. & Civ. Liberties, Staff Report, *The Trump Admin.'s Mistreatment of Detained Immigrants: Deaths & Deficient Medical Care by For-Profit Detention Contractors* at 10 (Sept. 2020), https://bit.ly/3NOqUJQ. And journalists uncovered further stories "of scrimping by prison operators, with bad

food and shabby health care for inmates, low pay and inadequate training for guards and hiring shortages." Clyde Haberman, *For Private Prisons, Detaining Immigrants Is Big Business*, N.Y. Times (Oct. 1, 2018), https://nyti.ms/3vkiZxH.

Unfortunately, CoreCivic facilities are not immune. DHS itself has described allegations that CoreCivic's Eloy Federal Contract Facility failed to provide proper medical or psychiatric care. *See* Quinn Memo, *supra*, at 2, 7. To take a few examples, in 2019, investigators at a New Mexico facility found "a backlog of 300 unanswered sick calls and that" mental health care and that care for those with chronic conditions was "inadequate" and "insufficient." U.S. House of Reps., Comm. On Homeland Sec., Majority Staff Report, *ICE Detention Facilities: Failing to Meet Basic Standards of Care* at 16 (Sept. 21, 2020), https://bit.ly/3S1AiMG. Strikingly, conditions at one CoreCivic facility were so dire in 2022 that OIG called for the immediate relocation of all detainees there—reasoning that "critical staffing shortages [there] have led to safety risks and unsanitary living conditions." OIG-22-31, *supra*, at 1.

B.    <u>Immigration Detention In New Jersey</u>.

Before passage of AB 5207 in 2021, three IGSA facilities and one Contract Detention Facility operated in New Jersey. The three IGSA facilities were operated by Hudson, Essex, and Bergen Counties, and together housed over 1,700 noncitizens detained for civil immigration violations in county jails. *See* Mariana Alfaro,

*Democrats Battle Over a N.J. Jail's Contract With ICE*, N.Y. Times (Aug. 31, 2018) (600 detainees in Hudson County jail), https://bit.ly/3XN67u3; Steve Janoski, *Bergen Cty. will collect $12M for housing immigrant detainees*, NorthJersey.com (July 2, 2018) (373 in Bergen County jail), https://bit.ly/3XDJb08; Monsy Alvarado, *Essex Cty. will end contract to house ICE detainees at Newark jail,* NorthJersey.com (Apr. 29, 2021) (close to 800 in Essex County jail), https://bit.ly/44A3DBh. CoreCivic, meanwhile, operated the single Contract Detention Facility located in the State—the Elizabeth Detention Center. Although EDC can hold 304 detainees, JA93 ¶16, in recent years, DHS has used only half that capacity, *id.* (average daily population of 156 in 2023); ICE, *FY2024 Congressional Justification*, 160 (Mar. 13, 2023), https://bit.ly/3N73mQS (43% capacity in 2022).

EDC's history of unsafe and unhealthy detention conditions spans decades. *See, e.g.*, INS, *Interim Assessment Report concerning the Elizabeth, New Jersey, contract detention facility*, 1-4 (July 21, 1995), https://bit.ly/46kVi6q (finding abuse and sexual harassment by inadequately-trained guards; inadequate supplies for detainees); *see also* Nina Bernstein, *Few Details on Immigrants Who Died in Custody*, N.Y. Times (May 5, 2008), https://nyti.ms/3O1rXW9; ICE, *ICE detainee passes away at N.J. hospital* (Sept. 26, 2011), https://bit.ly/3q3sIpN. Indeed, CoreCivic is facing a suit from the property's owner to terminate CoreCivic's leasehold interest at EDC, with the landlord alleging that CoreCivic "fail[ed] to …

meet the basic safety, health care, sanitation, and hygiene needs of the confined persons." *Portview Properties, LLC v. CoreCivic, Inc.,* No. 22-3220, 2023 WL 372857, at *2 (D.N.J. Jan. 24, 2023) (internal quotation marks omitted).

C.    AB 5207 And This Case.

After finding that "detention centers and correctional facilities in New Jersey have a history of poor conditions, including inadequate medical and mental health care, use of isolated confinement, and incidents of violence and retaliation against people in detention," N.J. Stat. Ann. § 30:4-8.15(c), the Legislature enacted AB 5207 and the Governor signed it into law on August 20, 2021. JA52 ¶20. The Act prohibits state and local government agencies from engaging in civil immigration detention, N.J. Stat. Ann. § 30:4-8.16(b)(1), and it prohibits any "private detention facility" in New Jersey from entering, renewing, or extending any contract to provide private immigration detention, *id.* § 30:4-8.16(b)(2). The law does not affect any preexisting contract to provide immigration detention. *Id.* § 30:4-8.16(b)-(c).

For approximately 18 months after the Act went into effect, CoreCivic did not file suit. During that time, Hudson, Bergen, and Essex Counties all announced they would no longer contract with DHS to detain any civil immigration violators. In late 2021, DHS released or transferred the detainees at those IGSA facilities to nearby facilities in Batavia, New York, and Goshen, New York. *See* Giulia McDonnel Nieto

Del Rio*, There Are No Immigrants Left in N.J. Cty. Jails. Where is ICE Sending Them?,* Documented (Nov. 18, 2021), https://bit.ly/3Q8irTJ.

However, in February 2023, CoreCivic challenged AB 5207 for the first time, seeking an injunction to prevent the New Jersey Governor and the Attorney General from enforcing the statute. JA13. After CoreCivic amended its complaint in June and sought a preliminary injunction, and after the United States filed a Statement of Interest in support of CoreCivic the next month, the district court granted summary judgment and enjoined enforcement of the statute on August 29, 2023. *See* JA13, 44 (Opinion), JA2-3 (Order). The district court, relying heavily on a Ninth Circuit decision that had invalidated an analogous California law, declared that AB 5207 is inconsistent with principles of intergovernmental immunity and preemption and enjoined its enforcement. *See* JA20-31 (citing *Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc)). Regarding intergovernmental immunity, the court held that private contractors are immune from complying with a State's law where the restriction produces an undue "interference" with the Federal Government's own "function," and concluded that AB 5207 did so. JA30-31. As to preemption, the district court held the INA grants federal officials discretion to employ private detention contractors, and that AB 5207 "interferes with the federal government's exercise of discretion." JA40.

The State timely appealed. JA1.

## SUMMARY OF ARGUMENT

The district court erred in declaring that AB 5207 violates intergovernmental immunity and is impliedly preempted by the INA.

I.     CoreCivic has no freestanding constitutional immunity from complying with generally applicable state laws. State laws are inconsistent with this immunity only if they "directly regulate" the United States or "discriminate" against the United States and its private partners. *Washington*, 596 U.S. at 835; *see also N. Dakota*, 495 U.S. at 435 (plurality). Although the district court determined that the Federal Government's private contractors also enjoy intergovernmental immunity from state laws when those state laws would excessively interfere with federal operations, that category of immunity is inconsistent with precedent and first principles. States have broad police powers to regulate goods and services within their borders, even when those regulations impact federal suppliers or contractors. *See N. Dakota*, 495 U.S. at 435-36 (plurality). Although the Supremacy Clause empowers Congress to provide its private contractors immunity from generally applicable state laws, nothing in the Constitution grants courts the authority to do the same. *See Penn Dairies*, 318 U.S. at 269. Granting private parties immunity from state law based on courts' concerns regarding the burden on federal operations therefore offends separation of powers, undermines federalism, lacks administrable rules, and has no clear limiting principle.

Nor is it necessary: if a state law like AB 5207 improperly restricts work the Federal Government needs performed, Congress can preempt that state law.

AB 5207 is consistent with intergovernmental immunity principles, properly understood. The statute does not "directly" regulate the United States; it regulates private companies with whom the United States would otherwise choose to work, a key constitutional distinction. The statute does not "discriminate" against the Federal Government or its contractors either; New Jersey law does not allow private, for-profit detention companies to operate for-profit facilities in any similarly situated criminal corrections context. Finally, even if this Court adopts a freestanding thread of intergovernmental immunity doctrine based upon burdens alone, the district court overstated the practical burdens on federal immigration operations here.

II.    The INA does not preempt AB 5027. The district court did not find that Congress expressly preempted AB 5207, or that it is impossible for private parties to comply with the INA and AB 5207. Instead, the district court invalidated the Act only under implied, obstacle preemption. Its ruling rests on two errors.

First, the relevant provisions of the INA do not preempt state laws. Every form of preemption works the same way: Congress enacts a law that "imposes restrictions or confers rights on private actors"; "a state law confers rights or imposes restrictions that conflict with the federal law"; and so "the federal law takes precedence and the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020). Put simply,

the first question in any preemption case is whether the relevant federal law actually confers rights or imposes restrictions on private parties. *Id.* The relevant provisions of the INA do not do so: they instruct *federal officials* to consider available detention facilities, and do not speak to the rights or duties of private companies at all.

Second, even if the relevant provisions of the INA had preemptive effect, they would not preempt New Jersey's law. Both the Supreme Court and this Court have, in recent years, repeatedly stressed that even implied preemption challenges require a careful analysis of the text and structure of the federal statute at issue. *Id.* at 804. That is especially critical in cases, like this one, where the state law reflects a State's health-and-safety judgment, and is entitled to a presumption against preemption. *See Medtronic*, 518 U.S. at 485. The INA does not impliedly preempt laws like AB 5207. 8 U.S.C. § 1231(g) directs DHS to "arrange for appropriate places of detention for aliens detained pending removal," and to "consider the availability for purchase or lease" of existing facilities before constructing new ones. But that simply requires DHS to canvass the market to determine what facilities are available for purchase or lease; it says nothing about what must *be* available in the marketplace. It therefore follows that the mere "congressional instruction to 'consider' available facilities and agreements to use them before building new ones does not preempt a State (or local) government's choice to make certain facilities unavailable." *McHenry Cty.*, 44 F.4th

at 591. And the other provisions the district court relied on are even further afield. Congress could pass a law preempting statutes like AB 5207, but it has not.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 357 (3d Cir. 2014). Where the court enters a permanent injunction as part of its grant of summary judgment, the injunction is likewise subject to plenary review. *Id.* at 357 n.2.

## ARGUMENT

The district court enjoined AB 5207 under two strands of Supremacy Clause jurisprudence—intergovernmental immunity and preemption. Although the district court believed that these doctrines "evade[] easy classification," JA18, there are key differences between the analyses. *N. Dakota*, 495 U.S. at 434 (plurality). Preemption represents "'a rule of decision' for determining whether federal or state law applies in a particular situation," *Garcia*, 140 S.Ct. at 801, and thus turns on the scope and effect of particular federal statutes. Intergovernmental immunity, on the other hand, is a constitutional immunity that applies regardless of any federal laws. The district court held that "regardless of the doctrine invoked, the result in this case is clear." JA18. But neither of its holdings withstands scrutiny.

16

## I.    CORECIVIC IS NOT IMMUNE FROM AB 5207.

The district court erred in finding that AB 5207 violates the intergovernmental immunity doctrine. The court adopted an overbroad standard for intergovernmental immunity and incorrectly applied its test to AB 5207.

A.    <u>The District Court Adopted The Incorrect Legal Standard</u>.

Intergovernmental immunity is a powerful, but circumscribed, constitutional doctrine. The Supremacy Clause declares that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Given that plain constitutional text, most Supremacy Clause claims turn on the preemptive effect of particular federal laws— *i.e.*, the challenger argues that "Congress enact[ed] a law that imposes restrictions or confers rights on private actors; a state law confer[red] rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *NCAA*, 138 S.Ct. at 1480.  Intergovernmental immunity, by contrast, is a self-executing immunity that restrains enforcement of certain state laws, even ones that are not inconsistent with any law Congress has enacted. Given that far reach, this immunity has long been carefully circumscribed.

The initial question this case presents involves the scope of that constitutional immunity from state regulation—especially as it relates to private contractors. To be sure, judges have disputed the breadth of this immunity. In *North Dakota v. United*

*States*, eight members of the Supreme Court divided on this question. 495 U.S. 423 (1990). Four justices held that a state law violates intergovernmental immunity only if a state law "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *Id.* at 435 (plurality). Four other justices wrote instead that in addition to these two agreed-on categories of intergovernmental immunity, "those dealing with the Federal Government enjoy immunity from state control not only when a state law discriminates but also when a state law actually and substantially interferes with specific federal programs." *Id.* at 451-52 (Brennan, J., concurring in the judgment in part and dissenting in part).

The district court, relying on the Ninth Circuit's decision in *Geo Group*, erred in adopting the broader formulation. The court did not hold that AB 5207 "regulates the United States," because AB 5207 applies to private companies. Nor did the court conclude that AB 5207 "discriminates against the Federal Government or those with whom it deals." *See* JA31 n.13 (declining to address discrimination). Rather, the district court reasoned that CoreCivic's provision of private immigration detention is immune from AB 5207 because that law regulates federal contractors in a manner that "interfered with the operations of the federal government." JA24. That goes too far. Instead, precedent and first principles instruct that intergovernmental immunity bars enforcement only of state laws that directly regulate the Federal Government or that discriminate against the Federal Government and its contractors.

The precedent is clear. Beginning over 80 years ago, and continuing through the present, the Court has "decisively rejected the argument that any state regulation which indirectly regulates the Federal Government's activity is unconstitutional." *N. Dakota*, 495 U.S. at 434 (plurality). Although the *North Dakota* plurality recognized that the Court had "[a]t one time … struck down" non-discriminatory state laws that regulated private contractors "on the theory that they interfered" too much with the Federal Government's activities "to carry into effect its powers," the plurality found this approach had been "thoroughly repudiated." *Id.* at 434-35 (quoting *S. Carolina v. Baker*, 485 U.S. 505, 520 (1988)); *see also, e.g.*, *Penn Dairies*, 318 U.S. at 270-71 (confirming that the "trend … is not to extend governmental immunity from state taxation and regulation beyond the national government itself and governmental functions performed by its officers and agents," and excluding private contractors and/or suppliers); *see also Hancock v. Train*, 426 U.S. 167, 179 (1976) (noting the limits of intergovernmental immunity).

Instead, the *North Dakota* plurality found, a "state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *N. Dakota*, 495 U.S. at 435. On that basis, the plurality upheld state rules requiring the labeling of alcohol products even when applied to suppliers of federal military bases, even though the rules caused several suppliers to stop selling to the bases altogether. *See id.* at 429. Their reasoning was

straightforward: because the law "operate[d] against suppliers, not the Government," and because it did so in a non-discriminatory way, the Federal Government's private suppliers were not immune from compliance. *Id.* at 437-39.

Although *North Dakota* involved a divided set of opinions, a unanimous Court adopted the same analysis in 2022. In *United States v. Washington*, the Court again began by recognizing intergovernmental immunity's evolution. 596 U.S. 832, 838-39 (2022). As the Court explained, the judiciary's first foray into this field held that this immunity "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *Id.* at 838 (citing *McCulloch v. Maryland*, 17 U.S. 316 (1819)). While the Court "[o]riginally … understood" this "as barring any state law whose 'effect ... was or might be to increase the cost to the Federal Government of performing its functions,' including laws that imposed costs on federal contractors," *id.* (quoting *United States v. Cty. of Fresno*, 429 U.S. 452, 460 (1977)), the doctrine had "evolved" dramatically, *id.* In modern years, the Court explained, it had more properly viewed this immunity as "prohibiting state laws that *either* 'regulate the United States directly *or* discriminat[e] against the Federal Government or those with whom it deals' (*e.g.,* contractors)." *Id.* at 838-39 (quoting *N. Dakota*, 495 U.S. at 435 (plurality)) (emphasis in *Washington*). The Court noted that "all agree" these two forms of immunity exist, *id.* at 39 (quoting *N. Dakota*, 495 U.S. at 444 (Scalia,

J., concurring in judgment)), and conspicuously declined to include the third, more controversial form of immunity to its intergovernmental immunity test.

First principles support the rule laid out by *Washington* and the *North Dakota* plurality. Initially, it is easy to understand the constitutional basis for the *Federal Government's* immunity from state regulation: sovereigns enjoy police power over private parties operating within their domain, not over a separate sovereign. *See McCullough*, 17 U.S. at 327 (contrary rule would leave government "depend[ent] on the discretion of the state governments for its existence"); *Camfield v. United States*, 167 U.S. 518, 526 (1897) (same). It is also easy to understand the basis for protecting federal contractors from *discriminatory* state laws. *See N. Dakota*, 495 U.S. at 438 (plurality) (explaining that to prevent "direct[] obstruct[ion]" with "activities of the Federal Government," state law applies to a contractor only if it is "imposed equally on other similarly situated constituents of the State"). Courts regularly bar the States from discriminating against federal law generally, to protect its supreme power. *See Haywood v. Drown*, 556 U.S. 729, 736 (2009) (holding generally that States cannot adopt rules disfavoring "federal law because of disagreement with its content," else they could "nullify a federal right or cause of action"); *McKnett v. St. Louis & S.F. Ry. Co.*, 292 U.S. 230, 234 (1934) (same).

But there is no clear constitutional basis for granting federal contractors a self-executing immunity from *non*discriminatory state statutes. Instead, "the Constitution

presupposes the continued existence of the states functioning in coordination with the national government," with both enjoying authority over the private parties that operate in their overlapping borders. *Penn Dairies*, 318 U.S. at 270-71. As a result, States often adopt regulations on private business that impact the goods or services U.S. officials can find in the marketplace, but "[w]hatever burdens are imposed on the Federal Government by a neutral state law regulating its suppliers 'are but normal incidents of the organization within the same territory of two governments.'" *N. Dakota*, 495 U.S. at 435 (quoting *Helvering v. Gerhardt*, 304 U.S. 405, 422 (1938)); *see also, e.g.*, *Penn Dairies*, 318 U.S. at 271 (same).

The Founders, to be sure, included a constitutional provision to guarantee that States could not use their powers to thwart the Federal Government. The Supremacy Clause establishes federal "law" "shall be the supreme law of the land." U.S. Const. art. VI, cl. 2; *see also Garcia*, 140 S.Ct. at 801 (explaining this Clause is "'a rule of decision' for" when federal statutes supplant state law). Because it is federal *laws* that are supreme, "it is Congress" the Constitution empowers to reconcile competing federal-state demands on private parties. *Chamber of Com. of United States v. Whiting*, 563 U.S. 582, 607 (2011). Said another way, "Congress has the power to confer immunity from state regulation on Government suppliers beyond that conferred by the Constitution alone." *N. Dakota*, 495 U.S. at 439 (plurality). But if Congress does *not* do so, then the Supremacy Clause does not provide private

companies such a self-executing immunity from neutral statutes. *See Penn Dairies*, 318 U.S. at 269 (holding "no clause of the Constitution … purports, unaided by Congressional enactment, to prohibit such regulations").

Granting private contractors an immunity from nondiscriminatory state laws therefore offends both separation-of-powers and federalism principles. It offends the separation of powers because it permits *courts*, rather than Congress, to declare that private parties should be free of state regulations based their own view of intolerable federal interference. *See id.* at 271 (holding "the Constitution has left Congress free to set aside local taxation and regulation of government contractors which burden the national government, [leaving] no basis for implying from the Constitution alone a restriction upon such regulations which Congress has not seen fit to impose"); *N. Dakota*, 495 U.S. at 439, 444 (plurality) (agreeing its approach is more "respectful of the primary role of Congress in resolving conflicts between the National and State Governments"); *United States v. New Mexico*, 455 U.S. 720, 744 (1982) (adding that when to accord private contractors "broader immunity" from state law is a "complex problem[] ... which Congress is best qualified to resolve"). Extending immunity to private entities offends federalism too: it exempts companies from general laws to which the State Legislature believes they should be subject, even though Congress never mandated that result. *See N. Dakota*, 495 U.S. at 435 (plurality) (noting its rule "accommodat[es] the full range of each sovereign's legislative authority"); *Penn*

*Dairies*, 318 U.S. at 270-71 (agreeing that its approach better protects "authority in the states to lay taxes and to regulate their internal affairs and policy").

Moreover, a rule that grants immunity to federal contractors based on indirect burdens on federal operations is inadministrable. Both *Geo Group* and the district court rightly admitted that "[f]ederal contractors are not federal instrumentalities," so the "scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee." *GEO Grp.*, 50 F.4th at 755; *see* JA22 (same); *accord Penn Dairies*, 318 U.S. at 269. But they could not identify a bright line demarcating the burden needed to grant them constitutional immunity, citing a smorgasbord of legal tests. *See N. Dakota*, 495 U.S. at 452 (Brennan, J., concurring and dissenting) ("actually and substantially interferes with specific federal programs"); *GEO Grp.*, 50 F.4th at 755-56 (a "level of control over federal operations that the Supremacy Clause does not tolerate"); JA21 ("dictate how the federal government carries out its function"); JA31 ("such naked interference with the federal function"). For good reason: without any textual or doctrinal basis, and absent federal statutes on point, it is unclear which burdens go too far. *See N. Dakota*, 495 U.S. at 437 n.8 (plurality) (noting this immunity "contains no standard by which 'burdensomeness' may be measured," and contrasting it to the "traditional

standard," which asks which burdens have been prohibited "by Congress" and which "exceed[] the burden imposed on other comparably situated citizens").[1]

Relatedly, a rule that grants immunity to federal contractors based upon undue burdens risks extending well beyond this case. *See id.* (arguing this third immunity "would either result in the invalidation or the trial, by some undisclosed standard, of every state regulation that in any way touched federal activity"). This is not abstract: scholars have identified a range of circumstances in which federal contractors have invoked the Federal Government's own protections. K. Elengold & J. Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969, 974-76 (2021). Private detention companies are even demanding exemptions from minimum wage laws, trying to pay detainees their $1 per day via a voluntary work program at their facility and (unsuccessfully to date) asserting immunity. *See Novoa v. GEO Grp., Inc.*, No. 17-2514, 2022 WL 2189626, at *21-23 (C.D. Cal. Jan. 25, 2022); *Nwauzor v. GEO Grp.*, No. 17-5769, 2020 WL 1689728, at *7-8 (W.D. Wash. Apr. 7, 2020) (same). Claims like these should fail—Congress has not granted companies like CoreCivic a right to pay workers $1 a day. But citing the alleged broader immunity, contractors can and do

---

[1] Still worse, the results of a test reliant on practical interference could change over time, fluctuating with the vicissitudes of unrelated contracting decisions. Indeed, the district court emphasized that CoreCivic must be immune from this law given the purported interruptions ICE would experience given its extensive use of private contracts. JA27-30. That suggests the converse is also true—that CoreCivic would have had a weaker case for immunity decades ago, when ICE did not rely on private contractors as much. That is not how constitutional immunities work.

contend that state minimum wage laws interfere with a work program at detention facilities that ICE permitted, requiring testing in burdensome litigation. The decision below opens a Pandora's Box that *Washington* sensibly left closed.

For all these reasons, multiple circuits—including this Court—have faithfully followed the narrower standard. In *Treasurer of New Jersey v. U.S. Department of Treasury*, 684 F.3d 382 (3d Cir. 2012), this Court stated that "under the doctrine of intergovernmental immunity, states may not 'regulate the Government directly or discriminate against it,'" *id.* at 406 (quoting *N. Dakota*, 495 U.S. at 434 (plurality))— without recognizing other tests for intergovernmental immunity, *see id.* at 409-410 (citing *Hancock*, 426 U.S. at 178-80). The Seventh Circuit also held that whatever its prior scope, intergovernmental immunity "[t]oday" only impedes "state laws that either 'regulate the United States directly or discriminate against the Federal Government or those with whom it deals.'" *McHenry Cty.*, 44 F.4th at 592 (quoting *Washington*, 596 U.S. at 838) (cleaned up).[2] Other circuits have adopted the same formulation. *See Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991). And while

---

[2] The district court's response to *McHenry County* is puzzling. The court correctly noted that *McHenry County* involved a challenge to a state law barring immigration detention in state and local jails, not private facilities. JA21 (quoting *McHenry Cty.*, 44 F.4th at 585). But that has no bearing on whether intergovernmental immunity has two or three varieties. Nor does *McHenry County* "actually support[]" the district court's view. *Id.* While that court noted that the "federal government remains free … to contract with private parties" for private detention, 44 F.4th at 593, the Seventh Circuit was merely describing the limits of the Illinois law at issue, not the absolute limits of *state power* under the Constitution.

the district court correctly highlighted (at JA20) that the Ninth Circuit adopted the broader formulation for intergovernmental immunity in *Geo Group*, that decision is an outlier. *See* 50 F.4th at 763-65 & 765 n.1 (Murguia, C.J., dissenting).

The district court's and *Geo Group*'s responses as to both precedent and first principles prove wanting. As to precedent, both courts err in failing to accord proper respect to *Washington*. The district court cited *Washington* to hold that States cannot control or interfere with federal operations, JA18-19, but the district court diverged from *Washington*'s explicit instruction that the *way* to assess improper interference is to evaluate whether there is direct or discriminatory regulation, 596 U.S. at 838-839. The court also claimed that neither *North Dakota* nor *Washington* reflect "a wholesale repudiation" of previous decisions espousing a broader view of interference-based immunity, JA24, notwithstanding that both expressly described the evolution of this immunity, the *North Dakota* plurality identified myriad reasons to reject the district court's very approach, and *Washington* expressly restated the plurality's version of the test. *See supra* at 18-20. Moreover, while the district court cited *Fresno County*, 429 U.S. 452, as a "recent case[]" supporting its test, JA25, it overlooked that the *North Dakota* plurality cited *Fresno County* as direct support for the principle that a "state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or [its contractors]," 495 U.S. at 435. And *Geo Group*, for its part, incorrectly believed the *Washington* "Court

was citing the *North Dakota* plurality opinion only in passing to describe how the discrimination theory evolved over time." 50 F.4th at 759 n.8. But the discrimination prong of intergovernmental immunity has stayed consistent; what evolved is whether private contractors enjoy immunity from *non*discriminatory state laws too.

The district court and *Geo Group* likewise erred in claiming support from the Court's previous decisions in *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956), and *Public Utilities Comm'n of Cal. v. United States*, 355 U.S. 534 (1958) (*PUC*). *See* JA22-24; *Geo Group*, 50 F.4th at 756-58. Although both courts correctly noted that these decisions invalidated state restrictions on federal contractors, both were *preemption* cases: they involved a "direct conflict" between state regulations and federal laws, and explicitly distinguished "cases where, absent a conflicting federal regulation, a State seeks to impose safety or other requirements on a contractor who does business for the United States." *North Dakota*, 495 U.S. at 435 n.7 (plurality). In *Leslie Miller*, the Court identified a direct conflict between the comprehensive federal regulations governing contractors that work with the U.S. Air Force, and a separate state statute requiring private construction contractors to obtain a state license subject to distinct criteria. *See* 352 U.S. at 188-90. Likewise, in *PUC*, the Court found a conflict between the "numerous and extensive" regulations governing the "negotiat[ion] [of] rates for shipment of federal property," and a separate state statute requiring a California board to approve any reduced-price contracts between

a common carrier and any public entity, even a federal entity. 355 U.S. at 542-43. Neither *Leslie Miller* nor *PUC* provides a basis to grant CoreCivic a self-executing immunity from non-preempted state laws.

Nor are the district court's and *Geo Group*'s first-principles arguments more persuasive. Neither identifies a constitutional source for a self-executing immunity for private contractors. Neither identifies guardrails for this immunity either. Instead, both are driven by concerns about States exercising control over federal operations. *See* JA20-26, 28-29; *Geo Group*, 50 F.4th at 755-56. But the concerns are misguided. For one, the Federal Government is only affected if it employs private contractors. *Cf. United States v. Pa. Env't Hearing Bd.*, 584 F.2d 1273, 1279 (3d Cir. 1978) (explaining that whenever the government works with private contractors, it "enjoys the benefits that are derived from private operation, but by the same measure, it must also suffer any reciprocal burdens"). For another, the only state laws at issue in this methodological debate are *neutral and generally applicable* ones; that is, restrictions the States are willing to impose across the board, and that limit their own work with contractors too. *See N. Dakota*, 495 U.S. at 438 (plurality) (agreeing the need for States to shoulder the same burdens is how the Constitution protects against state efforts to "obstruct governmental functions"). And finally, but most importantly, if state laws do unduly interfere with federal operations, Congress can say so—"under

principles of congressional pre-emption." *Id.* at 435; *see Penn Dairies*, 318 U.S. at 269-71 (same). No third immunity exists, nor is one needed.

B.     AB 5207 Withstands Intergovernmental Immunity Scrutiny.

New Jersey law is plainly consistent with the two forms of immunity that both *Washington* and the *North Dakota* plurality recognize.

First, AB 5207 does not "directly" regulate the United States. This analysis is straightforward: New Jersey does not regulate "the national government itself and governmental functions performed by its officers and agents," who are free to detain immigrants within the State. *Penn Dairies*, 318 U.S. at 270. Although AB 5207 does regulate federal contractors, that is not "direct" regulation: "those who contract to furnish supplies or render services to the government are not such agencies and do not perform governmental functions." *Id.* at 269; *see also N. Dakota*, 495 U.S. at 436-37 (plurality) (there can be "no claim" of direct regulation if the law "operate[s] against" private contractors and "not the Government"); *McHenry County*, 44 F.4th at 593 n.6 (finding state law "does not directly regulate the federal government by applying non-discriminatory regulations to private entities or local governments … that contract with the government"). Nor is this a "wooden formalism," JA26; it respects the difference between regulating another sovereign and private parties, as the discussion above explains, and as decades of precedent recognize. *See N. Dakota*,

495 U.S. at 437 (plurality) (collecting cases); *New Mexico*, 455 U.S. at 734-35; *United States v. Boyd*, 378 U.S. 39, 44 (1964); *Penn Dairies*, 318 U.S. at 270-71.

Second, AB 5207 is not discriminatory, an issue the district court declined to reach. *See* JA31 n.13. The question here is whether New Jersey law treats "similarly situated" entities differently based on their federal status. *Washington*, 596 U.S. at 839 (citation omitted). If it accords federal contractors "less favorable 'treatment'" or "regulates them unfavorably on some basis related to their governmental 'status,'" the contractors are immune. *Id.* (citations omitted). But a "State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *N. Dakota*, 495 U.S. at 438 (plurality) (citation omitted). Moreover, an individual statute "that appears to treat the Government differently on the most specific level of analysis may, in its broader regulatory context, not be discriminatory." *Id.* Rather, courts assess how the overall body of state law impacts "similarly situated constituents." *Id.* Differential treatment is also permissible if any "significant differences between the two classes" explain it. *Davis v. Mich. Dep't of the Treas.*, 489 U.S. 803, 816 (1989) (citation omitted).

Below, CoreCivic and the United States failed to identify such discrimination. While AB 5207 itself only addresses private immigration detention, New Jersey does not treat any "similarly situated" detention facilities better than it treats immigration detention facilities. As the record establishes, even before AB 5207, the New Jersey

31

Legislature had never authorized the state Department of Corrections to hire private, for-profit companies like CoreCivic to provide general criminal detention, and DOC thus has never done so. *See* JA110 ¶¶8-10 (Declaration of Assistant Commissioner Melinda Haley). And while both CoreCivic and the United States claimed below that DOC *could* hire "similarly situated" private detention facilities, *see* D.N.J. Dkt. 17-4 at 21; D.N.J. Dkt. 37 at 13, they simply misunderstood the statute they were citing. *See* N.J. Stat. Ann. §§ 30:4-91.9 to -91.10. Rather than permitting private detention generally, those provisions empower DOC to transfer a small number of especially low-security prisoners to "nonprofit" "residential center[s]" (such as facilities often called "halfway houses," JA110 ¶8) at the end of their sentences. *See* N.J. Stat. Ann. §§ 30:4-91.9 to -91.10. That, of course, is hardly a similarly situated comparator.

Nor are other facilities that focus specifically on therapeutic services such as medical care or mental health care similarly situated either. For instance, the United States below cited a hypothetical "private hospital [that] contract[s] with a private company to house the mentally ill." D.N.J Dkt. 37 at 12. Indeed, under New Jersey statutes, certain public or licensed private psychiatric care facilities can "provide voluntary and involuntary mental health services." N.J. Stat. Ann. § 30:4-27.2. Such facilities are not similarly situated to for-profit immigration detention. After all, one of New Jersey's animating concerns for its prohibition on private detention are the facilities' own troubling "history of … inadequate medical and mental health care,"

which undermines detainees' "health and safety." N.J. Stat. Ann. § 30:4-8.15(c). Distinguishing those entities that exist specifically to provide specialized medical or mental health care from other entities that provide general detention evinces no anti-federal discrimination—rather, "significant differences" between the two groups obviously explain the difference. *See Davis*, 489 U.S. at 816.

Finally, even assuming private contractors are constitutionally immune from state laws that unduly interfere with the Federal Government's operations, AB 5207 is not the practical impediment the district court believed. The district court reasoned that AB 5207 creates an intolerable "level of federal disruption," JA28 because the law would require ICE not only to operate its own facility, but also to "build a new [immigration detention] facility" in New Jersey, a process that may consume "years of time," *id.* The court was wrong: AB 5207 does not allow private companies to operate such detention facilities, *see* N.J. Stat. Ann. § 30:4-8.16(b)(2) ("a private detention facility ... shall not enter into, renew, or extend any immigration detention agreement"), but ICE would not have to construct new ones. Instead, ICE remains free to buy, take, or lease an appropriate building from a private company. *See id.* § 30:4-8.16(a) (defining an "immigration detention agreement" as one "that authorizes the … private detention facility to house or detain individuals for civil immigration violations," which would not include an ICE-operated facility).

In other words, AB 5207 does not dictate to the Federal Government whether it can maintain immigration detention in the State. ICE could even buy or lease the EDC property itself and operate the facility directly, *cf. Portview Properties*, 2023 WL 372857 (indicating CoreCivic's landlord plays no part in immigration detention), which would address ICE's concerns about having a detention facility in this area without that facility being operated by a private entity. And while it could impose *costs* on the Federal Government to "train a bevy of staff" to operate EDC, JA28 even the district court admits that the mere imposition of downstream costs on a federal agency cannot be enough to grant a private company immunity, JA24. Thus, while ICE may prefer to work with a private contractor, the agency's mere preference is no basis to confer constitutional immunity on CoreCivic from generally-applicable state law.

## II.   THE INA DOES NOT IMPLIEDLY PREEMPT NEW JERSEY LAW.

The district court likewise erred in finding a conflict between federal law and AB 5207. *See* JA31-43. The district court did not hold, and the challengers have not argued, that Congress enacted a law expressly preempting state restrictions like this one. The district court also did not hold, and the challengers have not argued, that it would be impossible for any party to comply with federal law and AB 5207. Instead, the court held that AB 5207 "erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." JA31-32 (quoting *Treasurer*, 684

F.3d at 406). But the court's holding that AB 5207 is impliedly preempted by federal law fails for two independent reasons. First, the various provisions on which the district court and private parties cited below do not regulate private parties. Second, there is simply no conflict between AB 5207 and these federal statutes.

A.  <u>The Federal Laws On Which The Challengers And The District Court Rely Lack Preemptive Effect</u>.

The Supreme Court and this Court have repeatedly cautioned that not every federal law supports preemption. *See NCAA*, 138 S.Ct. at 1479 (explaining that not every federal law "constitutes a valid preemption provision"). To the contrary, "[f]or a federal law to preempt state law" it "must be best read as one that regulates private actors." *Ocean Cty Bd. of Commissioners.*, 8 F.4th 176, 181 (3rd Cir. 2021) (quoting *NCAA*, 138 S.Ct. at 1479); *see NCAA*, 138 S.Ct. at 1481 (agreeing "every form of preemption is based on a federal law that regulates the conduct of private actors"). When evaluating a preemption challenge, courts ask whether the underlying federal law "imposes restrictions or confers rights on private actors." *Garcia*, 140 S.Ct. at 801 (citation omitted); *see also Me. Forest Prod. Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022) (agreeing that the Supreme "Court's recent cases have subtly reframed the obstacle preemption analysis as limited to cases in which Congress enacts a law that imposes restrictions or confers rights on private actors").

There is a good reason why the Supreme Court and this Court engage in this threshold inquiry. The Supremacy Clause creates no federal rights; instead, it is "'a

rule of decision' for determining whether federal or state law applies in a particular situation." *Garcia*, 140 S.Ct. at 801 (quoting *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015)). As such, while there are "three different types of preemption—express, conflict, and field," all three "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *NCAA*, 138 S.Ct. at 1480; *see Garcia*, 140 S.Ct. at 801 (same). Said another way, the core question in a preemption case is whether a *private* actor is subject to the dictates of federal, not state, law. Any federal statute that does not impose restrictions on, or grant rights to, private parties has no bearing on that question. *See NCAA*, 138 S.Ct. at 1481.[3]

NCAA and *Ocean County* illustrate how this works in practice. In *NCAA*, the Court explained that a federal statute which prohibited States from authorizing sports gambling could not support preemption when it did not also "give [private actors] a federal right to engage in sports gambling" or "impose any federal restrictions on private actors." *Id.* at 1481. And applying *NCAA*, the Third Circuit in *Ocean County*

---

[3] Although this case is primarily about the "obstacle" form of implied preemption, impossibility preemption illustrates the same point. Impossibility preemption applies whenever "it is impossible for a private party to comply with both state and federal requirements." *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 480 (2013). It is of course only impossible for private parties "to comply with both state and federal law" if federal law imposes some restrictions or duties on them. *Id.* at 486-87. There is no reason to think that obstacle preemption is any different.

held that two provisions of the INA—which allegedly prohibited States from placing restrictions on state and local official communications with ICE—likewise could not preempt state laws because they said "nothing about private actors" and "cannot be fairly read to regulate them." 8 F.4th at 181-82. Although the United States claimed that federal immigration law imposed a duty on federal agents to remove noncitizens that "cannot be achieved" without procuring such information, *County of Ocean v. Grewal*, 475 F.Supp.3d 355, 380 (D.N.J. 2020) (describing argument), a mandate on *federal officials* to procure information neither requires private parties to provide the information nor confers on them a right to do so. *See Ocean Cty.*, 8 F.4th at 181-82. As a result, the federal statutes had no preemptive effect. *Id.*

That logic applies with full force here. As the district court noted, CoreCivic's and the United States' fundamental preemption claim is that "AB 5207 'prohibits conduct the [INA] expressly authorizes the Federal Government to carry out.'" JA32 (quoting CoreCivic's and the United States' briefs); *see also* JA38 (asking whether AB 5207 conflicts with federal provisions that "authorize[]" "the federal government … to decide whether to detain individuals for civil immigration violations, and if so how to detain them," and that "instruct the federal government how to carry out" this function) (citing 8 U.S.C. §§ 1231(a)(2), 1225(b)(1)-(2), and 1226(a)-(c)(1)). Those provisions are directed at federal officials. They require federal officials to consider "appropriate" places of detention from the "available" options, or to build facilities

if insufficient capacity is available. 8 U.S.C. § 1231(g). They do not require private parties to provide detention services or establish a "federal right to engage in" private immigration detention. *NCAA*, 138 S.Ct. at 1481. Congress could have written a law giving private parties a right to provide immigration detention services (for implied preemption), or authorizing them to do so despite state law (for express preemption). Because Congress did not do so, the preemption inquiry stops there.

The district court's brief analysis of this threshold step falls short. *See* JA38. The district court did not find the INA provisions impose restrictions or confer rights on private actors. Instead, the court declined to engage in the threshold inquiry at all, limiting *NCAA* and *Ocean County* only to federal laws that regulate States. *See id.* (distinguishing both cases because "each involved a federal regulation that purported to control actions *of the state*"). But while the district court correctly described those cases as a matter of fact, its opinion is nonresponsive to the *principle* they establish: that preemption applies only if a federal law is "best read as one that regulates private actors.'" *Ocean Cty.*, 8 F.4th at 181. After all, cases like *NCAA* and *Ocean County* could have rested solely on the Tenth Amendment's prohibition against federal laws that operate on States. *See NCAA*, 138 S.Ct. at 1476 (discussing anticommandeering doctrine). But *NCAA* did not rely entirely on anticommandeering grounds. Instead, "[t]he Court said at least three times in *Murphy* that a valid preemption provision is one that regulates private actors." *McHenry Cty.*, 44 F.4th at 588. And *Ocean County*

expressly rendered its holding without reaching anticommandeering at all. 8 F.4th at 182 n.4. "[A] good rule of thumb for reading [court] decisions is that what they say and what they mean are one and the same." *McHenry Cty.*, 44 F.4th at 588.[4]

The district court's alleged distinction also fails as a matter of logic. Although the district court thought *NCAA* and *Ocean County* were distinguishable because of the concerns about state autonomy present in both, JA38, its holding generates the same concerns here. As *NCAA* noted, "the Constitution confers upon Congress the power to regulate individuals," 138 S.Ct. at 1479, a power that allows Congress to preempt contrary state laws when it so regulates. But federal statutes cannot directly operate on States. So if Congress enacted a law stating that "a State entity or official may not prohibit, or in any way restrict" private companies from providing detention services without expressly or impliedly providing any private companies the right to do so—mirroring the law in *Ocean County*—that would run afoul of federalism. *See* 8 F.4th at 181. Yet that is the regime the district court established with its obstacle preemption holding—one in which the INA accords no rights to private detention companies, yet bars States from regulation. This direct "command on New Jersey," JA38, is no less offensive to federalism when it is achieved *impliedly*.

---

[4] Moreover, although the district court cited a single statement in *NCAA* that every preemptive provision "regulates the conduct of private actors, *not the States*," JA38 (quoting *NCAA*, 138 S.Ct. at 481) (emphasis in original), the italicized phrase was a descriptive truism in *NCAA*—not another step in the test. *See Garcia*, 140 S.Ct. at 801 (restating that threshold inquiry without that italicized language).

Finally, the district court erred by treating this threshold analysis as a mere formalism that "federal law must explicitly name a private actor." *Id.* Instead, this is a careful analysis of the statutory text to determine whether Congress expressly or impliedly conferred rights or imposed restrictions on private parties to be free from contrary state laws. *See Garcia*, 140 S.Ct. at 801. Indeed, there are many instances in which "restrictions or rights" can be "inferred from statutory law" even when they are not expressly stated. *Id.*; *see also id.* at 806 (explaining that the federal statute in *Arizona v. United States*, 567 U.S. 387 (2012), implied private persons had a right to be free of prosecution for certain immigration conduct and therefore preempted contrary criminal laws). But instructing federal officials merely to consider available detention options confers no such right on private detention companies.

B.    The Federal Laws On Which The Challengers And The District Court Rely Do Not Otherwise Preempt AB 5207.

Even assuming that the relevant provisions of the INA can preempt contrary state laws, however, they do not preempt AB 5207. As explained above, AB 5207 is a "health and safety" measure designed to protect "individuals detained within New Jersey" from the concerns associated with private detention. N.J. Stat. Ann. § 30:4-8.15(b). The question is whether the INA empowers private companies to offer these private detention services in New Jersey notwithstanding that contrary law.

1. In recent years, the Supreme Court and this Court have repeatedly stressed that even in implied preemption cases, a close examination of the operative statutory

40

text is paramount. Because "[t]he Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute 'the supreme Law of the Land,'" the "federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Garcia*, 140 S.Ct. at 801 (quoting U.S. Const. art. VI, cl. 2). So even if a challenger contends that, as here, state regulation is "preempted by implication" rather than by an express preemption provision, "[t]his argument, like all preemption arguments, must be grounded 'in the text and structure of the [federal] statute at issue.'" *Id.* (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)); *see also Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 463 (3d Cir. 2021) (same).

That places important limits on the scope of obstacle preemption. Simply put, courts have warned, "preemption cannot be based on 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Garcia*, 140 S.Ct. at 801 (quoting *Whiting*, 563 U.S. at 607); *see also MD Mall Assocs. LLC v. CSX Transp., Inc.*, 715 F.3d 479, 495 (3d Cir. 2013) (agreeing "'tension' between federal and state law … is generally not enough"). Because "it is Congress rather than the courts that preempts state law," *Whiting*, 563 U.S. at 607 (cleaned up), the inquiry is whether a state measure poses an obstacle to federal statutes based on their "text, structure, and history," *Arizona*, 567 U.S. at 406," not whether the state law offends "some brooding federal interest." *Garcia*, 140 S.Ct. at 801 (quoting *Va. Uranium v.*

*Warren*, 139 S.Ct. 1894, 1901 (2019) (lead op. of Gorsuch, J.)); *McHenry Cty.*, 44 F.4th at 591 (same).

The INA's text and structure do not impliedly preempt AB 5207. Begin with the main statutory provision on which the district court relied, 8 U.S.C. § 1231(g)(1)-(2). *See* JA39. That provision solely directs DHS to "arrange for appropriate places of detention for aliens detained pending removal," and requires that DHS "consider the availability for purchase or lease" of existing facilities before constructing new ones. 8 U.S.C. § 1231(g)(1)-(2). Initially, this provision never even mentions private detention; it contemplates that DHS can "acquire, build, remodel, repair, and operate facilities," and can "purchase or lease any existing" building to be used for detention, not that DHS will contract with private detention companies to operate the facilities. It strains credulity that a state law restricting privately operated detention facilities would be an obstacle to a federal statute that does not even mention them.

But more fundamentally, Section 1231(g) simply requires DHS to canvass the marketplace to determine what facilities are available for purchase or lease; the law says nothing about what must *be* available in that market. As the Seventh Circuit put it, the statutory language "demonstrates at most a general preference to use existing facilities when they are available." *McHenry Cty.*, 44 F.4th at 591. That preference is "not enough to support a preemption claim," however, because state laws—no less than economic factors—impact what is available in a market in the first place. *Id.* It

thus follows that the mere "congressional instruction to 'consider' available facilities and agreements to use them before building new ones does not preempt a State (or local) government's choice to make certain facilities unavailable." *Id.*[5]

The structure of Section 1231 (g) makes the district court's holding especially untenable. Not only does the plain statutory text direct federal officials to "consider the availability for purchase or lease" of existing facilities, it even acknowledges that "facilities adapted or suitably located for detention" might be "unavailable for rental." 8 U.S.C. § 1231(g)(1), (2). Despite this, the INA neither imposes a duty on private property owners to make their unavailable properties available, nor grants private companies a right to operate such facilities notwithstanding contrary state laws. Instead, the INA directs federal officials to canvass the marketplace, and if such facilities are unavailable, to build their own facilities. *Id.* § 1231(g)(1). That Congress made construction of federal facilities—not preemption—the backstop confirms that AB 5207 poses no obstacle to Congress's design.

---

[5] The district court again incorrectly dismissed *McHenry County* out of hand due to the factual differences across these cases. The district court correctly noted that the challenge in *McHenry County* involved Illinois's "remov[al]" of "its own" state and local facilities "from the [federal government's] list of options" for civil immigration detention, not a regulation of private detention companies. JA21 (quoting *McHenry Cty.*, 44 F.4th at 590). And indeed, much of *McHenry County* has no bearing on this case—including its discussion of provisions like 8 U.S.C. § 1103(a)(11)(B) that deal with IGSAs, and the discussion of States' authority over localities. But these factual distinctions offer no basis to distinguish the court's direct and clear interpretation of Section 1231(g)—that Section 1231(g) does not address state laws that make some facilities "unavailable" for detention in the first place. *See* 44 F.4th at 591.

Nor do the other statutes the United States and CoreCivic cited below change the result. As the district court noted, a series of interlocking provisions of the INA charge federal immigration officials with "detain[ing] non-citizens" and exercising their "discretion to decide whether detention is appropriate." JA38 (citing 8 U.S.C. §§ 1231(a)(2); 1225(b)(1)-(2); 1226(a)-(c)(1)); *e.g.*, 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien."). AB 5207 does not interfere with those decisions whatsoever. It affords no individual the right to remain in this country and it does not address whether or when a noncitizen may be detained. Rather, AB 5207 speaks to whether private companies can offer private detention— a question the text and structure of these federal statutes do not address.

The United States' resort to 6 U.S.C. § 112 below is likewise unavailing. *See* 6 U.S.C. § 112(b)(2) (granting Secretary "authority to make contracts … as may be necessary and proper to carry out the Secretary's responsibilities"). While this statute affords the Secretary general authority to make contracts with available partners, like Section 1231(g), it nowhere suggests private detention companies must be available on the market. The United States' view seems to be that if an agency has power to contract, that statute alone immunizes its future contracting partners from complying with state laws. But no cases have read Section 112 in that way, and for good reason: such provisions—undeniably common, given the multiplicity of private contractors,

*see* Elengold & Glater, *supra*, at 974-76—authorize purchases from what is available *in* the market, rather than re-shaping that market by displacing state regulation.

Nor do congressional appropriations offer the missing evidence that Congress wanted to empower private companies to offer immigration detention regardless of state law. The district court "note[d]" the presence of recent appropriations laws that allow DHS to spend funds to fulfill contracts for detention, except when the facilities fell below a certain rating. *See* JA40 n.17. The district court believed that this showed Congress's "cognizan[ce]" that DHS uses private immigration detention services, and a lack of objection to the practice. *Id.* That misses the point. These appropriations merely confirm that federal officials can procure private detention services and pay for the private services when they do, subject to availability in the marketplace. The appropriations nowhere say what private facilities must be available in the first place and, again, "do[] not preempt a State (or local) government's choice to make certain facilities unavailable." *McHenry Cty.*, 44 F.4th at 591.

Finally, the various regulations the district court cited do not support it either. Consistent with Section 1231(g), regulations permit ICE to enter into contracts with private companies to provide immigration detention space or facilities. JA39 (citing 48 C.F.R. § 3017.204-90). That gets the challengers no further than their reliance on Section 1231(g): they are free to contract with private companies whose services are available, but that is a far cry from empowering DHS to decide which services must

be allowed to trump contrary state law. Nor does it matter that a separate regulation requires all detention facilities, public or private, to meet four basic criteria. JA39; *see* 8 C.F.R. § 235.3 (24-hour supervision, safety and emergency codes, food service, and emergency medical care). That reflects baseline standards to which available facilities are subject, not which facilities must be available.[6] Nothing in the INA suggests Congress empowered private companies to make private detention services available despite state law, and nothing in these rules fills that gap.

2. There is a second, independent problem with preemption: the longstanding presumption against preemption of health and safety laws. As this Court has clarified repeatedly, "all preemption cases start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Sikkelee v. Precision Airmotive Corp*., 822 F.3d 680, 687 (3d Cir. 2016) (cleaned up) (noting "duty to accept the reading [of federal law] that disfavors pre-emption"). That particularly includes health and safety measures, which lie at the core of a State's traditional powers. *See, e.g.*, *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) ("Health and safety issues have traditionally fallen within the province of state regulation."); *Medtronic*,

---

[6] Moreover, these regulations do not amount to the sort of well-reticulated statutory criteria or licensing regimes needed to establish an implied right for these companies to offer services notwithstanding additional state criteria or licensing provisions. *See Leslie Miller*, 352 U.S. at 189; *PUC*, 355 U.S. at 541-42; *supra* at 28-29.

518 U.S. at 485 (presumption against preemption respects "federalism concerns and the historic primacy of state regulation of matters of health and safety").

That presumption applies here. The Legislature enacted AB 5207 to "protect the health and safety … of individuals detained within New Jersey." N.J. Stat. Ann. § 30:4-8.15(b). The United States has acknowledged in a related context that private "detention facilities do not maintain the same levels of safety and security," Exec. Order 14006 (Jan. 26, 2021), and the facts unfortunately bear that out. *See supra* at 7-9 (citing reports and examples, including from CoreCivic facilities, of improper conditions and inadequate health care services). These are not "mere reference[s] to health and safety interests," JA34; they are important concerns for the State, and the challengers introduced no record evidence to suggest they are makeweight. Indeed, States often enact regulations to address health-and-safety concerns in areas that also touch on immigration concerns, and courts have continued to apply the presumption. *See, e.g.*, *Arizona v. United States*, 567 U.S. at 400; *DeCanas v. Bica*, 424 U.S. 351, 357 (1976); *United States v. California*, 921 F.3d 865, 885-86 (9th Cir. 2019).

Despite recognizing that state health-and-safety regulations are presumptively not preempted even in the immigration context, JA33, the district court erroneously held the presumption inapplicable, JA34-35. The district court reasoned that while health and safety considerations are usually valid state interests, "the health and safety of individuals *detained for violating federal law* is not an area [they] have

traditionally occupied." JA34 (emphasis in original). That is wrong. Federal officials "primarily use[] intergovernmental service agreements (IGSA) to acquire detention space" for removable noncitizens at state and local detention facilities. U.S. Gov't Accountability Office, Immigration Detention at 2, https://www.gao.gov/assets/gao-21-149.pdf. Yet these facilities have always been subject to their State's police powers, even when they house noncitizen detainees. *See Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973) (it is "difficult to imagine an activity in which a State has a stronger interest … than the administration of its prisons"); *McHenry Cty.*, 44 F.4th at 585 (States can withdraw such facilities from use in immigration detention). The question is therefore not what individuals are "detained for," but whether the operator is subject to state authority.

The district court's objections were thus misplaced. New Jersey agrees States cannot set standards that ICE must meet at the facilities it operates, even those within New Jersey's borders. That is not traditional state regulation and wrongly "dictate[s] the manner in which the federal government may detain individuals." JA35. States certainly also cannot regulate "the decision to detain individuals" for immigration violations. JA35 But when *private* companies are involved, then those companies, just like state and local entities, are subject to neutral health-and-safety regulations. *See supra* at 17-34 (rejecting CoreCivic's immunity argument). And because States can subject private contractors to neutral laws, it follows that Congress would not

upset that typical federal-state balance regarding private detention without speaking clearly. *See Medtronic*, 518 U.S. at 485. Yet nothing in the federal provisions cited above clearly or manifestly demonstrates a congressional intent to immunize private detention contractors from state health-and-safety measures.

The district court's reliance on *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013) (*Lozano I*), and *Lozano v. City of Hazleton*, 620 F.3d 170 (3d Cir. 2010) (*Lozano II*), also proves unavailing. Those precedents involved an extraordinary and *sui generis* municipal law "prohibit[ing] unauthorized aliens from residing in any rental housing." JA34 (quoting *Lozano I*, 724 F.3d at 304, 313). This Court declined to apply the presumption against preemption in that unusual context, where the law only "superficially dealt with health and safety," but actually dictated "which aliens may live" within their borders—a "prerogative of the federal government." *Lozano II*, 620 F.3d at 220. Yet even in that case, the Court applied the presumption to a range of other employment provisions that did not directly arrogate this central and exclusively federal prerogative. *See Lozano I*, 724 F.3d at 314 n.23; *Lozano II*, 620 F.3d at 206. Here, meanwhile, the State agrees it could not bar "unauthorized aliens" from being detained within its borders—that is a federal prerogative alone, and it falls within the terms of *Lozano I* and *Lozano II* (as well as intergovernmental immunity). But AB 5207 does not dictate who may be admitted into the country or the conditions under which they may remain. Instead, it regulates the provision of

*private* detention within the State—which falls well within traditional state powers and requires a clear statement from Congress to overcome.[7]

3. Against the INA's text, and the venerable presumption against preemption, the district court's and *Geo Group*'s contrary approach falls short.

The district court's central mistake was in identifying general federal interests at too high a level of abstraction, and thereby failing to ground its holding in the text and structure of the INA itself. The district court reasoned that the broader "purpose and effect of these" federal provisions "is to permit the federal government to make independent decisions on the proper manner for housing its own detainees," JA39, from which it concluded that companies "must be free from restrictive state laws that circumscribe the federal government's ability to contract for the housing of its own detainees," JA40. But because "Congress rather than the courts … preempts state law," *Whiting*, 563 U.S. at 607 (cleaned up), any identification of this broader "purpose and effect" must come from the "text, structure, and history" of the federal laws themselves, *Arizona*, 567 U.S. at 406; *see Garcia*, 140 S.Ct. at 801 (confirming need to rely on "text and structure" rather than a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives"). And although the INA

---

[7] Field preemption is an even weaker fit, which explains why the district court did not rely on it. That form of implied preemption is "confined to only a few areas of the law," and regulation of private detention is not one of them. *McHenry Cty.*, 44 F.4th at 589 (cleaned up).

establishes that federal officials have discretion to select among available facilities, there is no evidence that Congress also intended them to trump the States' decisions on what services are available. *See McHenry*, 44 F.4th at 581 (rejecting reliance on the "brooding federal interest" allegedly animating Section 1231(g)).

The district court's complaint that AB 5207 would excessively "interfere[] with the federal government's exercise of discretion," JA40, therefore assumes the premise—that the "text, structure, and history" of the INA in fact suggest Congress decided to strip the States of the traditional regulatory power to enact neutral health-and-safety laws and give that discretion to federal officials alone. The INA says no such thing, let alone clearly: it simply gives federal officials the discretion to consider leasing properties already available on the market. *Supra* at 42-46. And all manner of federal laws provide federal officials with exclusive discretion to make some choices, while leaving other choices to States. *See Garcia*, 140 S.Ct. at 804 (despite exclusive federal authority over parts of the federal employment verification system, holding States retain discretion to enact identity theft statutes).

The remaining cases the district court cited do not support its approach. JA40-41 (citing *Arizona*, 567 U.S. 387, and *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). These cases do not stand for the sweeping proposition that a state law is preempted anytime it impedes the "discretion" federal officials otherwise enjoyed. JA40. Instead, the Supreme Court in *Arizona* closely considered the INA's

text and structure and found that it "implicitly conferred a right to be free of criminal (as opposed to civil) penalties for working illegally." *Garcia*, 140 S.Ct. at 806. And given that design, "a state law making it a crime to engage in that conduct conflicted with this federal right" and was thus preempted. *Id. Crosby*, for its part, involved a federal statute tasking the President with developing "a comprehensive, multilateral strategy" for sanctions designed to improve human rights in Burma, 530 U.S. at 374, giving the President "as much discretion to exercise economic leverage" as possible, *id.* at 375-76. That is hardly like the INA's statutory text, which gives ICE power to select appropriate facilities from available options, but is silent regarding whether and when a private facility must be available.

Finally, while the district court gave considerable attention to the "real-life" ways AB 5207 impacts federal officials' current approach to immigration detention, JA42, that only highlights the errors in its analysis, *see* JA42-43 (finding that AB 5207 will impact the number of immigrants ICE can detain, because ICE has chosen to use private detention arrangements and could not swiftly build its own facilities to accommodate the lost capacity). Most obviously, "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the … preferences of federal officers," which means "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Garcia*, 140 S.Ct. at 801. Nor could it be otherwise; the district court's reasoning suggests AB 5207 could be preempted

today, when DHS has extensive private contracts for detention, but not decades ago, when DHS did not often hire these companies—even if the federal statutes remained exactly the same. Moreover, as explained above, the court overstated the impacts of a ruling for New Jersey, as AB 5207 would not prevent ICE from buying, taking, or leasing an appropriate private facility to operate it directly, and would even allow ICE to continue using EDC. *See supra* at 33-34. Last, if AB 5207 unduly impedes ICE's work, Congress *can* preempt it. But Congress has not done so in the INA, let alone with the clarity necessary to preempt a state health-and-safety measure.

## **<u>CONCLUSION</u>**

This Court should reverse the decision below.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:   <u>/s/ Nathaniel Levy</u>
Nathaniel Levy
Deputy Attorney General
Office of the New Jersey Attorney General

Dated: January 3, 2024

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c), I certify that:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 12,981 words, excluding sections exempted by Fed. R. App. P. 32(f), and thus does not exceed the 13,000-word limit.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

3.    This brief complies with L.A.R. 31.1(c) in that prior to being electronically mailed to the Court today, it was scanned by the following virus detection software and found to be free from computer viruses:

        Company: McAfee, Inc.
        Product:  McAfee Endpoint Security, version 10.7.0.2687

4.    This brief complies with L.A.R. 31.1(c) in that the text of the electronic brief is identical to the text of the paper copies.

Dated: January 3, 2024

                /s/ Nathaniel Levy
                Nathaniel Levy
                Deputy Attorney General
                Office of the New Jersey Attorney General

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated: January 3, 2024

<div style="margin-left:40%">

/s/ Nathaniel Levy
Nathaniel Levy
Deputy Attorney General
Office of the New Jersey Attorney General

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 3, 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

<div style="margin-left: 40%;">

 /s/ Nathaniel Levy

Nathaniel Levy
Deputy Attorney General
Office of the New Jersey Attorney General

</div>