No. 23-2598

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

CORECIVIC, INC.,

Plaintiff-Appellee,

v.

PHILIP D. MURPHY, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF NEW JERSEY, et al.

Defendants-Appellants.

———————————————

On Appeal from the United States District Court
for the District of New Jersey (No. 23-cv-967)

The Honorable Judge Robert Kirsch

## BRIEF OF AMICI CURIAE ILLINOIS, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, AND WASHINGTON IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

ALEX HEMMER
Deputy Solicitor General
JOHN R. MILLIGAN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

Attorneys for Amici States

*(Additional counsel on signature page)*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ii

IDENTITY AND INTEREST OF AMICI STATES ................................... 1

SUMMARY OF ARGUMENT .................................................................. 3

ARGUMENT ........................................................................................... 4

I.    The Constitution Limits The Contexts In Which State
      Sovereignty Must Yield To Federal Interests. ................................. 4

II.   The Decision Below Disregards Basic Principles of Federalism..... 8

III.  The District Court's Reasoning Would Raise Needless Questions
      About State Authority To Regulate Entities That Contract With
      The Federal Government. ............................................................. 16

CONCLUSION ..................................................................................... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alden v. Maine,*
   527 U.S. 706 (1999) ................................................................. 4

*Chamber of Commerce v. Whiting,*
   563 U.S. 582 (2011) ................................................................. 6

*Florida Lime & Avocado Growers, Inc. v. Paul,*
   373 U.S. 132 (1963) ............................................................... 21

*GEO Group, Inc. v. Newsom,*
   50 F.4th 745 (9th Cir. 2022) (en banc) ................................... 17, 18, 19

*Kansas v. Garcia,*
   425 U.S. 238 (1976) ......................................................... 6, 11, 12, 15

*Kelley v. Johnson,*
   140 S. Ct. 791 (2020) ............................................................... 1

*Leslie Miller, Inc. v. Arkansas,*
   352 U.S. 187 (1956) ................................................................ 15

*Manigault v. Springs,*
   199 U.S. 473 (1905) ................................................................. 2

*McCulloch v. Maryland,*
   17 U.S. 316 (1819) ................................................................... 7

*McHenry County v. Raoul,*
   44 F.4th 581 (7th Cir. 2022) ............................................... 9, 10, 11, 19

*Murphy v. NCAA,*
   138 S. Ct. 1461 (2018) ...................................................... 2, 5, 9, 10

*Mutual Pharmaceutical Co. v. Bartlett*,
  570 U.S. 472 (2013) .................................................................. 5

*North Dakota v. United States*,
  495 U.S. 423 (1990) ............................... 4, 7, 8, 14, 15, 19, 19

*Ocean County Board of Commissioners v. Attorney General of New
  Jersey*, 8 F.4th 176 (3d Cir. 2021) ........................................ 5

*Novoa v. GEO Group, Inc.*,
  No. 17-cv-2514, 2022 WL 2189626 (C.D. Cal. Jan. 25, 2022) ........... 20

*New York v. Pennsylvania Higher Education Assistance Agency*,
  No. 19-cv-9155, 2020 WL 2097640 (S.D.N.Y. May 1, 2020).............. 22

*Pennsylvania Higher Education Assistance Agency v. Perez*,
  457 F. Supp. 3d 112 (D. Conn. 2020) ................................... 22

*Preiser v. Rodriguez*,
  411 U.S. 475 (1973) ..................................................... 1

*Public Utilities Commission of California v. United States*,
  355 U.S. 354 (1958) .................................................... 15

*South Carolina v. Baker*,
  485 U.S. 505 (1988) ................................................. 7, 13

*Student Loan Servicing Alliance v. District of Columbia*,
  351 F. Supp. 3d 26 (D.D.C. 2018) ...................................... 21

*United States v. California*,
  921 F.2d 865 (9th Cir. 2019) ...................................... 19, 20

*United States v. County of Fresno*,
  429 U.S. 452 (1977) .................................................... 7

*United States v. Lopez*,
  514 U.S. 549 (1995) .................................................... 2

*United States v. Washington*,
  596 U.S. 832 (2022) ............................................................ 7, 8, 12, 13

*Virginia Uranium, Inc. v. Warren*,
  39 S. Ct. 1894 (2019) ..................................................................... 6

*Washington v. GEO Group, Inc.*,
  No. 3:17-cv-5806, 2018 WL 6448778 (W.D. Wash.) ............................ 20

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ........................................................................ 9

## CONSTITUTIONAL PROVISIONS, STATUTES AND REGULATIONS

U.S. Const. art. VI, ¶ 2 ................................................................. 4

8 U.S.C. § 1231 ....................................................................... 10, 12, 14

Minn. Rev. Stat. § 116.943 ............................................................ 8

N.J. Stat. Ann.
  § 30:4-8:15 ............................................................................... 2, 8
  § 30:4-8.16 ................................................................................. 3

Rev. Code. Wash.
  § 70A.350.030 ............................................................................ 18
  § 70A.350.050 ............................................................................ 18

## OTHER AUTHORITIES

Elengold, Kate Sabolsky & Jonathan D. Glater,
  *The Sovereign Shield*, 73 Stan. L. Rev. 969 (2021) ............................ 19

U.S. Government Accountability Office, A *Snapshot: Government-Wide Contracting*, https://gaoinnovations.gov/Federal_Government_Contracting/ (last updated May 2023) ............................................................... 17

Press Release, *Attorney General Raoul Announces $1.85 Billion Settlement With Student Loan Servicer Navient* (Jan 13. 2022), https://ag.state.il.us/pressroom/2022_01/20220113.html ................ 21

## IDENTITY AND INTEREST OF AMICI STATES

The amici States of Illinois, Colorado, Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New York, Oregon, and Washington submit this brief in support of Defendants-Appellants Philip D. Murphy, in his official capacity as Governor of New Jersey, and Matthew J. Platkin, in his official capacity as Attorney General of the State of New Jersey, pursuant to Federal Rule of Appellate Procedure 29(a)(2).

The amici States have a substantial interest in the public health, safety, and welfare of their communities, which encompasses protecting those who are incarcerated. As the Supreme Court has explained, the "safety of persons . . . is unquestionably at the core of the State's police power," *Kelley v. Johnson*, 425 U.S. 238, 247 (1976), and that power is at its apogee in the detention context, *see Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973) ("[I]t is difficult to imagine an activity in which a State has a stronger interest . . . than the administration of its prisons.").

The amici States also have a substantial interest in ensuring that the Constitution's limitations on federal authority are respected and

enforced.  The Constitution "withhold[s] from Congress a plenary police power."  *United States v. Lopez*, 514 U.S. 549, 566 (1995).  Instead, under our federalist system, it is States that exercise the sovereign power to "protect the lives, health, morals, comfort and general welfare of the people."  *Manigault v. Springs*, 199 U.S. 473, 480 (1905).  Consistent with that allocation of authority, the federal government has limited power to control state regulatory regimes or override state policy choices.  Congress cannot, for instance, "issue orders directly to the States," *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018); rather, it is the States who have primary authority to regulate individuals within their jurisdiction, subject to limited federal interference.

This case implicates both of these important state interests.  New Jersey has determined that it can best "protect the health and safety" of "those detained within" the State by eliminating the practice of private detention, including the detention of individuals who have violated civil immigration laws.  N.J. Stat. Ann. § 30:4-8:15(b).  It thus extended its longstanding bar on private, for-profit detention, *see* N.J. Br. 31-32, to corporations operating immigration detention facilities, while likewise prohibiting state instrumentalities from providing detention services,

N.J. Stat. Ann. § 30:4-8.16(b). That decision was within the State's authority. But the district court here enjoined enforcement of the challenged statute on the grounds that it is preempted by federal law and violates principles of intergovernmental immunity. JA4-44. Its opinion is badly flawed and should be reversed, as explained below.

## SUMMARY OF ARGUMENT

The district court's decision is incorrect. The Constitution limits the contexts in which state law yields to federal interests. If Congress passes a law regulating individuals, that law preempts a state statute that establishes a contrary regime. Even absent a federal law of this sort, a State cannot regulate the federal government directly or enact a law that discriminates against federal interests. But AB 5207 violates neither of these rules, because federal immigration law does not bar a State from prohibiting private detention and because AB 5207 regulates private entities, not the government, and it is not discriminatory. The district court's reasoning, if affirmed, would amount to a significant expansion of Supremacy Clause doctrine, one that would threaten state authority in a wide range of contexts. For that reason, as well as those set out by New Jersey, the decision below should be reversed.

# ARGUMENT

## I. The Constitution Limits The Contexts In Which State Sovereignty Must Yield To Federal Interests.

This case concerns the intersection of state and federal power. As the Supreme Court has explained, the Framers had the "unique insight that freedom is enhanced by the creation of two governments, not one." *Alden v. Maine*, 527 U.S. 706, 758 (1999). Under our federalist system, therefore, the States "retain the dignity . . . of sovereignty," *id.* at 715, and can regulate to protect the health and safety of those within their jurisdiction, subject only to the Supremacy Clause, which makes federal law the "supreme law of the land," U.S. Const. art. VI, ¶ 2. Under the Supremacy Clause, two frameworks determine whether state law yields to federal interests: preemption and intergovernmental immunity. These frameworks work hand in hand to balance state sovereignty and federal uniformity. While the doctrine of intergovernmental immunity prohibits the States from "directly interfer[ing]" with federal programs, *North Dakota v. United States*, 495 U.S. 423, 439 (1990) (plurality opinion), preemption doctrine ensures that the federal government may not override States' policy decisions absent a federal law that

4

establishes a right or duty that conflicts with a state law on the same subject.  Both doctrines are at issue in this case.

a.    First, state law will yield to federal law where Congress has regulated private parties in a manner that conflicts with state law, such that private parties cannot obey both.  *See Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013) ("Under the Supremacy Clause, state laws that require a private party to violate federal law are pre-empted and, thus, without effect." (quotation marks omitted)).  As the Supreme Court has explained, all preemption cases "work in the same way:  Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018); *see Ocean Cnty. Bd. of Commissioners v. Att'y Gen.*, 8 F.4th 176, 181-82 (3d Cir. 2021).  Thus, the Court has stated, preemption is possible only where a federal law is "best read as one that regulates private actors," *Murphy*, 138 S. Ct. at 1479, as opposed to a law that directs a federal agency how to act (or purports to command a State to do so).

Furthermore, a state law can be preempted only by a federal *law*, not by a mere federal interest or policy.  As the Supreme Court also explained, "[t]here is no federal preemption *in vacuo*."  *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).  Instead, "the federal restrictions or rights that are said to conflict with state law must stem from . . . a valid statute enacted by Congress."  *Id.*  A preemption claim thus cannot be based on a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011); rather, even in so-called "implied" preemption cases, like this one, a preemption claim "must be grounded in the text and structure of the [federal] statute at issue," *Kansas*, 140 S. Ct. at 804 (quotation marks omitted).  "'Invoking some brooding federal interest or appealing to a judicial policy preference,'" that is, "does not show preemption."  *Id.* at 801 (quoting *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J.)).  That limitation is critical to respecting "the principle that it is Congress rather than the courts that pre-empts state law."  *Whiting*, 563 U.S. at 607.

b.    Second, even absent a federal law, States cannot directly regulate the federal government—a principle known as the doctrine of

intergovernmental immunity.  That doctrine traces back to *McCulloch v. Maryland*, which held two centuries ago that "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control . . . the national government."  17 U.S. 316, 436 (1819); *see United States v. Washington*, 596 U.S. 832, 838-39 (2022).  For a time, courts interpreted this rule broadly, holding invalid state laws whose "effect . . . was or might be to increase the cost to the Federal Government of performing its functions."  *United States v. County of Fresno*, 429 U.S. 452, 460 (1977).  But that view has been "repudiated," *South Carolina v. Baker*, 485 U.S. 505, 520 (1988), in favor of a rule that better respects state sovereignty and the reality that many permissible state laws have the functional effect of creating friction for federal activities.

The scope of contemporary intergovernmental immunity law is thus narrow, as the Supreme Court recently emphasized:  It prohibits only "state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals (*e.g.*, contractors)."  *Washington*, 596 U.S. at 838 (emphasis in original; cleaned up); *see, e.g.*, *North Dakota*, 495 U.S. at 435 (plurality

opinion).  But if a statute does not transgress either prohibition, it is not unconstitutional "just because it indirectly increases costs for the Federal Government."  *Washington*, 596 U.S. at 389.  Rather, a state law that simply increases the cost or difficulty of carrying out the federal government's tasks is presumptively lawful and can be set aside only if it is preempted, as discussed above.  *Supra* pp. 5-6.  That rule serves to "accommodat[e] . . . the full range of each sovereign's legislative authority and [is] respectful of the primary role of Congress in resolving conflicts between the National and State Governments." *North Dakota*, 495 U.S. at 435 (plurality opinion).

## II.    The Decision Below Disregards Basic Principles of Federalism.

The district court's decision does not adhere to these principles. New Jersey has concluded that, given the health and safety issues that have plagued detention centers within the State, its "responsibility to protect . . . individuals detained within New Jersey" is best exercised by ending the practice of civil immigration detention at private and state-run facilities alike.  N.J. Stat. Ann. § 30:4-8:15(b).  The district court held that the State's decision offends the Supremacy Clause, JA17-43, but its opinion rests on expansive views of the preemption and

immunity doctrines that the Supreme Court has repeatedly and recently rejected.  This Court should reverse.

a.    First, AB 5207 is not preempted by federal law.  As New Jersey explains, N.J. Br. 34-53, CoreCivic's preemption claim fails on multiple independent grounds.  AB 5207 falls squarely within the States' historic police powers to protect health and safety, and so the presumption against preemption should apply, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); the federal statutes that CoreCivic identifies as preempting AB 5207 do not regulate private actors, but merely direct the federal government itself, and so lack preemptive force, *Murphy*, 138 S. Ct. at 1479; and, in any event, those statutes cannot fairly be read to preempt state law in the context of immigration detention, as the Seventh Circuit held just two years ago, *McHenry Cnty. v. Raoul*, 44 F.4th 581, 591-92 (7th Cir. 2022).  CoreCivic's preemption claim thus fails.

The district court's contrary view cannot be squared with basic preemption principles.  To start, the court expressly declined to determine—as the Supreme Court instructed in *Murphy*—whether the federal statutes at issue are "best read as one[s] that regulate[] private

actors."  138 S. Ct. at 1479.  The answer to that question is plainly "no."

The statutes on which CoreCivic relies do not "confer rights on private

actors" like CoreCivic, *id.* at 1480; they simply provide guidance to the

federal government about how and where to detain noncitizens.  Indeed,

the primary statute on which CoreCivic relies could not be clearer:  It

simply instructs the federal government to "consider the availability for

purchase or lease of any existing" detention facility before constructing

its own.  8 U.S.C. § 1231(g)(2).  That statute cannot reasonably be read

to "confer[] on CoreCivic . . . the right to engage in the remunerated . . .

operation of private detention facilities," as the company insisted below,

Doc. 45 at 7; it simply reflects an instruction to the executive branch to

"use existing facilities when they are available," *McHenry Cnty.*, 44 F.

4th at 591.[1]  Statutes of that sort establish no rights or obligations for

private parties, and thus lack preemptive force.  *See Murphy*, 138 S. Ct.

---

[1] The district court dismissed *McHenry County* as irrelevant because
the state statute at issue there regulated only state-owned facilities, not
private facilities.  *See* JA20-21.  But as New Jersey explains, N.J. Br.
42-43 & n.5, CoreCivic's conflict-preemption claim is identical to the
claim advanced in *McHenry County*, so the Seventh Circuit's reasoning
in rejecting that claim applies with equal force here.

at 1481 (preemption claim fails if a statute cannot "be understood as a regulation of private actors").

Indeed, the same error plagued the district court's decision more broadly. The touchstone of any preemption claim must be "the text and structure of the [federal] statute at issue," *Kansas*, 140 S. Ct. at 804, but the district court identified no statutory provision that can fairly be read to prohibit States from regulating private companies within their jurisdiction in a manner contrary to federal preference. The district court read the various statutes and regulations authorizing the federal government to arrange for immigration detention to reflect Congress's general preference that the Executive be able to enter into detention contracts "free from restrictive state laws." JA40. But an "instruction to 'consider' available facilities . . . before building new ones," *McHenry Cnty.*, 44 F.4th at 591—in essence, an instruction to avoid waste in detention operations—cannot preempt state regulations that have the effect of making those operations more costly or more difficult. *See Kansas*, 140 S. Ct. at 807 ("The Supremacy Clause gives priority to 'the laws of the United States,' not the . . . preferences of federal officers."). Indeed, the statutes at issue expressly contemplate the possibility that

existing facilities might be "unavailable for rental," and authorize the federal government to construct its own in that circumstance. 8 U.S.C. § 1231(g)(1), (2). The district court's conclusion that it would be too hard for the Executive to actually implement Congress's direction, JA42-43, is just the sort of "judicial policy preference," *Kansas*, 140 S. Ct. at 804, on which courts cannot rely in analyzing preemption claims. AB 5207 is thus consistent with, and does not countermand, the regulatory regime that Congress enacted.

     b.    AB 5207 also does not violate intergovernmental immunity principles. As New Jersey explains, N.J. Br. 17-34, AB 5207 neither "regulate[s] the United States directly" nor "discriminate[s] against the Federal Government or those with whom it deals (*e.g.*, contractors)." *Washington*, 596 U.S. at 838 (cleaned up). AB 5207 regulates private companies (not the United States) and, in light of preexisting New Jersey law barring the State from hiring private for-profit companies to provide general criminal detention, it does so in an evenhanded way (treating federal contractors no differently than state law does similarly situated state contractors, *see* N.J. Br. 31-32). It therefore does not violate principles of intergovernmental immunity.

The district court's contrary opinion impermissibly attempts to resuscitate immunity principles "repudiated," *South Carolina*, 485 U.S. at 520, many decades ago.  The district court held neither that AB 5207 directly regulates the United States nor that it discriminates against the federal government or federal contractors.  *See* JA23-26; *see also* JA31 n.13 ("declin[ing] to reach" discrimination argument).  Instead, the court held that AB 5207 violates principles of intergovernmental immunity because, as a functional matter, it would "interfere[] with" the "current" manner in which the federal government performs its operations, thus forcing the federal government to "adopt an entirely new approach."  JA31.  But, as the Supreme Court explained just last year, that manner of functional reasoning—in which a court decides whether, in its view, a state law imposes too great a burden on federal operations (and thus violates immunity principles)—is no longer the law.  *See Washington*, 596 U.S. at 838.  Instead, a court simply asks whether a state law (1) regulates the United States directly or (2) discriminates against the federal government or its contractors.  *Id.*  If the state law does neither, it is "no longer unconstitutional just because

it indirectly increases costs for the Federal Government." *Id.* at 839. The district court should have applied that rule, but did not.

The justifications the district court offered for its novel approach are not persuasive. The court reasoned at one point that AB 5207 is no more than a direct regulation of the federal government disguised as a regulation of private parties, positing that New Jersey cannot do "what it could not do directly—enjoining the federal government from detaining individuals for civil immigration violations—by simply omitting the federal government's name from the law." JA27. But AB 5207 does not "enjoin[] the federal government," *id.*, from doing anything. It remains free to detain individuals within the State at facilities that *it* operates, just as Congress envisioned. *See* 8 U.S.C. § 1231(g)(1). As the Supreme Court has explained, when a "regulation operate[s] against suppliers, not the Government," "there is no claim . . . nor could there be, that [a State] regulates the Federal Government directly." *North Dakota*, 495 U.S. at 436 (plurality opinion). Rather, the statute violates immunity principles only if it discriminates against federal interests, which AB 5207 does not.

14

The district court also erred in relying on two Supreme Court cases that, in its view, stand for the proposition that state laws that "in effect make[] federal operations subject to state approval" violate the intergovernmental immunity doctrine.  JA22-24 (citing *Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 354 (1958), and *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956)).  But both cases rest on *preemption* holdings, not on immunity holdings; indeed, the Court in *Public Utilities Commission* expressly distinguished those cases "where, absent a conflicting federal regulation, a State seeks to impose safety or other requirements on a contractor who does business for the United States."  355 U.S. at 543; *accord North Dakota*, 495 U.S. at 440 (plurality opinion) (characterizing *Public Utilities Commission* and *Leslie Miller* as cases in which state law "prohibited what federal law required").  These opinions simply stand for the proposition that a state may not impose a rule on a federal contractor that is preempted by federal law (which AB 5207 is not, *supra* pp. 9-12).  The district court erred in reading them to authorize a sweeping and standardless inquiry into the degree to which a state law interferes with federal operations for purposes of invoking intergovernmental immunity.

15

### III. The District Court's Reasoning Would Raise Needless Questions About State Authority To Regulate Entities That Contract With The Federal Government.

The district court thus erred in two related respects.  It read a federal statute that reflects no more than a congressional preference to avoid unnecessary expenditures by the Executive to preempt state laws that have the effect of increasing those expenditures, and it held that a state law that has the effect of burdening federal operations can violate immunity principles on that basis alone.  *Supra* pp. 8-15.  Those two errors, taken together, permitted the district court to hold invalid under the Supremacy Clause a state law simply on the ground that it imposed burdens on government contractors that had—in the court's view—too significant a downstream impact on federal operations.  That reasoning, if affirmed, could open the door to time-consuming and expensive, if ultimately meritless, litigation about amici States' authority to regulate private parties that contract with the federal government.

All States regulate private parties that contract with the federal government.  Indeed, such regulation is ubiquitous, primarily because federal contracting is ubiquitous.  Last year, the federal government spent $694 billion on federal contracts, hiring private companies to do

everything from provide healthcare to perform research to repair the government's planes, trains, and automobiles. *See* Gov't Accountability Off., *A Snapshot: Government-Wide Contracting* (2022).[2] Under the principles set out above, States can "enforce their generally applicable laws against federal contractors," *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022) (en banc)—that is, they may ensure that these companies are complying with evenhanded statutes designed to ensure health and safety, protect consumers and workers, and more. But the district court's reasoning would permit federal contractors to contend that they should be exempt from these regulations simply by virtue of the indirect burden that they would pose on federal operations. That would open a Pandora's box of litigation over whether a state statute "intrude[s]" too greatly "on the federal government's performance." JA30. The Court should reject such an amorphous approach, under which courts might sit in judgment of all manner of state laws.

For instance, the district court appeared to critique AB 5207 on the ground that it "makes federal operations subject to state approval."

---

[2] https://gaoinnovations.gov/Federal_Government_Contracting/ (last updated May 2023).

JA24; *accord GEO Group*, 50 F.4th at 761 (States cannot enforce statutes that "effectively" prohibit "the Federal government from operating with its desired personnel" (cleaned up)).  But many state statutes may have the effect of decreasing the number of companies available to contract with the federal government, or even putting its "desired" partners, *GEO Group*, 50 F.4th at 761, out of business.  For instance, many States prohibit the manufacture or sale of certain substances that they have deemed toxic.  *See, e.g.*, Minn. Rev. Stat. § 116.943(5) (prohibiting sale of certain non-essential perfluoroalkyl and polyfluoroalkyl substances, or "PFAS" chemicals); Rev. Code Wash. §§ 70A.350.030-.050 (authorizing state agency to prohibit the sale or manufacture of PFAS chemicals).  Those laws, too, might be said to subject federal operations to "state approval," JA21, if they impact federal procurement priorities—for instance, if the federal government relied on such materials in building facilities, repairing vehicles, and the like.  But such a statute generally would not violate immunity or preemption principles, even if it requires the government to change its operating procedures.  Rather, as the Supreme Court has explained, such burdens are "normal incidents of the organization within the same

territory of two governments." *North Dakota*, 495 U.S. at 435 (plurality opinion).[3]  To suggest, as the district court did, that a statute of this sort could violate immunity or preemption principles if it is too burdensome would expand those principles beyond the bounds recognized by the Supreme Court.

Such concerns are not hypothetical.  "Federal contractors" have increasingly invoked preemption and immunity doctrines "in as many types of circumstances as there are federal contracts."  K. Elengold & J. Glater, *The Sovereign Shield*, 73 Stan. L. Rev. 969, 974 (2021).  Private prison operators have invoked immunity and preemption defenses to state laws like AB 5207 that have attempted to close private detention centers.  *See GEO Group*, 50 F.4th at 673 (California); *GEO Group, Inc. v. Inslee*, No. 3:21-cv-05313 (W.D. Wash.) (Washington).[4]  Those same

---

[3]  Of course, such a statute could be preempted by a federal law that specifically grants contractors the right to perform federal contracts free of applicable state law.  *See North Dakota*, 495 U.S. at 440 (plurality opinion).

[4]  The same defenses have been asserted in challenges to state statutes that simply terminate those States' *own* participation in certain federal programs.  *See, e.g.*, *McHenry Cnty.*, 44 F.4th at 586-87; *United States v. California*, 921 F.2d 865, 890 (9th Cir. 2019).  Statutes of that sort, of course, also do not violate the Supremacy Clause for a separate reason: They reflect these States' decision to exercise their Tenth Amendment

corporations have invoked the same defenses to the application of state minimum-wage laws within their detention centers, contending among other things that such statutes are impermissible because they effectively control federal operations. *See Washington v. GEO Group, Inc.*, No. 3:17-cv-5806, 2018 WL 6448778, at *3 (W.D. Wash.), *appeal pending*, Nos. 21-36024, 21-36025 (9th Cir.); *see also Novoa v. GEO Group, Inc.,* No. 17-cv-2514, 2022 WL 2189626, at *22 (C.D. Cal. Jan. 25, 2022). But a generally applicable state statute does not offend the Supremacy Clause just because it affects federal operations; rather, as discussed, *supra* pp. 4-8, state law yields to federal law only if it (1) is preempted or (2) directly regulates or discriminates against the federal government. The district court's theory, under which a state law can contravene the Supremacy Clause on the sole basis of the burdens that it imposes on the federal government, would invite endless litigation over the status of federal contractors like CoreCivic and their claims to exemptions from state law.

---

right to not participate in federal programs. *See California*, 921 F.3d at 891. But the preemption and immunity defenses advanced in these cases also fail on their own terms, for substantially the same reasons set out in New Jersey's brief.

The district court's expansive reasoning likewise would raise questions about state regulatory authority in other contexts. States have "traditional[ly]" exercised the power to "enforce . . . regulations designed for the protection of consumers." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 150 (1963). That encompasses the enforcement of state consumer-protection statutes against financial institutions that service student loans, which, as many amici States have concluded, have engaged in predatory and deceptive practices in collecting and servicing student loans. *See, e.g.*, Press Release, *Attorney General Raoul Announces $1.85 Billion Settlement With Student Loan Servicer Navient* (Jan. 13, 2022).[5] Over the last five years, however, many student loan servicers have attempted to argue that they are exempt from state regulation on preemption or immunity grounds, contending that their status as federal contractors shields them from generally applicable state consumer finance law. Although courts have rejected many of these claims, *see, e.g.*, *Student Loan Servicing All. v. District of Columbia*, 351 F. Supp. 3d 26, 75 (D.D.C. 2018) (rejecting servicer's immunity argument but agreeing that aspects of District of

---

[5] https://ag.state.il.us/pressroom/2022_01/20220113.html.

Columbia law were preempted in part based on statute not at issue here); *Pa. Higher Educ. Assistance Agency v. Perez*, 457 F. Supp. 3d 112, 131 (D. Conn. 2020) (similar); *New York v. Pa. Higher Educ. Assistance Agency*, No. 19-cv-9155, 2020 WL 2097640, at *8 (S.D.N.Y. May 1, 2020) (similar), the district court's reasoning would substantially aid efforts of these entities and others to evade state law.

In short, the district court's reasoning, if upheld, would create a roadmap for private parties that contract with the federal government to negate state law. The Court should not accept CoreCivic's effort to expand preemption and immunity doctrines in a manner that would permit that result.

## CONCLUSION

For these reasons, the Court should reverse the judgment below.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Alex Hemmer
ALEX HEMMER
Deputy Solicitor General
JOHN R. MILLIGAN
Assistant Attorney General
115 South LaSalle Street
23rd Floor
Chicago, Illinois 60603
(312) 814-5526
alex.hemmer@ilag.gov

PHILLIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of*
*Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 MLK Jr, Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

January 10, 2024

# CERTIFICATE OF COMPLIANCE

1.      Pursuant to Third Circuit Local Appellate Rule 46.1(d), I certify that I am a member of the bar of this Court.

2.      I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,344 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirement of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

3.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that the text of the electronic copy of this brief is identical to the text in the paper copies of the brief.

4.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), I certify that a virus detection program was performed on this electronic brief and that no virus was detected.


/s/ Alex Hemmer
ALEX HEMMER

January 10, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2024, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


/s/ Alex Hemmer
ALEX HEMMER