**23-2598**

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆

CORECIVIC, INC.,

*Plaintiff-Appellee,*

—v.—

GOVERNOR OF NEW JERSEY, ET AL.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (NO. 3:23-CV-00967)

## BRIEF FOR *AMICUS CURIAE* PAX CHRISTI USA
## IN SUPPORT OF DEFENDANTS-APPELLANTS

DAVID N. CINOTTI
BRENDAN M. WALSH
DOMINIQUE KILMARTIN
PASHMAN STEIN WALDER
   HAYDEN, P.C.
21 Main Street, Suite 200
Hackensack, New Jersey 07601
(201) 488-8200

*Attorneys for Amicus Curiae*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.......................................................... ii

CORPORATE DISCLOSURE STATEMENT ........................................1

INTEREST OF AMICUS CURIAE ...................................................1

STATEMENT OF COMPLIANCE WITH FED. R. APP. P. 29(a)(4)(E)..................1

SUMMARY OF ARGUMENT...........................................................2

ARGUMENT .......................................................................3

    I.    AB 5207 falls within the heart of New Jersey's police powers. ..................3

    II.   The federal government admits and has long known that private prisons are less safe than their government-run counterparts. ..................6

    III.  Profit motives and a lack of accountability lead private prisons to offer inadequate medical care. ..........................................10

    IV.  Private prisons pose a challenge to transparency and public accountability. ....................................................18

CONCLUSION ...................................................................31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Auto. Workers v. Wis. Emp. Rels. Bd.*,
  351 U.S. 266 (1956)...................................................................................5

*Bond v. United States*,
  572 U.S. 844 (2014)...................................................................................4

*Butchers' Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co.*,
  111 U.S. 746 (1884)...................................................................................4

*City of New Orleans v. Dukes*,
  427 U.S. 297 (1976)...................................................................................4

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*,
  471 U.S. 707 (1985)...................................................................................5

*In re Fed.-Mogul Glob. Inc.*,
  684 F.3d 355 (3d Cir. 2012).......................................................................5

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905).....................................................................................5

*Kelley v. Johnson*,
  425 U.S. 238 (1976)...................................................................................4

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)...................................................................................5

*Metro. Life Ins. Co. v. Massachusetts*,
  471 U.S. 724 (1985)...................................................................................5

*S. Bay United Pentecostal Church v. Newsom*,
  140 S. Ct. 1613 (2020)...............................................................................5

*W. Turf Ass'n v. Greenberg*,
  204 U.S. 359 (1907)................................................................................4

**Statutes**

N.J. Stat. Ann. § 30:4-8.15(b) ...............................................................2

**Constitution**

U.S. Const. amend. X.............................................................................4

**Federal Rules**

Fed. R. App. P. 26.1............................................................................... 1
Fed. R. App. P. 29................................................................................. 1, 32
Fed. R. App. P. 32................................................................................32

**Other Authorities**

ACLU, Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private
  Prison System (2014), https://www.aclu.org/documents/warehoused-and-
  forgotten-immigrants-trapped-our-shadow-private-prison-system ....................26

Am. Immigr. Counsel, *Oversight of Immigration Detention: An Overview* (May 16,
  2022), https://www.americanimmigrationcouncil.org/research/oversight-
  immigration-detention-overview ..........................................................28

Angela E. Addae, *Challenging the Constitutionality of Private Prisons: Insights
  from Israel*, 25 Wm. & Mary J. Women & L. 527 (2019)....................................20

Anna Gunderson, Captive Market: Accountability and State Prison
  Privatization (2022) ..........................................................18, 19, 21, 30

Ashlynd Huffman, *Stabbings Soar at Southeast Oklahoma Private Prison*,
  Oklahoma Watch (Sept. 16, 2022),
  https://oklahomawatch.org/2022/09/16/stabbings-soar-at-southeast-oklahoma-
  private-prison/ ...............................................................................27

Bureau of Just. Statistics, Census of State and Federal Correctional Facilities,
  2015 (Oct. 2008), https://bjs.ojp.gov/content/pub/pdf/csfcf05.pdf. ....................21

Bureau of Just. Statistics, Census of State and Federal Correctional Facilities, 2019 (Nov. 2021), https://bjs.ojp.gov/content/pub/pdf/csfacf19st.pdf .................21

Christie Thompson, *Everything You Ever Wanted to Know About Private Prisons . . . is None of Your Damn Business,* Marshall Project (Dec. 18, 2014), https://www.themarshallproject.org/2014/12/18/everything-you-ever-wanted-to-know-about-private-prisons ..................................................................................19

CoreCivic, 2022 Annual Report, Form 10-K, https://ir.corecivic.com/static-files/2786ec23-1bb7-4e6e-a445-8692ac0f4a24 ...20

Curtis R. Blakeley & Vic W. Bumphus, *Private and Public Sector Prisons–A Comparison of Select Characteristics*, Federal Probation (2000), https://www.uscourts.gov/sites/default/files/68_1_5_0.pdf.................................22

Derek Gilna, *$690,000 Settlement in HRDC Suit Over Death of Prisoner's Baby at CCA Jail*, Prison Legal News (June 8, 2015), https://www.prisonlegalnews.org/news/2015/jun/8/690000-settlement-hrdc-suit-over-death-prisoners-baby-cca-jail/ .....................................................................17

Detention Watch Network, A Toxic Relationship: Private Prisons and U.S. Immigration Detention (2016), https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20 Relationship_DWN.pdf...................................................................................26

*Executive Order on Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities*, White House (Jan. 26, 2021), https://www.whitehouse.gov/briefing-room/presidential actions/2021/01/26/executive-order-reforming-our-incarceration-system-to-eliminate-the-use-of-privately-operated-criminal-detention-facilities/ ............6, 10

Hannan Adely, *Somali Immigrant Detained in NJ Fights to Stay with Family in US*, NorthJersey.com, (June 19, 2019), https://www.northjersey.com/story/news/2019/06/10/somali-man-immigration-detention-nj/1385862001/ ...................................................................................16

Ira P. Robbins, *Privatization of Corrections: A Violation of U.S. Domestic Law, International Human Rights, and Good Sense*, 13 Hum. Rts. Brief 12 (2006), https://digitalcommons.wcl.american.edu/cgi/viewcontent. cgi?article=1275&context=hrbrief.......................................................................23

James Austin & Garry Coventry, Emerging Issues on Privatized Prisons (2001),
https://www.ojp.gov/pdffiles1/bja/181249.pdf ..................................................7, 8

Kelly A. Kirchgasser, *Minimizing Prison Abuses and Contract Opportunities: Biden's End to Private Prisons and Implications of Procurement, Employment, and Reform*, 52 Pub. Cont. L.J. 507 (2023)............................................................6

Laura I. Appleman, *Cashing in on Convicts: Privatization, Punishment, and the People,* 2018 Utah L. R. 579 (2018).....................................................................30

Lauren-Brooke Eisen, Inside Private Prisons: An American Dilemma in the Age of Mass Incarceration (2018) .....................................................................18, 23, 25

Megan Mumford, Diane Whitmore Schanzenbach, & Ryan Nunn, *The Economics of Private Prisons*, Hamilton Project (Oct. 2016), https://www.hamiltonproject.org/wp-content/uploads/2023/01/economics_of_private_prisons.pdf .................21

Mike Tartaglia, *Private Prisons, Private Records,* 94 B.U. L. Rev. 1689 (2014)...................................................................................24

Nina Bernstein, *Few Details on Immigrants Who Died in Custody*, N.Y. Times (May 5, 2008), https://www.nytimes.com/2008/05/05/nyregion/05detain.html...........................16

Noah Glick, *As Private Prisons Push to Keep Costs Down, Workers Can Pay the Price*, Pulitzer Ctr. (Mar. 10, 2020), https://pulitzercenter.org/stories/private-prisons-push-keep-costs-down-workers-can-pay-price........................................22

Off. of Senator Elizabeth Warren, The Accreditation Con: A Broken Prison and Detention Facility Accreditation System That Puts Profits Over People (2020), https://www.warren.senate.gov/imo/media/doc/The%20Accreditation%20Con%20-%20December%202020.pdf ..........................................................................25

*Oversight of the Bureau of Prisons: First-Hand Accounts of Challenges Facing the Federal Prison System, Hearing Before the Senate Committee on Homeland Security and Government Affairs*, 114th Cong. 5 (2015) (statement of Michael E. Horowitz, Inspector General, United States Department of Justice), https://oig.justice.gov/sites/default/files/2019-12/8.4.15.pdf ...............................11

Prison Legal News, *CCA Admits to Falsified Staffing Records, Violating Contract with Idaho DOC* (May 15, 2013), https://www.prisonlegalnews.org/ news/2013/may/15/cca-admits-to-falsified-staffing-records-violating-contract-with-idaho-doc/ ...................................................................................................23

Sally Q. Yates, *Memorandum: Reducing our Use of Private Prisons* (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download...10

Seth Freed Wessler, *Separate, Unequal, and Deadly,* TYPE (Jan. 27, 2016), https://www.typeinvestigations.org/investigation/2016/01/27/separate-unequal-deadly/ ...............................................................................................................14

Shane Bauer, American Prison: A Reporter's Undercover Journey into the Business of Punishment (2019).....................................................................................*passim*

Shane Bauer, *The True History of America's Private Prison Industry*, TIME (Sept. 25, 2018), https://time.com/5405158/the-true-history-of-americas-private-prison-industry.............................................................................................19

United Nations Office on Drugs and Crime, The United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules), https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf......................................................26

U.S. Dep't of Homeland Sec., Off. for Civil Rights and Civil Liberties, Stewart Detention Center Recommendation on Complaint (May 18, 2017), https://www.dhs.gov/sites/default/files/publications/stewart-detention-center_05-18-17.pdf................................................................................................................28

U.S. Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf .............................................29

U.S. Dep't of Just., Off. of Att'y Gen., Report to the Attorney General Inspection and Review of the Northeast Ohio Correctional Center (Nov. 25, 1998), https://www.justice.gov/archives/ag/report-attorney-general-inspection-and-review-northeast-ohio-correctional-center......................................................7, 24

U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of
    Prisons' Monitoring of Contract Prisons (2016),
    https://oig.justice.gov/reports/2016/e1606.pdf .....................................8, 10, 12, 25

U.S. Dep't of Just., Off. of Inspector Gen., Audit of the Fed. Bureau of Prisons'
    Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center
    in Natchez, Mississippi (Dec. 2016),
    https://www.oversight.gov/sites/default/files/oig-reports/a1708.pdf ...................13

U.S. Dep't of Just., Off. of Inspector Gen., Audit of the Federal Bureau of Prisons
    Contract No. DJB1PC007 Awarded to Reeves County, Texas to Operate the
    Reeves County Detention Center I/II Pecos, Texas (2015),
    https://oig.justice.gov/reports/2015/a1515.pdf .....................................................11

U.S. House Committee on Oversight and Reform and Subcommittee on Civil
    Rights and Civil Liberties, Deaths and Deficient Medical Care by For-Profit
    Detention Contractors (2020),
    https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2
    020-09-24.%20Staff%20Report%20on%20ICE%20Contractors.pdf...................13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure, amicus curiae Pax Christi USA ("Pax Christi") states that it is a national section of Pax Christi International. Pax Christi is a non-profit, 501(c)(3) organization, and no publicly held corporation owns 10% or more of its stock.

## INTEREST OF AMICUS CURIAE

Amicus curiae Pax Christi is the national Catholic peace movement. Pax Christi derives its 501(c)(3) status from the United States Conference of Catholic Bishops and is a national section of Pax Christi International, which has NGO status at the United Nations. It is Pax Christi's mission to promote peace with justice as articulated in the gospel and in Catholic social teaching. In line with its mission, Pax Christi is committed to promoting the human dignity, health, and safety of all individuals, especially the marginalized and including those who are incarcerated. It has extensive experience researching, educating, and advocating for reform across various public-health contexts, including immigration enforcement and incarceration.

## STATEMENT OF COMPLIANCE WITH FED. R. APP. P. 29(a)(4)(E)

No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief. No person or entity except Pax Christi or its counsel contributed money to fund the preparation or submission of this brief.

1

## SUMMARY OF ARGUMENT

In August 2021, the State of New Jersey (the "State" or "New Jersey") enacted Assembly Bill 5207 ("AB 5207"). As the State explains in its brief, the statute prohibits private detention centers from entering into future contracts, thus preventing their operation in the State once their existing contracts expire. CoreCivic, Inc. ("CoreCivic"), the world's largest private-prison company, challenged AB 5207's constitutionality and sought an injunction barring its enforcement with respect to the Elizabeth Detention Center ("EDC"), which CoreCivic operates and in which persons detained by the federal government on immigration-related matters are housed. The district court granted CoreCivic's motion, concluding that AB 5207 was preempted by federal immigration law and barred by the intergovernmental immunity doctrine. For the reasons explained by the State, the district court erred as a matter of law.

Pax Christi submits this amicus brief to provide background information demonstrating why New Jersey's exercise of its traditional police powers through AB 5207 was so important to protect the health and safety of those whom the federal government chooses to detain in New Jersey under its immigration authority. The legislative findings in connection with the statute make clear that the State was motivated "to protect the health and safety, including the physical and mental health, of individuals detained within New Jersey." N.J. Stat. Ann. §

30:4-8.15(b).  The State's concern about the physical and mental health of people in detention in private facilities is well founded.  Years of empirical data establish that health and safety conditions in private prisons are measurably worse than those in their government-run counterparts, and that existing oversight protocols have repeatedly proven ineffective at holding private prisons—including those run by CoreCivic—accountable for the harm to people detained within their walls.

CoreCivic and other private-prison companies are concerned primarily with their own profit, not the well-being of those placed in their custody.  Private prisons' profit motive, and their lack of transparency and public accountability, lead to inadequate medical care, understaffing, and increased violence.  The federal government's authority to detain noncitizens in New Jersey does not negate what the Supreme Court has long recognized as principally a state responsibility: to guard and protect the safety and health of the people.

## ARGUMENT

### I.    AB 5207 falls within the heart of New Jersey's police powers.

For the reasons thoroughly explained by the State, neither preemption nor the intergovernmental immunity doctrine prevents the State from exercising its traditional police powers to ban privately operated detention centers within its territory.  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to

the States respectively, or to the people." U.S. Const. amend. X. The Supreme Court has long recognized that the police powers "remained with the states in the formation of the original constitution of the United States, and had not been taken away by the amendments adopted since." *Butchers' Union Slaughter-House & Live-Stock Landing Co. v. Crescent City Live-Stock Landing & Slaughter-House Co.*, 111 U.S. 746, 747 (1884). This pre-constitutional sovereign authority gives "[t]he States . . . broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014).

Accordingly, the power to enact laws to protect health, safety, and welfare, and to regulate the economy within a state, is "unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976); *see, e.g.*, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("States are accorded wide latitude in the regulation of their local economies under their police powers."); *W. Turf Ass'n v. Greenberg*, 204 U.S. 359, 363 (1907) ("Decisions of this court . . . recognize the possession, by each state, of powers never surrendered to the general government; which powers the state, except as restrained by its own Constitution or the Constitution of the United States, may exert not only for the public health, the public morals, and the public safety, but for the general or common good, for the well-being, comfort, and good order of the people.").

4

Moreover, because the regulation of health and safety "is primarily, and historically, a matter of local concern," *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985), the "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons," *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (citations omitted); *see also Auto. Workers v. Wis. Emp. Rels. Bd.*, 351 U.S. 266, 274 (1956) ("The dominant interest of the State in preventing violence . . . cannot be questioned.  It is a matter of genuine local concern").  There is therefore a "long-standing presumption against preemption of state police power laws and regulations rooted in 'federalism concerns and the historic primacy of state regulation of matters of health and safety.'"  *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 381 (3d Cir. 2012) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

There can be no doubt that AB 5207 goes to the heart of New Jersey's police powers: it promotes the health, safety, morality, and general wellness within the State.  As Chief Justice Roberts has explained, "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11,

5

38 (1905)).  New Jersey's decision to prevent the operation of private detention centers in the state fulfills that constitutionally entrusted responsibility.

## II.    The federal government admits and has long known that private prisons are less safe than their government-run counterparts.

Within the first week of his presidency, President Biden issued an executive order directing the Attorney General not to renew Department of Justice ("DOJ") contracts with privately operated criminal detention facilities.  *Executive Order on Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities*, White House § 2 (Jan. 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/executive-order-reforming-our-incarceration-system-to-eliminate-the-use-of-privately-operated-criminal-detention-facilities/.  The executive order states that "privately operated criminal detention facilities do not maintain the same levels of safety and security for people in the Federal criminal justice system or for correctional staff," and further that the government has "a duty to provide these individuals with safe working and living conditions."  *Id.* § 1.

People incarcerated "under the governance of contracted prison companies have reported staff neglect and mistreatment for decades."  Kelly A. Kirchgasser, *Minimizing Prison Abuses and Contract Opportunities: Biden's End to Private Prisons and Implications of Procurement, Employment, and Reform*, 52 Pub. Cont. L.J. 507, 508 (2023).  The federal government has long possessed reliable

6

empirical data illuminating the shocking safety and health conditions that plague private prisons.[1]

In or about August 1998, the United States Attorney General requested an independent review of CoreCivic's Northeast Ohio Correctional Center to "understand the deficiencies, errors, and mismanagement that led to a series of unfortunate occurrences, including disruptions, escapes, and the deaths of two inmates."  U.S. Dep't of Just., Off. of Att'y Gen., Report to the Attorney General Inspection and Review of the Northeast Ohio Correctional Center (Nov. 25, 1998), https://www.justice.gov/archives/ag/report-attorney-general-inspection-and-review-northeast-ohio-correctional-center.  Later that year, the Attorney General received a report faulting both CoreCivic and the Department of Corrections in its oversight with "pivotal failures in [] security and operational management" at the facility.  *Id.*  Notably, the report documented "major failures" in security procedures; a lack of "correctional experience on the part of almost all staff"; and

---

[1] This brief cites predominantly government-conducted studies, as researchers have opined that many third-party studies are unreliable because they were produced or funded, in whole or in part, by the private prisons themselves.  *See, e.g.*, James Austin & Garry Coventry, Emerging Issues on Privatized Prisons 37 (2001), https://www.ojp.gov/pdffiles1/bja/181249.pdf (recognizing that data used for private prison analysis "either were flawed or may have been contaminated by staff because they knew the results would be used to reach unflattering conclusions by the researchers studying the facility").

CoreCivic's failure to implement mitigating measures, including internal controls and security audit processes, to prevent future incidents. *Id.*

Approximately two years later, the Bureau of Justice Assistance funded a nationwide study that resulted in a monograph examining emerging issues in private prisons. According to the monograph, private facilities had "a significantly lower staffing level than publicly operated prisons," lacked management-information support, and reported "a significantly higher rate of assaults on staff and inmates." Austin & Coventry, *supra*, at xi.

In 2016, the DOJ Office of the Inspector General (the "OIG") studied the Bureau of Prison's (the "BOP") monitoring of contract prisons and issued a report documenting its findings (the "OIG Report"). The OIG found that "in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons i (2016), https://oig.justice.gov/reports/2016/e1606.pdf.[2] Indeed, "[w]ith the exception of fewer incidents of positive drugs tests and sexual misconduct, the contract prisons had more incidents per capita than the BOP institutions in all of the other

---

[2] The OIG's review spanned fiscal years 2011-2014 and compared the 14 private institutions that were then-operational against 14 selected BOP institutions with comparable populations. *Id.* at ii.

categories of data . . . examined." *Id.* at ii.  The OIG made these notable findings, among others:

- Private prisons had higher rates of assaults, both "inmate-on-inmate" and "inmate-on-staff," than comparable BOP institutions.  Per capita, the private prisons reported a 28% higher average of "inmate-on-inmate" assaults per month (3.3 incidents compared to 2.5).  They also reported more than twice as many "inmate-on-staff" assaults per month (4.2 incidents compared to 1.6).  *Id.* at 18-19.

- Private prisons experienced 17% more use-of-force incidents than BOP institutions, and had nearly twice as many weapons confiscations on a monthly basis.  *Id.* at 17, 20.

- Lockdowns occurred more than nine times as often in private prisons, with private prisons reporting 30 partial and 71 full lockdowns, and BOP institutions reporting no partial and only 11 full lockdowns.  *Id.* at 21.

- Private prisons reported significantly more guilty findings per month on "serious offense charges" (namely, murder, assault, sexual assault, possession of weapons or drugs, setting fires, fighting, and participating in riots or demonstrations).  *Id.* at 22.

The OIG Report and its disturbing findings about the safety of people in private prisons prompted the Obama DOJ to issue a memorandum indicating that

the federal government would "begin[] the process of reducing—and ultimately ending—our use of privately operated prisons."  Sally Q. Yates, *Memorandum: Reducing our Use of Private Prisons* at 2 (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download.  Citing the 2016 OIG Report, the memorandum stated: "Private prisons . . . simply do not provide the same level of correctional services, programs, and resources . . . and as noted in a recent report by the [OIG], they do not maintain the same level of safety and security."  *Id.* at 1.  President Biden's January 2021 executive order also cited the OIG Report.  *See* White House, *supra*, at § 1.  But as will be explained below, the private prisons in existence today continue to be plagued by hazardous and unhealthy conditions, with little to no signs of improvement.

## III.    Profit motives and a lack of accountability lead private prisons to offer inadequate medical care.

The OIG Report did not directly address the adequacy of medical care in private prisons.  *See* U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons, *supra*, at 20 (recognizing that the "clinical adequacy of inmate medical care fell outside the scope of [the OIG's] review").  However, the report still contains stunning revelations regarding healthcare in private prisons.

By way of background, in or about early 2015, the OIG conducted an audit of two private prisons in Reeves County, Texas, and identified "several significant

concerns relating to compliance with the contract's requirements, including the

provision of health care services [and] the BOP's approach to minimum staffing

requirements." *Oversight of the Bureau of Prisons: First-Hand Accounts of*

*Challenges Facing the Federal Prison System, Hearing Before the Senate*

*Committee on Homeland Security and Government Affairs*, 114th Cong. 5 (2015)

(statement of Michael E. Horowitz, Inspector General, United States Department

of Justice), https://oig.justice.gov/sites/default/files/2019-12/8.4.15.pdf.  For

example, for the 37-month period between December 2010 and December 2013,

the facilities failed to meet the 85% staffing threshold for health services in 34 of

those 37 months.  *Id.* at 5-6.  Notably, the audit report found that the private-prison

company had a financial incentive to understaff its health-services unit, as it would

cost the company less to pay penalty deductions for understaffing than it would to

staff the prison adequately.  *See* U.S. Dep't of Just., Off. of Inspector Gen., Audit

of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves

County, Texas to Operate the Reeves County Detention Center I/II Pecos, Texas 8

(2015), https://oig.justice.gov/reports/2015/a1515.pdf.

In its report, the OIG recognized that while the BOP had endeavored to

improve its monitoring of health services in the wake of the Reeves County audit,

it had largely come up short.  For example, although the BOP had developed

"seven observation steps in [a] checklist for onsite monitors to verify that a

11

contract prison's health services comply with its contract," the OIG determined

that the observational steps were "primarily administrative procedures" and did not

"examine[] whether the contractors were providing *basic medical care* to the

inmates." *See* U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal

Bureau of Prisons' Monitoring of Contract Prisons, *supra*, at 32 (emphasis added).

Moreover, during the OIG's site visit to one contract prison, the OIG learned that

there was no full-time physician for the eight-month period between December

2013 and August 2014, and there was no full-time dentist for around six weeks

during that period. Despite these vacancies, which the OIG believed to be "critical

for ensuring basic inmate healthcare," the "onsite monitor's checklists showed that

the prison was in compliance with all health services observation steps." *Id.* at 33.[3]

---

[3] The OIG's site visit occurred at a CoreCivic facility in Eden, Texas. During the BOP's annual review of that facility in August 2014, the BOP reported significant adverse findings in health services:

> There were inadequate controls in the clinical care and staffing area of Health Services to ensure compliance with established procedures and practices. These inadequacies create a lack of appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment. Many issues from previous [monitoring] have not been corrected. Medical needs and documentation were incomplete, including reports.

*Id.* at 33-34 (alteration in original) (citation omitted).

The OIG's findings during its site visit were not unique to that prison. According to a December 2016 audit report, the OIG conducted an audit at a CoreCivic facility in Natchez, Mississippi, and discovered that the facility had suffered from extensive medical understaffing. Between December 2012 and September 2015, the approximately 2,300-bed facility was staffed with only a single physician 43% of the time, and a single dentist 69% of the time, which resulted in incarcerated person-to-provider ratios that were about double those specified in BOP program statements. *See* U.S. Dep't of Just., Off. of Inspector Gen., Audit of the Fed. Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi 7-8 (Dec. 2016), https://www.oversight.gov/sites/default/files/oig-reports/a1708.pdf.

Rampant medical mismanagement in private prisons is not just a contractual problem—it impacts the people in their custody. In 2019, the House Committee on Oversight and Reform investigated nearly two dozen private detention facilities across six states. The committee concluded that medical mismanagement— including, but not limited to, the facilities' failure to "provide necessary medical care to detainees with serious and chronic medical conditions, along with critical medical staff shortages"—may have contributed to the deaths of several people. *See* U.S. House Committee on Oversight and Reform and Subcommittee on Civil Rights and Civil Liberties, Deaths and Deficient Medical Care by For-Profit

13

Detention Contractors 1-3 (2020),

https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/20

20-09-24.%20Staff%20Report%20on%20ICE%20Contractors.pdf.  The

committee's investigative report references specific instances of avoidable deaths

in CoreCivic facilities.  *See, e.g.*, *id.* at 2, 9, 11-12.

Anecdotal reports confirm the gross inadequacy of medical care available to

people in custody in private prisons.  For example, Seth Freed Wessler, a reporter

for the Nation who investigated healthcare at private prisons, obtained more than

9,000 pages of medical records that private contractors had submitted to the BOP,

including the case files for 103 people who had died in custody in federal private

prisons through 2014.  Each of those case files was reviewed by at least two

independent doctors, who rendered opinions on the adequacy of medical care

provided.  Of the 78 case files that provided enough information to render a

judgment, the reviewing doctors found that 37 files (47%) contained indications of

inadequate medical care.  And in 25 of those cases, the reviewing doctors opined

that the inadequacies likely contributed to the premature deaths.  Seth Freed

Wessler, *Separate, Unequal, and Deadly,* TYPE (Jan. 27, 2016),

https://www.typeinvestigations.org/investigation/2016/01/27/separate-unequal-

deadly/.

Wessler's investigatory report describes the death of Nestor Garay, who was detained at a private detention center in West Texas.  Garay, who had suffered a stroke during the night, eventually received medical attention from the lone nurse on staff.  The nurse phoned the physician's assistant for guidance, who incorrectly assumed that Garay had suffered a seizure and instructed the nurse to administer a heavy dose of an anti-seizure drug.  When Garay could not swallow the pills, the nurse again called the on-call assistant, who instructed him to send Garay "back to unit and place on mattress on floor" and follow up with a physician's assistant or nurse practitioner in the morning.  It was not until the next morning that the facility's medical staff ordered that Garay be taken to the hospital, where he was declared brain-dead upon his arrival.  *See id.*

Shane Bauer, a journalist who worked for four months as a prison guard at a CoreCivic facility in Louisiana, has also recounted numerous instances of inadequate medical care.  According to Bauer, one man made at least nine requests to see a doctor over a four-month period due to sore spots on his feet, swelling, oozing pus, and severe pain.  Medical personnel told the man there was nothing wrong, and even threatened to write him up for malingering if he made another emergency medical request.  When the man's numbness spread and his fingers and toes turned black, he was sent to the local hospital, where medical professionals were left with no choice but to amputate his legs.  Shane Bauer, American Prison:

A Reporter's Undercover Journey into the Business of Punishment 49 (2019).

Medical personnel at the CoreCivic facility reportedly refused to send another man

with fluid on his lungs to the hospital, even though he was "almost passed out." *Id.*

at 204.  According to Bauer, the situation presented a financial "dilemma" for

CoreCivic, which is contractually obligated to both pay for the hospital stay of a

person in custody and to shoulder the expense of sending guards to watch over

him.  *Id.*

The EDC has also come under scrutiny for providing inadequate medical

care to people in custody.  The New York Times reported that an individual named

Boubacar Bah died of significant head trauma sustained while at the EDC.  Instead

of calling an ambulance, CoreCivic staff placed him in solitary confinement,

shackled, for over 13 hours.  Nina Bernstein, *Few Details on Immigrants Who

Died in Custody*, N.Y. Times (May 5, 2008),

https://www.nytimes.com/2008/05/05/nyregion/05detain.html.  Another news

outlet reported that an individual named Abdikadir Mohamed complained of chest

pain to medical staff at the EDC over an eight-month period, but was only given

pain medication and antacids.  He was hospitalized after his pain became "so

severe he was unable to get out of bed, eat or use the bathroom."  He was

diagnosed with tuberculosis, and remained in the hospital for 10 days.  Hannan

Adely, *Somali Immigrant Detained in NJ Fights to Stay with Family in US*,

NorthJersey.com (June 19, 2019),

https://www.northjersey.com/story/news/2019/06/10/somali-man-immigration-

detention-nj/1385862001/.

CoreCivic has been the subject of several lawsuits arising from shockingly

inadequate medical care in its facilities.  For example, CoreCivic settled a case for

$250,000 after a pregnant woman in a Nashville jail complained of vaginal

bleeding and severe abdominal pain.  Medical staff wanted "proof" that the

woman's complaints were legitimate, so they placed her in solitary confinement

and turned off the water so that her blood loss could be "monitored."  Medical staff

did nothing to help her pain, and the toilet in her solitary unit filled with blood.

The woman was not taken to the hospital until the next day, at which point she was

fully dilated.  She gave birth and was immediately sedated.  When she woke up,

she learned that her baby had died.  *See* Bauer, American Prison: A Reporter's

Undercover Journey into the Business of Punishment, *supra*, at 206.  In 2014,

CoreCivic settled a similar lawsuit for $690,000 after a pregnant woman being held

in a Chattanooga jail for a misdemeanor offense went into labor.  She was placed in

a cell with no mattress for over two hours as she bled heavily.  Employees did not

call an ambulance until about five hours after the woman asked for help.  Shortly

after she gave birth, the baby died.  Derek Gilna, *$690,000 Settlement in HRDC

Suit Over Death of Prisoner's Baby at CCA Jail*, Prison Legal News (June 8,

2015), https://www.prisonlegalnews.org/news/2015/

jun/8/690000-settlement-hrdc-suit-over-death-prisoners-baby-cca-jail/.

Significantly, although the facility's warden testified in court that surveillance

footage showed no signs of an emergency, CoreCivic claimed that the footage had

been "accidentally erased" and could not be reviewed.  Bauer, American Prison: A

Reporter's Undercover Journey into the Business of Punishment, *supra*, at 205-06.

The company was eventually sanctioned for destroying evidence.  *Id.* at 206.

## IV.    Private prisons pose a challenge to transparency and public accountability.

While the foregoing authorities show that private prisons suffer from

significant shortcomings, both empirical and anecdotal evidence strongly suggest

that these shortcomings are directly linked to a lack of transparency and

accountability.

The lack of transparency "is compounded in private prisons" because

private-prison companies are largely shielded from public-records laws.  Anna

Gunderson, Captive Market: Accountability and State Prison Privatization 7-8

(2022).  Some states have sought to increase transparency within private prisons,

requiring private-prison companies like CoreCivic to comply with state open-

records laws.  Lauren-Brooke Eisen, Inside Private Prisons: An American Dilemma

in the Age of Mass Incarceration 181 (2018).  At the federal level, however,

transparency is effectively non-existent because private-prison companies are not

subject to the federal Freedom of Information Act ("FOIA").  And legislation that

would require private-prison companies to comply with FOIA—namely, the

Private Prison Information Act—has consistently died in committee, despite

having been introduced in every congressional session since 2005.  *Id.* at 128.  As

such, "federally funded private prisons, holding mostly immigrants awaiting

deportation, remain a black box."  Christie Thompson, *Everything You Ever*

*Wanted to Know About Private Prisons . . . is None of Your Damn Business,*

Marshall Project (Dec. 18, 2014),

https://www.themarshallproject.org/2014/12/18/everything-you-ever-wanted-to-

know-about-private-prisons.

　　　A conflict of interest necessarily plagues private prisons: "while public

managers of prisons are responsible to citizens through the legislative and

executive branches, private managers are primarily responsible to their

shareholders," which creates cost-cutting incentives at the expense of health and

safety.  Gunderson, *supra*, at 6.  As Shane Bauer reported following his

employment as a CoreCivic prison guard: "CoreCivic prisons aren't nearly as

brutal [as] labor camps under convict leasing or the early 20th century state-run

plantations, *but they still go to grotesque lengths to make a dollar*."  Shane Bauer,

*The True History of America's Private Prison Industry*, TIME (Sept. 25, 2018),

https://time.com/5405158/the-true-history-of-americas-private-prison-industry/

(emphasis added).  Inevitably, then, "[p]rivate prison corporations' economic motives clash with social and political goals of inmate rehabilitation, crime reduction, and decreased recidivism."  Angela E. Addae, *Challenging the Constitutionality of Private Prisons: Insights from Israel*, 25 Wm. & Mary J. Women & L. 527, 531 (2019).

CoreCivic's economic motives—and its attempts to interfere with the democratic process—jump from the pages of its 2022 Form 10-K filed with the Securities and Exchange Commission.  Indeed, the company identifies the following as potential "risk factors" to its business:

> The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, the expansion of alternatives to incarceration and detention, leniency in conviction or parole standards and sentencing practices through the decriminalization of certain activities that are currently proscribed by criminal laws. For instance, *any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional or detention facilities to house them*. Immigration reform laws are currently a focus for legislators and politicians at the federal, state, and local level. *Legislation has also been proposed in numerous jurisdictions that could lower minimum sentences for some non-violent crimes and make more inmates eligible for early release based on good behavior.*

CoreCivic, 2022 Annual Report, Form 10-K, https://ir.corecivic.com/static-files/2786ec23-1bb7-4e6e-a445-8692ac0f4a24 (emphasis added).  One of CoreCivic's founders has stated that private prisons are no different than any other for-profit business: "[W]e could sell [prison] privatization as a solution, you sell it

*just like you were selling cars, or real estate, or hamburgers*." Gunderson, *supra*, at 10 (emphasis added) (second alteration in original) (quoting Thomas W. Beasley, co-founder of CoreCivic).

Studies show that private prison companies like CoreCivic routinely implement cost-saving measures, despite the adverse effect those measures have on health and safety. For example, according to the 2019 census—the most recent government statistic that addresses prison staffing—the overall ratio of incarcerated people to security staff is 5-to-1 in public facilities and 9-to-1 in private facilities. *See* Bureau of Just. Statistics, Census of State and Federal Correctional Facilities, 2019 3 (Nov. 2021), https://bjs.ojp.gov/content/pub/pdf/csfacf19st.pdf. A comparison with the 2005 census shows that staffing ratios in public facilities had not changed between 2005 and 2019, but the staffing in private prisons had significantly deteriorated from the 6.9-to-1 ratio in 2005. *See* Bureau of Just. Statistics, Census of State and Federal Correctional Facilities, 2005 5 (Oct. 2008), https://bjs.ojp.gov/content/pub/pdf/csfcf05.pdf.

Studies also show that, on average, private correctional officers are paid less than their government-employed counterparts. According to one study, private-officer salaries in 2015 were about $7,000 lower than those of public officers. *See* Megan Mumford, Diane Whitmore Schanzenbach, & Ryan Nunn, *The Economics of Private Prisons*, Hamilton Project 4 (Oct. 2016), https://www.hamiltonproject.

org/wp-content/uploads/2023/01/economics_of_private_prisons.pdf.  Another

study reached a similar conclusion, finding that the salary differential was slightly

lower at $6,000.  *See* Noah Glick, *As Private Prisons Push to Keep Costs Down,*

*Workers Can Pay the Price*, Pulitzer Ctr. (Mar. 10, 2020),

https://pulitzercenter.org/stories/private-prisons-push-keep-costs-down-workers-

can-pay-price.  Mr. Bauer recounted the statement of a CoreCivic supervisor:

> People say a lot of negative things about [CoreCivic] . . . That we'll hire
> anybody. That we are scraping the bottom of the barrel. Which is not
> really true, *but if you come here and you breathing and you got a valid*
> *driver's license and you willing to work, then we're willing to hire you*.

Bauer*,* American Prison: A Reporter's Undercover Journey into the Business of

Punishment, *supra*, at 48 (emphasis added).

Research also suggests that officers in private prisons on average receive

less training than their government-employed counterparts.  According to one

study published in the Federal Probation journal, the private sector requires

correctional officers to undergo 33% fewer hours of training.  Private sector

officers receive an average of 174 hours of annual pre-service training and 42

hours of annual in-service training, whereas the public sector requires an average

of 232 and 42 hours of training, respectively.  Curtis R. Blakeley & Vic W.

Bumphus, *Private and Public Sector Prisons–A Comparison of Select*

*Characteristics*, Federal Probation 4 (2000), https://www.uscourts.gov/sites/

default/files/68_1_5_0.pdf.  Another researcher reported that private-prison

officers received 35% fewer pre-service training hours than their public

counterparts.  Ira P. Robbins, *Privatization of Corrections: A Violation of U.S.*

*Domestic Law, International Human Rights, and Good Sense*, 13 Hum. Rts. Brief

12, 13 (2006), https://digitalcommons.wcl.american.edu/cgi/viewcontent.

cgi?article=1275&context=hrbrief.

A troubling lawsuit out of Idaho not only demonstrates the causal link

between inadequate staffing and unsafe conditions in private prisons, but also

reveals that the lack of transparency in private prisons is far from a theoretical

problem.  In 2008, the Idaho Department of Corrections conducted a study

showing that a private prison operated by CoreCivic—often referred to by people

in custody as "Gladiator School"—had four-times as many assaults between people

in custody than Idaho's seven other public prisons combined.  *See* Eisen, *supra*, at

179.  In 2010, the ACLU filed a federal class action alleging that CoreCivic

officials had facilitated a culture of rampant violence within the facility.  The case

settled in 2011, with CoreCivic agreeing to a two-year monitoring period to ensure

compliance with certain staffing requirements.  Yet, a 2013 Idaho state-police

investigation revealed that CoreCivic had significantly overrepresented staffing

hours at the facility during the monitoring period; indeed, the state had paid

CoreCivic for almost 4,800 staffing hours for positions that had in fact been

vacant.  *See* Prison Legal News, *CCA Admits to Falsified Staffing Records,*

*Violating Contract with Idaho DOC* (May 15, 2013),

https://www.prisonlegalnews.org/

news/2013/may/15/cca-admits-to-falsified-staffing-records-violating-contract-

with-idaho-doc/.  The court held CoreCivic in contempt, finding a "persistent

failure to fill required mandatory positions, along with a pattern of [CoreCivic]

staff falsifying rosters to make it appear that all posts were filled."  Mike Tartaglia,

*Private Prisons, Private Records,* 94 B.U. L. Rev. 1689, 1712 (2014) (citation

omitted).  It also chastised CoreCivic for failing to correct its staffing deficiencies

and improve its recordkeeping despite being subject to a court-ordered settlement

agreement.  *Id.* at 1712-13.[4]

 To be sure, private-prison companies are not entirely free from regulation.

They are required, because of their government contracts, to comply with standards

promulgated by the American Correctional Association ("ACA") and the National

---

[4] CoreCivic's "cover up" at its Idaho facility was not an isolated occurrence.  The
1998 report to the Attorney General on CoreCivic's Northeast Ohio Correctional
Center documented a similar pattern.  *See* U.S. Dep't of Just., Off. of Att'y Gen.,
Report to the Attorney General Inspection and Review of the Northeast Ohio
Correctional Center, *supra* ("On several occasions, Review Team staff were
informed by [CoreCivic] administrators that written reports were not done after
critical incidents on advice of corporate legal counsel.  It is apparent that more
importance was given to concerns for documents turning up in subsequent
litigation than with correcting past problems or with preventing future ones in
various facilities.").

Commission on Correctional Health Care ("NCCHC").[5]  They are also subject to some oversight by the state or federal government.  *See* Eisen, *supra*, at 198.  But these measures have repeatedly been proven insufficient to protect against neglect and abuse in private prisons.

For example, unlike public institutions, private facilities need not report how many people they hold in isolation; nor are they required to release the policies dictating who is placed in isolation.  Private prisons are, however, contractually obligated to comply with ACA standards governing solitary confinement.  *See id.* at 196-97.  In connection with the OIG's 2016 review of contract monitoring in private prisons, the OIG visited three private federal prisons and found that two of them were housing "all newly received inmates" in solitary due to lack of bed space, which is inconsistent with ACA standards and BOP policy.  One of the institutions housed newly received people in isolation for an average of 20 days, the other for 21 days.  U.S. Dep't of Just., Off. of Inspector Gen., Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons, *supra*, at 29.  The

---

[5] The ACA may be to blame, at least in part, for the accountability problem in private prisons.  According to a recent investigatory report, the ACA is "riddled with conflicts of interest, lacks transparency, and is subject to zero accountability even though millions in taxpayer dollars [] flow to the ACA and private prison companies."  Off. of Senator Elizabeth Warren, The Accreditation Con: A Broken Prison and Detention Facility Accreditation System That Puts Profits Over People 1 (Dec. 2020), https://www.warren.senate.gov/imo/media/doc/The%20Accreditation%20Con%20-%20December%202020.pdf.

United Nations Standard Minimum Rules for the Treatment of Prisoners

characterize solitary confinement over 15 consecutive days as "torture or other

cruel, inhuman or degrading treatment or punishment." United Nations Office on

Drugs and Crime, The United Nations Standard Minimum Rules for the Treatment

of Prisoners (the Nelson Mandela Rules) 13-14,

https://www.unodc.org/documents/justice-and-prison-

reform/Nelson_Mandela_Rules-E-ebook.pdf.

Public-interest organizations have also reported widespread misuse of

solitary confinement in violation of ACA standards. For example, Detention Watch

Network has reported "consistent" trends in private detention facilities regarding

the use of solitary confinement "due to overcrowding and as inappropriate or

disproportionate punishment." Detention Watch Network, A Toxic Relationship:

Private Prisons and U.S. Immigration Detention 5 (2016),

https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20

Relationship_DWN.pdf. So, too, has the ACLU. According to a 2014 report, the

ACLU reviewed five contracts and one solicitation for private prisons in Texas and

discovered that each "*require[s]* the prisons to use 10% of their bed space for

isolation cells," irrespective of any purported need—"nearly double the rate of

isolated confinement in BOP-managed institutions." *See* ACLU, Warehoused and

Forgotten: Immigrants Trapped in Our Shadow Private Prison System, 3-4 (2014),

https://www.aclu.org/documents/warehoused-and-forgotten-immigrants-trapped-our-shadow-private-prison-system.  Unsurprisingly, people housed in those institutions reported being sent to solitary confinement for nearly anything—from complaining about food or medical care, to helping other people in custody draft grievances or file lawsuits.  *Id.* at 4.  They also reported a widespread staff practice of sending newly arrived people to solitary confinement "for days or weeks" due to lack of space available in general-population dorms.  *Id.* at 32.

Additionally, anecdotal reports suggest that private prisons misuse lockdown procedures, in violation of BOP policy, to compensate for chronic understaffing.  For example, Shane Bauer recounted one occasion where his CoreCivic facility went on lockdown not because of any major disturbance, but because there "just [we]ren't enough people to run the prison."  Bauer, American Prison: A Reporter's Undercover Journey into the Business of Punishment, *supra*, at 113.  Another reporter noted that an Oklahoma CoreCivic prison, which had reported more than triple the stabbings from 2021 through July 2022, was "[locking] down constantly" for staff shortages.  Ashlynd Huffman, *Stabbings Soar at Southeast Oklahoma Private Prison*, Oklahoma Watch (Sept. 16, 2022) (alteration in original), https://oklahomawatch.org/2022/09/16/stabbings-soar-at-southeast-oklahoma-private-prison/.

Unfortunately, privately run immigration-detention centers also suffer from a woeful lack of oversight. ICE detention facilities are subject to Performance-Based National Detention Standards (the "PBNDS"). Although such standards are referenced in facility contracts, they are not codified, meaning that ICE is not legally bound to follow them. *See* Am. Immigr. Counsel, *Oversight of Immigration Detention: An Overview* (May 16, 2022), https://www.americanimmigrationcouncil.org/research/oversight-immigration-detention-overview.

In 2017, the DHS Office for the Civil Rights and Civil Liberties ("CRCL") investigated the Stewart Detention Center, a CoreCivic facility in Georgia, and found that the facility was noncompliant with the PBNDS medical standards in key areas. For example, the CRCL found that there were not enough medical exam rooms and provider offices, which resulted in the routine use of solitary-confinement units for medical overflow in violation of the PBNDS. The CRCL also reported that the cleanliness of medical spaces was well below PBNDS standards, noting that "the floor, walls, and door jams" in the medical unit were not properly cleaned and disinfected, and that several surfaces were in such disrepair that they could not be properly sanitized without first being repaired or replaced. U.S. Dep't of Homeland Sec., Off. for Civil Rights and Civil Liberties, Stewart Detention Center Recommendation on Complaint 2-3 (May 18, 2017),

https://www.dhs.gov/sites/default/files/publications/stewart-detention-center_05-18-17.pdf.

Moreover, in or about 2019, the Department of Homeland Security OIG (the "DHS OIG") conducted an investigation to determine (i) whether ICE contracting tools adequately hold immigration-detention facilities to applicable detention standards; and (ii) whether ICE disciplines facilities that fail to maintain those standards. The DHS OIG found that although ICE "employs a multilayered system to manage and oversee detention contracts, ICE does not adequately hold detention facility contracts accountable for not meeting performance standards"; nor does it "adequately share information about ICE detention contracts with key officials." Dep't of Homeland Sec., Off. of Inspector Gen., ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards 1 (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf. The DHS OIG also reported that although ICE uses a quality-assurance plan to ensure that detention facilities meet requisite performance standards, only 28 of the 106 contracts that the DHS OIG reviewed contained the plan. And because the plan provides instructions for the imposition of discipline and financial penalties, ICE had rendered itself unable to hold detention facilities accountable for their noncompliance. Indeed, between

October 1, 2015, and June 30, 2018, ICE imposed financial penalties only twice, despite thousands of documented instances of compliance failures. *See id.*

In short, a lack of transparency and accountability plagues private prisons. It also creates incentives for neglect and a perfect storm for abuse. As one author wrote, "[t]he combination of ruthless cost cutting . . . and lack of transparency has created a space where profit overtakes minimal prisoner health requirements, resulting in malpractice, mistreatment, and death." Laura I. Appleman, *Cashing in on Convicts: Privatization, Punishment, and the People,* 2018 Utah L. Rev. 579, 598 (2018). Although government-run prisons are far from "bastions of inmate health, the privatization of prisons adds layers of bureaucracy that make it even more difficult to hold . . . officials accountable for the very real horrors that occur within prisons." Gunderson, *supra*, at 130.

Given the extensive evidence that private prisons cause widespread mental and physical suffering to those detained in them, the hazards for those who work in them, and the clear alternatives to private detention, New Jersey's intervention to protect the health and safety of people detained within its borders was reasonable; indeed, it was critical.

# CONCLUSION

For these reasons, and for the reasons expressed in the State's brief, AB 5207

is a critically important use of New Jersey's police powers and is neither

preempted nor unenforceable due to intergovernmental immunity.

Date: January 10, 2024

*/s/ David N. Cinotti*
David N. Cinotti
Brendan M. Walsh
Dominique Kilmartin
**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
Court Plaza South
21 Main Street, Suite 200
Hackensack, NJ 07601

*Attorneys for Amicus Curiae Pax Christi USA*

## CERTIFICATION OF COMPLIANCE WITH FED. R. APP. P. 32(g)(1)

I, David N. Cinotti, of Pashman Stein Walder Hayden, P.C., attorneys of record for amicus curiae Pax Christi USA, hereby certifies as follows:

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,174 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word 365, Version 2311 in 14-point, Times New Roman font.

Date: January 10, 2024

*/s/ David N. Cinotti*
*David N. Cinotti*

**CERTIFICATION OF BAR MEMBERSHIP**

I hereby certify that I am a member in good standing of the bar of the United

States Court of Appeals for the Third Circuit.

Date: January 10, 2024                    */s/ David N. Cinotti*
                                          David N. Cinotti


**CERTIFICATION OF SERVICE**

I hereby certify that on January 10, 2024, the foregoing brief was filed via

CM/ECF.  Service was accomplished on all parties or their counsel of record via

CM/ECF.

Date: January 10, 2024                    */s/ David N. Cinotti*
                                          David N. Cinotti