# No. 23-2598

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

## CORECIVIC, INC.

*Plaintiff-Appellee,*

v.

## GOVERNOR OF NEW JERSEY, *et al*.,

*Defendants-Appellants*

On Appeal from the United States District Court
for the District of New Jersey
(No. 3:23-CV-00967, Judge Robert Kirsch)

## BRIEF OF 28 COMMUNITY ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS, URGING REVERSAL

Jeanne LoCicero
Farrin R. Anello
Molly K.C. Linhorst
American Civil Liberties Union
  of New Jersey Foundation
P.O. Box 32159
Newark, New Jersey
(973) 854-1715
jlocicero@aclu-nj.org

Lawrence S. Lustberg
Julia Bradley
Gibbons P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT .....................................................................1

INTEREST OF AMICI CURIAE.....................................................................3

I.   THE STATE OF NEW JERSEY HAS AN INTEREST, GROUNDED
     IN TRADITIONAL STATE POWERS, IN REGULATING HEALTH
     AND SAFETY CONDITIONS IN IMMIGRATION DETENTION
     FACILITIES WITHIN ITS BORDERS.......................................................3

     A.   Regulating Health and Safety Concerns in Immigration
          Detention Fall Squarely Within the States' Traditional Police
          Powers. ...........................................................................................3

     B.   Immigration Detention Presents Health and Safety Risks to
          People in New Jersey. ....................................................................10

          1.   Immigration detention presents myriad health risks to
               people in ICE custody................................................................11

          2.   The abuse of solitary confinement in immigration
               detention puts people at risk of severe health
               consequences.............................................................................177

          3.   Private immigration detention facilities present
               particularly significant health and safety risks to people
               who are detained. .....................................................................19

          4.   The risks to health and safety that arise in detention
               centers do not remain contained in the facilities. ....................22

CONCLUSION .............................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

Am. Pet. for Writ of Habeas Corpus and Compl.,
*Aganan et al. v. Rodriguez et al.*, No. 2:20-cv-05922 (May 29,
2020) ........................................................................................................21, 22

*Brooks v. Florida*,
389 U.S. 413 (1967).............................................................................18

*Chao Chen v. Geo Group, Inc.*,
287 F. Supp. 3d 1158 (W.D. Wash. 2017) .........................................9

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987)..................................................................................8

*Holk v. Snapple Beverage Corp.*,
575 F.3d 329 (3d Cir. 2009) ................................................................4

*In re Medley*,
134 U.S. 160 (1890).............................................................................18

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)..............................................................................3

*Metropolitan Life Ins. Co. v. Massachusetts*,
471 U.S. 724 (1985)..............................................................................4

*Novoa v. GEO Group, Inc.*,
No. 17-2514 JGB-SHK, 2022 WL 2189626 (C.D. Cal. Jan. 25,
2022) ......................................................................................................9

*Owino v. CoreCivic, Inc.*,
No. 17-1112 JLS-SBC, 2018 WL 2193644 (S.D. Cal. May 14,
2018) ......................................................................................................9

*Palakovic v. Wetzel*,
854 F.3d 209 (3d Cir. 2017) ..............................................................18

*Washington v. Geo Group, Inc.*,
No. 17-5806-RJB, 2021 WL 5824570 (W.D. Wash. Dec. 8, 2021),
*appeal filed*, No. 21-36025 ..................................................................9

*Williams v. Sec'y Pennsylvania Dep't of Corr.*,
848 F.3d 549 (3d Cir. 2017) ................................................................18

**Statutes and Regulations**

Admin. Code of the County of Essex, §§ 27-1–27-9 (2019 & 2021)......................7

Exec. Order No. 14006, 86 Fed. Reg. 7483 (Jan. 26, 2021)..................................20

N.J. Admin. Code 5:15-3.8 .................................................................8

N.J. Admin. Code 10A:31-10.9 ............................................................8

N.J. Admin. Code 10A:31-11.1 ............................................................8

N.J. Admin. Code 10A:31-12.1–12.8 .......................................................8

N.J. Admin. Code 10A:31-13.2 ............................................................8

N.J. Stat. Ann. § 26:2B-40 ..............................................................8

N.J. Stat. Ann. § 30:4-8.15.............................................................1, 2

N.J. Stat. Ann. § 30:4-82.6(b).........................................................6

N.J. Stat. Ann. § 30:4-82.7............................................................6

P.L. 2019, c. 160 ......................................................................5

**Other Authorities**

Altaf Saadi et al., *Cumulative Risk of Immigration Prison Conditions
on Health Outcomes Among Detained Immigrants in California*, 9
J. of Racial & Ethnic Health Disparities 2158 (2022),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8628823/.............................13

American Civil Liberties Union, Detention Watch Network, and Nat'l
Immigrant Justice Center, *Fatal Neglect: How ICE Ignores Deaths
in Detention* (Feb. 2016), https://www.aclu.org/wp-
content/uploads/legal-documents/fatal_neglect_acludwnnijc.pdf.....................21

American Friends Service Committee, *Free Them All: The Double Crisis of Human Caging and COVID-19 in New Jersey and How to End It* (Sept. 2022), https://afsc.org/sites/default/files/2023-03/AFSC%20-%20Free%20Them%20All%20NJ%20report%202022_web.pdf ............................................... 21

Andrew Lyubarsky & Juan Caballero, New Jersey Advocates for Immigrant Detainees, *23 Hours In The Box: Solitary Confinement in New Jersey Immigration Detention* (June 2015), https://www.prisonpolicy.org/scans/njaid/23_hours_in_the_box.pdf ................................................. 18, 19

Annie Correal & Michael Gold, *After Years of Protests, a New Jersey County Ends Its ICE Jail Contract*, N.Y. Times (May 1, 2021), https://www.nytimes.com/2021/05/01/nyregion/essex-ice.html ......................... 7

Caroline H. Lee et al., *Individuals' Experiences in U.S. Immigration Detention During the Early Period of the COVID-19 Pandemic*, 11 Health & Justice 1 (Feb. 2023), https://healthandjusticejournal.biomedcentral.com/articles/10.1186/s40352-023-00211-2 ..................................... 16

Chanelle Diaz & Elizabeth Chuang, *When Immigration Detention Makes Healthy People Sick*, NorthJersey.com (June 29, 2019), https://www.northjersey.com/story/opinion/contributors/2019/06/29/when-immigration-detention-makes-healthy-people-sick-opinion/1597541001/ ....................................... 24, 25

Chanelle Diaz et al., *Harmful by Design—a Qualitative Study of the Health Impacts of Immigration Detention*, 38 J. Gen. Intern. Med. 2030 (2022) .................................... 10, 13, 14

Dep't Homeland Sec., Off. Inspector Gen., *Concerns about ICE Detainee Treatment at Four Detention Facilities* (June 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf ....................................... 7

Dep't Homeland Sec., Off. Inspector Gen., *Issues Requiring Attention at the Essex County Correctional Facility in Newark, New Jersey* (Feb. 13, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-20-Feb19.pdf ..................................... 7, 12

Detention Watch Network et al., *Anthology of Abuse: End Three Decades of Abuse at the Elizabeth Detention Center* (June 2023), https://www.detentionwatchnetwork.org/sites/default/files/reports/ Elizabeth-%20Anthology%20of%20Abuse%20(1).pdf.....................................20

Eleni Bakst & Olga Byrne, Human Rights First, *Ailing Justice: New Jersey: Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention* (Feb. 2018), https://humanrightsfirst.org/wp-content/uploads/2022/10/Ailing-Justice-NJ.pdf...............................................................................19, 20, 21

*Essex County Announces Civilian Task Force to Oversee Immigration Detention Facility*, TAP into Newark (Dec. 12, 2019), https://www.tapinto.net/towns/newark/sections/government/article s/essex-county-announces-civilian-task-force-to-oversee-immigration-detention-facility..............................................................7

*Examining Best Practices for Incarceration and Detention During COVID-19: Hearing Before the S. Comm. on the Judiciary*, 116 Cong. 2 (June 2, 2020)...............................................................................16

Freedom for Immigrants, *Trafficked and Tortured: Mapping ICE Transfers* (Feb. 2023), https://static1.squarespace.com/static/5a33042eb078691c386e7bce /t/63ed9236ee82156a4608eba2/1676513859587/FInal+Report_FFI _T%26T_021523.pdf.........................................................................15

Gregory Hooks & Bob Libal, *Detention Watch Network, Hotbeds of Infection: How ICE Detention Contributed to the Spread of COVID-19 in the United States* (Dec. 2020), https://www.detentionwatchnetwork.org/sites/default/files/reports/ DWN_Hotbeds%20of%20Infection_2020_FOR%20WEB.pdf .......................23

Hamed Aleaziz, *Federal Officials Now Say That Transferring Detainees Between Jails Holding Immigrants Contributed to Coronavirus Outbreaks*, BuzzFeed News (Oct. 6, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/dhs-report-detainee-transfers-covid-spread.........................................................17

Human Rights First, *Detention of Asylum Seekers in New Jersey* (Nov. 2016), https://humanrightsfirst.org/wp-content/uploads/2017/04/hrf-detention-asylum-seekers-nj-nov2016.pdf ...................................................................14

Human Rights Watch, *Systemic Indifference: Dangerous & Substandard Medical Care in U.S. Immigration Detention* (May 2017), https://www.hrw.org/sites/default/files/report_pdf/usimmigration0 517_web_0.pdf...............................................................11, 15

Inter-Am. Comm'n on Human Rts., Report on Immigration in the United States: Detention and Due Process (2010), https://www.oas.org/en/iachr/migrants/docs/pdf/migrants2011.pdf ............14, 15

Isabela Dias, *A Judge Just Halted Efforts to End Immigration Detention in New Jersey*, Mother Jones (Aug. 30, 2023), https://www.motherjones.com/politics/2023/08/ice-corecivic-judge-halts-efforts-to-end-new-jersey-immigration-detention/...........................21

Isabelle Niu & Emily Rhyne, *4 Takeaways from Our Investigation into ICE's Mishandling of Covid-19*, N.Y. Times (Apr. 26, 2021), https://www.nytimes.com/2021/04/25/video/immigration-detention-covid-takeaways.html...................................................23

John Sullivan, *Talks Are Held on Reopening of Alien Unit*, N.Y. Times (Jan. 19, 1996), https://www.nytimes.com/1996/01/19/nyregion/talks-are-held-on-reopening-of-alien-unit.html...............................................20

Matt Katz, *ICE Jailer in New Jersey Is Sued By Its Landlord, Claiming Unsafe Conditions*, WNYC (May 3, 2021), https://gothamist.com/news/ice-jailer-new-jersey-sued-its-landlord-claiming-unsafe-conditions...............................................22

Michaelangelo Conte, *New Board to Review Medical and Mental Healthcare at Hudson County Jail*, NJ.com (Nov. 13, 2018), https://www.nj.com/hudson/2018/11/new_board_review_medical_and_mental_health_care_fo.html...........................................8

National Immigrant Justice Center, *Roadmap to Dismantle the U.S. Immigration Detention System* (July 28, 2021), https://immigrantjustice.org/research-items/white-paper-roadmap-dismantle-us-immigration-detention-system ......................................................15

New Jersey Advocates for Immigrant Detainees et al., *Isolated in Essex: Punishing Immigrants through Solitary Confinement* (June 2016), https://www.prisonpolicy.org/scans/afsc/isolated_in_essex.pdf ..................18, 19

Nicole J. Boardman et al., *Pulmonary Tuberculosis Disease Among Immigrant Detainees: Rapid Disease Detection, High Prevalence of Asymptomatic Disease, and Implications for Tuberculosis Prevention*, 73 Clinical Infectious Diseases 115 (July 1, 2021), https://academic.oup.com/cid/article/73/1/115/5820624 ....................................24

Nina Bernstein, *Few Details on Immigrants Who Died in Custody*, N.Y. Times (May 5, 2008), https://www.nytimes.com/2008/05/05/nyregion/05detain.html .........................21

Parsa Erfani et al., *COVID-19 Testing and Cases in Immigration Detention Centers, April-August 2020*, 325 J. Am. Med. Ass'n 182 (2021) ......................................................................................................................16

Rebecca B. Hershow et al., *COVID-19 Burden in Adult Correctional or Detention Facilities and the Surrounding Communities, January 1, 2020–July 20, 2021*, 29 J. Correct. Health Care 241 (May 10, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10527881/ .................17

Sarah R. Tosh et al., *Migrant Detention and COVID-19: Pandemic Responses in Four New Jersey Detention Centers*, 9 J. Migration & Hum. Sec. 44 (2021) ..................................................................................................17

Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH, Letter to House and Senate Comms. on Homeland Sec. at 4 (Mar. 19, 2020) .................23

Timothy F. Jones et al., *Increased Incidence of the Outbreak Strain of Mycobacterium Tuberculosis in the Surrounding Community After an Outbreak in a Jail*, 96 Southern Med. J. 155 (Feb. 2003) ............................24

Tom Dreisbach, *Government's Own Experts Found "Barbaric" and "Negligent" Conditions in ICE Detention*, NPR (Aug. 16, 2023), https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions......11, 12, 15

U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *Medical Expert Report: Aurora Detention Facility also known as the Denver Contract Detention Facility* (Sept. 2018), https://s3.documentcloud.org/documents/23814503/13-denver-contract.pdf ...............................................................................................12

U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *Medical Expert Report: Bergen County Jail* (April 2018), https://s3.documentcloud.org/documents/23814498/8-bergen-county.pdf .................................................................................................11

U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *On-site Investigation Report: Stewart Detention Center* (Feb. 8, 2017), https://s3.documentcloud.org/documents/23873571/26-stewart-detention-center.pdf ................................................................12

U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *Onsite Investigation Report: Calhoun County Correctional Center* (Aug. 8, 2019), https://s3.documentcloud.org/documents/23814501/11-calhoun-county.pdf .................................................................................................11

U.S. Dep't of Homeland Sec., Off. of Professional Responsibility, *External Reviews and Analysis Unit Detainee Death Review: Kamyar Samimi* (May 22, 2018), https://s3.documentcloud.org/documents/23905031/kamyar-samimi-detainee-death-review.pdf ...................................................12

U.S. Marshals Service, Federal Performance-Based National Detention Standards Handbook (May 2022) .......................................................5

World Health Org., Addressing the Health Challenges in Immigration Detention, and Alternatives to Detention (2022), https://iris.who.int/bitstream/handle/10665/353569/9789289057929-eng.pdf?sequence=2 ......................................................................14

## CORPORATE DISCLOSURE STATEMENT

The American Civil Liberties Union of New Jersey ("ACLU-NJ") is a private, nonprofit corporation organized under the laws of the State of New Jersey. ACLU-NJ states that it does not have a parent company, it does not issue stock, and thus no corporation owns 10% or more of its stock.

*Amici* are either private, nonprofit corporations, or unincorporated community organizations or coalitions. *Amici* do not have parent companies, do not issue stock, and thus no corporation owns 10% or more of their stock.

## RULE 29(A)(4)(E) STATEMENT

*Amici* represent that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and (3) no person or organization, other than *amici curiae* themselves, contributed money that was intended to fund preparing or submitting the brief.

## PRELIMINARY STATEMENT

In enacting AB 5207, the New Jersey State Legislature found that detention and correctional centers "have a history of poor conditions, including inadequate medical and mental health care, use of isolated confinement, and incidents of violence and retaliation" that posed significant health and safety risks to New Jersey residents. N.J. Stat. Ann. § 30:4-8.15(c). In light of these findings, the Legislature proscribed new, expanded, and renewed immigration detention agreements with

New Jersey State, local, and private entities in order to further the state's interest in "ensur[ing] respect for the human and civil rights of all people detained within New Jersey" and "protect[ing] the health and safety, including the physical and mental health, of individuals detained within New Jersey." N.J. Stat. Ann. § 30:4-8.15(a)-(b), (d).

The Legislature's decision was grounded in its traditional state powers to regulate health and safety within the state and reflected the long history of inhumane conditions within New Jersey immigration detention facilities. The district court nonetheless invalidated AB 5207[1] under the Supremacy Clause, holding in part that AB 5207 was preempted by the Immigration and Nationality Act. In doing so, the district court failed to appreciate New Jersey's strong and traditional interest in regulating these conditions. Below, *amici* (1) explain how AB 5207, like other protections in New Jersey and elsewhere, is a proper exercise of the state's core police powers; and (2) highlight the longstanding and egregious health and safety concerns that harm people in custody and reverberate through the surrounding community, and which justified the Legislature's reasoned decision to enact AB 5207. New Jersey's efforts to "protect and advance the health and just treatment of all people within the State of New Jersey" through AB 5207 should be upheld.

---

[1] Consistent with the parties' and district court's practice in the proceedings below, *amici* refer to the legislation as "AB 5207."

## INTEREST OF AMICI CURIAE

Proposed *amici curiae* are 28 organizations that represent or advocate on behalf of a wide range of New Jersey communities, including immigrants, religious communities, law enforcement professionals, people with disabilities, parents, youth, workers, people living in poverty, individuals identifying as LGBTQ+, and people who are currently or formerly detained. The addendum to this brief describes each of *amici*'s work and their individual interests in the issues presented in this case. *Amici* are united in their strong belief that AB 5207 is a lawful policy that benefits all New Jerseyans.

## ARGUMENT

### I. THE STATE OF NEW JERSEY HAS AN INTEREST, GROUNDED IN TRADITIONAL STATE POWERS, IN REGULATING HEALTH AND SAFETY CONDITIONS IN IMMIGRATION DETENTION FACILITIES WITHIN ITS BORDERS.

#### A. Regulating Health and Safety Concerns in Immigration Detention Fall Squarely Within the States' Traditional Police Powers.

"[T]he health and safety of [a state's] citizens . . . are primarily, and historically, . . . matter[s] of local concern." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotation marks and citation omitted) (concluding that a state statute requiring insurance policies to include certain health care benefits was not preempted by the Food, Drug, and Cosmetic Act). Thus, as the district court recognized in analyzing whether AB 5207 was entitled to the presumption against preemption, "[h]ealth and safety issues have traditionally fallen within the province

3

of state regulation." JA 33 (citing *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) (applying the presumption against preemption in light of New Jersey's longstanding interest in protecting consumers from deceptive food sales practices)). The states' "great latitude under their police powers to legislate" "protect[s] . . . the lives, limbs, health, comfort, and quiet of *all* persons." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (emphasis added) (internal quotation marks omitted) (concluding that a Massachusetts state law requiring insurance to provide certain mental health benefits is not preempted by the Employee Retirement Income Security Act or the National Labor Relations Act). In adopting AB 5207, New Jersey exercised these powers expressly to protect the public health and safety.

The court below held that "regulating the health and safety of individuals *detained for violating federal law* is not an area that states have traditionally occupied." JA 34 (emphasis in original). But the district court provided no doctrinal support for the notion that states have no traditional interest in regulating for the well-being of this entire category of people. More specifically, the court ignored the history of state regulation over federally-contracted detention centers in New Jersey and elsewhere: as the federal government itself has recognized in promulgating its national detention standards, facilities holding people for federal violations must adhere not only to federal law, but to applicable state and local regulations that

govern various aspects of health, including medical care, sanitation, transportation, and work programs.[2] Meanwhile, the New Jersey Legislature and subdivisions of the state have enacted policies to protect the health and safety of people impacted by immigration detention within state borders.

For example, years before enacting AB 5207 to protect the health of people in immigration detention, the New Jersey Legislature enacted the Isolated Confinement Restriction Act, P.L. 2019, c. 160 ("ICRA"), to address the punitive, harmful practice of locking individuals in a cell alone for 23 hours every day. Isolated

---

[2] *See* U.S. Marshals Service, Federal Performance-Based National Detention Standards Handbook (May 2022) (requiring compliance with state and/or local laws and regulations related to: licensing medical providers (§ B.1.7); the provision of health care "rendered against the patient's will" (§ B.1.11); bio-hazardous waste disposal and decontamination (§ B.5.13); inmate detoxification (§ B.5.14); safety inspections of prisoner transportation vehicles (§ C.9.1); fire codes (§ F.1.1); sanitation inspections (§ F.2.2); and safety in work programs (§ G.8.2)); U.S. Immigration and Customs Enforcement, Performance-Based National Detention Standards 2011 (Dec. 2016) (requiring compliance with state and/or local laws and regulations related to: garbage and refuse, fire codes, and hazardous waste disposal (§§ 1.2(V)(A)(7), 1.2(V)(C)(1), 1.2(V)(D)(6)(c)); vehicle inspection and driver's licensing laws (§§ 1.3(V)(B), 1.3(V)(D)); state accessibility standards applicable to hold rooms (§ 2.6(V)(A)); bio-hazardous waste, management and reporting of infectious disease, building codes in medical housing, medicine administration and management, health care staff licensing, and tele-health services (§§ 4.3(V)(C), 4.3(V)(D)(3), 4.3(V)(G), 4.3(V)(I), 4.3(V)(GG)); Advance Directive and Do Not Resuscitate requirements (§ 4.7); disability nondiscrimination and accommodations (§§ 4.8(V)(B), 4.8(V)(C)); telephone service rates (§ 5.6(V)(A)(1)); work safety regulations (§ 5.8(II)(5)); and release of information about people in custody ( §7.1(II)(5))).

confinement can "foster psychological trauma, psychiatric disorders, or serious, long-term damage to an isolated person's brain." N.J.S.A. § 30:4-82.6(b). ICRA imposed time restrictions on the use of isolated (so called "solitary") confinement and safeguards for specific populations with the purpose of "ensur[ing] the safe and humane operation" of correctional facilities in New Jersey. *Id*. As detailed further in Part B below, immigration detention centers in New Jersey and elsewhere have often abused isolated confinement. In recognition of that reality, the Legislature expressly applied ICRA to public and private facilities in which New Jerseyans are detained "pursuant to any intergovernmental service agreement or other contract with any . . . federal agency, including, but not limited to, United States Immigration and Customs Enforcement." N.J.S.A. § 30:4-82.7. Immigration detention facilities in New Jersey are required to comply with these restrictions.

Political subdivisions of New Jersey have likewise taken action to address the health and safety concerns running rampant in local immigration detention facilities. In 2019, the Office of the Inspector General ("OIG") within the Department of Homeland Security ("DHS") issued two scathing reports highlighting poor conditions at the Essex County Correctional Facility. Through an unannounced inspection of the facility, the OIG identified "significant health and safety risks" and

called for ICE's "immediate attention."[3] After the community expressed outrage at these egregious conditions, Essex County established a civilian task force to oversee conditions at the jail.[4] The task force was intentionally designed to examine conditions of confinement within both the criminal and civil populations of the jail, including those in ICE custody.[5,6]

After several deaths at the Hudson County Correctional Facility, including the 2017 death of a person in ICE custody, Hudson County similarly created an advisory

---

[3] Dep't Homeland Sec., Off. Inspector Gen., *Issues Requiring Attention at the Essex County Correctional Facility in Newark, New Jersey* (Feb. 13, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-20-Feb19.pdf. *See also* Dep't Homeland Sec., Off. Inspector Gen., *Concerns about ICE Detainee Treatment at Four Detention Facilities* (June 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf (reporting "egregious violations of detention standards" in four detention facilities, including the Essex County Jail in New Jersey, such as "inadequate medical care, unreported security incidents, and significant food safety issues").

[4] Admin. Code of the County of Essex, §§ 27-1–27-9 (2019 & 2021).

[5] *Id.* at § 27-1 (dedicating the task force to "protecting the lives, health, safety, and rights of *all people confined at the ECCF* and ensuring that the conditions of their confinement are safe, sanitary, respectful, and humane") (emphasis added); *see also Essex County Announces Civilian Task Force to Oversee Immigration Detention Facility*, TAP into Newark (Dec. 12, 2019), https://www.tapinto.net/towns/newark/sections/government/articles/essex-county-announces-civilian-task-force-to-oversee-immigration-detention-facility.

[6] A year and a half after establishing the task force, ECCF ended its cooperative arrangement with ICE to hold people in immigration detention. Annie Correal & Michael Gold, *After Years of Protests, a New Jersey County Ends Its ICE Jail Contract*, N.Y. Times (May 1, 2021), https://www.nytimes.com/2021/05/01/nyregion/essex-ice.html.

board to evaluate medical care at the county jail and a medical grievance review board.[7] These oversight mechanisms, like ICRA, demonstrate that the state does, in fact, take responsibility for and intervene when necessary in response to poor conditions in immigration detention facilities within its borders. The district court was incorrect in holding that the state is preempted from doing so here.[8]

Likewise, states' traditional police power to regulate labor standards extends to people detained in federal immigration detention facilities within state borders.[9]

[7] *See* Michaelangelo Conte, *New Board to Review Medical and Mental Healthcare at Hudson County Jail*, NJ.com (Nov. 13, 2018), https://www.nj.com/hudson/2018/11/new_board_review_medical_and_mental_health_care_fo.html.

[8] Further, regulations governing conditions in local jails that detain individuals pursuant to Intergovernmental Service Agreements with ICE consequently also regulate immigration detention. *See, e.g.*, N.J. Stat. Ann. § 26:2B-40 (regulation of drug treatment programs in state or county facilities); N.J. Admin. Code 10A:31-10.9 (requiring inspection of food service areas and equipment); N.J. Admin. Code 10A:31-11.1 (requiring compliance with "Federal, State and local sanitation, safety and health codes"); N.J. Admin. Code 10A:31-12.1–12.8 (requiring hygienic living conditions, including the provision of personal hygiene products); N.J. Admin. Code 10A:31-13.2 (regulating the provision of medical services). Additionally, New Jersey also regulates shelters for immigrant youth that are administered by the federal Office for Refugee Resettlement ("ORR"). The state licenses these facilities as emergency shelters for the homeless and specifically names ORR shelters in the context of setting admission standards. *See* N.J. Admin. Code 5:15-3.8.

[9] Like health and safety, regulating labor standards is a traditional police power of the states. *See, e.g.*, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987) (holding that the National Labor Relations Act did not preempt a Maine statute establishing minimum labor standards and stating that preemption "should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State").

Several courts have concluded that people in custody at private detention facilities who engage in a voluntary work program qualify as employees under state law, and must therefore be paid the state minimum hourly wage. *See*, *e.g.*, *Novoa v. GEO Group, Inc.*, No. 17-2514 JGB-SHK, 2022 WL 2189626, at \*22, \*24, \*27 (C.D. Cal. Jan. 25, 2022) (rejecting defendant Geo Group's affirmative defenses of intergovernmental immunity and preemption and finding violations of California's Minimum Wage Law as applied to detainees employed at the Adelanto Detention Center); *Washington v. Geo Group, Inc.*, No. 17-5806-RJB, 2021 WL 5824570, at \*3 (W.D. Wash. Dec. 8, 2021), *appeal filed*, No. 21-36025 (finding "no credible information in the record" indicating that Washington's Minimum Wage Act does not apply to people in ICE custody and concluding that the state wage law therefore applies to the work program Geo Group operated within the state of Washington). Many of these decisions are grounded in the courts' recognition of the traditional state police power over labor and wages. *See Chao Chen v. Geo Group, Inc.*, 287 F. Supp. 3d 1158, 1167 (W.D. Wash. 2017) (declining to dismiss in part because defendant failed to show that state minimum wage laws – "an area of traditional state prerogative" – are not preempted by federal law); *Owino v. CoreCivic, Inc.*, No. 17-1112 JLS-SBC, 2018 WL 2193644, at \*20 (S.D. Cal. May 14, 2018) (declining to apply conflict preemption to California's minimum wage laws because "[r]egulating labor and wages is a historic police power belonging to the States").

For the same reasons, AB 5207 is a valid exercise of New Jersey's traditional police powers, which apply even to federal immigration facilities located within the state's borders. As a reasoned response to a public health threat, the law aims to protect the state from the health and safety concerns detailed below.

**B.    Immigration Detention Presents Health and Safety Risks to People in New Jersey.**

The Legislature's findings in AB 5207 are supported by a long history of egregious conditions in immigration detention facilities, which notoriously threaten the health and safety of people in their custody. From inadequate medical care to the serious mental health consequences arising out of solitary confinement, individuals face threats to their well-being each day they remain in detention.[10] These harmful conditions also risk the health and safety of the surrounding communities, presenting a public health risk for all New Jersey residents. Given these significant concerns, the state's decision to limit immigration detention advances its strong interest in protecting the public health.

---

[10] *See, e.g.*, Chanelle Diaz et al., *Harmful by Design—a Qualitative Study of the Health Impacts of Immigration Detention*, 38 J. Gen. Intern. Med. 2030, 2030 n.10-13 (2022) (collecting studies demonstrating negative health impacts of immigration detention).

### 1. Immigration detention presents myriad health risks to people in ICE custody.

People who are detained often receive severely inadequate medical care – their symptoms are ignored, facilities deny necessary care, and there is little to no oversight of these poor medical practices.[11] For example, recently, the Department of Homeland Security's own Office for Civil Rights and Liberties and Office of Professional Responsibility documented negligent medical care and unsafe conditions in facilities across the country.[12] Among the many violations in these reports, one facility failed to provide "even the most basic care" to a person with an open wound.[13] Another presented "chronic insufficiencies in janitorial service" in

---

[11] *See* Human Rights Watch, *Systemic Indifference: Dangerous & Substandard Medical Care in U.S. Immigration Detention* (May 2017) at 51-78, 79-92, https://www.hrw.org/sites/default/files/report_pdf/usimmigration0517_web_0.pdf.

[12] *See* Tom Dreisbach, *Government's Own Experts Found "Barbaric" and "Negligent" Conditions in ICE Detention*, NPR (Aug. 16, 2023), https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions (reporting on the content of more than 1,600 pages of inspection reports conducted in 26 ICE detention facilities across the country). One of the reports evaluated the medical care provided in a New Jersey detention facility. *See* U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *Medical Expert Report: Bergen County Jail* (April 2018), https://s3.documentcloud.org/documents/23814498/8-bergen-county.pdf. Despite finding the overall care to be "appropriate," the investigator identified serious inadequacies with mental healthcare and suicide prevention, including subpar evaluation and placement practices, *id.* at PDF pp. 36-41, and a complete lack of preventative dental care and appropriate treatment for tooth pain, *id.* at PDF p. 23.

[13] U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *Onsite Investigation Report: Calhoun County Correctional Center* at 6 (Aug. 8, 2019), https://s3.documentcloud.org/documents/23814501/11-calhoun-county.pdf.

the medical unit, leaving it littered with paint chips, dust, and deteriorating surfaces that are "impossible to sanitize,"[14] while another facility failed to disclose a human immunodeficiency virus diagnosis to a person in custody, administered little to no care for diabetic residents,[15] and provided inappropriate care based on a presumption that the person in detention was "faking" symptoms – the person later died.[16]

In its 2019 report described above (focusing on the Essex County Correctional Facility's ICE-contracted units), DHS OIG identified significant health and safety risks, including mishandling of meats (investigators identified open packages of raw chicken leaking blood as well as "slimy, foul-smelling" meats),[17] "unsanitary"

[14] U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *On-site Investigation Report: Stewart Detention Center* at 5 (Feb. 8, 2017), https://s3.documentcloud.org/documents/23873571/26-stewart-detention-center.pdf.

[15] U.S. Dep't of Homeland Sec., Off. for Civil Rights & Civil Liberties, *Medical Expert Report: Aurora Detention Facility also known as the Denver Contract Detention Facility* at 2 (Sept. 2018), https://s3.documentcloud.org/documents/23814503/13-denver-contract.pdf.

[16] U.S. Dep't of Homeland Sec., Off. of Professional Responsibility, *External Reviews and Analysis Unit Detainee Death Review: Kamyar Samimi* at 27, 40, 49 (May 22, 2018), https://s3.documentcloud.org/documents/23905031/kamyar-samimi-detainee-death-review.pdf (PDF pp. 71, 84, 93). *See also* Dreisbach, *Government's Own Experts Found "Barbaric" and "Negligent" Conditions in ICE Detention* (recounting the death of Kamyar Samimi, which one medical expert described as "one of the most egregious failures to provide optimal care" because of the "complete lack of medical leadership, supervision and care").

[17] Dep't Homeland Sec., Off. Inspector Gen., *Issues Requiring Attention at the Essex County Correctional Facility in Newark, New Jersey* at 4-5.

conditions in living areas and bathrooms (extensive leaking, mold, and peeling paint),[18] and an incident in which a person in custody discovered a guard's loaded handgun in a facility bathroom – a fact that the facility failed to report to ICE.[19] There is no question that these substandard living conditions contribute to deteriorating physical health within these facilities, and thus within New Jersey's borders.[20]

Many of the health risks are inherent in the design of immigration detention itself. By virtue of the fact that they are detained, individuals experience social isolation from family and experience interruptions in the medical treatment they received prior to detention.[21] These conditions of confinement are associated with higher stress and worsening physical and psychological health.[22] This is especially true when several poor conditions of confinement exist simultaneously such that a person in detention experiences them cumulatively.[23] Because people in

---

[18] *Id.* at 7-8.

[19] *Id.* at 3.

[20] *See generally* Diaz et al., *Harmful by Design.*

[21] *See* Altaf Saadi et al., *Cumulative Risk of Immigration Prison Conditions on Health Outcomes Among Detained Immigrants in California*, 9 J. of Racial & Ethnic Health Disparities 2158, 2520, 2521 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8628823/.

[22] *See id.* at 2522-23.

[23] *See id.* at 2523 (noting also that although immigration detention facilities are "governed by civil rather than criminal law," they "replicate prison conditions" such that they "are similarly associated with negative health outcomes because of their de facto design and operation").

immigration detention are detained civilly for the pendency of their immigration proceedings, rather than serving sentences of set duration, the uncertainty of their length of stay – and whether they will be permitted to remain in the country – often exacerbates stress, anxiety, and depression.[24]

Further, certain features that are unique to our nation's system of immigration enforcement and detention exacerbate the major health risks faced by people in detention.[25] Because immigration detention is intended to be short-term, medical care in immigration detention facilities is inherently substandard, as it is designed to address only "short-term emergencies."[26] In reality, people are often detained in immigration detention facilities for much, much longer: it often takes months or even years for their cases to be resolved.[27] The result is "chronically inadequate medical

[24] *See* Diaz et al., *Harmful by Design* at 2032-33.
[25] *See, e.g.*, World Health Org., *Addressing the Health Challenges in Immigration Detention, and Alternatives to Detention* at 9 (2022), https://iris.who.int/bitstream/handle/10665/353569/9789289057929-eng.pdf?sequence=2 (collecting studies of European detention centers that found a higher prevalence of mental health disorders and fewer medical resources available in immigration detention as compared to criminal detention because "migrants in [detention] do not always have many of the services, amenities and rights made available to people living in prisons").
[26] Inter-Am. Comm'n on Human Rts., *Report on Immigration in the United States: Detention and Due Process* at 98 ¶¶ 276-78 (2010), https://www.oas.org/en/iachr/migrants/docs/pdf/migrants2011.pdf.
[27] *See* Human Rights First, *Detention of Asylum Seekers in New Jersey* at 1 (Nov. 2016), https://humanrightsfirst.org/wp-content/uploads/2017/04/hrf-detention-asylum-seekers-nj-nov2016.pdf (explaining that asylum seekers in New Jersey often remain

care" for people in prolonged detention.[28]

The frequency with which ICE transfers individuals between detention facilities presents another unique risk to health. Unlike in criminal detention, transfers between immigration detention centers are common,[29] and transfers can result in a lapse in care. Indeed, often a person's medical files are not transferred with them.[30] Frequent transfers between detention centers also expedite the spread

in detention for six to eight months); National Immigrant Justice Center, *Roadmap to Dismantle the U.S. Immigration Detention System* (July 28, 2021), https://immigrantjustice.org/research-items/white-paper-roadmap-dismantle-us-immigration-detention-system (noting that ICE has often detained people for months or even years as a result of ICE's restrictive interpretations of the INA that preclude immigration court review of unconstitutionally prolonged detention).

[28] Inter-Am. Comm'n on Human Rts., *Report on Immigration in the United States* at 98 ¶ 276.

[29] While ICE no longer publishes public data about internal transfers, advocates documented thousands of intra-detention transfer flights between January 2020 and May 2022, and in 2015 – the last year when the federal government published transfer data – identified 374,059 transfers in a fiscal year. Freedom for Immigrants, *Trafficked and Tortured: Mapping ICE Transfers* at 4, 11 (Feb. 2023), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/63ed9236ee8 2156a4608eba2/1676513859587/FInal+Report_FFI_T%26T_021523.pdf.

[30] *See, e.g.*, Dreisbach, *Government's Own Experts Found "Barbaric" and "Negligent" Conditions in ICE Detention* ("ICE detention, they say, is even more problematic because detainees are frequently transferred between facilities, which increases the odds that medical records and care plans fail to move with people, and because the facilities are often located in remote areas that lack access to high-quality health care."); Human Rights Watch, *Systemic Indifference* at 77 (finding records indicating that "crucial medical information was not provided when the individual was transferred from one detention facility to another").

of disease and increase the risk of exposure.[31]

The COVID-19 pandemic underscored the unique risks that present themselves in immigration detention facilities. In 2020, case rates among people in ICE detention were "consistently higher" than rates in the broader community, "suggest[ing] that COVID-19 [was] escalating more rapidly inside detention centers compared with the US population."[32] Detention facilities, in turn, proved themselves incapable of implementing protections to prevent contagion. This was in part due to the design of detention facilities, which "limit[] detained individuals' ability to practice social distancing."[33] Even compared to other carceral environments, the

---

[31] *Examining Best Practices for Incarceration and Detention During COVID-19: Hearing Before the S. Comm. on the Judiciary*, 116 Cong. 2 (June 2, 2020) (written statement of Dr. Scott A. Allen, MD, Professor Emeritus of Medicine at University of California Riverside) (describing the ease with which viruses move between detention facilities because "detention facilities are not islands – in fact, they are more like bus terminals with people coming and going. . . . Immigrants are transferred regularly throughout the detention system, with staff accompanying them as escorts. They are released without warning at court and immigrants are dropped at bus stations and airports. Officers and staff come and go, three shifts a day.").

[32] Parsa Erfani et al., *COVID-19 Testing and Cases in Immigration Detention Centers, April-August 2020*, 325 J. Am. Med. Ass'n 182, 183-84 (2021). *See also Examining Best Practices for Incarceration and Detention During COVID-19: Hearing Before S. Comm. on the Judiciary*, 116 Cong. 2 (June 2, 2020) (statement of Dr. Scott A. Allen) (citing the "substantially higher" COVID rates among prison populations to confirm the "tinderbox scenario" warned of in March 2020 for detention and correctional facilities).

[33] Caroline H. Lee et al., *Individuals' Experiences in U.S. Immigration Detention During the Early Period of the COVID-19 Pandemic*, 11 Health & Justice 1, 5 (Feb. 2023), https://healthandjusticejournal.biomedcentral.com/articles/10.1186/s40352-

median cumulative incident rate of COVID-19 in immigration detention facilities (667 cases per 1,000 people) was significantly higher than the rate in public or private criminal detention facilities (ranging from 125 to 287 cases per 1,000 people).[34] The Department of Homeland Security cited to "frequent detainee transfers" to explain COVID-19 outbreaks in immigration detention.[35]

### 2. The abuse of solitary confinement in immigration detention puts people at risk of severe health consequences.

The overuse and misuse of isolated or solitary confinement presents another serious health risk in immigration detention. People who are subjected to these prolonged periods of isolation suffer from panic attacks, hallucinations, and other

---

023-00211-2; *see also* Sarah R. Tosh et al., *Migrant Detention and COVID-19: Pandemic Responses in Four New Jersey Detention Centers*, 9 J. Migration & Hum. Sec. 44, 49-56 (2021) (describing the infrastructural constraints in New Jersey's immigration detention facilities that prevented appropriately responding to COVID-19, concluding that "preexisting structural constraints . . . increase[d] the vulnerability of detainees and the difficulties in social distancing and other prescribed public health measures").

[34] Rebecca B. Hershow et al., *COVID-19 Burden in Adult Correctional or Detention Facilities and the Surrounding Communities, January 1, 2020–July 20, 2021*, 29 J. Correct. Health Care 241, 10 (May 10, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10527881/ ("COVID-19 cumulative incidence was higher in most correctional or detention facilities than in associated counties, with immigration facilities showing the highest burden.").

[35] Hamed Aleaziz, *Federal Officials Now Say That Transferring Detainees Between Jails Holding Immigrants Contributed to Coronavirus Outbreaks*, BuzzFeed News (Oct. 6, 2020), https://www.buzzfeednews.com/article/hamedaleaziz/dhs-report-detainee-transfers-covid-spread.

distressing and long-lasting psychiatric symptoms.[36] Indeed, the U.S. Supreme Court and the Third Circuit have long recognized the devastating harms that isolated confinement imposes. *See, e.g.*, *In re Medley*, 134 U.S. 160, 171 (1890) ("[T]he solitary confinement to which the prisoner was subjected . . . was a[ ] punishment of the most important and painful character."); *Brooks v. Florida*, 389 U.S. 413, 414-15 (1967) (describing the petitioner's two-week isolated confinement in a "barren cage" as a "shocking display of barbarism"); *Palakovic v. Wetzel*, 854 F.3d 209, 225 (3d Cir. 2017) (acknowledging "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"); *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 567 (3d Cir. 2017) (noting medical findings demonstrating that "even a short time in solitary confinement is associated with drastic cognitive changes" and that solitary confinement also leads to physical harm, including self-mutilation and suicide). Similarly, international human rights experts have cautioned that overuse of the practice may violate international treaties or amount to torture, and

---

[36] New Jersey Advocates for Immigrant Detainees et al., *Isolated in Essex: Punishing Immigrants through Solitary Confinement* at 13 (June 2016), https://www.prisonpolicy.org/scans/afsc/isolated_in_essex.pdf (reporting on conditions at Essex County Correctional Facility); Andrew Lyubarsky & Juan Caballero, New Jersey Advocates for Immigrant Detainees, *23 Hours In The Box: Solitary Confinement in New Jersey Immigration Detention*, at 10 n.6 (June 2015), https://www.prisonpolicy.org/scans/njaid/23_hours_in_the_box.pdf (examining use of solitary confinement for immigrants detained in county-run facilities).

have accordingly recommended that isolated confinement be used as a last resort.[37]

Nevertheless, New Jersey facilities that have housed individuals in immigration detention systematically over-relied on the practice of isolated confinement, using it in ways that human rights organizations have found to be "excessive," "disproportionate," "arbitrary," and lacking in transparency.[38] For example, staff at immigration detention facilities have used isolated confinement to punish people for even minor and non-disciplinary infractions that pose no immediate threat to the security of the facility, such as merely failing to follow an order.[39] These same detention facilities have also subjected individuals who are particularly vulnerable – because, for example, they have preexisting mental health issues – to prolonged isolation, exacerbating their illnesses.[40]

### 3. Private immigration detention facilities present particularly significant health and safety risks to people who are detained.

The health and safety concerns described above are magnified in private immigration detention facilities such as EDC, which are shielded from traditional

---

[37] Lyubarsky & Caballero, *23 Hours In The Box* at 24-25, 28.

[38] New Jersey Advocates for Immigrant Detainees, *Isolated in Essex* at 6.

[39] Eleni Bakst & Olga Byrne, Human Rights First, *Ailing Justice: New Jersey: Inadequate Healthcare, Indifference, and Indefinite Confinement in Immigration Detention* at 6 (Feb. 2018), https://humanrightsfirst.org/wp-content/uploads/2022/10/Ailing-Justice-NJ.pdf; Lyubarsky & Caballero, *23 Hours In The Box* at 28-29.

[40] Lyubarsky & Caballero, *23 Hours In The Box* at 32.

accountability mechanisms, such as state public records laws.[41] Reports regarding

conditions at EDC have consistently documented patterns of poor conditions since

shortly after the facility's inception in 1994.[42] People in custody at EDC have

described unsanitary conditions, including maggots in food and the shower area,

undrinkable water, and lack of sanitary pads and clothing.[43] There have been many

complaints of poor ventilation and dust buildup within the facility, causing

respiratory issues among people detained there.[44] Staff at EDC have also neglected

the medical needs of detained people: health care providers have reportedly been

---

[41] EDC is New Jersey's only private detention facility. Shortly after taking office, President Biden, citing the federal government's duty to provide "safe working and living conditions" to people in the federal criminal justice system, ordered that Department of Justice contracts with private criminal detention centers not be renewed. Exec. Order No. 14006, 86 Fed. Reg. 7483, 7483 (Jan. 26, 2021).

[42] *See, e.g.*, Detention Watch Network et al., *Anthology of Abuse: End Three Decades of Abuse at the Elizabeth Detention Center* at 1 (June 2023), https://www.detentionwatchnetwork.org/sites/default/files/reports/Elizabeth-%20Anthology%20of%20Abuse%20(1).pdf; John Sullivan, *Talks Are Held on Reopening of Alien Unit*, N.Y. Times (Jan. 19, 1996), https://www.nytimes.com/1996/01/19/nyregion/talks-are-held-on-reopening-of-alien-unit.html (quoting local officials and attorneys who described conditions at EDC under the facility's initial contractor as "unacceptable" and as putting people detained there, as well as law enforcement officers, "in harm's way"); Bakst & Byrne, *Ailing Justice* at 6-10 (describing instances of in which people's medical and mental health needs were neglected at three different detention facilities in New Jersey, including EDC).

[43] Bakst & Byrne, *Ailing Justice* at 4.

[44] *Id*.

abusive and dismissive of medical complaints.[45] And in at least two cases, medical neglect at EDC is believed to have led to the death of individuals detained there.[46]

In the early days of the COVID-19 pandemic, people detained at EDC alleged that CoreCivic failed even to adhere to basic Centers for Disease Control sanitation guidelines, such as providing basic protective gear and cleaning supplies, putting those individuals at increased risk of contracting the virus.[47] In a lawsuit filed against EDC and ICE in May 2020, plaintiffs – some of whom had underlying chronic

[45] *See, e.g.*, American Friends Service Committee, *Free Them All: The Double Crisis of Human Caging and COVID-19 in New Jersey and How to End It* at 37-38 (Sept. 2022), https://afsc.org/sites/default/files/2023-03/AFSC%20-%20Free%20Them %20All%20NJ%20report%202022_web.pdf (describing the accounts of five individuals detained at EDC whose serious medical complaints were dismissed by EDC staff); Bakst & Byrne, *Ailing Justice* at 6-10 (describing instances in which people's medical and mental health needs were neglected).

[46] Isabela Dias, *A Judge Just Halted Efforts to End Immigration Detention in New Jersey*, Mother Jones (Aug. 30, 2023), https://www.motherjones.com/politics/2023/08/ice-corecivic-judge-halts-efforts-to-end-new-jersey-immigration-detention/ (citing the deaths of Boubacar Bah, who died in 2007 from a head injury that was neglected for hours, and Victor Ramirez-Reyes, who died in 2011 from heart disease caused in part by EDC's medical neglect); American Civil Liberties Union, Detention Watch Network, and Nat'l Immigrant Justice Center, *Fatal Neglect: How ICE Ignores Deaths in Detention* at 18-19 (Feb. 2016), https://www.aclu.org/wp-content/uploads/legal-documents/fatal_neglect_acludwnnijc.pdf (describing death of Victor Ramirez-Reyes); Nina Bernstein, *Few Details on Immigrants Who Died in Custody*, N.Y. Times (May 5, 2008), https://www.nytimes.com/2008/05/05/nyregion/05detain.html (describing death of Boubacar Bah).

[47] *See* Am. Pet. for Writ of Habeas Corpus and Compl., *Aganan et al. v. Rodriguez et al.*, No. 2:20-cv-05922 (May 29, 2020), ECF No. 34 at ¶ 13 (describing short supply of soap and other cleaning supplies and protective equipment).

medical conditions – alleged that they were confined in "filthy," cramped quarters with others who were sick.[48] They also alleged that they sometimes had to wash their hands without soap and were given "no more than Tylenol from the medical unit, no matter their symptoms."[49] Indeed, EDC's negligent health practices led to more COVID-19 cases than other regional detention centers.[50] Compounding these harms, the complaint alleged that EDC and ICE's lack of transparency made it difficult to learn details about the conditions inside EDC, leaving advocates, who might otherwise have been able to assist their clients, in the dark.[51]

### 4. The risks to health and safety that arise in detention centers do not remain contained in the facilities.

The health and safety risks discussed above threaten the health of New Jersey communities beyond immigration detention centers, further justifying the Legislature's reasoned decision to prohibit new, renewed, or expanded immigration detention contracts in an effort to protect the public health in New Jersey.

---

[48] *Id.* at ¶¶ 22-25, 42-43, 112, 115.

[49] *Id.* at ¶¶ 112, 115.

[50] Matt Katz, *ICE Jailer in New Jersey Is Sued By Its Landlord, Claiming Unsafe Conditions*, WNYC (May 3, 2021), https://gothamist.com/news/ice-jailer-new-jersey-sued-its-landlord-claiming-unsafe-conditions ("The Elizabeth Detention Center has had more Covid cases than other ICE facilities in the region, and both security and medical employees have died.").

[51] Am. Pet. for Writ of Habeas Corpus and Compl., *Aganan et al. v. Rodriguez et al.*, No. 2:20-cv-05922 (May 29, 2020), ECF No. 34 at ¶ 15 (describing EDC staff's failure to provide information to people in custody and advocates outside the facility, despite advocate outreach).

The COVID-19 pandemic presents clear evidence of how the failure to protect health and safety within immigration detention centers reverberates across the state. During the pandemic, outbreaks in detention centers seeded outbreaks of COVID-19 in surrounding communities, as staff and vendors regularly traveled in and out of these congregate settings. As a result, data showed that nationally, communities with immigration detention facilities faced a significantly higher likelihood of early cases and serious outbreaks.[52] Of course, this concern is not unique to COVID-19. Immigration detention centers increase the risk of outbreak of all communicable

---

[52] *See* Gregory Hooks & Bob Libal, Detention Watch Network, *Hotbeds of Infection: How ICE Detention Contributed to the Spread of COVID-19 in the United States* at 22-23 (Dec. 2020), https://www.detentionwatchnetwork.org/sites/default/files/reports/DWN_Hotbeds %20of%20Infection_2020_FOR%20WEB.pdf (using county-level data and controlling for other variables to conclude that counties with ICE facilities were more likely to have reported cases of COVID-19 early on and the surrounding community was more likely to have faced a serious outbreak than counties without ICE facilities, and linking ICE detention to an additional 245,581 cases from May 1 to August 1 of 2020); Isabelle Niu & Emily Rhyne, *4 Takeaways from Our Investigation into ICE's Mishandling of Covid-19*, N.Y. Times (Apr. 26, 2021), https://www.nytimes.com/2021/04/25/video/immigration-detention-covid-takeaways.html (reporting that "[i]nfections inside detention centers have ripple effects in surrounding communities" and that inconsistent data from ICE makes it difficult to understand the full extent of community spread); Scott A. Allen, MD, FACP and Josiah Rich, MD, MPH, Letter to House and Senate Comms. on Homeland Sec. at 4 (Mar. 19, 2020) (describing a "tinderbox scenario" in which, as a result of outbreaks occurring in prison or jail settings, "the infection inevitably is carried by staff to the community").

diseases in surrounding communities, presenting a constant threat to public health.[53]

One study examining whether the outbreak of a tuberculosis strain in a Tennessee jail spread to the surrounding community revealed that even after transmission in the jail ended, 23% of new tuberculosis cases in the county were the distinctive strain occurring in the jail outbreak.[54] In the majority of these cases, the infected community members had no direct link to the jail (*i.e.*, were not incarcerated at the jail), indicating community spread.[55] In New Jersey, an outbreak of the mumps among people in ICE detention at the Bergen County Jail in 2019 caused alarm among public health experts.[56]

---

[53] *See* Nicole J. Boardman et al*., Pulmonary Tuberculosis Disease Among Immigrant Detainees: Rapid Disease Detection, High Prevalence of Asymptomatic Disease, and Implications for Tuberculosis Prevention*, 73 Clinical Infectious Diseases 115, 118-19 (July 1, 2021), https://academic.oup.com/cid/article/73/1/115/5820624 (presenting the higher incidence of tuberculosis among people in immigration detention and the risk of transmission in the surrounding community).

[54] Timothy F. Jones et al., *Increased Incidence of the Outbreak Strain of Mycobacterium Tuberculosis in the Surrounding Community After an Outbreak in a Jail*, 96 Southern Med. J. 155, 156 (Feb. 2003) ("[T]he lesson to be learned from this observation is important. Jails may play an important role in the epidemiology of tuberculosis in the surrounding community, serving as reservoirs of disease and potential accelerants of dissemination.").

[55] *Id.*

[56] Chanelle Diaz & Elizabeth Chuang, *When Immigration Detention Makes Healthy People Sick*, NorthJersey.com (June 29, 2019), https://www.northjersey.com/story/opinion/contributors/2019/06/29/when-immigration-detention-makes-healthy-people-sick-opinion/1597541001/ ("Currently, individuals in ICE detention at Bergen County Jail in New Jersey are being quarantined for mumps, leading to interruptions in their court hearings and

In sum, the interests cited by the Legislature in enacting AB 5207 are not "mere reference[s]" to health and safety, *see* JA 34. Rather, the state's interests are well-supported by the terrible history of poor conditions in New Jersey immigration detention facilities and concern for the welfare of people within its borders.

## CONCLUSION

Immigration detention presents serious health and safety risks both inside detention centers and in the surrounding communities. In enacting AB 5207, New Jersey took steps within its core police powers to protect the public health from these risks. For the foregoing reasons, *amici curiae* urge this Court to reverse the lower court's decision and hold that AB 5207 is a lawful exercise of New Jersey's traditional police powers to regulate in the interest of health and safety.

Respectfully submitted,

*/s/ Jeanne LoCicero*

| | |
|---|---|
| Jeanne LoCicero | Lawrence S. Lustberg |
| Farrin R. Anello | Julia Bradley |
| Molly K.C. Linhorst | Gibbons P.C. |
| American Civil Liberties Union | One Gateway Center |
| of New Jersey Foundation | Newark, New Jersey 07102 |
| P.O. Box 32159 | (973) 596-4500 |
| Newark, NJ 07102 | llustberg@gibbonslaw.com |
| (973) 854-1715 | |
| jlocicero@aclu-nj.org | *Attorneys for* Amici Curiae |

---

visitations. Given that detention centers are located in our communities and staffed by community members, these outbreaks threaten the health of everyone.").

# CERTIFICATE OF COMPLIANCE

I, Jeanne LoCicero, hereby certify that:

(1) this brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,242 words, exclusive of the portions exempted by Rule 32(f);

(2) this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because this brief has been prepared in the proportionally spaced typeface of 14-point Times New Roman;

(3) the text of the electronic and hard copies of this brief are identical;

(4) the electronic copy of this brief was scanned with Windows Defender for Endpoint (DFE) software, and no virus was detected; and

(5) I am a member of good standing of the Bar of the United States Court of Appeals for the Third Circuit.


January 10, 2024                                /s/ *Jeanne LoCicero*
                                                Jeanne LoCicero

**CERTIFICATE OF SERVICE**

I hereby certify that I am filing the foregoing Brief of *Amici Curiae* and accompanying Motion for Leave to File electronically via this Court's ECF system and am serving the same Brief and Motion, via this Court's ECF, upon all counsel of record for the Appellants and Appellees.

January 10, 2024

*/s/ Jeanne LoCicero*
Jeanne LoCicero

# ADDENDUM – LIST OF AMICI

**AAPI New Jersey** is a 501(c)3 non-profit organization that advocates for the rights, representation, health, safety, and well-being of New Jersey's 1.1 million Asian American & Pacific Islander ("AAPI") community members. Through a range of programs, AAPI NJ serves community members of diverse backgrounds, including immigrants and low-income AAPIs, to ensure they have access to and benefit from critical programs free of barriers, and works to reduce the harms and unnecessary interventions of law enforcement, immigration authorities, and others.

Founded in 1960 and based in Newark, the **American Civil Liberties Union of New Jersey** ("ACLU-NJ") is a non-partisan organization that operates on several fronts – legal, political, cultural – to bring about systemic change and build a more equitable society. The ACLU-NJ has over 30,000 members and hundreds of thousands of additional supporters in New Jersey. The ACLU-NJ is the state affiliate of the American Civil Liberties Union (ACLU), which was founded in 1920 for identical purposes, and is composed of more than 1,200,000 members nationwide.

The **American Friends Service Committee** ("AFSC") is a Quaker organization whose work is shaped by its spiritual framework and based on the belief in the worth of every person, and faith in the power of love to overcome violence and injustice. Founded in 1917, AFSC has programs throughout the United States that work with immigrants through legal representation, leadership training, community organizing, and policy advocacy. AFSC's offices in Florida and New Jersey represent and provide a voice for many vulnerable immigrant populations, including immigrant detainees, asylum seekers, survivors of domestic violence and other crimes, individuals who have faced long struggles to obtain legal status, and immigrant children and youth. AFSC's Immigrant Rights Program in New Jersey, in particular, has provided legal representation for over 26 years to hundreds of immigrant detainees, including people detained at the Elizabeth Detention Center. In addition, AFSC programs across the United States have engaged in organizing and advocacy with and on behalf of individuals in immigration detention in their quest to reunite with their families and their communities, as they also work to end detention and deportation.

The **Bayard Rustin Center for Social Justice** ("BRCSJ"), located physically in Princeton, New Jersey, and virtually at rustincenter.org, is a pivotal Queer safe-space, community activist hub, and educational enclave for LGBTQIA youth, intersectional families, and all marginalized folx across the spectrum. The BRCSJ organized Princeton's first-ever Pride Parade, offers free therapy and counseling in-

house for our LGBTQIA youth, and holds rallies, events, and other happenings, both in response to current events and as dedicated, planned programming in support of political, environmental, gender, and identity issues. During the pandemic, the BRCSJ broadcast its "Social Justice Power Hour" every weeknight, creating virtual community-building and remote fellowship through inspirational conversations with nationally-known figures on a variety of topics facing our communities.

**Bend the Arc: Jewish Action** is a movement of tens of thousands of progressive Jews across the country fighting for Black liberation and a world in which all people are thriving. As a multiracial community of progressive Jews, Bend the Arc understands that standing in solidarity with marginalized communities is not only a sacred duty but also necessary for our own survival in this country. White supremacist systems of oppression are a threat to us all. Bend the Arc: Jewish Action South Jersey is Bend the Arc's chapter in New Jersey, and is active in advocating for immigrants' rights across the Garden State.

**Deportation & Immigration Response Equipo** ("DIRE") Support Services and DIRE Legal Services provide immigrants and asylum seekers, particularly undocumented individuals and families, with housing support, case management, emergency cash assistance, and immigration legal services. Many DIRE clients have firsthand experience with immigration detention, family separation, and deportation, which has harmed their physical and mental well-being and the well-being of their family and community members.

**Detention Watch Network** ("DWN") is a national coalition of approximately 200 organizations and individuals working to end immigration detention in the United States. Founded in 1997, DWN has worked for more than two decades to fight abuses in detention. DWN members are lawyers, activists, community organizers, advocates, social workers, doctors, artists, clergy, students, formerly detained immigrants, and affected families from around the country. They are engaged in individual case and impact litigation, documenting conditions violations, local and federal administrative and legislative advocacy, community organizing and mobilizing, teaching, and social service and pastoral care. For years, DWN and its members have carefully documented egregious abuses inside of detention and advocated to address them systemically through changes to law, policy, and practice. DWN has an interest in this litigation because DWN has been closely supporting members in New Jersey advocating on behalf of people detained inside Elizabeth Detention Center and asking for the closure of the facility, given the human rights abuses inside and the public health and safety risks of immigration detention.

**El Pueblo Unido of Atlantic City y Pueblos Cercanos** ("El Pueblo Unido") is a New Jersey non-profit organization working to empower the Latino and Immigrant Community of Atlantic City, Pleasantville, and other towns in Atlantic County in order to create a more just and inclusive community, one that respects the rights and dignity of all immigrants. Through transformative education, community resource development, legal defense, civic engagement, and community organizing, El Pueblo Unido works to uplift the entire Latino community. The majority of El Pueblo Unido members are working-class undocumented immigrants in Atlantic County who struggle every day to put food on their families' table and provide a roof over their heads. El Pueblo Unido has visited and consoled our community members in detention and has heard tragic accounts that demonstrate the failure of the detention center to protect the health and safety, including both physical and mental health, of individuals detained within New Jersey.

**Faith in New Jersey** ("FINJ") is a multi-faith multi-racial power building vehicle for faith communities and everyday people traditionally excluded from the decision making that impacts their everyday lives. Our members come from all walks of life. Some are justice impacted, undocumented, have been detained and/or deported by ICE, come from mixed status households, are youth, elders, working class, faith leaders and have multiple identities. Together through faith-based community organizing we deliver tangible changes for communities to thrive with a co-created social justice agenda that supports human rights, an end to immigration detention, expanding democracy, ending gun violence, and restorative, racial, economic, and immigrant justice on the local, state, and federal level. FINJ has offices in Rahway, Camden, Trenton, and Paterson.

Founded in 1997, **First Friends of New Jersey and New York**'s mission is to uphold the inherent dignity and humanity of immigrants impacted by the immigration enforcement system. A volunteer-based organization, First Friends strives to reduce the isolation of detained immigrants and provide compassion and hope through its various programs for detained Friends, including visitation. First Friends also provides support to non-detained Friends through transportation, accompaniment, and financial assistance. First Friends staff and volunteers are also active advocates for reforming the United States' inhumane and racist immigration system, including through a commitment to disentangling the immigration enforcement and criminal legal systems.

**Latina Civic Action** advocates for the rights of Latinas to have a seat at the table in government and politics so that the Latina community in New Jersey can have a voice in enacting policies that encourage economic opportunity, equity and

inclusion across all areas of society. Founded in 2001, Latina Civic Action is a statewide organization working to build political power and promote policy solutions that improve the lives of Latinas and their families through legislative advocacy, electoral education, and voter engagement. Latina Civic Action believes that immigration policies should respect the dignity of the individual, and that America must continue to be a safe haven for all who come seeking asylum.

The **Latino Action Network** ("LAN") was founded in 2009 to advance the equitable inclusion of the diverse Latino communities in all aspects of American society. LAN unites Latino individuals and organizations in New Jersey to advocate on issues of importance to the state's Latino community, including immigrant rights, education, healthcare, affordable housing, criminal justice reform, voting rights, disability equity, youth empowerment, environment, community organizing, and poverty. Since its inception, LAN has played an essential role in influencing legislative redistricting in the state and has been a clear voice on the need for diversity on the state's highest court and marriage equality. LAN has participated in numerous legal challenges promoting fair housing, equitable healthcare delivery, desegregation of New Jersey schools, and quality public education.

**Latino Coalition of New Jersey** ("LCNJ"), based in Monmouth and Ocean counties, is a civil rights organization dedicated to the political empowerment of communities of color and the working poor. LCNJ is a founding organization of the Latino Action Network.

**LatinoJustice PRLDEF** ("LatinoJustice"), founded in 1972 as the Puerto Rican Legal Defense and Education Fund, is a national non-profit civil rights legal defense fund that has advocated for and defended the constitutional rights of all Latinos to ensure their equal protection under the law. LatinoJustice champions an equitable society through advancing Latino civil engagement, cultivating leadership, and protecting civil rights and equality. LatinoJustice has long been engaged in New Jersey criminal justice and rights restoration policy advocacy in addition to engaging in law reform litigation across the country challenging discriminatory federal immigration enforcement and detention policies and practices that adversely impact Latino immigrants' rights.

The **Law Enforcement Action Partnership** ("LEAP") is a nonprofit organization composed of current and former police officers, prosecutors, judges, corrections officers, and other law enforcement officials. Its mission is to unite and mobilize the voice of law enforcement in support of reform of the criminal justice system, with the aims of making law enforcement more effective and communities

safer. LEAP advocates for these goals by urging law enforcement agencies to channel their resources toward the greatest threats to public safety, by promoting alternatives to arrest, detention, and incarceration, by addressing the root causes of crime, and by working to improve the relationships between police officers and police departments and the communities they serve.

**Lazos América Unida** is a non-profit organization in Central New Jersey that advocates on behalf of workers in the Mexican American community and works to strengthen the relationship between the Hispanic and broader community through grassroots projects that enhance and foster individual and collective prosperity. Lazos América Unida regularly works with Mexican immigrant families and youth, including people who are currently or formerly detained.

**Make the Road New Jersey** ("MRNJ"), founded in 2014, is a community-based organization that provides services to individuals across New Jersey through our vibrant centers in Elizabeth, Passaic, and Perth Amboy. MRNJ builds the power of immigrant, working-class, and Latinx communities to achieve dignity and respect through community organizing, legal and support services, policy innovation and transformative education. MRNJ's legal services, support services, outreach and adult and youth education programs serve more than 25,000 immigrant families of color each year and reach over 120,000 people through our health care and vaccine promotora work. Among its membership, MRNJ counts many individuals and families who have been directly impacted by immigration detention policy in New Jersey.

The **New Jersey Alliance for Immigrant Justice** ("NJAIJ") is the state's largest immigration coalition. Comprising over 50 member organizations, NJAIJ fights for policies that empower and protect immigrants. NJAIJ was a lead coalition in the campaign to pass legislation banning immigration detention in New Jersey and continues to push for stronger policies that prevent collaboration and cooperation with immigration enforcement agencies.

The **New Jersey Consortium for Immigrant Children** ("NJCIC") is dedicated to empowering New Jersey's young immigrants. NJCIC works tirelessly to secure lawful status and advocate for systemic changes in education, access to justice, and health equity. NJCIC envisions a New Jersey where every young immigrant has the opportunity to thrive. NJCIC defends the State of New Jersey's authority to protect the safety of noncitizens in New Jersey and regulate detention facilities. Through serving a diverse range of immigrant children and youth, NJCIC

recognizes that the well-being of children is intricately linked to the adults in their lives.

The **New Jersey Parents' Caucus**, Inc. ("NJPC") is a statewide advocacy coalition of parents, caregivers, and young adults whose mission is to ensure that families raising children with mental health challenges and are involved in the juvenile justice or child welfare systems have the opportunity to play a strong and active role in systemic reform. NJPC seeks to advance racial equity and justice, recognizing racism as a public health issue, and aims to eliminate the disparities in mental health care experienced by races and ethnicities disenfranchised by our current system. As an organization seeking to ensure that children remain with their families, NJPC has witnessed firsthand the devastating effects that immigration enforcement and detention have on families and their children, exacerbating emotional, behavioral, and mental health challenges in children, families, and their communities.

**New Jersey Policy Perspective** ("NJPP") is a nonprofit 501(c)3 research organization. Specifically, NJPP is a nonpartisan think tank that drives policy change to advance economic, social, and racial justice through evidence-based, independent research, analysis, and strategic communications. It is the core belief of NJPP that New Jersey thrives when all residents enjoy lives of dignity, opportunity, and economic security. To that end, NJPP has produced reports containing analyses and recommendations for policies that directly impact immigrants in our state, citizen and non-citizen alike, including reports on the negative impact of detention on New Jersey families. NJPP has also worked with a variety of partners and coalitions that have first-hand experience in or are a part of immigrant communities.

Established in 2000, **New Labor** is a community-based organization dedicated to amplifying workers' voices in New Jersey. With offices in New Brunswick, Lakewood, and Newark, New Labor fights wage theft, organizes for equitable wages and working conditions, and educates New Jersey residents about workers' and immigrants' rights.

Founded in 2006, **Northern New Jersey Sanctuary Coalition** is an all-volunteer non-profit organization that assists applicants for asylum, including those who have been released from federal detention. The Coalition assists clients with their transition to life in this country by providing support for and/or linkages to housing, education, legal assistance, job training, counseling, medical care, transportation, and other resources. Additionally, the Coalition advocates for a

humane immigration and asylum system. Many of our clients have experienced detention at ICE detention centers, including Elizabeth Detention Center.

The **Reformed Church of Highland Park** ("RCHP"), founded 129 years ago, is a religious community of more than five hundred people. RCHP has founded and headquarters organizations that provide direct services to immigrant community members. Through its service work, RCHP has witnessed the damage that unnecessary detention has done to individuals and to their families, including economic hardship, family separation, and mental health trauma for those in and out of detention. For ten years prior to the COVID-19 pandemic, RCHP members regularly visited people detained in the Elizabeth Detention Center. The RCHP Affordable Housing Corporation has housed over 150 formerly detained individuals who spent significant time in detention.

**T'ruah: The Rabbinic Call for Human Rights** ("T'ruah") organizes Jewish clergy across North America to fight for social justice causes, including immigrants' rights. T'ruah's member clergy, including nearly one hundred rabbis in New Jersey, have been very active in the state, organizing against local engagement with ICE and opening synagogues to immigrants seeking sanctuary.

**Unitarian Universalist FaithAction of New Jersey** ("UU FaithAction") is a community of member congregations of Unitarian Universalists working to establish just and compassionate public policy. UU FaithAction engages in public education, research, legal advocacy, and policy advocacy. UU FaithAction has been committed to immigration justice in New Jersey for over ten years, seeking to achieve immigration policy that recognizes the inherent worth and dignity of every person.

**Volunteer Lawyers for Justice** ("VLJ") is a non-profit civil legal services organization whose mission is to ensure justice for people experiencing poverty. Headquartered in Newark, NJ for more than 20 years, VLJ provides legal services in a variety of civil legal issues including housing, consumer law, bankruptcy, re-entry, family law, and education law. Additionally, VLJ has specialized programming for veterans, families in Newark's South Ward, and survivors of human trafficking, many of whom are immigrants. VLJ regularly serves noncitizens who are at risk of detention or have previously been detained.

**Wind of the Spirit Immigrant Resource Center** ("WOTS") is a faith-based, grassroots, non-profit organization founded in 2000. WOTS works to create a dignified existence for all immigrants through organizing and advocacy, youth programs, legal services, and health and safety trainings. The organization's mission

is to educate, organize, and mobilize immigrant communities and allies for humane immigration policy and social change using the human rights framework. WOTS' earliest organizing occurred around preventing a 287(g) agreement for its original home county, Morris, which WOTS was successful in stopping; this led to greater security throughout the community and positive relations with public officials. Still, the overreach of federal immigration enforcement has left scars of harassment, detention, deportation, and distrust among those WOTS serves. Wind of the Spirit supports communities in Madison, Dover, Plainfield, and Morristown, New Jersey.