**23-2598**

IN THE

# United States Court of Appeals

FOR THE THIRD CIRCUIT

⤚ ➤➤ ◄◄ ⤛

CORECIVIC, INC.,

*Plaintiff-Appellee,*

*against*

GOVERNOR OF NEW JERSEY;
ATTORNEY GENERAL NEW JERSEY,

*Defendants-Appellants.*

———————————

*On Appeal from the United States District Court
for the District of New Jersey (No. 3:23-cv-00967)*

## BRIEF FOR APPELLEE CORECIVIC, INC.

Bradley D. Simon
Thomas A. Kissane
David J. Goldsmith
SCHLAM STONE & DOLAN LLP
*Attorneys for Plaintiff-Appellee*
26 Broadway, 19th Floor
New York, New York 10004
212-344-5400

**RULE 26.1 DISCLOSURE STATEMENT**

CoreCivic, Inc. has no parent corporation.  BlackRock, Inc., a publicly traded company, is beneficial owner of approximately 16.6% of CoreCivic's stock and no other publicly held corporation owns 10% or more of CoreCivic's stock.

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENT.............................................................i

TABLE OF AUTHORITIES ........................................................................... v

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF THE CASE.................................................................... 1

   A.  The Federal Statutory Scheme and its Implementation ............................. 1

   B.  The EDC and its Role in ICE's Immigration Enforcement ........................ 4

   C.  The New Jersey Statute and its Intended Effect ......................... 5

SUMMARY OF ARGUMENT ................................................................... 7

ARGUMENT ................................................................................................ 10

   I.  THE DISTRICT COURT PROPERLY APPLIED
       INTERGOVERNMENAL IMMUNITY ................................................. 12

      A.  The District Court Properly Applied the Correct Standard
         for Impermissible Regulation Under Intergovernmental
         Immunity .......................................................................... 13

         i.  The district court properly found that AB 5207
            directly operates against the federal government ........................ 14

         ii.  Washington did not adopt the North Dakota
            plurality's view as to what constitutes direct
            regulation .................................................................... 16

         iii.  New Jersey's discussion of the case law provides
            no basis to disturb the district court's order ................................. 21

         iv.  New Jersey fails in its factual challenge to the
            district court's finding that AB 5207 impermissibly
            obstructs federal operations ..........................................29

v.   If considered, the non-controlling reasoning of the North Dakota plurality would not warrant reversal of the district court........................................................30

vi.   The "first principles" and policy considerations that New Jersey identifies do not justify overturning the district court..................................................................31

B.   The District Court's Order Was Also Proper on the Independent Ground That AB 5207 Discriminates Against the Federal Government and CoreCivic as its Contractor ........................................................................34

II.   THE DISTRICT COURT PROPERLY APPLIED PREEMPTION TO ENJOIN ENFORCEMENT OF AB 5207 ...............................................................................37

A.   The District Court Properly Found Conflict/Obstacle Preemption..........................................................................40

i.   The district properly considered the INA's operation with respect to private parties  ....................................40

ii.   The district court properly declined to apply a "presumption against preemption" ..............................................45

iii.   The district court followed controlling law in finding AB 5207 to be preempted as an obstacle to accomplishment of the INA's purposes ....................................49

B.   The District Court's Holding Would Also Have Been Proper If Based On Field Preemption........................................57

III.   NOTHING IN THE AMICUS BRIEFS SUPPORTS NEW JERSEY'S APPEAL .........................................................................59

CONCLUSION.............................................................................................64

CERTIFICATE OF COMPLIANCE...........................................................65

CERTIFICATION OF BAR MEMBERSHIP ......................................................... 66

CERTIFICATE OF SERVICE ................................................................. 67

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arizona v. United States*,
  567 U.S. 387 (2012)..................................................................*passim*

*Armstrong v. Exceptional Child dr., Inc.*,
  575 U.S. 320 (2015)................................................................10

*Bosse v. Oklahoma*,
  580 U.S. 1 (2016).............................................................16, 45

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988).............................................................15

*Bruesewitz v. Wyeth Inc.*,
  561 F.3d 233 (3d Cir. 2009), *aff'd*, 562 U.S. 223 (2011)...................53

*Chamber of Com. of United States v. Whiting*,
  563 U.S. 582 (2011)......................................................27, 38, 50

*City of Detroit v. Murray Corp. of Am.*,
  355 U.S. 489 (1958)..................................................................*passim*

*Colson v. Bertsch*,
  586 F. Supp. 1289 (D.N.J. 1984) ........................................34

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)..................................................38, 43, 52, 53

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993)..............................................................50

*Davis v. Michigan Dep't of Treasury*,
  489 U.S. 803 (1989)..........................................................36, 37

*DeCanas v. Bica*,
  424 U.S. 351 (1976)..............................................................48

*Dep't of Homeland Sec. v. Texas*,
   No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024) ........................................20

*Farina v. Nokia Inc.*,
   625 F.3d 97 (3d Cir. 2010) ...........................................................................*passim*

*Fellner v. Tri-Union Seafoods, L.L.C.*,
   539 F.3d 237 (3d Cir. 2008) .................................................................................39

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982)...............................................................................................39

*Gade v. Nat'l Solid Wastes Mgmt. Assn.*,
   505 U.S. 88 (1992)..................................................................................................39

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000)................................................................................................56

*Geo Group, Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) ........................................................................*passim*

*Gibbons v. Ogden*,
   22 U.S. 1 (1824).....................................................................................................10

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988)........................................................................................23, 27

*Granillo v. FCA US LLC*,
   No. 16-cv-153, 2016 WL 9405772 (D.N.J. Aug. 29, 2016).............................23

*Hancock v. Train*,
   426 U.S. 167 (1976)........................................................................................26, 27

*Helvering v. Gerhardt*,
   304 U.S. 405 (1938)...............................................................................................34

*Hines v. Davidowitz*,
   312 U.S. 52 (1941)...........................................................................................37, 58

*Hohn v. United States*,
   524 U. S. 236 (1998)..............................................................................................16

*Holk v. Snapple Beverage Corp.*,
   575 F.3d 329 (3d Cir. 2009) ...............................................................48

*Imbler v. Pachtman*,
   424 U.S. 409 (1976)...........................................................................34

*In re Capital Cities/ABC, Inc.'s Application for Access to Sealed
   Transcripts*,
   913 F.2d 89 (3d Cir. 1990) ................................................................60

*Johnson v. Maryland*,
   254 U.S. 51 (1920)........................................................................23, 24

*Kansas v. Garcia*,
   140 S. Ct. 791 (2020)..........................................................................50

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
   991 F.3d 458 (3d Cir. 2021) ...............................................................50

*Leslie Miller Inc. v. Arkansas*,
   352 U.S. 187 (1956)......................................................................*passim*

*Lozano v. City of Hazleton*,
   620 F.3d 170 (3d Cir. 2010) ...............................................................38

*Lozano v. City of Hazleton*,
   724 F.3d 297 (3d Cir. 2013) ..........................................................*passim*

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ......................................................32, 34

*McHenry County v. Raoul*,
   44 F.4th 581 (7th Cir. 2022) .........................................28, 45, 48, 63

*MD Mall Assocs. LLC v. CSX Transp., Inc.*,
   715 F.3d 479 (3d Cir. 2013) ...............................................................51

*Me. Forest Prod. Council v. Cormier*,
   51 F.4th 1 (1st Cir. 2022)....................................................................45

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996)............................................................................39

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)...................................................................48

*Metropolitan Life Ins. Co. v. Massachusetts*,
471 U.S. 724 (1985)...................................................................63

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)...................................................................41

*Murphy v. National Collegiate Athletic Association*,
584 U.S. 453 (2018)......................................................8, 40, 44

*Newbrough v. Piedmont Reg'l Jail Auth.*,
No. 10-867, 2012 WL 169988 (E.D. Va. Jan. 19, 2012)....................43

*North Dakota v. United States*,
495 U.S. 423 (1990)............................................................*passim*

*Ocean Cty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*,
8 F.4th 176 (3d Cir. 2021) ....................................................*passim*

*Penn Dairies v. Milk Control Commission of Pennsylvania*,
318 U.S. 261 (1943)...................................................................26

*Preiser v. Rodriguez*,
411 U.S. 475 (1973)...................................................................47

*Public Utilities Commission of Cal. v. United States*],
355 U.S. 534 (1958)..............................................................21, 44

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
490 U. S. 477 (1989)..................................................................16

*Rowe v. New Hampshire Motor Transp. Ass'n*,
552 U.S. 364 (2008)...................................................................56

*Schrob v. Catterson*,
948 F.2d 1402 (3d Cir. 1991) ....................................................34

*Sikkelee v. Precision Airmotive Corp.*,
822 F.3d 680 (3d Cir. 2016) .....................................................48

*South Carolina v. Baker*,
    485 U.S. 505 (1988)........................................................26

*State Oil Co. v. Khan*,
    522 U. S. 3 (1997)..........................................................16

*State v. United States Dep't of Homeland Sec.*,
    88 F.4th 1127 (5th Cir. 2023) .......................................20

*TD Bank N.A. v. Hill*,
    928 F.3d 259 (3d Cir. 2019) ....................................37, 59

*The GEO Group, Inc. v. Inslee*,
    No. C23-5626 BHS, 2024 WL 1012888
    (W.D. Wash. Mar. 8, 2024) ..........................................35

*Toll v. Moreno*,
    458 U.S. 1 (1982)...........................................................38

*Treasurer of New Jersey v. U.S. Department of the Treasury*,
    684 F.3d 382 (3d Cir. 2012) ....................................19, 46

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ....................................46

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019) ........................................48

*United States v. City of Philadelphia*,
    798 F.2d 81 (3d Cir. 1986) ................................22, 27, 28

*United States v. Fresno County*,
    429 U.S. 452 (1977)......................................................26

*United States v. Hatter*,
    532 U. S. 557 (2001).....................................................16

*United States v. Locke*,
    529 U.S. 89 (2000)..................................................46, 55

*United States v. New Mexico*,
    455 U.S. 720 (1982)................................................14, 26

*United States v. Pa. Env't Hearing Bd.*,
  584 F.2d 1273 (3d Cir. 1978) .................................................................27

*United States v. Texas*,
  No. 1:23-CV-1537-DAE, 2024 WL 861526 (W.D. Tex.
  Feb. 29, 2024), *administrative stay granted*, No. 24-50149,
  2024 WL 909612 (5th Cir. Mar. 2, 2024), *administrative
  stay stayed*, 2024 WL 909451 and 2024 WL 909454
  (U.S. Mar. 4, 2024.) .................................................................................58

*United States v. Town of Windsor*,
  765 F.2d 16 (2d Cir. 1985) ...............................................................15, 28

*United States v. Washington*,
  596 U.S. 832 (2022)..........................................................................*passim*

*Va. Uranium, Inc. v. Warren*,
  139 S. Ct. 1894 (2019)...............................................................................11

*Webb v. City of Philadelphia*,
  562 F.3d 256 (3d Cir. 2009) .............................................................47, 59

**Statutes**

6 U.S.C. § 112(b)(2)......................................................................................2

8 U.S.C. §§1221-1232..................................................................................58

8 U.S.C. § 1222 ...........................................................................................58

8 U.S.C. § 1225(b)(1)(B)(ii) ....................................................................1, 42

8 U.S.C. § 1225(b)(2)(A).............................................................................42

8 U.S.C. § 1226 ...........................................................................................58

8 U.S.C. § 1226(a) ..................................................................................2, 42

8 U.S.C. § 1226(c)(l).....................................................................................42

8 U.S.C. § 1231(a)(2)..............................................................................2, 42

8 U.S.C. § 123l(g) ........................................................................................43

8 U.S.C. § 1231(g)(1)............................................................................2, 42

8 U.S.C. § 1231(g)(2)............................................................................2, 43

8 U.S.C. § 1357(g) ...............................................................................2, 58

8 U.S.C. § 1357(g)(3)..........................................................................30, 49

8 U.S.C. § 1357(g)(5)................................................................................30

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. §1332 .........................................................................................1

28 U.S.C. § 1367 ........................................................................................1

Immigration and Nationality Act,
    8 U.S.C. §§ 1101–1537 ......................................................................1

N.J. Stat. Ann. §§ 30:4-8.15 to -8.16 ........................................................5

N.J. Stat. Ann. § 30:4-91.10...........................................................6, 34, 36

**Regulations**

8 C.F.R. § 235.3(e)..............................................................................43, 58

48 C.F.R. § 1.601(a)...................................................................................3

48 C.F.R. § 3017.204-90........................................................................3, 43

**Constitutional Provisions**

U.S. Const. Article I, § 8, cl. 4 ...............................................................38

U.S. Const. Article VI, cl. 2 ...................................................................10

Plaintiff CoreCivic, Inc. ("CoreCivic") submits this brief in response to the brief of Appellants Philip D. Murphy in his official capacity as Governor of the State of New Jersey and Matthew J. Platkin in his official capacity as Attorney General of the State of New Jersey (collectively, "New Jersey," whose brief is referred to below as the "N.J. Br.") and the three briefs submitted by various amici in support of New Jersey.[1]

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331, 1332 and 1367.

## STATEMENT OF THE CASE

This appeal concerns New Jersey's attempt to control a central aspect of U.S. immigration enforcement – the detention of undocumented persons for civil immigration violations. Only the United States Immigration and Customs Enforcement ("ICE") is responsible for the detention of individuals for civil immigration violations.

### A.    The Federal Statutory Scheme and its Implementation

Congress has codified ICE's statutory powers and responsibilities in the Immigration and Nationality Act ("INA"), 8 U.S.C. §§1101–1537. The INA provides for the civil detention of aliens in various contexts. *See*, *e.g.*, 8 U.S.C.

---

[1] Amici are: various states and the District of Columbia, the American Civil Liberties Union of New Jersey and 27 other community organizations, and Pax Christi USA.

§§1225(b)(1)(B)(ii) (asylum); 1226(a) and 1231(a)(2) (detention pending

removal). States may participate in immigration detention under the INA's

comprehensive scheme only at the written agreement of and, most significantly for

this appeal, subject to the direction and supervision of, the Secretary of Homeland

Security.  8 U.S.C.A. §1357(g)(3, 5).[2]  Congress has directed the Secretary to

"arrange for appropriate places of detention for aliens detained pending removal or

a decision on removal."  8 U.S.C. §1231(g)(1).

The INA gives the Secretary options for obtaining the necessary detention

space when existing federal government facilities are unavailable.  The Secretary

may expend "amounts necessary to acquire land and to acquire, build, remodel,

repair, and operate facilities . . . necessary for detention."  8 U.S.C. §1231(g)(1).

Before "initiating any project for the construction of any new detention facility,"

the INA directs that ICE "shall consider the availability for purchase or lease of

any existing prison, jail, detention center, or other comparable facility suitable for

such use."  8 U.S.C. §1231(g)(2).

Congress also has vested the Secretary with "authority to make contracts . . .

as may be necessary and proper to carry out the Secretary's responsibilities."  6

U.S.C. §112(b)(2).  She may "delegate broad authority to manage the agency's

---

[2] Authority vested in the Attorney General was transferred to the Secretary of the
Department of Homeland Security (DHS) and divisions thereof by the Homeland
Security Act of 2002.  JA7 & n.2.

contracting functions to heads of such contracting activities." 48 C.F.R. §1.601(a).

ICE may "enter into contracts of up to fifteen years' duration for detention or

incarceration space or facilities, including related services." 48 C.F.R. §3017.204-

90.

ICE neither constructs nor solely operates its own immigration detention

facilities, but rather houses immigration detainees through: (1) ICE-owned,

contractor-operated facilities; (2) contractor-owned and contractor-operated

facilities; and (3) facilities owned by or operated on behalf of local governments

pursuant to an Intergovernmental Service Agreement. JA91-92 (Burke Dec.).[3]

This affords ICE necessary flexibility given the significant fluctuations in the

number and location of removable noncitizens apprehended by DHS and subject to

detention. JA91. ICE thus avoids investing heavily in its own facilities only to

have them stand idle if a particular area later experiences a drastic decrease in

demand for detainee housing. *Id.*

---

[3] Most of the record citations in this brief regarding the circumstances of civil immigrant detention are taken from the declarations submitted to the district court by the United States: Monica Burke, Acting Assistant Director of DHS and ICE Enforcement and Removal Operations (JA89-97), and Robert Guardian, Deputy Assistant Director for Field Operations within DHS and ICE Enforcement and Removal Operations (JA98-106). Certain other citations are to declarations submitted by CoreCivic's counsel, Bradley Simon (JA65-70) or its Vice President/Federal & Local Partnership Relations, Bart Verhulst (JA71-78).

The federal government has been housing immigration detainees in New Jersey since at least 1986. JA92. Prior to AB 5207's passage, ICE had use of four contracts to house detainees in New Jersey: two intergovernmental-service agreements with Essex County and Hudson County, the use of the U.S. Marshals' agreement with Bergen County, and the privately owned-and-operated Elizabeth Detention Center ("EDC") run by CoreCivic. ICE's access to the New Jersey counties' facilities was terminated in 2021 after the passage of AB 5207. JA93 (Burke Dec.).

### B. The EDC and its Role in ICE's Immigration Enforcement

CoreCivic operates the EDC under strict detention standards set by ICE, which employs a multilevel oversight and compliance program to ensure compliance with each contract's terms and conditions and the applicable ICE detention standards. JA75 (Verhulst Dec.). CoreCivic operates the EDC pursuant to a contract with ICE. ICE awarded CoreCivic the initial contract to operate the EDC in 2005 for a three-year period and, as of the order on appeal, had renewed that contract five times. JA73. The EDC is the only facility that houses ICE detainees within 60 miles of New York City. JA100. The facility has the capacity to hold 304 detainees. JA93 (Burke Dec.).

The EDC recorded 2,142 immigration detainee book-ins during Fiscal Year 2022, and 2,035 book-ins for Fiscal Year 2023 (as of July 15, 2023). JA100

(Guardian Dec.).  As of mid-June 2023, the EDC held approximately 285

detainees.  JA73 (Verhulst Dec.).  If AB 5207 were enforced to prevent ICE and

CoreCivic from operating the EDC, ICE would no longer have any facilities in

New Jersey to house civil immigration detainees.  JA94 (Burke Dec.).  Preventing

the EDC from continuing to operate would force ICE to either transport detainees

to out-of-state facilities or release noncitizens.  *Id.*  Transportation would cause

overcrowding and otherwise negatively affect detention in out-of-state facilities,

while release could, depending on the individual, create risks for the community.

*Id.*  As of the date of the district court's order, loss of access to the three county-

owned facilities in New Jersey had adversely affected ICE's operations and forced

it to relocate large numbers of high-risk and medium-risk noncitizen detainees to

detention facilities outside of New Jersey.  *Id.*

### C.    The New Jersey Statute and its Intended Effect

In August 2021, AB 5207 became law, codified at N.J. Stat. Ann. §§30:4-

8.15 to -8.16.  Because the detention of individuals for civil immigration violations

is an exclusively federal responsibility carried out by ICE and AB 5207 applies

only to "any immigration detention agreement," the effect of the statute is to

prevent ICE from discharging its statutory and Constitutional civil immigration

detention duties within the State.  This is also its purpose.  JA69-70 (Simon Dec.)

(statements of AB 5207's primary sponsor and Executive Director of amicus

ACLU of New Jersey).  In contrast, New Jersey allows itself use of private detention facilities for state detainees.  *See* N.J. Stat. Ann. §30:4-91.10 (". . . the Commissioner of Corrections may authorize the confinement of eligible inmates in private facilities.").

But for the district court's order, AB 5207 would have forced ICE to house civil immigration detainees outside of New Jersey upon the August 31, 2023 expiration of its contract with CoreCivic.  To do so, ICE would need to solicit new private contracts in other States to replace the lost capacity in New Jersey, which wouldn't be available for some time.  JA96 (Burke Dec.).  The EDC's proximity to two international airports makes the EDC crucial to ICE's operations as well as those of other federal agencies.  JA100-101 (Guardian Dec.).

Reliance on out-of-state facilities would impact the federal government by requiring transport of detainees to and from out-of-state facilities at 10 to 11 hours per trip, impeding the FBI's Joint Terrorism Task Force's ability to detain and interview at the EDC individuals who are watch-listed, delaying deportation of noncitizens who are denied entry at one of the nearby international airports, preventing ICE from taking custody of noncitizens subject to an immigration detainer upon their release by New Jersey state and local facilities, causing overcrowding at facilities that house ICE detainees in New York and, and

hampering "the ability of detainees with families in New Jersey to access their families" and their attorneys.  JA100-106.

Neighboring states could adopt similar laws, thus compounding the impact on ICE and effectively preventing it from detaining noncitizens who are public safety or national security risks in the region.  JA30 & n.12, 42-43 (district court opinion), 96 (Burke Dec.).  By opinion and order dated August 29, 2023, the district court declared that AB 5207 is inconsistent with principles of intergovernmental immunity and preemption and enjoined its enforcement with respect to ICE's arrangement with CoreCivic to house civil immigration detainees. JA20-31.[4]

## SUMMARY OF ARGUMENT

The district court correctly recognized that, as this Court and the Supreme Court have repeatedly held, state laws that regulate or unduly obstruct federal operations are barred by the Supremacy Clause under the doctrines of intergovernmental immunity and preemption.

New Jersey's challenge to the district court's order requires the acceptance of two contentions.  The first is that, in *United States v. Washington*, 596 U.S. 832 (2022), the Supreme Court supposedly overruled *sub silentio* decades of precedent

---

[4] ICE recently extended its EDC contract with CoreCivic from March 1, 2024 through August 31, 2024.  We note this development in the event the Court may deem it of significance in considering this appeal.

and held that a state statute is barred by intergovernmental immunity only if that law facially addresses the operations of the federal government, regardless of any substantial interference it may impose on federal operations carried out using federal contractors. *Washington* did not do so. Even if it had, the district court properly rejected New Jersey's contention by focusing on the substance rather than the form of AB 5207 to find that, both in purpose and effect, the New Jersey statute directly regulates the federal government. New Jersey's second contention is that, under *Murphy v. National Collegiate Athletic Association,* 584 U.S. 453 (2018), the INA does not sufficiently address private parties to permit a finding of preemption. The district court properly rejected this contention based on its careful review of the INA's statutory and regulatory scheme.

New Jersey puts its two contentions together to argue that AB 5207 survives review under the Supremacy Clause, even though its purpose and effect is to prohibit ICE from using contractors to discharge its Constitutional and statutory duties with respect to immigration – a subject over which the "Government of the United States has broad, undoubted power," *Arizona v. United States,* 567 U.S. 387, 394 (2012). But it is settled law that "[t]he Constitution's Supremacy Clause generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *Washington*, 596 U.S. at 835.

8

The district court properly found that AB 5207 prohibits ICE from exercising the discretion granted to it by Congress to carry out its responsibilities under the INA.  Based on that finding, the district court enjoined the application of the New Jersey statute as a matter of intergovernmental immunity and conflict/obstacle preemption.  The district court should be affirmed on both grounds.  While the district court had no need to consider whether AB 5207 is also invalid under intergovernmental immunity's anti-discrimination prong or is field preempted by the INA, both of these represent independent grounds on which to affirm the district court's order.

New Jersey's argument stretches both *Washington* and *NCAA* beyond their fair scope to reach a result neither intended.  New Jersey's argument that *Washington* adopted the view of the plurality opinion in *North Dakota v. United States*, 495 U.S. 423 (1990), regarding what constitutes direct regulation need be considered only if this Court rejects the district court's finding that AB 5207 operates against the federal government, as that finding of direct regulation renders the argument between the four-judge plurality and the four-judge partial dissent in *North Dakota* moot.  But even if AB 5207 were regarded as operating only against federal contractors, the non-binding plurality opinion that New Jersey says *Washington* adopted does not support reversal of the district court, because *Washington* did not even consider, much less adopt, the *North Dakota* plurality's

9

view of what constitutes direct regulation.  The differences between that case and this one are manifest: The *North Dakota* plurality saw no substantial obstruction of federal operations in that statute's operation on contractors and dismissed the dissent's concerns about the effect of its proposed narrowing of intergovernmental immunity by noting that Supremacy Clause concerns raised by state laws directed at federal contractors would be addressed by preemption.  *NCAA*, in turn, says nothing to overturn the substantial body of case law confirming that preemption is available to address Supremacy Clause concerns raised by state laws directed at federal contractors, whether or not intergovernmental immunity also applies.

Nothing in the amicus briefs supports New Jersey's challenge to the district court order.

## ARGUMENT

The district court based its decision on well-settled principles of law:

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof. . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  The Supremacy Clause prevents courts from "giv[ing] effect to state laws that conflict with federal laws."  *Armstrong v. Exceptional Child dr., Inc.,* 575 U.S. 320, 324 (2015) (citing *Gibbons v. Ogden*, 22 U.S. 1 (1824)). …

Two strains of Supremacy Clause jurisprudence are at issue in the case at bar.  One branch, the intergovernmental immunity doctrine, "prohibit[s] States from interfering with or controlling the operations of the Federal Government."  *United States v. Washington,* 142 S. Ct.

1976, 1984 (2022).  A separate branch, the preemption doctrine,
comprises several "different ways in which federal statutes may
displace state laws . ..." *Va. Uranium, Inc. v. Warren*, 139 S. Ct.
1894, 1901 (2019).

JA17-18.

New Jersey argues that the district court "adopted an overbroad standard for

intergovernmental immunity and incorrectly applied its test to AB 5207," N.J. Br.

17; and that preemption is unwarranted because the INA and its regulations "do not

regulate private parties" and "there is simply no conflict between AB 5207 and

these federal statutes."  N.J. Br. 35.

New Jersey's primary argument on intergovernmental immunity – that

*United States v. Washington* resolved a split in the Supreme Court's *North Dakota*

decision to hold that substantial inference with federal operations through

regulation of federal contractors is insufficient to support application of the

doctrine -- is relevant only if this Court concludes that (i) the district court erred in

finding that AB 5207 operates directly against the federal government, and (ii) AB

5207 does not discriminate against the federal government (an issue the district

court had no need to address).

There is no basis to disturb the district court's holding that AB 5207 operates

directly against the federal government.  Point I(A)(i).  Even if there were,

*Washington* did not adopt the *North Dakota* plurality's view of what constitutes

direct regulation (Point I(A)(ii)).  Neither New Jersey's discussion of the case law

11

(Point I(A)(iii)) nor its factual argument that AB 5207 does not interfere with federal operations (Point I(A)(iv)) provides any basis to disturb the district court's order. If considered, the *North Dakota* plurality did not say that states can escape scrutiny under the doctrine by "writing around" substantial interference with federal operations (Point I(A)(v)), and the policy arguments New Jersey advances provide no basis for reversal. Point I(A)(vi).

Affirmance also is proper on the independent ground that AB 5207 discriminates against the federal government and CoreCivic as its contractor, because New Jersey allows itself the very access to private facilities for certain of its own prisoners that AB 5207 denies to the federal government and CoreCivic for civil immigration detainees. Point I(B).

As to preemption, the district court conducted a detailed review of AB 5207's statutory and regulatory scheme and considered *NCAA* and New Jersey's other authorities in properly finding that the statute obstructs the purposes of the INA. Point II.

The amicus briefs raise matters outside the record that the Court should strike or disregard, and in any event provide no basis for reversal. Point III.

## I.    THE DISTRICT COURT PROPERLY APPLIED INTERGOVERNMENAL IMMUNITY

New Jersey is mistaken in arguing that the district court adopted an overbroad standard for intergovernmental immunity or incorrectly applied its test

to AB 5207.  Point I(A).  The district court's decision regarding intergovernmental immunity was also proper on the independent ground that AB 5207 discriminates against the federal government and CoreCivic as its contractor.  Point I(B).  Because this issue presents a question of law, it is subject to *de novo* review.

### A.    The District Court Properly Applied the Correct Standard for Impermissible Regulation Under Intergovernmental Immunity

New Jersey says that the district court "did not hold that AB 5207 'regulates the United States'," and that it applied the wrong standard in doing so.  N.J. Br. 17-18.  Those inconsistent arguments both rely on the contention that direct regulation can never be found based on a law that is facially directed at federal contractors regardless of the law's actual and intended impact on the federal government.

As we show at Point I(A)(i), the district court properly found that AB 5207 operates directly against the federal government.  This dispenses with the need to consider New Jersey's argument based on *United States v. Washington.*  But if this Court disagrees, the district court nevertheless properly found that *Washington* does not preclude a finding of direct regulation through substantial interference, Point I(A)(ii); and controlling law supports the district court's finding of impermissible regulation.  Point I(A)(iii).  New Jersey's factual arguments do not change this.  Point I(A)(iv).  Moreover, the *North Dakota* plurality considered dramatically different facts and never addressed the type or quantum of proof

13

required to establish direct regulation of federal operations.  Point I(A)(v).  New

Jersey's policy arguments do not warrant reversal.  Point I(A)(vi).

> i. *The district court properly found that AB 5207 directly operates against the federal government*

The district court found that AB 5207 constitutes impermissible direct

regulation:

> Although AB 5207 *purports to* not directly regulate the federal government, the Court finds that *New Jersey cannot accomplish what it could not do directly — enjoining the federal government from detaining individuals for civil immigration violations — by simply omitting the federal government's name from the law*.  *See City of Detroit v. Murray Corp. of Am.,* 355 U.S. 489, 492 (1958) ("Consequently in determining whether these taxes violate the Government's constitutional immunity we must look through form and behind labels to substance.").  Here, New Jersey's argument is tantamount to linguistic sophistry.

JA27 (emphases supplied).  And the district court properly rejected New Jersey's

argument that courts should "ask simply whether the federal government is named

in the text of a state statute":

> the Supreme Court has not adopted such a cramped view of the doctrine.  *In New Mexico*, the Court rejected the federal government's attempt to clothe its contractors working at nuclear sites under Supremacy Clause taxation immunity by designating them its "agents."  455 U.S. [720] at 732 [(1982)].  The Court decried this "manipulation and wooden formalism that . . . have no proper place in determining the allocation of power between coexisting sovereignties."  *Id.*  "We cannot believe that an immunity of constitutional status rests on such technical considerations, for that approach allows 'any government functionary to draw the constitutional line by changing a few words in a contract.'"  *Id.* at 737.

JA25-26 (citation omitted).

The district court also cited the Ninth Circuit's *en banc* decision in *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022), which struck a state statute prohibiting application to the federal government or its contractor of a ban on private detention facilities. *Geo Grp.* held:

> When a state regulation of a contractor would control federal operations, "[e]nforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government." *United States v. Town of Windsor*, 765 F.2d 16, 19 (2d Cir. 1985). Regardless of the object of enforcement, 'there is obviously implicated the same interest in getting the Government's work done.' *Boyle v. United Techs. Corp.*, 487 U.S. 500, 505, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); *see also Murray Corp.*, 355 U.S. at 492, 78 S. Ct. 458 ("[W]e must look through form and behind labels to substance" in assessing "constitutional immunity.").

New Jersey concedes that the doctrine of intergovernmental immunity, if applicable, precludes it from directly regulating the federal government's immigration enforcement practices. *See*, *e.g.*, N.J. Br. 3. The only argument it advances to challenge the district court's holding that AB 5207 operates directly against the federal government is its contention that there can be no claim of direct regulation if the law is drafted to prohibit private parties from contracting with the federal government and is phrased to avoid the necessary corollary that the federal government is also prohibited from contracting with those private parties. N.J. Br. 30 (collecting cases).

New Jersey fails to show that, in this context unlike all others, form rather than substance should determine whether a state statute engages in direct regulation of the federal government, nor does New Jersey even attempt to show that the many cases cited by the district court to the contrary have ever been overruled.  As the Supreme Court has often noted,

> "[I]t is this Court's prerogative alone to overrule one of its precedents," *United States v. Hatter*, 532 U. S. 557, 567 (2001) (quoting *State Oil Co. v. Khan*, 522 U. S. 3, 20 (1997); internal quotation marks omitted); *see Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U. S. 477, 484 (1989). … "Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States*, 524 U. S. 236, 252–253 (1998).

*Bosse v. Oklahoma,* 580 U.S. 1, 3 (2016).

Accordingly, because the district court was clearly correct in holding that "we must look through form and behind labels to substance," *Murray Corp.*, 355 U.S. at 492, in applying intergovernmental immunity, its order should be affirmed.

> ii.    *Washington did not adopt the North Dakota plurality's view as to what constitutes direct regulation*

New Jersey says the district court erred in finding direct regulation because *United States v. Washington*'s recital of the direct regulation standard means that it adopted the supposed view of the plurality opinion in *North Dakota* that impermissible regulation can never be found under a statute that facially operates

16

against federal contractors.[5]  According to New Jersey, because AB 5207 does not name the federal government, and because form rather than substance supposedly controls, New Jersey is free to negate the federal government's ability to contract with CoreCivic to provide a detention facility, even though the INA explicitly grants ICE discretion to carry out its detention responsibilities through agreements with private contractors.  That is so, says New Jersey, because "[a]lthough *North Dakota* involved a divided set of opinions, a unanimous Court adopted the same analysis in 2022 . . . [i]n *United States v. Washington . . . .*"  N.J. Br. 20.

The district court considered and properly rejected that argument:

The Supreme Court's deviation from its nineteenth century Supremacy Clause cases that struck down state laws *solely* on the increased costs they imposed on the federal government does not impose blinders on a reviewing court to refrain from *any* consideration of the state law's effect. . . .

Indeed, recent cases in which the Court held that a state statute did not violate the intergovernmental immunity doctrine specifically noted that the challenged state law did not affect the federal government's operations. . . .  The Court's most recent admonishment that a "a state law is thus no longer unconstitutional just because it indirectly increases costs for the Federal Government," *Washington*, 142 S. Ct. at 1984, does not bar the Court from any consideration of increased cost to the federal government.  Rather it merely commands that increased costs may not be the sole reason to find that a state law violates intergovernmental immunity.

---

[5] As noted above, this argument has no application unless this Court finds that the district court erred in holding that AB 5207 does, in fact, operate directly against the federal government.

JA24-25.

New Jersey seeks to dismiss the extensive Supreme Court and Third Circuit authority supporting the district court by arguing that, because it "conspicuously declined to include" substantial interference with federal operations as a separate basis for applying intergovernmental immunity, *Washington* should be read to have adopted the view of the *North Dakota* plurality that a statute that operates facially on contractors can never be found to constitute direct regulation. N.J. Br. 21. But *Washington* found the law before it invalid under the doctrine's discrimination prong. For that reason, the *Washington* Court had *no occasion to consider* whether or when a state law facially directed at federal contractors could constitute direct regulation of federal operations for purposes of intergovernmental immunity's regulatory prong.

The only thing *Washington* accepted from the *North Dakota* plurality opinion was the proposition that intergovernmental immunity requires direct regulation of the federal government. At pages 19-20 of its brief, New Jersey cites Justice Scalia's *North Dakota* concurrence as recognizing that the existence of the direct regulation requirement was not the subject of dispute in *North Dakota*. The question on which the plurality and Justice Brennan's partial dissent differed was whether a statute operating against contractors can constitute impermissible regulation; the focus of the Justices in both camps was on that question, not on

whether such a regulation should be called "direct." *Washington* never even

considered, much less addressed, that question.[6] This is confirmed by review of

the *Washington* Court's very brief decision, which cites *North Dakota* only twice –

once for the proposition that intergovernmental immunity requires either direct

regulation or discrimination, and then for the proposition that, as to the

discrimination prong, an indirect cost to the federal government is no longer *by

itself* sufficient:

> We later came to understand the doctrine, however, as prohibiting
> state laws that either "regulat[e] the United States directly or
> discriminat[e] against the Federal Government or those with whom it
> deals" (e.g., contractors.) . . . *As to the latter, discrimination-related
> prohibition, a state law is thus no longer unconstitutional just because
> it indirectly increases costs for the Federal Government*, so long as
> the law imposes those costs in a neutral, nondiscriminatory way.

596 U.S. at 838-39 (citations omitted, emphasis supplied).

New Jersey asks this Court to hold that the *Washington* Court resolved the

vigorous split between the plurality and partial dissent in *North Dakota,* and did so

by overturning *sub silentio* its own substantial precedents, all based on a passing

reference to a standard whose application was not at issue in *Washington.* Instead,

*Washington* confirms that direct regulation is required, but has nothing to say about

---

[6] Similarly, *Treasurer of New Jersey v. U.S. Department of the Treasury*, 684 F.3d
382, 410-11 (3d Cir. 2012), which concerned application of various state escheat
statutes to federal bonds and did not present any question about regulation of
contractors, had no reason to consider or apply some "other test" (N.J. Br. 26).

whether it can be presented through a statute that operates facially on federal contractors but in substance controls the federal government itself.

The Supreme Court's recent reversal of a preliminary injunction confirms, in the immigration context, that *Washington* does not remove substantial interference with federal operations from the reach of the intergovernmental immunity doctrine. In *State v. United States Dep't of Homeland Sec.*, 88 F.4th 1127 (5th Cir. 2023), Texas sought to enjoin the U.S. Border Patrol from interfering with wire barriers Texas had constructed along a portion of its border with Mexico. The Fifth Circuit expressly relied on *Washington* to reject the federal government's intergovernmental immunity argument:

> Defendants have no intergovernmental immunity because Texas is exercising its rights only as a proprietor, and, as the district court found, Texas is neither directly regulating the Border Patrol nor discriminating against the federal government. *See United States v. Washington*, 596 U.S. 832, 838–39, 142 S.Ct. 1976, 213 L.Ed.2d 336 (2022).

88 F.4th at 1135. Although the Circuit had properly noted that Texas did not seek to dictate how the federal government should conduct its immigration enforcement activities and sought only relief against interference with its own, supplementary actions to prevent unauthorized entry, the Supreme Court vacated the injunction in a summary opinion. *Dep't of Homeland Sec. v. Texas,* No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024).

20

*Washington*'s statement that "a state law is thus no longer unconstitutional just because it indirectly increases costs for the Federal Government" applies on its face only to intergovernmental immunity's discrimination prong.  Having found direct regulation, the district court did not reach the discrimination prong and was not obliged to consider the heightened standard *Washington* identified.  It elected to do so anyway, and New Jersey cannot complain of the application of a standard more favorable to its view.  We proceed to show that even under that more demanding standard, the district court properly applied Supreme Court and Third Circuit authority to find impermissible regulation.

> iii.   *New Jersey's discussion of the case law provides no basis to disturb the district court's order*

The district court considered AB 5207's interference with federal operations, JA26-31, and explained why intergovernmental immunity does not permit it:

> New Jersey's de facto prohibition on the federal government's exercise of discretion to determine what constitutes an "appropriate place [] of detention" is akin to Arkansas's restriction of the government's discretion to determine a "responsible bidder," held unconstitutional in *Leslie Miller* [*Inc. v. Arkansas*], 352 U.S. [187] at 190 [(1956)]. In *Public Utilities Commission* [*of Cal. v. United States*], the Court enjoined enforcement of a California law that affected the "practice of the [federal] Government" to effectuate the "federal policy of negotiated rates," 355 U.S. [534] at 544-45 [(1958)]; similarly, AB 5207 would impede the federal government's method of effectuating its congressional mandate to detain individuals for civil immigration violations.
>
> Indeed, AB 5207 would pose a greater impediment to the federal method of detaining individuals for civil immigration violations than

the impediments found unconstitutional in *Leslie Miller* and *Public Utilities Commission*. In those cases, the state statutes that fell before the Supremacy Clause merely set conditions on private contractors performing federal work. AB 5207 goes steps further by entirely banning them from contracting with the federal government. A law that skips the unconstitutional burdening of a federal contractor and instead directly bars any contract between the United States and its chosen contractor cannot survive Supremacy Clause scrutiny.

JA26-27.

The district court also cited *Geo Grp.* which, as quoted above, supports its earlier conclusion that a statute that forbids contractors from entering into agreements with the federal government operates directly on the federal government as well as on the contractors. As the district court noted, the *Geo Grp.* court also considered the related but distinct question whether the same statute would be permissible if it were regarded as regulating only contractors:

> [W]hen federal law gives discretion to a federal official to hire a contractor to perform federal work, a state cannot override the federal official's decision to do so. That is a level of control over federal operations that the Supremacy Clause does not tolerate. And while a state has greater power to apply neutral regulations to a federal contractor than a federal employee, interfering with the federal government's hiring decisions goes too far—regardless of whether the decision is to hire an employee or a private contractor.

JA20 (quoting 50 F.4th at 757).

The district court's holding is further supported by *United States v. City of Philadelphia*, 798 F.2d 81 (3d Cir. 1986) (citing intergovernmental immunity in affirming injunction against application of regulation prohibiting discrimination

against homosexuals with respect to such agency's relationship with the U.S.

military); *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988) ("a federally

owned facility performing a federal function is shielded from direct state

regulation, even though the federal function is carried out by a private contractor,

unless Congress clearly authorizes such regulation"); and *Granillo v. FCA US*

*LLC,* No. 16-cv-153, 2016 WL 9405772, at *19 (D.N.J. Aug. 29, 2016) (because

"[a] recall of motor vehicles cannot be conducted pursuant to the [National

Highway Traffic Safety Administration]'s guidelines without the involvement of,

and action being taken by, the NHTSA", Plaintiff's requested order for automobile

manufacturer to recall certain vehicles "clearly violates the doctrine of

intergovernmental immunity.").

New Jersey's analysis of the case law fails to identify any error by the

district court.  New Jersey does not address *Johnson v. Maryland,* 254 U.S. 51, 55

(1920), which the district court cited for the proposition that "state laws that dictate

how the federal government carries out its federal functions" constitute

impermissible regulation of the federal government.  JA21.  And New Jersey fails

in its effort to distinguish the cases the district court cited to support its conclusion

that "*Johnson*'s predominant constitutional concern — that states should not

impose conditions on top of 'those that the Government has pronounced

23

sufficient,' *Johnson*, 254 U.S. at 57 — applies with similar force to federal

contractors." JA22.

New Jersey contends that *Leslie Miller* and *Public Utilities Commission* do

not apply because the *North Dakota* plurality regarded them as preemption, rather

than intergovernmental immunity, decisions.  N.J. Br. 28.  But the Court's

decisions in those cases expressly conduct their analyses under, and rely on

precedents under, intergovernmental immunity.  *See Leslie Miller,* 352 U.S. at 190;

*Public Utilities Commission*, 355 U.S. at 544, 548, 551-52; *see also North Dakota,*

495 U.S. at 452–54.  They also support preemption, due to the relatedness of the

doctrines (as discussed at Point II), but neither expressly mentions the principle of

preemption.

New Jersey's argument that *Leslie Miller* and *Public Utilities Commission*

should be read to abandon the immunity principles on which they relied in favor of

preemption principles they did not invoke does not survive review of those cases.

Both concerned laws that operated against the federal government through

regulation of its contractors, and found obstruction through conflict with the policy

behind federal law sufficient.  *Leslie Miller*, 352 U.S. at 258-59 ("Subjecting a

federal contractor to the Arkansas contractor license requirements would give the

State's licensing board a virtual power of review over the federal determination of

'responsibility' and would thus frustrate the expressed federal policy of selecting

the lowest responsible bidder"); *Public Utilities Commission*, 355 U.S. at 544

(state law that operated facially against contractors "places a prohibition on the

Federal Government "and "the conflict between the federal policy of negotiated

rates and the state policy of regulation of negotiated rates seems to us to be clear").

This fully supports the district court's reliance on these cases to find that

enforcement of AB 5207 "would impede the federal government's method of

effectuating its congressional mandate to detain individuals for civil immigration

violations." JA26.

The district court explained in detail why it found the Ninth Circuit's

decision in *Geo Grp.* persuasive. JA20-27. After carefully reviewing the

substantial body of case law under the doctrine of intergovernmental immunity,

*Geo Grp.* held that a statute outlawing contracts for private detention could not be

applied to the federal government and its contractors. 50 F.4th at 759-61. The

Ninth Circuit recognized that such regulation is the very paradigm of what the

intergovernmental immunity doctrine forbids. Invoking *Leslie Miller*, it

concluded, in strikingly applicable language quoted by the district court: "'[i]f

California could not prohibit ICE from hiring a particular private detention

operator by imposing licensing requirements, it surely cannot regulate private

detention operators out of existence through a direct ban.'" *Geo Grp.*, 50 F.4th at

757-58, quoted at JA27.  New Jersey's dismissal of the Ninth Circuit's review of a substantially identical statute as "an outlier" (N.J. Br. 27) is baseless.

New Jersey's reliance on *South Carolina v. Baker,* 485 U.S. 505 (1988), *United States v. New Mexico*, 455 U.S. 720 (1982), and *United States v. Fresno County,* 429 U.S. 452 (1977), is misplaced.  The district court considered these authorities, which concerned state taxation, not regulation, of federal contractors. *See*, *e.g.*, JA24 & n.11.  Indeed, the district court noted that *New Mexico* and *Fresno County* both supported its holding, as each allowed the taxing schemes at issue only after finding that they did not threaten to obstruct federal operations. JA25.

New Jersey's contention that the district court erred because "the *North Dakota* plurality cited *Fresno County* as direct support for the principle that a 'state regulation is invalid only if it regulates the United States directly or discriminates against the Federal Government or [its contractors],'" N.J. Br. 27 (citation omitted), misses the point.  As discussed above, the district court applied the direct regulation standard, JA23-24, 27, and neither *Fresno County* nor any of New Jersey's authorities give reason to question the manner in which it did so.

New Jersey fares no better in its reliance on *Penn Dairies v. Milk Control Commission of Pennsylvania*, 318 U.S. 261 (1943), and *Hancock v. Train*, 426 U.S. 167 (1976).  *Penn Dairies* upheld application of Pennsylvania minimum milk

price regulations for sales to U.S. military installations in Pennsylvania. But the sale of milk is incidental to the business of the military and New Jersey never explains why this authority should be read to overrule *Leslie Miller*, *Public Utilities Commission*, and the other authorities relied on by the district court, to sustain a state statute that seeks to control a central federal function like immigrant detention and that flatly prohibits, rather than merely regulates, the federal government's use of contractors in discharging that function.[7]

Unlike New Jersey's cases, *City of Philadelphia* addresses direct regulation of the federal government through regulation of its contractors and confirms that a state or local provision regulating private parties that obstructs federal operations implicates intergovernmental immunity. There, the district court granted an injunction preventing the City from "adjudicating any complaint or taking any

---

[7] New Jersey's other cases add nothing of substance. New Jersey cites *Hancock v. Train* as "noting the limits of intergovernmental immunity," N.J. Br. 19; and *Chamber of Com. of United States v. Whiting*, 563 U.S. 582 (2011), and *United States v. Pa. Env't Hearing Bd.*, 584 F.2d 1273 (3d Cir. 1978), for the proposition that courts are powerless to "reconcile competing federal-state demands on private parties." N.J. Br. 22. New Jersey never explains why *Hancock*, which barred a state's enforcement against federally owned or operated facilities of a federally approved state implementation plan under the Clean Air Act, should be read to prohibit the application of intergovernmental immunity to a state law like AB 5207 which seeks to exercise unilateral control over federal operations; or why *Whiting* or *Pa. Env't Hearing Bd's* analyses of "competing federal-state demands on private parties" should control analysis of the intergovernmental immunity doctrine here. *Leslie Miller, Public Utilities Commission, Goodyear Atomic Corp.* and the other cases discussed above make plain that they should not.

adverse action under the [Ordinance] against any person, corporation, association or group based on the Commission's objection to the policy of the United States in discriminating on the basis of sexual orientation in its military recruitment efforts." 798 F.2d at 85.

Although all parties agreed that the Ordinance could not be enforced directly against the United States military, *id.*, this Court affirmed the injunction, expressly finding enforcement of the Ordinance against private actors who cooperated in military recruiting to be an impermissible direct regulation of the Government itself:

> Temple is barred from cooperating with the military unless and until the United States changes its employment policy with respect to homosexuals.  Under these circumstances, we believe that the Commission has no more right to enforce the Ordinance against Temple than did the *Town of Windsor* to enforce its building permit regulations against the contractor hired to construct a top-secret federal research facility.

798 F.2d at 89.[8]

---

[8] New Jersey relies on *McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022), N.J. Br. 26-27, which, contrary to this Court's holding in *City of Philadelphia*, expressed the view that direct regulation can never be properly found under a statute that facially operates on federal contractors.  But *McHenry Cty.* did not concern application of state law to contractors – it presented the dramatically different question of whether intergovernmental immunity bars application of a state statute that prevents the state and its subordinate bodies from engaging in the detention of immigrants.  As the district court noted (JA20-21), *McHenry Cty.* relied heavily on that distinction.  Moreover, in declining to extend a stay it had granted to two counties against enforcement of the state law's provision requiring them to terminate existing immigration detention agreements with the federal

> iv.  *New Jersey fails in its factual challenge to the district court's finding that AB 5207 impermissibly obstructs federal operations*

New Jersey argues that "even assuming private contractors are constitutionally immune from state laws that unduly interfere with the Federal Government's operations, AB 5207 is not the practical impediment the district court believed" because ICE could "buy or lease the EDC property itself and operate the facility directly" and "the mere imposition of downstream costs on a federal agency cannot be enough to grant a private company immunity."  N.J. Br. 33-34.  As shown above, the district court applied this heightened standard even though the language from *Washington* setting it out applies only to intergovernmental immunity's discrimination prong, not to the regulatory prong on which the district court relied.

In applying the heightened standard, the district court correctly found that controlling law holds only that increased costs "may not be the *sole* reason to find that a state law violates intergovernmental immunity" (JA25), not that they can never be considered.  Based on undisputed evidence in the record, the district court found that "AB 5207 would force the federal government to do something it currently does not do because it has expressly contracted performance of that

---

government, the Seventh Circuit wrote: "The Act does not appear to violate principles of intergovernmental immunity because the Act only directly regulates state political subdivisions."  2022 WL 636643, at *1 (7th Cir. Jan. 12, 2022).

function [civil immigrant detention] out to private operators." JA25. It then

confirmed that such interference is sufficient to invoke intergovernmental

immunity under controlling law:

> This forced change, as AB 5207 would require, is on par with the
> level of federal disruption the Supreme Court sought to avoid in
> *Public Utilities Commission*. There, the Court reviewed in depth "the
> seriousness of the impact of California's regulation on the action of
> federal procurement officials." 355 U.S. at 544 . . .. Similarly here,
> once New Jersey takes ICE's ability to contract with counties or
> private entities off the table, ICE would be required to conduct its
> detention operations in an entirely different manner.

JA28-29. It bears repeating in this regard that the INA allows states to participate

in immigrant detention only by written agreement with, and "subject to the

direction and supervision of," the Secretary. 8 U.S.C. §1357(g)(3,5).

> v.     *If considered, the non-controlling reasoning of the*
>        *North Dakota plurality would not warrant reversal of the*
>        *district court*

As acknowledged at page 18 of the N.J. Br., only four Justices in the *North*

*Dakota* plurality, not a majority of the Court, held that intergovernmental

immunity was not applicable there because the statute before it did not "'regulate[]

the United States directly or discriminate[] against the Federal Government or

those with whom it deals'." New Jersey relies on the plurality's view that direct

regulation could not be found because the statute there at issue "operate[d] against

suppliers, not the Government." N.J. Br. 19. But, in expressing its view that a law

requiring labeling and reporting by contractors as to liquor purchased out of state

and sold on military bases did not constitute impermissible regulation of the
federal government, the *North Dakota* plurality expressly found that there was "no
evidence" that the burden on federal operations it created would be "substantial."
495 U.S. at 443.  The four Justices joining Justice Brennan's partial dissent from
the Court's decision as to the labeling requirement[9] disagreed: "[t]he labeling
requirement imposed by North Dakota is not a trifling inconvenience . . . The cost
of complying with the regulation [] is far greater than the few pennies per label
acknowledged by the plurality."  495 U.S. at 449.

There is no comparison between the degree of obstruction presented by a
law requiring federal contractors to put a label on liquor bottles sold to military
bases and one that, like AB 5207, completely denies the federal government the
right to use its chosen contractors in discharging core Constitutional and statutory
obligations.  The view of the *North Dakota* plurality as to direct regulation was
thus expressed under entirely different facts, and its analysis provides no guidance.

> vi.    The *"first principles"* and policy considerations that New
>        Jersey identifies do not justify overturning the district court

New Jersey makes two arguments about "policy" or "principle" regarding
the district court's application of intergovernmental immunity.  N.J. Br. 23-25, 29-
30.  First, it argues that application of intergovernmental immunity offends

---

[9] Justice Scalia wrote separately and concurred in judgment, providing the fifth
vote to uphold the labeling requirement.

"separation of powers" because Congress, not the courts, should decide whether and how states can regulate federal operations, and offends federalism because it interferes with the state's general regulatory powers.  Second, and relatedly, it argues that, because there is no "bright line" demarcating what degree of obstruction triggers intergovernmental immunity, application of the doctrine would be "inadministrable" and may lead to undesirable results in other circumstances.

Issues of separation of powers and federalism are inherent to application of the Supremacy Clause, have been frequently considered by the Supreme Court since at least *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819), and informed the case law relied on by the district court.  New Jersey does not attempt to dispute this, and the district court's opinion presents no special concerns on these points, as it concerned direct regulation through operation of a statute that is directed at preventing the federal government from hiring its contractor of choice to discharge its Constitutional and statutory duties in an area of core federal concern.

New Jersey's argument amounts to the contention that prohibiting it from denying the federal government the right to use private facilities for civil immigrant detention would leave the scope of federal immunity insufficiently defined.  N.J. Br. 4 ("courts cannot imply a freestanding constitutional immunity for private contractors").  But that is not true.  The district court's rejection of the

unprecedented degree of state control over federal operations in an area of core

federal concern that AB 5207 represents does not involve any difficult line-

drawing.  The district court's decision was specific to the facts before it:

> In [*Leslie Miller* and *Public Utilities Commission*], the state statutes
> that fell before the Supremacy Clause merely set conditions on private
> contractors performing federal work.  AB 5207 goes steps further by
> entirely banning them from contracting with the federal government.
> A law that skips the unconstitutional burdening of a federal contractor
> and instead directly bars any contract between the United States and
> its chosen contractor cannot survive Supremacy Clause scrutiny.

JA26-27.

The district court also specifically based its application of intergovernmental

immunity on its detailed finding, amply supported by its citations to the record,

that "AB 5207 — far from merely increasing the cost to ICE to house immigrant

detainees in New Jersey — would effectively shut down its operations in violation

of the Supremacy Clause" and would therefore require the federal government "to

conduct its detention operations in an entirely different manner."  JA29.  The

district court further found that this would be contrary to the INA's express

preference for existing facilities over new construction, and to ICE's judgment that

private facilities allow it to carry out its responsibilities under the INA without

incurring the cost of owning facilities that may not be needed during periods of

lesser demand.  JA28.

That more difficult line-drawing may be required in future cases, if true, provides no basis to disturb the district court's holding on the facts before it. *See, e.g.*, *Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976) ("Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them," quoted by *Schrob v. Catterson*, 948 F.2d 1402, 1414 (3d Cir. 1991)); *Helvering v. Gerhardt*, 304 U.S. 405, 415 (1938) ("We need not stop to inquire how far, as indicated in *McCulloch v. Maryland*, supra, the immunity of federal instrumentalities from state taxation rests on a different basis from that of state instrumentalities; or whether or to what degree it is more extensive. As to those questions, other considerations may be controlling which are not pertinent here"); *Colson v. Bertsch*, 586 F. Supp. 1289, 1295 (D.N.J. 1984) ("That the result of the employment of an economic reality test [with respect to the federal securities laws] requires courts to undertake difficult line drawing . . . , , cannot be gainsaid. Such, however, is the function of the judge: courts draw difficult to ascertain lines every day where to do so is in the interests of justice or, as here, congressional purpose.") (collecting examples).

**B.    The District Court's Order Was Also Proper on the Independent Ground That AB 5207 Discriminates Against the Federal Government and CoreCivic as its Contractor**

N.J. Stat. §30:4-91.10 expressly permits "the Commissioner of Corrections [to] authorize the confinement of eligible inmates in private facilities." In contrast,

AB 5207 prohibits all use of private detention facilities for civil immigration

detainees, without exception.

Having stricken AB 5207 on the grounds of the intergovernmental immunity

doctrine's prohibition of impermissible regulation of the federal government's

operations (as well as preemption), the district court did not reach this issue.  JA31

n.13.  But it could have acted on this ground as well.  As stated by the *North*

*Dakota* plurality (in language regarding intergovernmental immunity's

discrimination prong that was not within the scope of Justice Brennan's four-

Justice partial dissent regarding the regulation prong, and therefore enjoyed

support from the full Court):

> Since a regulation imposed on one who deals with the Government
> has as much potential to obstruct governmental functions as a
> regulation imposed on the Government itself, the Court has required
> that the regulation be one that is imposed on some basis unrelated to
> the object's status as a Government contractor or supplier, that is, that
> it be imposed equally on other similarly situated constituents of the
> State.

495 U.S. at 438 (internal quotation marks omitted); *see also The GEO Group, Inc.*

*v. Inslee*, No. C23-5626 BHS, 2024 WL 1012888, at *15 (W.D. Wash. Mar. 8,

2024) (enjoining as discriminatory enforcement against federal immigration

detention facility of state statute concerning conditions at private detention

facilities.)

New Jersey concedes that "[i]f it accords federal contractors 'less favorable 'treatment' or 'regulates them unfavorably on some basis related to their governmental 'status,' the contractors are immune."  N.J. Br. 31 (internal citations omitted).

New Jersey's contention that §30:4-91.10 applies only to certain categories of State detainees (N.J. Br. 31-32) is of no moment.  AB 5207 does not allow the federal government to contract with private immigration detention facilities in any circumstances, including with respect to "especially low-security prisoners" or "public or licensed private psychiatric care facilities" as New Jersey concedes it allows itself.

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989), New Jersey's sole authority on this point, illustrates the deficiency in its argument.  There, the Court struck as discriminatory a state tax that applied to federal but not state employees.  Michigan put forward two justifications for its less favorable treatment of the federal government: 1) its interest in hiring and retaining qualified civil servants, and 2) that the retirement benefits of state employees were generally less than those of federal employees.  489 U.S. at 816.  The Court rejected both bases, the first because "[t]he State's interest in adopting the discriminatory tax, no matter how substantial, is simply irrelevant to an inquiry into the nature of the two classes receiving inconsistent treatment", *id.*, and the second because a "tax exemption

truly intended to account for differences in retirement benefits would not

discriminate on the basis of the source of those benefits . . . rather, it would

discriminate on the basis of the amount of benefits received by individual retirees."

*Id.* at 817.

Similarly here, New Jersey's recognition that there are instances where it

benefits from access to private facilities does not show that the federal government

is in a different class that may be treated differently. In any event, New Jersey has

no basis to argue that the federal government has no low-security detainees or

detainees it believes could benefit from psychiatric care. And, as in *Davis*, a non-

discriminatory law would allow access to such facilities based on some rational

criteria other than status as a state or federal entity.

This Court should therefore affirm on the additional ground that AB 5207

violates the anti-discrimination prong of the intergovernmental immunity standard.

*TD Bank N.A. v. Hill,* 928 F.3d 259, 270 (3d Cir. 2019) ("We may affirm on any

basis supported by the record, even if it departs from the District Court's

rationale.").

## II.    THE DISTRICT COURT PROPERLY APPLIED PREEMPTION TO ENJOIN ENFORCEMENT OF AB 5207

"When the national government by treaty or statute has established rules and

regulations touching the rights, privileges, obligations or burdens of aliens as such,

the treaty or statute is the supreme law of the land." *Hines v. Davidowitz,* 312 U.S.

52, 62–63 (1941), *superseded by statute on other grounds* as stated in *Lozano v. City of Hazleton,* 724 F.3d 297, 303 (3d Cir. 2013).[10]  The district court's legal conclusion that preemption bars enforcement of AB 5307 is reviewed *de novo*.

As the district court found, and New Jersey does not dispute:

> "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012) (citing *Toll v. Moreno*, 458 U.S. 1, 10 (1982)).  This authority flows from "the National Government's constitutional power to 'establish a uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* at 394-95 (quoting U.S. Const. art. I, § 8, cl. 4, then citing *Toll*, 458 U.S. at 10).  "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Id.* at 396.  "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Id.*  "Agencies in [DHS]," including ICE, "play a major role in enforcing the country's immigration laws." *Id.* at 397.

JA63.

The district court set out the standard governing its conflict/obstacle preemption analysis as follows:

> The Court's determination of "an unconstitutional impediment to federal law . . . [is] 'informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *Lozano [I]*, 724 F.3d at 303] (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)).  This requires weighing "the entire scheme of the statute" to determine "if the purpose of the federal act cannot

___

[10] In *Lozano*, this Court reconsidered its decision in *Lozano v. City of Hazleton,* 620 F.3d 170 (3d Cir. 2010), in light of *Whiting* and *Arizona* and adhered to its prior determination, with certain adjustments in reasoning not relevant here.  JA41 & n.19.  We refer to the earlier-reported decision at 620 F.3d 170 as "*Lozano II*" and to the later-reported case at 724 F.3d 297 as "*Lozano I*".

otherwise be accomplished — if its operation with its chosen field would be frustrated and its provisions be refused their natural effect" — by enforcement of the conflicting state law. . . .

"Federal regulations preempt state laws in the same fashion as congressional statutes." *Farina* [*v. Nokia Inc.*,] 625 F.3d [97] at 115 [(3d Cir. 2010)], (citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).  "Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive affect than federal statutes, assuming those regulations are a valid exercise of the agency's delegated authority." *Id.* at 243 (quoting *Fellner* [*v. Tri-Union Seafoods, L.L.C.*], 539 F.3d [237] at 248) [(3d Cir. 2008)].

The "ultimate touchstone" of any preemption analysis is Congress's intent. *Medtronic,* [*Inc. v. Lohr*], 518 U.S. [470] at 485 [(1996)] (citations omitted).  Congressional intent is determined through "the language of the pre-emption statute and the 'statutory framework' surrounding it." *Id.* at 486 (quoting *Gade* [*v. Nat'l Solid Wastes Mgmt. Assn.*], 505 U.S. [88] at 111 [(1992)] (Kennedy, J., concurring)).  The Court must also consider the "structure and purpose of the statute as a whole," considered in light of "the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* (citing *Gade*, 505 U.S. at 98).

JA36-37 (certain internal citations omitted).

New Jersey argues that the district court erred in finding preemption because 1) the INA does not regulate private parties, and 2) there is no conflict between AB 5207 and the INA.  N.J. Br. 35.

The district court properly applied controlling law in finding

conflict/obstacle preemption (Point II(A)) and, although it did not reach the issue,

its holding would also have been proper under field preemption.  Point II(B).

**A.    The District Court Properly Found Conflict/Obstacle Preemption**

The district court properly considered the INA's operation with respect to

private parties, Point II(A)(i), properly declined to apply a "presumption against

preemption," Point II(A)(ii), and, whether or not such a presumption applies,

followed controlling law in finding AB 5207 to be preempted as an obstacle to

accomplishment of the INA's purposes.  Point II(A)(iii).

> i.    *The district properly considered the INA's operation with respect to private parties*

Relying on *NCAA* and *Ocean Cty. Bd. of Commissioners v. Att'y Gen. of

State of New Jersey,* 8 F.4th 176 (3d Cir. 2021), New Jersey argues that the district

court erred in finding the INA to have preemptive effect because, it says, the INA's

statutory and regulatory scheme does not sufficiently concern itself with private

actors.  N.J. Br. 35-40.  But review of *NCAA* and *Ocean Cty.* and of the district

court's analysis of the INA's statutory and regulatory scheme shows otherwise.

*NCAA* struck down a federal law that sought to prevent the State of New

Jersey from partially repealing its prohibitions against sports gambling.  The Court

began by acknowledging that, under the Supremacy Clause, "when federal and

state law conflict, federal law prevails and state law is preempted."  584 U.S. at

471.  In the immediately ensuing text, it confirmed that its holding was premised

primarily on the anticommandeering doctrine.  In any event, its discussion of

preemption is consistent with the district court's holding with respect to private

parties.

This is illustrated by *NCAA*'s distinction of *Morales v. Trans World Airlines,*

*Inc.*, 504 U.S. 374 (1992), which had found preemption warranted by a federal

statute that did not name private actors as its subject.  *NCAA* did not overrule

*Morales.*  Instead, the Court held that it is not whether federal law operates facially

on private individuals that matters, but rather whether it does so as a practical

matter: "This language [from the Federal Aviation Act, on which the preemption

analysis turned] might appear to operate directly on the States, but if we look

beyond the phrasing . . . , it is clear that this provision confers on private entities

(*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to

certain (federal) constraints."  *NCAA*, 138 S. Ct. at 1480.

Similarly, in *Ocean Cty.* this Court went out of its way to clarify that it

found preemption inapplicable because there was no plausible reading of the

federal statutes at issue that could implicate private actors:

> Section 1644 [provides] "no State or local government entity may be
> prohibited, or in any way restricted," from communicating
> immigration information to the federal government.  Written in the
> passive voice, § 1644 does not specify who may not prohibit or
> restrict state action.  But in our view, the best reading of the provision

> is that it does not regulate private actors. . . because private actors can neither "prohibit[ ]" state action nor "restrict[ ]" it.

8 F.4th at 181–82. *Ocean Cty.* was concerned with the state's right to direct its own officials as to whether or not to share information – not with the federal government's right to contract with private contractors in the discharge of its duties. In reviewing and explaining how the INA encourages, regulates and authorizes private immigration agreements, the district court recognized the right of private parties to enter into such agreements, as we show immediately below. *See also* JA38-40. Therefore, *Ocean Cty.*, like *NCAA*, is not contrary to the district court's finding of preemption.

New Jersey's argument that the district court failed to properly consider *NCAA* and *Ocean Cty.* is disproven by review of the opinion below, which carefully analyzed the INA's statutory and regulatory scheme and concluded that it applies to private actors:

> The language and framework of the [INA] make plain Congress's intent that the federal government is authorized to decide whether to detain individuals for civil immigration violations, and if so how to detain them, without submitting to state regulation. Congress either requires ICE to detain non-citizens under various provisions of the INA, *see* 8 U.S.C. § 1231(a)(2); 8 U.S.C. § 1225(b)(l)(B)(ii), (b)(2)(A); 8 U.S.C. § 1226(c)(l), or grants DHS discretion to decide whether detention is appropriate, *see* 8 U.S.C. § 1226(a). Whether an individual is detained either by congressional mandate or pursuant to a DHS determination. Congress has granted DHS the discretion to decide the appropriate manner of detention. 8 U.S.C. § 1231(g)(l) ("The [Secretary of the DHS] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on

42

removal.").  Congress has also guided the exercise of DHS's discretion, by instructing DHS to "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use" before "initiating any project for the construction of any new detention facility for the Service."  8 U.S.C. § 1231(g)(2).

JA38-39.

The district court also properly considered the INA's regulatory scheme, under which:

> ICE may "enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services."  48 C.F.R. § 3017.204-90.  However, any private facility that houses detainees pursuant to an ICE contract must meet additional requirements. When "an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service" must meet four listed "mandatory criteria."  8 C.F.R. § 235.3(e).

JA39.

Based on that review, the district court concluded:

> Read together, the "purpose and intended effects" of these statutes, *Crosby*, 530 U.S. at 373, considered along with the federal regulations promulgated under them, *Farina*, 625 F.3d at 115, is to permit the federal government to make independent decisions on the proper manner for housing its own detainees.  These statutes "give[] both responsibility and broad discretion to the Secretary to choose the place of detention for deportable aliens."  *Geo Grp.*, 50 F.4th at 751 (cleaned up); *see also Newbrough v. Piedmont Reg'l Jail Auth.*, No. 10-867, 2012 WL 169988, at *4 (E.D. Va. Jan. 19, 2012) (observing that these provisions of the INA "leave [ICE] ample room for judgment: ICE remains free to choose among any number of detention facilities that comport with the threshold parameters established by 8 U.S.C. § 1231(g) and 8 C.F.R. § 235.3(e)").  To carry out Congress's intent, these statutes must be free from restrictive state laws that

circumscribe the federal government's ability to contract for the
housing of its own detainees.

JA39-40.

That the federal government must be free to contract for housing of
immigration detainees necessarily carries with it the corollary proposition that
qualified contractors have the right to accept such contracts.  New Jersey
acknowledges this at page 50 of its brief (noting district court's finding "that
**companies** 'must be free from restrictive state laws that circumscribe the federal
government's ability to contract for the housing of its own detainees'" (emphasis
supplied)).  *See also NCAA*, 584 U.S. at 478 ("we do not require Congress to
employ a particular linguistic formulation when preempting state law") (citation
omitted).  This acknowledgment, fully supported by the district court's analysis,
disposes of New Jersey's contention that the district court "declined to engage in
the threshold inquiry" required by *NCAA* as to whether "the INA provisions
impose restrictions or confer rights on private actors."  N.J. Br. 38.

This is further confirmed by the failure of *NCAA* (or *Ocean Cty.*) even to
address *Public Utilities Commission* or *Leslie Miller*, leading Supreme Court
Supremacy Clause cases that support preemption (as well as intergovernmental
immunity, as discussed at Point I) based on federal regulations that, like the INA,
concerned the federal government's dealings with contractors and, in the case of
*Public Utilities Commission*, addressed only the federal government.  *See* 355 U.S.

44

at 540–42.  It is implausible to suggest the Court intended to overrule these leading

authorities *sub silenti*o (and as noted above *Bosse v. Oklahoma* precludes New

Jersey's speculation that it did so).

New Jersey's other cases setting forth the private actor requirement would

matter only if they supported an argument that the district court erred in its

application of that requirement.  They do not.  For example, while *McHenry Cty.*

states that a valid preemption provision must regulate private actors, it expressly

declined to reach the question of whether the INA provisions before it met that

requirement.  44 F.4th at 588.  New Jersey argues that the district court misapplied

*Arizona* because the Supreme Court there "closely considered the INA's text and

structure and found that it 'implicitly conferred a right to be free of criminal (as

opposed to civil) penalties for working illegally.'"  N.J. Br. 51-52 (internal citations

omitted).  This does nothing to suggest error by the district court, which conducted

its own close consideration of the same statute.  Nor does *Me. Forest Prod.*

*Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022) (N.J. Br. 35), which recognized

an "implicit federal right" to hire foreign laborers.

> ii.  *The district court properly declined to apply a "presumption*
> *against preemption"*

The district court properly recognized that the "presumption against

preemption" was not applicable to AB 5207 because that presumption is not

triggered by state regulation, as here, in an "area of 'significant federal presence,'

*Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (citing [*United States v.*] *Locke*, 529 U.S. [89] at 108 [(2000)], or in a field that 'the States have [not] traditionally occupied.' *Treasurer of New Jersey*, 684 F.3d at 407." JA33 (internal citation omitted).

In challenging this, New Jersey argues that *Lozano* applied the presumption to employment provisions and declined to apply it only as to "an extraordinary and *sui generis* municipal law 'prohibit[ing] unauthorized aliens from residing in any rental housing,'" N.J. Br. 49 (citation to district court opinion omitted). This does not support New Jersey's argument because neither housing nor employment falls as squarely within the INA's statutory and regulatory scope as does immigrant detention. *Lozano*'s application of the presumption to the employment regulation but not the housing regulation therefore does nothing to suggest that it should be employed here.[11] See also JA36 & n.16 (citing *Geo Grp.*, 50 F.4th 761-62); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (state law prohibiting courts from recognizing contracts with aliens lacking lawful immigration status "constitute[d] a thinly veiled attempt to regulate immigration under the guise of contract law, and thus, we do not think the presumption against preemption

---

[11] A discussed below at Point II(A)(iii), *Lozano* found the employment provisions to be conflict preempted even without applying the presumption against preemption. 724 F.3d at 313.

applies"). New Jersey does not address *Alabama*, although it was expressly relied upon by this Court in *Lozano I*, 724 F.3d at 316.

New Jersey seeks to avoid the authorities relied on by the district court by arguing that ICE contracts with state and local governments for immigrant housing under intergovernmental service agreements (IGSA), which "have always been subject to their State's police powers, even when they house noncitizen detainees. *See Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973)." N.J. Br. 48. This argument fails for two independent reasons. First, the report on which it relies is not part of the record and should be stricken or disregarded by the Court. *See Webb v. City of Philadelphia*, 562 F.3d 256, 261 at n.4 (3d Cir. 2009) ("We do not consider material on appeal that is outside of the district court record").[12]

In any event, application of state law to IGSA's concerns only **state** detention facilities. That is the sole subject of both *Preiser v. Rodriguez*, 411 U.S.

---

[12] In the event the Court elects to consider the GAO report, it bears noting that it states:

- "at least 31 of the 108 IGSA facilities ICE used to hold detainees were operated by private contractors" (p. 17);
- private contracts are necessary because "ICE-owned service processing centers are not a viable option because of the substantial amount of time needed to design and construct such a facility, coupled with the fact that ICE does not have construction authority (p. 13); and
- "ICE-owned service processing centers, which ICE primarily operates, are generally more expensive than contractor-run detention facilities" (p. 13).

475, 491-92 (1973), and *McHenry Cty.*, 44 F.4th at 585, so neither supports New Jersey's intrusion into how ICE contracts for detention services with parties other than state or local government bodies.  Indeed, as shown above at Points I (intergovernmental immunity) and II(a)(iii), II(B) (preemption), New Jersey has identified no authority supporting such intrusion.  *See also* JA36-40 (district court discussion of *Geo. Grp.* and other authorities to find preemption).

New Jersey's reliance on *Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996), *DeCanas v. Bica*, 424 U.S. 351, 357 (1976), *United States v. California*, 921 F.3d 865, 885-86 (9th Cir. 2019), *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 687 (3d Cir. 2016), and *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009), is misplaced because those cases all involved traditional areas of state regulation, not an attempt to regulate how the federal government discharges core federal functions.  *See Medtronic*, 518 U.S. at 474 (defective medical device); *DeCanas*, 424 U.S. 351 (state laws concerning the *employment* of immigrants, not the nature of their detention by federal authorities); *California*, 921 F.3d at 886 (state's regulation of its own law enforcement officers); *Sikkelee*, 822 F.3d at 690 ("aviation torts have been consistently governed by state law"); *Holk*, 575 F.3d at 334 (food and beverage labeling).

*iii.*    *The district court followed controlling law in finding AB 5207 to be preempted as an obstacle to accomplishment of the INA's purposes*

New Jersey also argues that "[e]ven assuming that the relevant provisions of the INA can preempt contrary state laws . . . they do not preempt AB 5207." N.J. Br. 40. This argument relies on New Jersey's characterization of AB 5207 as a health and safety regulation of general application and its contention that the district court's analysis was not "grounded 'in the text and structure of the [federal] statute at issue.'" N.J. Br. 41 (citation omitted).

We touched upon the "health and safety" argument at Point II(B)(ii) (regarding the presumption against preemption) and demonstrated the thoroughness of the district court's analysis of the INA's statutory and regulatory scheme above at Point II(B)(i) (regarding the effect of *NCAA* and *Ocean Cty.*). AB 5207 is not a health and safety measure of general application. Rather, as the district court found (JA27), by its terms it is specifically and exclusively directed at federal operations, as only the federal government has responsibility for immigrant detention. As the INA makes clear, states may participate in that area only "subject to the direction and supervision of" the Secretary. 8 U.S.C. §1357(g)(3). AB 5207's disruption of the federal government's ability to contract for civil immigrant detention is manifest not only from its text, but also from the statement of its prime sponsor ("The renewal of the lease between CoreCivic and ICE

demonstrates how important AB5207 is for our state"), JA69 (Simon Dec.), and its supporters recognized it as a step toward "dismantle[ing] immigration detention wholesale." *Id.* (statement of Executive Director of amicus ACLU of New Jersey).

New Jersey's cases regarding health and safety laws of general application, including those that express concerns about "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" are therefore wholly inapposite. *Kansas v. Garcia*, 140 S. Ct. 791, 794 (2020), found the INA did not prevent Kansas from applying an identity fraud statute of general application to immigrants. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993), held that state common law negligence claims were not preempted by federal regulations that either expressly allowed more stringent state regulations or did not address the same subject matter as state law, *id.* at 665-73, but that federal regulations regarding appropriate warnings to be given motorists "given variations in train speed" preempted a state law excessive speed claim. *Id.* at 674–76. To the extent it has any relevance at all, *CSX Transp.* supports preemption where, as here and absent an express federal exemption, a state law applies to the same matter as federal regulations. *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 464 (3d Cir. 2021), held only that the state "doctrine of necessities" was not pre-empted because it fell within the Fair Debt Collection Practices Act's exemption to preemption for "incidental credit." *Chamber of Commerce of United*

50

*States v. Whiting*, 563 U.S. 582 (2011), declined to preempt state laws that

complemented the INA's purposes, rather than obstructing them.  And *MD Mall*

*Assocs. LLC v. CSX Transp., Inc.*, 715 F.3d 479, 492 (3d Cir. 2013), held that a

federal directive requiring railroad operators to keep water away from their tracks

without addressing how they might do so did not fall within an express preemption

in the federal statute for matters that "cover the subject matter of the State

requirement, and therefore did not expressly preempt state storm water trespass

law."  715 F.3d at 487-93.  As to implied preemption, *MD Mall Assocs.* remanded

for the district court to determine "whether and to what extent, if any, Pennsylvania

law stands as an obstacle to the accomplishment and execution of § 213.33's

railroad safety purpose."  715 F.3d at 496.

Review of *Lozano I* reveals why New Jersey discusses it only in connection

with the presumption against preemption, although the district court relied on it in

support of its finding that "even with the benefit of the presumption, AB 5207 still

would be preempted by federal law."  JA36.  As discussed above, *Lozano I* found a

state law prohibiting unauthorized aliens from renting housing to be conflict

preempted, and this Court's reasons for doing so are telling:

> the housing provisions constitute an attempt to unilaterally attach
> additional consequences to a person's immigration status *with no
> regard for the federal scheme, federal enforcement priorities, or the
> discretion Congress vested in the Attorney General*. . . .  Hazleton
> may not unilaterally prohibit those lacking lawful status from living
> within its boundaries, without regard for the Executive Branch's

> enforcement and policy priorities . . . *Hazleton's attempt to regulate*
> *where aliens can live implicates strong national interests and must be*
> *done with a single voice.*

724 F.3d at 318-19 (emphases supplied).  Thus, the municipality's attempt to

regulate where aliens can live through the housing provisions was subject to

conflict preemption, because under the Immigration Reform and Control Act

(IRCA) or the INA:

> employers are not required to verify contractors' work eligibility, as
> they must with employees.  Given the intricate framework of IRCA,
> we cannot assume that the distinction is immaterial.  Rather, it appears
> to be a deliberate distinction that Congress included as part of the
> balance it struck in determining the scope and impact of IRCA's
> employer sanctions.  However, Hazleton's ordinance does not
> distinguish between employees, on the one hand, and independent
> contractors or casual hires, on the other. . . . *The result is a local*
> *ordinance that conflicts with Congress's intent to limit IRCA*
> *application to the employer/employee relationship.  See Arizona,* 132
> S.Ct. at 2505 ('[A] "[c]onflict in technique can be fully as disruptive
> to the system Congress enacted as conflict in overt policy."').

724 F.3d at 307, 309 (internal citation omitted, emphasis supplied.)

New Jersey's attempt to demonstrate that the INA does not preempt AB

5207 under conflict preemption principles not only fails to discuss *Lozano*, but also

fails to distinguish the cases apart from *Lozano* relied on by the district court in

that regard.

The district court cited *Crosby,* 530 U.S. at 373, for the proposition that

conflict preemption is warranted where state law would cause the federal statutory

and regulatory scheme to "be frustrated and its provisions be refused their natural

effect." JA36-37. New Jersey says only that the federal provision there, which gave the President wide discretion to develop sanctions designed to improve human rights in Burma, "is hardly like the INA's statutory text, which gives ICE power to select appropriate facilities from available options but is silent regarding whether and when a private facility must be available." N.J. Br. 52. But the federal provision in *Crosby* was silent as to whether states could impose sanctions and, as discussed above, the INA gives wide discretion to the Secretary and is far from silent about federal contractors. New Jersey provides no reason why *Crosby* does not support preemption – especially in light of the finding, which New Jersey concedes the district court made, "that companies 'must be free from restrictive state laws that circumscribe the federal government's ability to contract for the housing of its own detainees.'" N.J. Br. 50 (describing district court's holding).

*Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 239 (3d Cir. 2009), *aff'd*, 562 U.S. 223 (2011), cited by the district court for the same proposition as *Crosby*, is not addressed by New Jersey at all. Nor does New Jersey address *Geo Grp.* in connection with preemption, apart from a passing assertion (N.J. Br. 50) that its preemption analysis "falls short," despite the district court's citation to it, among other authorities, in its preemption analysis. *See*, *e.g.*, JA39 (citing *Geo Grp.* for the proposition that the INA provisions "give[] both responsibility and broad discretion to the Secretary to choose the place of detention for deportable aliens.");

JA40-41 (citing *Geo Grp.* for the proposition that "interference with the discretion that federal law delegates to federal officials' by a state law restricting the federal government's contracting parties for immigration detention 'goes to the heart of obstacle preemption.'").

Moreover, while New Jersey seeks to avoid the effect of the Supreme Court's seminal holdings in *Leslie Miller* and *Public Utilities Commission* with respect to intergovernmental immunity by insisting those cases are exclusively preemption cases, N.J. Br. 28, its argument on preemption treats them only as bare citations to a footnote asserting that the INA's "regulations do not amount to the sort of well-reticulated statutory criteria or licensing regimes needed to establish an implied right for these companies to offer services notwithstanding additional state criteria or licensing provisions." N.J. Br. 46 n.6. This argument rests on the mistaken premise that conflict preemption requires something like a comprehensive federal scheme. It does not – that requirement relates to field preemption, discussed at Point II(B); conflict preemption looks at the federal scheme to determine whether the state provision under review would "frustrate the expressed federal policy." *Leslie Miller*, 352 U.S. at 190; *see also Public Utilities Commission*, 355 U.S. at 544 (finding preemption where "the conflict between the federal policy of negotiated rates and the state policy of regulation of negotiated rates seems to us to be clear").

Similarly, while the district court cited *Locke*, 529 U.S. at 111, and this Court's holding in *Farina*, 625 F.3d at 115, for the proposition that a state law is conflict preempted "where it erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," JA31-32, New Jersey never addresses either authority.

Rather than engaging with the case law on which the district court relied, New Jersey argues that the district court failed to ground its holding on the INA and its regulations. New Jersey says that, in expressly authorizing ICE's use of private contractors for detention, the INA merely calls for the federal government "to canvass the marketplace to determine what facilities are available for purchase or lease; the law says nothing about what must *be* available in that market." This argument is overly cute. It ignores that fact that (i) the "market" at issue has only one potential buyer (ICE); and (ii) New Jersey has *eliminated* the "market" for private civil immigrant detention in New Jersey for the purpose and with the intent of precluding the federal government from housing civil immigration detainees. New Jersey shows no error in the district court's extensive review of the INA and its regulations; it simply disagrees with the district court's conclusion that a state statute obstructing the role for contractors that the INA expressly contemplates is subject to preemption.

New Jersey's "marketplace" argument ignores the substantial case law

establishing that preemption is proper where state laws obstruct federal operations

without rendering their performance impossible. As this Court stated in *Farina,*

625 F.3d at 123:

> The Supreme Court's preemption case law indicates that regulatory
> situations in which an agency is required to strike a balance between
> competing statutory objectives lend themselves to a finding of conflict
> preemption. . . . When Congress charges an agency with balancing
> competing objectives, it intends the agency to use its reasoned
> judgment to weigh the relevant considerations and determine how best
> to prioritize between these objectives. Allowing state law to impose a
> different standard permits a re-balancing of those considerations.

*See also Rowe v. New Hampshire Motor Transp. Ass'n,* 552 U.S. 364, 371-72

(2008) (state contractor licensing law preempted where it "produces the very effect

that the federal law sought to avoid, namely, a State's direct substitution of its own

governmental commands for 'competitive market forces' in determining (to a

significant degree) the services that motor carriers will provide."); *Geier v. Am.

Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state common law claim for

automobile manufacturer's failure to install airbag restraints conflict/obstacle

preempted where it would require manufacturers "to install airbags rather than

other passive restraint systems" and thereby "presented an obstacle to the variety

and mix of devices that the federal regulation sought."); *Leslie Miller*, 352 U.S. at

190 ("Subjecting a federal contractor to the Arkansas contractor license

requirements would give the State's licensing board a virtual power of review over

the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder."); *Geo Grp.* 50 F.4th at 756 n.5 (collecting cases showing that "[e]ven when upholding state regulations that merely increase the federal government's costs, the Supreme Court has specified that those regulations did not control or obstruct federal functions."); *Lozano I*, 724 F.3d at 318-19 (quoted above).

Finally, New Jersey does not address the district court's observation that AB 5207 impermissibly treads on federal authority because, as recognized by *Arizona*:

> When a foreign nation's citizens are detained for violating federal immigration law, the foreign nation holds the national government responsible for the manner in which they are detained" and New Jersey's attempt to dictate the manner of that detention "attempts to make 'policy choices that bear on this Nation's international relations.' *Id.* at 396; *see also Lozano I*, 724 F.3d at 318-19.

JA41 n.18 (quoting *Arizona,* 567 U.S. at 396).

## B.     The District Court's Holding Would Also Have Been Proper If Based On Field Preemption

In *Lozano I*, this Court found that certain local laws regarding the housing of immigrants were not only conflict/obstacle preempted by the INA, as discussed above, but also field preempted:

> [The INA] is centrally concerned with "'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully admitted.'" . . .The INA's comprehensive scheme "plainly precludes state efforts, whether harmonious or conflicting, to regulate

residence in this country based on immigration status." . . . [A]lthough Hazleton's housing provisions do not control actual physical entry into, or expulsion from, Hazleton or the United States, "in essence, that is precisely what they attempt to do."

724 F.3d at 315–16.

Similarly, in *Arizona* the Supreme Court found the field of alien registration to be preempted by the INA:

the Federal Government has occupied the field of alien registration . . . . The federal statutory directives provide a full set of standards governing alien registration, including the punishment for noncompliance. It was designed as a "'harmonious whole.'" *Hines*, supra, at 72, 61 S.Ct. 399. Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible. . . . . *Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders* . . . .

567 U.S. at 401-2 (citations omitted, emphasis supplied).

As shown above, the INA and its regulations provide a full set of standards governing immigrant detention that were designed as a harmonious whole. 8 U.S. Code §§1221-1232, including §1222 ("Detention of aliens for physical and mental examination"), §1226 ("Apprehension and detention of aliens"); *see* 8 C.F.R. §235.3(e) (mandatory standards for detention facilities contracting with ICE); 8 U.S.C. §1357(g)(3, 5) (states may participate in immigrant detention only "subject to the direction and supervision of" and by written agreement with the Secretary); JA38-40 (reviewing INA regarding detention); *see also United States v. Texas*, No. 1:23-CV-1537-DAE, 2024 WL 861526, at *11 (W.D. Tex. Feb. 29, 2024)

(granting preliminary injunction against Texas' enforcement of state law criminalizing commission of certain federal immigration offenses: "Applied to the field of immigration, the federal government has both a dominant interest and a pervasive regulatory framework that preclude state regulation in the area."), *administrative stay granted*, No. 24-50149, 2024 WL 909612, at *1 (5th Cir. Mar. 2, 2024), *administrative stay stayed*, 2024 WL 909451 and 2024 WL 909454 (U.S. Mar. 4, 2024.)

The district court therefore could have based its finding on field preemption, and this Court should affirm on that ground should it see fit to reach the issue. *TD Bank N.A.*, 928 F.3d at 270.

## III.    NOTHING IN THE AMICUS BRIEFS SUPPORTS NEW JERSEY'S APPEAL

The amici briefs consist of two components, one primarily factual and the other legal, neither of which provides a basis to overturn the district court.

On the facts, amici link to a host of materials that are not in the appellate record concerning the history, operations and purported motivations of private detention centers generally, some of which concern CoreCivic. These materials include reports as well as newspaper and other articles, and many of them are confessedly "anecdotal" in nature. Pax Br. 14, 18, 27. All of these materials should be stricken or disregarded, as this Court recognized under strikingly similar circumstances in *Webb v. City of Philadelphia*, 562 F.3d at 261 n.4:

Amici filed a Brief in Support of Reversal with a Supplemental Appendix containing articles regarding the policies and practices of other para-military organizations in the United States and the world which allow, to various degrees, religious symbols and garb as part of their uniforms. The City points out the "blatant hearsay nature" of this material and the fact it was not presented to the District Court. We do not consider material on appeal that is outside of the district court record. *In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*, 913 F.2d 89, 96 (3d Cir. 1990).

Even if considered, these materials offer nothing contrary to the district court's holding. The relative merits of private or public detention facilities were not before the district court. Rather, the issue before it, and before this Court, concerns who Congress intended to make that evaluation – that is, whether New Jersey violated the Supremacy Clause by involving itself in the balancing of interests that the INA commits to the federal government. *Compare Farina,* 625 F.3d at 123 ("When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives. Allowing state law to impose a different standard permits a re-balancing of those considerations"), *with* JA39-40 (AB 5207 preempted because purpose and intent of INA "is to permit the federal government to make independent decisions on the proper manner for housing its own detainees" and conflict preemption is warranted "when the challenged state statute interferes with the federal government's exercise of discretion, as long as that discretion is sufficiently recognized by Congress").

Amici's voluminous citations to factual materials outside the record is therefore not only improper, but irrelevant.

On the law, amici largely echo New Jersey's arguments, and their additional cases and arguments do not change the analysis. Apart from citations offered for points that are either irrelevant or undisputed, amici principally rely on a variation of New Jersey's argument that, unless New Jersey is permitted to deny ICE the use of contractors for civil immigrant detention, the resulting regime will favor insufficiently clear federal interests and jeopardize the State's ability to enforce routine laws of general application. As discussed at Point II(B)(i & iii), the district court showed how ICE's right to contract with private detention centers is grounded in the INA. There is no "brooding federal interest," "freewheeling inquiry," or difficult line to be drawn as to the federal interest. Nor are issues about state laws of general application presented, because AB 5207 is not such a law. Amici's cases concerning minimum wage laws, sale of toxic substances chemicals, federal student loan contractors, or other areas of traditional state prerogative are therefore beside the point.

At pages 4-9 of its brief, the ACLU argues that the district court erred in finding that federal immigrant detention is not an area of traditional state concern, because i) the federal government has chosen to comply with certain state and local regulations "that govern various aspects of health, including medical care,

sanitation, transportation, and work programs" and, before it terminated its cooperation in immigrant housing, New Jersey applied state law to facilities it operated under contracts with ICE; ii) New Jersey passed the Isolated Confinement Restriction Act ("ICRA") in 2019 and "[i]mmigration detention facilities in New Jersey are required to comply with these restrictions"; and iii) political subdivisions in New Jersey "have taken action" with respect to immigrant detention.  Even if these arguments are deemed to be appropriately raised on appeal, they carry no weight.

  i)  Whether the federal government chooses to apply to immigration detention certain state or local laws regarding state or local detention facilities, like New Jersey's application of state law to agreements it used to operate under agreements with ICE, has no tendency to show that New Jersey has historically regulated federal detention.  It shows rather that New Jersey has historically regulated detention in its own facilities, and that ICE has exercised its discretion to determine whether and to what extent to apply such regulation.

  ii)  ICRA's passage in 2019 can hardly be taken as evidence of a tradition of state regulation, and New Jersey's argument that immigration detention facilities in New Jersey are required to comply with ICRA is entirely circular – AB 5207 is part of ICRA, and AB 5207 (30:4.8.15-.16) shows on Westlaw as red-flagged due to the decision on this appeal.

iii)    By the ACLU's own account, the "action" political subdivisions in New Jersey have taken consist of establishing two civilian task forces to oversee conditions at *county* facilities.  There is no indication that these task forces took any action with respect to federal detainees, and any consideration it gave to the conditions of their detention was limited to their capacity as detainees held by the county under agreement with ICE.

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985), which the ACLU quotes at page 4 of its brief as establishing the states "great latitude under their police powers to legislate' 'protect[s] . . . the lives, limbs, health, comfort, and quiet of all persons'", does not support New Jersey, as it merely declined to find preemption where the state law fell within an ERISA exemption and was not related to the purposes of the National Labor Relations Act.  This has no bearing on the district court's holding, which found preemption of AB 5207 based on analysis of the INA's statutory and regulatory scheme.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff-Appellee CoreCivic respectfully submits that order of the district court dated August 29, 2023 should be affirmed.

Dated:  March 13, 2024

**SCHLAM STONE & DOLAN LLP**

By:    <u>/S/ Bradley D. Simon</u>
      Bradley D. Simon
      Thomas A. Kissane
      David J. Goldsmith
26 Broadway, 19th Fl.
New York, New York 10004
(212) 344-5400
(212) 344-7677 (fax)
bsimon@schlamstone.com

*Attorneys for Plaintiff-Appellee*
*CoreCivic, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I, Bradley D. Simon, certify under the penalty of perjury, as follows:

1.      This Brief complies with length limitation of the Court's February 2, 2024 Order because this brief contains words 15,528 excluding the parts of the Brief exempted, by Fed. R. App. P. 32(a)(7)(B)(III).

2.      This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word, font size 14 point Times New Roman.

3.      Pursuant to the Third Circuit L.A.R. 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the hard, paper copies of the brief, and that a virus detection program was performed on this electronic brief using anti-virus software, and that no virus was detected,

4.      I further certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  March 13, 2024

**SCHLAM STONE & DOLAN LLP**

By:    /S/ Bradley D. Simon

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

Pursuant to Third Circuit L.A.R. 46.1(e ), I, Bradley D. Simon, certify under penalty of perjury that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated:  March 13, 2024

**SCHLAM STONE & DOLAN LLP**

By:    <u>/S/ Bradley D. Simon            </u>

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Third Circuit L.A.R. 31.1, I, Bradley D. Simon, certify under the

penalty of perjury, that a true and correct copy of the foregoing Brief of Appellees

and Certification of Compliance was served on this day, upon counsel of record for

Appellants, via the Court's CM/ECF system.

Dated:  March 13, 2024

**SCHLAM STONE & DOLAN LLP**

By:    <u>/S/ Bradley D. Simon</u>