No. 23-2598

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CORECIVIC, INC.,

Plaintiff-Appellee,

v.

GOVERNOR OF NEW JERSEY, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of New Jersey

# BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE SUPPORTING APPELLEE

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

PHILIP R. SELLINGER
  *United States Attorney*

MARK B. STERN
McKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7231*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8100*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION AND INTEREST OF THE UNITED STATES .........................1

STATEMENT OF THE ISSUE................................................................................3

STATEMENT OF THE CASE.................................................................................3

    A.      Federal Background...............................................................................3

    B.      New Jersey AB 5207..............................................................................4

    C.      Prior Proceedings..................................................................................5

SUMMARY OF ARGUMENT................................................................................6

ARGUMENT...........................................................................................................7

AB 5207 Contravenes Fundamental Principles of Intergovernmental Immunity
    and Preemption in Barring Contracts with DHS for the Detention of
    Noncitizens Subject to Immigration Proceedings....................................................7

    A.      AB 5207 Violates Principles of Intergovernmental Immunity. .................8

          1.      AB 5207 Impermissibly Regulates the Operations of the
                Federal Government...........................................................................9

          2.      AB 5207 Singles Out and Discriminates Against Federal
                Operations...........................................................................................15

    B.      AB 5207 Poses a Significant Obstacle to the Implementation of
          the Immigration Laws Authorized by Congress and Is Preempted.........19

CONCLUSION ......................................................................................................27

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                       **Page(s)**

*Arizona v. United States,*
567 U.S. 387 (2012) ............................................................................... 21

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ............................................................................... 21

*Dawson v. Steager,*
139 S. Ct. 698 (2019) ......................................................................... 18, 19

*Essex Cty. Corr. Officers PBA Local No. 382 v. County of Essex,*
106 A.3d 1238 (N.J. Super. Ct. App. Div. 2014) ...................................... 17

*Fasano v. Federal Reserve Bank of N.Y.,*
457 F.3d 274 (3d Cir. 2006) ........................................................ 21, 21-22

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
458 U.S. 141 (1982) ............................................................................... 21

*GEO Grp., Inc. v. Newsom,*
50 F.4th 745 (9th Cir. 2022) ....................... 2, 11, 12, 13, 15, 19, 22, 23

*Goodyear Atomic Corp. v. Miller,*
486 U.S. 174 (1988) ............................................................................... 25

*Hughes v. Talen Energy Mktg., LLC,*
578 U.S. 150 (2016) ............................................................................... 19

*Johnson v. Maryland,*
254 U.S. 51 (1920) ......................................................................... 6, 10, 11

*Leslie Miller, Inc. v. Arkansas,*
352 U.S. 187 (1956).......................................................................... 10, 12

*Lozano v. City of Hazleton,*
724 F.3d 297 (3d Cir. 2013) ................................................................... 22

*McCulloch v. Maryland,*
17 U.S. (4 Wheat.) 316 (1819) .............................................................. 8, 9

*Murphy v. NCAA,*
584 U.S. 453 (2018) ............................................................................... 22

*North Dakota v. United States,*
  495 U.S. 423 (1990) ................................................................... 11, 12, 13

*Ocean Cty. Bd. of Comm'rs v. Attorney Gen. of N.J.,*
  8 F.4th 176 (3d Cir. 2021) ................................................................. 22

*Osborn v. Bank of the U.S.,*
  22 U.S. (9 Wheat.) 738 (1824) .................................................. 10, 11, 14

*Public Utils. Comm'n of Cal. v. United States,*
  355 U.S. 534 (1958) .................................................................. 11, 12, 14

*South Carolina v. Baker,*
  485 U.S. 505 (1988) ......................................................................... 19

*Treasurer of N.J. v. U.S. Dep't of the Treasury,*
  684 F.3d 382 (3d Cir. 2012) .............................................................. 9

*United States v. City of Philadelphia,*
  798 F.2d 81 (3d Cir. 1986) ............................................................... 11

*United States v. County of Fresno,*
  429 U.S. 452 (1977) ........................................................................ 14

*United States v. New Mexico,*
  455 U.S. 720 (1982) ........................................................................ 14

*United States v. Virginia,*
  139 F.3d 984 (4th Cir. 1998) ............................................................ 14

*United States v. Washington,*
  596 U.S. 832 (2022) ........................................... 9, 14, 15, 16, 24, 26

**U.S. Constitution:**

Art. VI, cl. 2 ....................................................................................... 8

**Statutes:**

Consolidated Appropriations Act, 2021,
  Pub. L. No. 116-260, div. F, tit. II, § 215(a),
  134 Stat. 1182, 1457 (2020) ............................................................21

Consolidated Appropriations Act, 2022,
Pub. L. No. 117-103, div. F, tit. II, § 215(a),
136 Stat. 49, 322 ...................................................................21

Consolidated Appropriations Act, 2023,
Pub. L. No. 117-328, div. F, tit. II, § 214(a),
136 Stat. 4459, 4736 (2022) ...................................................20, 21, 22

6 U.S.C. § 112(b)(2) ........................................................................... 3

8 U.S.C. § 1231(g)(1) ........................................................ 3, 7, 19, 24, 25

8 U.S.C. § 1231(g)(1)-(2) ............................................................... 4, 21

8 U.S.C. § 1231(g)(2) ................................................................... 3, 25

N.J. Stat. Ann. § 30:4-8.15(b) (West) ...................................... 23

N.J. Stat. Ann. § 30:4-8.15(c) (West) ...................................... 18

N.J. Stat. Ann. § 30:4-8.16(a) (West) ...................................... 5, 18

N.J. Stat. Ann. § 30:4-8.16(a)-(b) (West) ................................. 5

N.J. Stat. Ann. § 30:4-8.16(b)(2) (West) .................................. 3, 16

N.J. Stat. Ann. § 30:4-91.2 (West) ........................................... 17

N.J. Stat. Ann. § 30:4-91.9 (West) ........................................... 17, 18

N.J. Stat. Ann. § 30:4-91.10 (West) ......................................... 17

## Regulations:

8 C.F.R. § 235.3(e) ............................................................... 4

48 C.F.R. § 3017.204-90 ....................................................... 4

**INTRODUCTION AND INTEREST OF THE UNITED STATES**

The Constitution and the Immigration and Nationality Act (INA) vest in the national government the exclusive authority to regulate immigration and determine which noncitizens will be permitted to reside in the United States and which will be removed from the country. In support of that authority, Congress has vested in the Executive Branch broad discretion over the housing of immigration detainees. The district court held that New Jersey Assembly Bill 5207 (AB 5207) impermissibly intrudes on that discretion, and the United States respectfully urges that its judgment be affirmed.

It is common ground that the New Jersey legislature could not preclude the United States from entering into contracts for the private operation of detention facilities. It is also uncontroverted that New Jersey sought to achieve essentially the same result in AB 5207, which prohibits the operation of civil immigration-detention facilities in New Jersey by private contractors. AB 5207 would force U.S. Immigration and Customs Enforcement (ICE) to abandon the means by which it houses noncitizens awaiting immigration proceedings in New Jersey. The sole ICE detention facility in New Jersey is privately owned and operated, and thus subject to the statutory ban. If left in place, AB 5207 would require the federal government either to operate detention facilities itself or to move detainees to facilities outside the state.

Fundamental principles of intergovernmental immunity and preemption preclude that result. The Supreme Court and courts of appeals have repeatedly made

clear that an unconstitutional intrusion into the operations of the federal government is not saved by casting legislation as a restriction or requirement on persons who do business with the United States, rather than on the government itself. Thus, for example, even a state requirement of general applicability, such as a contractor licensing requirement, cannot be applied when the contractor does business with a federal agency. The law here extends even further than such impermissible licensing requirements. AB 5207 does not merely restrict the federal government's choice of contractor: it eliminates choice altogether. As the en banc Ninth Circuit recently recognized in rejecting a similar state law, the Supremacy Clause prohibits such attempts to control how the federal government carries out its operations. *See GEO Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc).

AB 5207 would be unconstitutional even if it did not single out the United States—but it does. In enacting AB 5207, the New Jersey legislature took direct aim at ICE facilities, and the law violates principles of intergovernmental immunity for that reason as well. The law bans the use of private contractors for civil immigration-detention facilities only, allowing New Jersey to continue to contract for private operations in the areas it considers expedient to do so.

For many of the same reasons that AB 5207 contravenes intergovernmental immunity, it also poses a major obstacle to the implementation of the immigration laws and thus runs afoul of preemption principles. Congress gave ICE broad authority in housing noncitizens subject to removal proceedings, including its use of privately

2

operated facilities.  Congress is not required to explicitly state all the lawful means by which an agency can fulfill its responsibilities in order to protect its actions from state prohibitions.

## STATEMENT OF THE ISSUE

New Jersey AB 5207 bars private detention facilities from "enter[ing] into, renew[ing], or extend[ing] any immigration detention agreement."  N.J. Stat. Ann. § 30:4-8.16(b)(2) (West).  The question presented is whether that prohibition violates principles of intergovernmental immunity and preemption.

## STATEMENT OF THE CASE

### A.    Federal Background

**1.**    Congress has given agencies, including the Department of Homeland Security (DHS), broad authority to provide for the detention of detainees, including through private detention facilities.  As particularly relevant here, Congress provided that "[t]he [Secretary of Homeland Security] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. § 1231(g)(1).  More specifically, Congress authorized DHS to build and operate detention facilities when "United States Government facilities" or "facilities adapted or suitably located for detention are unavailable for rental."  *Id.*; *see also id.* § 1231(g)(2). The Secretary also has general authority to make contracts in exercising his functions. 6 U.S.C. § 112(b)(2).  And DHS has promulgated regulations permitting ICE to enter

3

into contracts for and house detainees in private detention facilities so long as the facility meets certain requirements. *See* 48 C.F.R. § 3017.204-90; 8 C.F.R. § 235.3(e).

2. In carrying out its responsibilities, ICE does not construct or solely operate any of its own detention facilities. That policy reflects the "significant fluctuations in the number and location of removable noncitizens" that are apprehended by ICE and subject to detention, which demand flexibility in the location and capacity of detention facilities. JA91; *see* 8 U.S.C. § 1231(g)(1)-(2) (requiring DHS to consider more flexible options before building and operating own facilities).

As of August 2021, ICE housed detainees in four detention facilities in New Jersey. Access to three facilities was through intergovernmental-services agreements with various counties. JA91, 93. The remaining facility—the Elizabeth Detention Center (EDC)—was privately owned and operated by government contractor CoreCivic, Inc., pursuant to a contract with ICE that was set to expire in August 2023. JA93. EDC is in "a mission critical location for DHS and ICE operations nationwide." JA100. EDC is the only facility within 60 miles of New York City that houses ICE detainees. JA100. Given its proximity to both Newark and JFK airports, EDC is "crucial to effect removals from field offices nationwide." JA100.

## B. New Jersey AB 5207

AB 5207 places limits on the operation of civil immigration-detention facilities within New Jersey. It prohibits New Jersey, local-government agencies, and private detention facilities from "enter[ing] into, renew[ing], or extend[ing] any immigration

4

detention agreement," defined as any "contract, agreement, intergovernmental service agreement, or memorandum of understanding that authorizes the State, local government agency, or private detention facility to house or detain individuals for civil immigration violations." N.J. Stat. Ann. § 30:4-8.16(a)-(b) (West). Private detention facilities under the law include "any privately owned or operated facility that houses or detains individuals for civil immigration violations." *Id.* § 30:4-8.16(a).

Following the enactment of AB 5207 in August 2021, the three county facilities stopped housing ICE detainees, leaving EDC as the only remaining facility for immigration detainees in New Jersey. JA93.

## C. Prior Proceedings

In February 2023, CoreCivic brought this suit against the Governor and Attorney General of New Jersey (collectively, the State), arguing that AB 5207 violates the Supremacy Clause by precluding CoreCivic from renewing its contract with ICE for the operation of EDC. Dkt. No. 1; *see* JA45-64. The United States filed a statement of interest in support of CoreCivic, Dkt. No. 37, and the district court entered summary judgment in favor of CoreCivic, JA5. The court concluded that AB 5207 impermissibly regulates federal operations in violation of intergovernmental-immunity principles, and that AB 5207 is preempted because it impermissibly circumscribes ICE's discretion under federal law to arrange for detainee housing. JA18-43.

## SUMMARY OF ARGUMENT

**A.** AB 5207 bars contractors from contracting with ICE to operate private civil immigration-detention facilities. The single remaining ICE detention facility in New Jersey is privately operated by CoreCivic. AB 5207, if left in place, will preclude ICE from continuing to contract with this or other facilities, and might force ICE to relocate hundreds of noncitizens each year to detention facilities outside of New Jersey. JA93-94, 100, 104. The district court correctly recognized that principles of intergovernmental immunity do not permit that result.

First, those principles preclude state regulation of federal government operations. Thus, as the Supreme Court held a century ago, even licensing requirements of general applicability may be invalid when they impinge on the federal government's choice of who will carry out federal operations. *See Johnson v. Maryland*, 254 U.S. 51, 57 (1920). As that case and a host of other decisions also make clear, framing a restriction as a regulation on private entities rather than the federal government itself does not save the provision from constitutional scrutiny. AB 5207 does not merely restrict the government's choice of contractors; it eliminates the possibility of choice.

Second, AB 5207 impermissibly singles out and discriminates against the federal government and is independently invalid for this reason as well. Unlike the general licensing requirements at issue in cases such as *Johnson*, AB 5207 targets only contractors doing business with the United States. New Jersey is free to make its own contracting decisions regarding whether its agencies and political subdivisions will house civil

6

immigration detainees. It cannot, however, wield its regulatory authority against private contractors to target ICE facilities.

**B.** The district court also correctly concluded that AB 5207 is preempted by federal law. The INA confers broad discretion on DHS to "arrange for appropriate places of detention." 8 U.S.C. § 1231(g)(1). AB 5207 impermissibly limits that discretion by dictating that privately owned-and-operated facilities cannot serve as "appropriate places of detention" in New Jersey.

The federal statutory scheme here authorizes the use of private entities and establishes conditions for continuing eligibility to operate detention facilities on the government's behalf. AB 5207 cannot override Congress's conditions with a determination that private facilities are categorically ineligible to provide such services. States have no constitutional or statutory authority to control the scope of services available to the federal government in the marketplace by intentionally barring private actors from working with the federal government.

## ARGUMENT

### AB 5207 CONTRAVENES FUNDAMENTAL PRINCIPLES OF INTERGOVERNMENTAL IMMUNITY AND PREEMPTION IN BARRING CONTRACTS WITH DHS FOR THE DETENTION OF NONCITIZENS SUBJECT TO IMMIGRATION PROCEEDINGS.

It is uncontroverted that New Jersey could not prohibit the federal government from contracting with private entities to provide facilities for the detention of removable noncitizens. New Jersey cannot accomplish the same result by regulating

the other end of the contract and prohibiting private entities from contracting with the federal government.

It is also uncontroverted that AB 5207 would accomplish that precise result. The significant prospective impact on ICE operations is self-evident. ICE neither constructs nor solely operates its own detention facilities. JA91. It currently uses only one privately owned-and-operated detention facility in New Jersey, run by CoreCivic, which has been in operation for over two decades. JA46, 93. AB 5207 would require ICE either to acquire and operate facilities to house these detainees or to transfer them to facilities in other states. New Jersey has no power to compel either result.

AB 5207 thus runs afoul of longstanding principles of intergovernmental immunity and preemption, doctrines that are closely related in cases of this kind, with decisions often drawing on precedents under each doctrine regardless of the rubric under which the case is decided. Whatever their doctrinal emphasis, however, decisions dating to *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), foreclose New Jersey's attempt to preclude ICE from contracting for the operation of private detention facilities.

### A. AB 5207 Violates Principles of Intergovernmental Immunity.

The Supremacy Clause makes federal law "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and it has been firmly established for over two centuries that a state has no power "to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested

in the general government." *McCulloch*, 17 U.S. (4 Wheat.) at 436. As the Supreme Court recently reiterated, the Supremacy Clause "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022). Accordingly, the doctrine of intergovernmental immunity "prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals (*e.g.,* contractors)." *Id.* (cleaned up). AB 5207 runs afoul of both prongs of intergovernmental immunity.

### 1. AB 5207 Impermissibly Regulates the Operations of the Federal Government.

**a.** Under the doctrine of intergovernmental immunity, "states may not directly regulate the federal government's operations or property." *Treasurer of N.J. v. U.S. Dep't of the Treasury*, 684 F.3d 382, 410 (3d Cir. 2012) (quotation marks omitted). The district court correctly determined that AB 5207 violates this principle because it "directly bars any contract between the United States and its chosen contractor" and "would effectively shut down [ICE's detainee-housing] operations" in New Jersey. JA27. This conclusion is dictated by a long line of Supreme Court precedent establishing the fundamental principle at stake here: states cannot limit the federal government's authority in choosing its contractors or establish the terms on which the federal government can contract. Nor can states go even further by barring the federal government's ability to contract entirely and impose on the federal government the

burden of operating itself any detention facilities necessary to its regulation of immigration.

In *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) (per curiam), the Supreme Court held that an Arkansas licensing requirement could not constitutionally be applied to federal contractors. *Id.* at 190. The Court relied on *Johnson v. Maryland*, 254 U.S. 51 (1920), which had held that a state licensing requirement "does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." *Leslie Miller*, 352 U.S. at 190 (quoting *Johnson*, 254 U.S. at 57). The Court in *Leslie Miller* thus confirmed that the Supremacy Clause does not permit "[s]ubjecting a federal contractor to [state] contractor license requirements" and giving "the State's licensing board a virtual power of review over the federal determination" of the contractor's eligibility. *Id.*

In *Johnson*, the Supreme Court explained that the question in such licensing cases "is whether the State can interrupt the acts of the general government itself," and the Court found the answer was plainly no. 254 U.S. at 55. The Court explained that "[w]ith regard to taxation, no matter how reasonable, or how universal and undiscriminating, the State's inability to interfere has been regarded as established since *McCulloch* v. *Maryland*." *Id.* The Court in *Johnson* also relied on another seminal decision, *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738 (1824), which posed rhetorical questions that have particular resonance in this case: "Can a contractor for supplying a

10

military post with provisions, be restrained from making purchases within any State, or from transporting the provisions to the place at which the troops were stationed? or could he be fined or taxed for doing so? We have not yet heard these questions answered in the affirmative." *Johnson*, 254 U.S. at 56 (quoting *Osborn*, 22 U.S. (9 Wheat.) at 867). Those are the very type of restraints that AB 5207 places on contractors, restraints that the Supreme Court regarded as patently unconstitutional almost two centuries ago.

In *Public Utilities Commission of California v. United States* (*PUC*), 355 U.S. 534 (1958), the Supreme Court further held that a state law could not require common carriers to seek approval from a state agency in order to transport government property at the rates the carrier had negotiated with the federal government. *Id.* at 535-38, 544. The Court explained that this scheme placed a "restraint or control on federal transportation procurement" that amounted to "a prohibition on the Federal Government," presenting a conflict between state and federal policy "as clear as any that the Supremacy Clause of the Constitution was designed to resolve." *Id.* at 543-44 (citation omitted).[1]

---

[1] The State contends (Br. 28-29) that *Leslie Miller* and *PUC* are "*preemption* cases" and thus irrelevant. As the Ninth Circuit explained in *GEO Group, Inc. v. Newsom*, however, "[w]hile both cases discussed conflicts between federal and state law, they also undoubtedly drew on principles of intergovernmental immunity." 50 F.4th 745, 760 (9th Cir. 2022) (en banc). Indeed, this Circuit has described both *Leslie Miller* and *PUC* as "involving questions of governmental immunity." *United States v. City of Philadelphia*, 798 F.2d 81, 89 (3d Cir. 1986). In *North Dakota v. United States*, 495 U.S. 423 (1990), justices disagreed as to whether *Leslie Miller* and *PUC* were decided on intergovernmental-immunity or preemption grounds. *See id.* at 435 n.7 (plurality

*Continued on next page.*

11

Drawing on those decisions, the en banc Ninth Circuit in *GEO Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc), concluded that a similar California law barring private contractors from operating ICE detention facilities violated intergovernmental immunity. *Id.* at 759-61. The Ninth Circuit explained that California's law "clearly falls on the same side as *Leslie Miller* and [*PUC*], controlling federal operations by interfering in the same way with ICE's contracting decisions." *Id.* at 761. The law gave "California a 'virtual power of review' over ICE's contracting decisions, and effectively 'place[d] a prohibition on the Federal Government' from operating with its desired personnel." *Id.* (citation omitted) (first quoting *Leslie Miller*, 352 U.S. at 190; then quoting *PUC*, 355 U.S. at 544). The law thus impermissibly "prohibit[ed] ICE from exercising its discretion to arrange for immigration detention in the privately run facilities it has deemed appropriate." *Id.*

As the district court here explained, "AB 5207 would pose a greater impediment to the federal method of detaining individuals for civil immigration violations than the impediments found unconstitutional in *Leslie Miller* and [*PUC*]." JA26. Those state laws "merely set conditions on private contractors performing federal work," whereas

---

opinion) (preemption); *id.* at 453-54 (Brennan, J., concurring in the judgment in part and dissenting in part) (intergovernmental immunity). And *Johnson*, in relying on *McCulloch*, clearly invoked principles of intergovernmental immunity. As these cases reflect, the applications of the doctrines frequently converge in this area. In this case also, the state law fails on preemption and intergovernmental-immunity grounds for closely related reasons.

"AB 5207 goes steps further by entirely banning them from contracting with the federal government."  JA26-27.

**b.**      The State does not dispute that a law expressly barring ICE from entering into contracts with private detention facilities would violate intergovernmental immunity.  Nor does it dispute that AB 5207 achieves the same result and precludes ICE from contracting for detention services within New Jersey.  The State asserts, however (Br. 17-30), that state laws regulating federal contractors violate intergovernmental immunity only insofar as they are discriminatory.  As discussed below, AB 5207 is indeed impermissibly discriminatory.  The State is quite wrong, however, to urge that the law would otherwise be consistent with principles of intergovernmental immunity.

The State relies on the plurality decision in *North Dakota v. United States*, 495 U.S. 423 (1990) (plurality opinion), for the proposition that the first prong of intergovernmental-immunity analysis has lost its vitality and that states are now free to regulate the federal government through its contractors.  *See* Opening Br. 19-20.  But *North Dakota* involved an extensive statewide scheme regulating the distribution of liquor, which affected the federal government only insofar as it might incidentally raise liquor prices at military bases.  495 U.S. at 438-41; *see GEO Grp.*, 50 F.4th at 760-61 (observing that the *North Dakota* plurality "dealt only with regulations that increased the cost of liquor rather than regulations that would have negated the federal government's control over its own operations").  The *North Dakota* plurality nowhere suggested that

13

a state could prohibit employees or contractors from performing work for the United States, or impede the implementation of federal programs. On the contrary, as the Fourth Circuit explained, *North Dakota* confirmed *Leslie Miller*'s continuing vitality and "recognized the significant differences between" the "incidental effect" of the law in *North Dakota* and "direct interference" of the law in *Leslie Miller* regarding "the decisional processes of the federal government." *United States v. Virginia*, 139 F.3d 984, 989 n.7 (4th Cir. 1998); *id.* at 989-90 (holding that Virginia licensing requirements for private-security agencies could not bar unlicensed entities from contracting to perform FBI background investigations).

Indeed, in similar cases involving generally applicable taxes, the Supreme Court has taken pains to emphasize the absence of any direct effect on government operations. *See, e.g.*, *United States v. New Mexico*, 455 U.S. 720, 731-32 (1982); *United States v. County of Fresno*, 429 U.S. 452, 464 (1977). And the Court has otherwise been careful to distinguish between "nondiscriminatory state taxes on activities of contractors" that merely "increase the costs," and regulations that "place[] a prohibition on the Federal Government." *PUC*, 355 U.S. at 543-44; *see also Osborn*, 22 U.S. (9 Wheat.) at 867.

The State is equally mistaken in asserting (Br. 20-21) that the Supreme Court effected a sea change in intergovernmental-immunity analysis in its passing reference to *North Dakota* in *Washington*, 596 U.S. 832. *Washington* concerned a statutory waiver of intergovernmental immunity that permits the application of state workmen's compensation laws to federal projects and lands, but which the Court held did not

14

extend to the discriminatory taxation scheme imposed by Washington. *Id.* at 835. As the en banc Ninth Circuit noted in rejecting the same argument pressed by the State here, the Court in *Washington* cited "*North Dakota* only in passing to describe how the *discrimination* theory evolved over time." *GEO Grp.*, 50 F.4th at 759 n.8 (emphasis added). The Supreme Court did not redefine the parameters of intergovernmental immunity, and nothing in *Washington* remotely suggests that New Jersey could now bar the United States from entering into its desired contracts.

Finally, contrary to the State's suggestion (Br. 22-24), Congress does not need to specifically grant immunity to federal operations that are carried out by contractors. As discussed above, states have been barred from regulating federal operations since the Founding. To allow states to dictate where and how the federal government conducts its sovereign responsibilities, merely because Congress has not expressly barred such intervention in a particular circumstance, would turn the Supremacy Clause on its head.

> **2.  AB 5207 Singles Out and Discriminates Against Federal Operations.**

a. Because AB 5207 regulates the federal government's ability to contract, the law would be invalid even if it did not target the federal government and its contractors. But it does single out and discriminate against the federal government, and accordingly contravenes principles of intergovernmental immunity for this reason as well.

A state law "discriminates against the Federal Government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." *Washington*, 596 U.S. at 839 (cleaned up). To survive this analysis, a regulation must be "neutral and generally applicable." *See* Opening Br. 29 (emphasis omitted).

AB 5207 singles out civil immigration detention and prevents the federal government—and only the federal government—from using private contractors to carry out detention operations. *See* N.J. Stat. Ann. § 30:4-8.16(b)(2) (West). (Indeed, a law targeting civil immigration detention *necessarily* singles out federal operations, since the federal government is the only entity authorized to engage in such detention.) AB 5207 would bar ICE from renewing CoreCivic's contract, which would severely impair ICE's public safety and border security operations in the region by eliminating the sole remaining detention facility within the state and the facility closest to New York City. JA93-94, 100-106, *see* JA106 ("The lack of detention resources in New Jersey has already had a severe impact on national-security, public-safety and border-security operations in a critical area of the nation. And if [EDC] is forced to close due to AB 5207, those severe impacts will become catastrophic."). Singling out federal contractors and operations in this way violates the Supremacy Clause.

**b.** The State nonetheless contends that AB 5207 is not discriminatory because "New Jersey does not treat any 'similarly situated' detention facilities better." Opening Br. 31.

As the State acknowledges, however (Br. 32-33), New Jersey *does* permit some other forms of private detention. Specifically, the Department of Corrections has conditioned authority to "authorize the confinement of eligible inmates in private facilities." N.J. Stat. Ann. § 30:4-91.10 (West); *see id.* § 30:4-91.2. These "private correctional facilities" are "residential center[s]" "operated by a private nonprofit" contractor, and can house certain inmates with up to two years remaining on their sentences. *Id.* § 30:4-91.9. The State claims that such facilities are "hardly a similarly situated comparator," Opening Br. 32, but offers no explanation for that bare assertion.

The State also fails to acknowledge that its political subdivisions are free to use certain private criminal detention facilities. Under state law, New Jersey counties are permitted to "confin[e] inmates who are in need of and receiving rehabilitative and similar services in private facilities" operated by for-profit entities. *Essex Cty. Corr. Officers PBA Local No. 382 v. County of Essex*, 106 A.3d 1238, 1248 (N.J. Super. Ct. App. Div. 2014). In barring private immigration-detention facilities, New Jersey left unaffected the ability of its counties to utilize these private facilities.

The State suggests that only "general criminal detention" facilities could be similarly situated for purposes of intergovernmental-immunity analysis, Opening Br. 32, but offers no justification for why that would be the sole comparator to *civil* immigration-detention facilities. Nor does the record support so limiting the field of comparison. In legislative findings supporting AB 5207, the legislature found that "[d]etention centers and correctional facilities in New Jersey have a history of poor

17

conditions, including inadequate medical and mental health care, use of isolated confinement, and incidents of violence and retaliation against people in detention." N.J. Stat. Ann. § 30:4-8.15(c) (West).[2] This finding pertains to *all* "[d]etention centers and correctional facilities" in New Jersey: criminal and civil, public and private, state and federal, for immigration and other purposes. *See id.*; *id.* § 30:4-91.9 (referring to residential centers as "private correctional facilities"). And yet New Jersey discriminatorily banned only a small subset: federal, private, civil immigration facilities.

In any event, AB 5207 does not actually draw lines between private facilities based on their conditions. As the Supreme Court explained, in determining "[w]hether a State treats similarly situated state and federal [actors] differently"—and whether differential treatment is "'justified by'" a "'significant difference' between the two classes"—a court must look to "how the State has defined the favored class." *Dawson v. Steager*, 139 S. Ct. 698, 705-06 (2019). Here, the distinction is whether an entity "houses or detains individuals for civil immigration violations." N.J. Stat. Ann. § 30:4-8.16(a) (West). AB 5207 does not classify private facilities based on "poor conditions" at a specific facility. Instead, it permits New Jersey and its counties to use private contractors to operate certain facilities and "categorically denies that same benefit to"

---

[2] Any "significant differences" between private psychiatric-care facilities and immigration-detention facilities with respect to this legislative finding, *see* Opening Br. 32-33, would merely justify treating *only* psychiatric-care facilities differently from all other "[d]etention centers and correctional facilities," which AB 5207 does not do.

ICE and its immigration facilities, even if the conditions "turned out to be *identical*" for both sets of facilities. *Dawson*, 139 S. Ct. at 706.

In enacting AB 5207, New Jersey purposefully barred only private immigration detention, but allowed its agencies and political subdivisions to continue using all forms of private facilities favored by state policy. This is not the kind of nondiscriminatory burden "affect[ing] the government in an[] indirect or incidental way" that the Supremacy Clause permits. *South Carolina v. Baker*, 485 U.S. 505, 520 (1988) (quotation marks omitted).

### B. AB 5207 Poses a Significant Obstacle to the Implementation of the Immigration Laws Authorized by Congress and Is Preempted.

Many of the same features of AB 5207 that offend intergovernmental-immunity principles demonstrate that the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quotation marks omitted).

1. The Secretary of Homeland Security has "both responsibility and broad discretion … to choose the place of detention for deportable aliens." *GEO Grp.*, 50 F.4th at 751 (quotation marks omitted). Congress has provided that "[t]he [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). As the district court recognized (JA38-40), ICE has the authority to utilize private facilities, and Congress has authorized ICE to make the detention arrangements that best accommodate its needs.

19

In exercising its authority, ICE does not own or solely operate its own detention facilities in order to maintain flexibility and best facilitate its housing and removal of noncitizens, JA91-92. The impact of AB 5207 will be to remove a choice approved by Congress and require the federal government either to operate facilities itself or to move noncitizens subject to removal to facilities in another state. AB 5207 thus presents a significant obstacle to ICE's ability to exercise its congressionally authorized discretion in arranging immigration detention.

**2.a.** The State acknowledges that Congress could preempt AB 5207, but mistakenly contends that it has not done so with sufficient clarity. *See* Opening Br. 53; Opening Br. 42, 44 (emphasizing that INA does not expressly reference private facilities).

But Congress not only contemplates the operation of detention facilities by private contractors; it appropriates funds for those contracts in annual appropriations legislation. These enactments both authorize expenditures for privately operated facilities and set a minimum requirement that the facilities must meet in order for the federal government to continue to contract for their detention services. *See, e.g.,* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. F, tit. II, § 214(a), 136 Stat. 4459, 4736 (2022) ("None of the funds provided under the heading 'U.S. Immigration and Customs Enforcement—Operations and Support' may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than

'adequate' or the equivalent median score in any subsequent performance evaluation system."); Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. F, tit. II, § 215(a), 136 Stat. 49, 322 (same); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. F, tit. II, § 215(a), 134 Stat. 1182, 1457 (2020) (same).

In addition to this minimum performance-evaluation requirement, *see* Pub. L. No. 117-328, § 214(a), 136 Stat. at 4736, Congress requires ICE to attempt to purchase, lease, or use pre-existing facilities before constructing, owning, and operating its own facilities, *see* 8 U.S.C. § 1231(g)(1)-(2).  Otherwise, Congress imposes no restrictions on ICE's discretion to determine appropriate housing for detainees.  In delegating broad discretion, Congress need not explicitly add that all state laws that would prevent the Secretary from exercising such discretion are preempted.  *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 386-88 (2000) (rejecting argument that "failure of Congress to [expressly] preempt" a state law interfering with executive discretion "demonstrates implicit permission" to the state).  Rather, for preemption to apply, "[i]t is sufficient that the state law imposes additional conditions not contemplated by Congress." *Fasano v. Federal Reserve Bank of N.Y.*, 457 F.3d 274, 283 (3d Cir. 2006) (cleaned up).  That is precisely what AB 5207 does.

Accordingly, courts have repeatedly recognized that the grant of discretion by Congress impliedly preempts state law that would interfere with the exercise of that discretion.  *See, e.g.*, *Crosby*, 530 U.S. at 373-77; *Arizona v. United States*, 567 U.S. 387, 409 (2012); *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154-56 (1982); *Fasano*,

457 F.3d at 283, 288; *Lozano v. City of Hazleton*, 724 F.3d 297, 317-20 (3d Cir. 2013). "Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption." *GEO Grp.*, 50 F.4th at 762.

**b.** The State is on no firmer ground in urging that the federal laws at issue lack preemptive effect because they do not regulate private actors. Opening Br. 35-40. The State relies primarily upon *Murphy v. NCAA*, 584 U.S. 453, 480-81 (2018), and *Ocean County Board of Commissioners v. Attorney General of New Jersey*, 8 F.4th 176, 182 (3d Cir. 2021), cases in which the courts determined that the federal laws at issue did not have preemptive effect because they regulated *state* action, rather than *private* actors. Here, the federal laws at issue clearly do not regulate states.

Instead, the INA authorizes contracts with private persons, and, as noted, the annual appropriations statutes establish eligibility standards, requiring that a "contracted facility" must have received "'adequate'" ratings in its "two most recent overall performance evaluations." Pub. L. No. 117-328, § 214(a), 136 Stat. at 4736. This requirement regulates contractors' eligibility to operate immigration-detention facilities. AB 5207 would pretermit the federal eligibility determination by making all contractors ineligible to operate such facilities.

**c.** The State is similarly wide of the mark in arguing that the district court should have accorded a presumption against preemption in its review of AB 5207. AB 5207, is not, as the State urges (Br. 46-50), a health-and-safety measure in an area of traditional state authority, and the State's characterization of the measure does not alter

22

its nature. Indeed, AB 5207 cannot correctly be said to "protect the health and safety[]

… of individuals *detained within New Jersey*," N.J. Stat. Ann. § 30:4-8.15(b) (West) (emphasis added). The purpose of AB 5207 is to shut down all private immigration-detention facilities in New Jersey—with the effect of forcing the transfer of those detainees to facilities in other states, JA94, 104-105—not to improve conditions at in-state facilities.

Whether and when to contract for detention facilities in fulfilling its immigration responsibilities are matters committed to the national government, which is answerable to the citizens of all states for its conduct, not to the New Jersey legislature or the legislature of any other state. A law that regulates where detainees can be confined and interferes with "inherently federal relationships" between the government and its contractors thus trenches on a field occupied by federal law and does not warrant the presumption against preemption. *See GEO Grp.*, 50 F.4th at 761-62; *id.* at 761 ("While we have applied the presumption when state regulations have 'incidental effects in an area of federal interest,' we have never applied the presumption to a state law that would control federal operations." (citation omitted)). Indeed, as the en banc Ninth Circuit recognized, "a state law that obstructs federal functions as thoroughly as AB [5207] would normally be analyzed under intergovernmental immunity, and it would therefore be subject to precisely the opposite presumption." *Id.* at 762.[3]

---

[3] Moreover, the district court correctly determined that "even with the benefit of the presumption, AB 5207 still would be preempted by federal law." JA36.

**d.** Finally, the State underscores its misunderstanding of the INA and preemption principles when it urges that the INA "simply gives federal officials the discretion to consider leasing properties already available on the market." Opening Br. 51. According to the State (Br. 42-46), this leaves states free to intentionally remove private detention facilities from the marketplace.

This argument fundamentally misunderstands the relevant statutory text. Under the Supremacy Clause, states are presumed to have no authority to control federal operations by requiring federal contractors to comply with state licensing requirements or otherwise obtain state approval to deal with the federal government. *See supra* Part A. Against that constitutional backdrop, the INA cannot be read to empower states to intentionally restrict the market for federal detention services. *See Washington*, 596 U.S. at 840 ("Congress must provide clear and unambiguous authorization for" state regulation that would otherwise violate intergovernmental immunity. (cleaned up)).

In § 1231(g), Congress delegated to DHS the responsibility to "arrange for appropriate places of detention" for detained noncitizens. 8 U.S.C. § 1231(g)(1). In doing so, Congress conferred broad discretion to choose where and how to house noncitizens pending their removal. The broad authority vested in DHS and ICE to "arrange for appropriate places of detention" for detained noncitizens does not reduce to the ability "to consider leasing properties already available on the market."

The State focuses instead (Opening Br. 42-43) on the provisions following the delegation in § 1231(g)(1), which simply direct that before "build[ing]" or "acquir[ing]"

its own detention facilities to operate itself, DHS must try to use pre-existing federal facilities or rent non-federal facilities, 8 U.S.C. § 1231(g)(1), and that before constructing "any new detention facility," DHS must consider "purchas[ing] or leas[ing]" an existing facility, *id.* § 1231(g)(2). These provisions thus condition DHS's ability to "acquire land" and "acquire, build, remodel, repair, and operate facilities … necessary for detention." *Id.* § 1231(g)(1). They do not limit DHS's discretion when it is not seeking to own and operate its own facilities. When ICE seeks to use private contractors to run a privately owned-and-operated facility, the conditions in (g)(1) and (g)(2) do not apply.[4]

Moreover, the INA's recognition that private facilities might be "unavailable" to "rent[]," 8 U.S.C. § 1231(g)(1), cannot be read to implicitly recognize state authority to intentionally render privately owned-and-operated facilities unavailable. *Contra* Opening Br. 43. The statute recognizes that both "United States Government facilities" and private "facilities adapted or suitably located for detention" might be "unavailable." 8 U.S.C. § 1231(g)(1). Because the INA does not clearly and unambiguously authorize states to prohibit ICE from using other federal government-owned facilities for

---

[4] The State concedes that, notwithstanding its text, AB 5207 does not prohibit ICE from leasing a private facility and operating the facility itself. Opening Br. 33-34, 52. And AB 5207 is clearly unconstitutional to the extent it seeks to prohibit private contractors from operating a federal government-owned detention facility. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988). New Jersey thus has no authority to preclude ICE from using either of the preceding options. The only question is whether the INA permits states to circumscribe ICE's discretion to contract for the use of privately *owned-and-operated* detention facilities. It does not.

immigration-detention purposes, *see Washington*, 596 U.S. at 840, it does not authorize states to render private facilities unavailable either.

More fundamentally, even taking the State's argument on its own terms, New Jersey is not engaged in a general regulation of which properties may be placed on the rental market. AB 5207 is a bar on operating a federal facility. The State does not dispute that Congress has authorized ICE to employ private contractors to operate detention facilities; that use of those detention facilities is vital to the agency's implementation of the immigration laws; and that AB 5207 would bar all such facilities in New Jersey. The law is plainly an obstacle to ICE operations, and the State makes no serious attempt to show otherwise.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

PHILIP R. SELLINGER
*United States Attorney*

MARK B. STERN

*s/ McKaye L. Neumeister*
McKAYE L. NEUMEISTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7231*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8100*
*McKaye.L.Neumeister@usdoj.gov*

March 2024

# COMBINED CERTIFICATIONS

1.     Government counsel are not required to be members of the bar of this Court.

2.     This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(4)-(5) and 32(a)(7) because it contains 6390 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

3.     On March 20, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

4.     The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

5.     This document was scanned for viruses using CrowdStrike Falcon Sensor, Version 7.11.18110.0, and no virus was detected.

*s/ McKaye L. Neumeister*
McKaye L. Neumeister

**ADDENDUM**

# TABLE OF CONTENTS

6 U.S.C. § 112................................................................................................................A1

8 U.S.C. § 1231.............................................................................................................A1

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. F, tit. II,
§ 214, 136 Stat. 4459, 4736 (2022) ........................................................A2

8 C.F.R. § 235.3............................................................................................................A2

48 C.F.R. § 3017.204-90 .............................................................................................A2

N.J. Stat. Ann. § 30:4-8.15 (West) ...........................................................................A3

N.J. Stat. Ann. § 30:4-8.16 (West) ...........................................................................A3

## 6 U.S.C. § 112

### § 112. Secretary; functions

\* \* \*

(b) Functions

The Secretary--

\* \* \*

(2) shall have the authority to make contracts, grants, and cooperative agreements, and to enter into agreements with other executive agencies, as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law; and

\* \* \* \*


## 8 U.S.C. § 1231

### § 1231. Detention and removal of aliens ordered removed

\* \* \*

(g) Places of detention

(1) In general

The Attorney General shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal. When United States Government facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the Attorney General may expend from the appropriation "Immigration and Naturalization Service--Salaries and Expenses", without regard to section 6101 of Title 41, amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities (including living quarters for immigration officers if not otherwise available) necessary for detention.

(2) Detention facilities of the Immigration and Naturalization Service

Prior to initiating any project for the construction of any new detention facility for the Service, the Commissioner shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use.

\* \* \* \*

**Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. F, tit. II, § 214, 136 Stat. 4459, 4736 (2022)**

(a) None of the funds provided under the heading "U.S. Immigration and Customs Enforcement—Operations and Support" may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than "adequate" or the equivalent median score in any subsequent performance evaluation system.

(b) The performance evaluations referenced in subsection (a) shall be conducted by the U.S. Immigration and Customs Enforcement Office of Professional Responsibility.


## 8 C.F.R. § 235.3

### § 235.3. Inadmissible aliens and expedited removal

* * *

(e) Detention in non-Service facility. Whenever an alien is taken into Service custody and detained at a facility other than at a Service Processing Center, the public or private entities contracted to perform such service shall have been approved for such use by the Service's Jail Inspection Program or shall be performing such service under contract in compliance with the Standard Statement of Work for Contract Detention Facilities. Both programs are administered by the Detention and Deportation section having jurisdiction over the alien's place of detention. Under no circumstances shall an alien be detained in facilities not meeting the four mandatory criteria for usage. These are:

  (1) 24–Hour supervision,

  (2) Conformance with safety and emergency codes,

  (3) Food service, and

  (4) Availability of emergency medical care.

* * * *


## 48 C.F.R. § 3017.204-90

### § 3017.204-90. Detention Facilities and Services (ICE)

The ICE Head of the Contracting Activity (HCA), without delegation, may enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services.

**N.J. Stat. Ann. § 30:4-8.15 (West)**

**§ 30:4-8.15. Legislative findings and declarations relating to immigration detention agreements**

The Legislature finds and declares that:

a. It is the responsibility of the State to ensure respect for the human rights and civil rights of all people detained within New Jersey.

b. It is the responsibility of the State to protect the health and safety, including the physical and mental health, of individuals detained within New Jersey.

c. Detention centers and correctional facilities in New Jersey have a history of poor conditions, including inadequate medical and mental health care, use of isolated confinement, and incidents of violence and retaliation against people in detention.

d. In keeping with its obligation to protect and advance the health and just treatment of all people within the State of New Jersey, it is therefore the intent of the Legislature to prevent new, expanded, or renewed agreements to detain people for civil immigration purposes.

**N.J. Stat. Ann. § 30:4-8.16 (West)**

**§ 30:4-8.16. Prohibition of immigration detention agreements; definitions**

a. As used in this act:

"Immigration detention agreement" means any contract, agreement, intergovernmental service agreement, or memorandum of understanding that authorizes the State, local government agency, or private detention facility to house or detain individuals for civil immigration violations.

"Local government agency" means a county, county sheriff, municipality, or other political subdivision and any agency, officer, employee, or agent thereof.

"Private detention facility" means any privately owned or operated facility that houses or detains individuals for civil immigration violations.

b. On or after the effective date of this act:

(1) the State or a local government agency shall not enter into, renew, or extend any immigration detention agreement as defined in subsection a. of this section; or

(2) a private detention facility operating in this State shall not enter into, renew, or extend any immigration detention agreement as defined in subsection a. of this section.

c. Nothing in this section shall be construed to prohibit, or in any way restrict, any action where the prohibition or restriction would be contrary to federal law, the United States Constitution, or the New Jersey Constitution.