# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 23-2598

CORECIVIC, INC.,
*Plaintiff-Appellee,*

v.

GOVERNOR OF NEW JERSEY, et al.,
*Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY (No. 3:23-cv-00967)

## REPLY BRIEF OF APPELLANTS

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

JEREMY M. FEIGENBAUM
*Solicitor General*

MICHAEL L. ZUCKERMAN
*Deputy Solicitor General*

PETER WINT
*Assistant Attorney General*

NATHANIEL I. LEVY
DANIEL RESLER
ASHLEIGH B. SHELTON
*Deputy Attorneys General*

Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
(862) 350-5800
Nathaniel.Levy@njoag.gov

*Attorneys for Appellants*

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................1

ARGUMENT ...........................................................................3

I.    CORECIVIC IS NOT IMMUNE FROM AB 5207. ..........................................3

   A.    The Supremacy Clause Does Not Grant Private Federal Contractors A Freestanding Immunity From Nondiscriminatory State Laws. .............................3

   B.    New Jersey Law Is Nondiscriminatory. .........................................14

II.   THE INA DOES NOT IMPLIEDLY PREEMPT AB 5207. ...........................19

   A.    The Relevant Provisions Of The INA Neither Impose Obligations Nor Confer Rights On Private Parties.........................................19

   B.    The Relevant Federal Laws Do Not Impliedly Preempt AB 5207.................22

CONCLUSION ........................................................................28

# TABLE OF AUTHORITIES

**Page Number(s)**

**Cases**

*Arizona v. Bowsher*,
  935 F.2d 332 (D.C. Cir. 1991)......................................................................4

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................. 4, 20, 26

*Boeing Co. v. Movassaghi*,
  768 F.3d 832 (9th Cir. 2014) ................................................................14

*Chamber of Com. v. Whiting*,
  563 U.S. 582 (2011) ...............................................................................9

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)..............................................................................27

*Davis v. Mich. Dep't of the Treas.*,
  489 U.S. 803 (1989)..............................................................................15

*Dep't of Homeland Sec. v. Texas*,
  144 S.Ct. 715 (2024) ..............................................................................7

*Essex Cty. Corr. Officers PBA Loc. No. 382 v. Cty. of Essex*,
  No. A-3806-15T2, 2016 WL 7369046
  (N.J. Super. Ct. App. Div. Dec. 20, 2016)...........................................18

*Essex Cty. Corr. Officers PBA Local No. 382 v. Cty. of Essex*,
  106 A.3d 1238 (N.J. Super. Ct. App. Div. 2014) .................................17

*Farina v. Nokia*,
  625 F.3d 97 (3d Cir. 2010) ...................................................................26

*Fasano v. Fed. Rsrv. Bank of New York*,
   457 F.3d 274 (3d Cir. 2006) ..................................................................26

*Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982) ..............................................................................26

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000) ..............................................................................26

*GEO Grp, Inc. v. Inslee*,
   No. 23-5626, 2024 WL 1012888 (W.D. Wash. Mar. 8, 2024) ..............18

*GEO Grp. v. Newsom*,
   50 F.4th 745, 760 (9th Cir. 2022) ....................................................6, 10

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988) ................................................................................7

*Holk v. Snapple Beverage Corp.*,
   575 F.3d 329 (3d Cir. 2009) ..................................................................27

*Johnson v. Maryland*,
   254 U.S. 51 (1920) ............................................................................7, 14

*Kansas v. Garcia*,
   140 S.Ct. 791 (2022) ..................................................................... *passim*

*Leslie Miller v. Arkansas*,
   352 U.S. 187 (1956) ....................................................................... 5, 6, 21

*Lozano v. City of Hazleton*,
   724 F.3d 297 (3d Cir. 2013) .......................................................... 26, 27

*Maine Forest Prod. Council v. Cormier*,
   51 F.4th 1 (1st Cir. 2022) ......................................................................21

iii

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ........................................................................8

*McHenry Cty. v. Raoul*,
  44 F.4th 581 (7th Cir. 2022) ............................................ 12, 16, 19, 22

*Morales v. Trans World Airlines*,
  504 U.S. 374 (1992) ....................................................................20

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ................................................................ 19, 20

*Mut. Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013) ....................................................................20

*N. Dakota v. United States*,
  495 U.S. 423 (1990) .............................................................. *passim*

*Ocean Cty. Bd. of Comm'rs v. Attorney General of N.J.*,
  8 F.4th 176 (3d Cir. 2021) ..........................................................19

*Osborn v. Bank of the U.S.*,
  22 U.S. 738 (1824) ........................................................................8

*Penn Dairies v. Milk Control Comm'n of Penn.*,
  318 U.S. 261 (1943) .............................................................. *passim*

*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ........................................................16

*Public Utils. Comm'n of Cal. v. United States*,
  355 U.S. 534 (1958) ............................................................. 5, 6, 21

*Rowe v. N.H. Motor Transp. Ass'n*,
   552 U.S. 364 (2008) ......................................................................... 26, 27

*Sikkelee v. Precision Airmotive Corp.*,
   822 F.3d 680 (3d Cir. 2016) ...................................................................27

*Treasurer of N.J. v. U.S. Dep't of Treasury*,
   684 F.3d 382 (3d Cir. 2012) .......................................................... 4, 5, 14

*United States v. Boyd*,
   378 U.S. 39 (1964) .................................................................................13

*United States v. City of Phila.*,
   798 F.2d 81 (3rd Cir. 1986) ..................................................................6, 7

*United States v. Missouri*,
   660 F. Supp. 3d 791 (W.D. Mo. 2023) ..................................................14

*United States v. New Mexico*,
   455 U.S. 720 (1982) ............................................................................9, 13

*United States v. Virginia*,
   139 F.3d 984 (4th Cir. 1998) ...................................................................7

*United States v. Washington*,
   596 U.S. 832 (2022) ................................................................. 3, 5, 8, 15

## Statutes

8 U.S.C. § 1231 ............................................................................ *passim*

Consolidated Appropriations Act, P.L. No. 117-328, §214(a), 136 Stat. 4459 .......24

N.J. Stat. Ann. § 30:4-8.15 ......................................................................15

N.J. Stat. Ann. § 30:4-27.2 ........................................................16

N.J. Stat. Ann. § 30:4-91.9 ........................................................16

N.J. Stat. Ann. § 30:4-91.10 .......................................................16

**Other Authorities**

Reply Brief of DHS, *DHS v. Texas*, No. 23A607 (U.S. Jan. 10, 2024) ...... 10, 15, 17

## **INTRODUCTION**

Neither CoreCivic nor the United States can square the decision below with the Supremacy Clause. That bedrock provision establishes the boundaries between the States and the Federal Government via two distinct doctrines: intergovernmental immunity and preemption. The former prohibits the States from directly regulating the United States and discriminating against the United States and its contractors. The latter ensures that if federal and state laws impose conflicting rights or duties on private parties, federal laws will prevail. Neither allows a private federal contractor like CoreCivic to demand a freestanding immunity from a State's nondiscriminatory health-and-safety provisions. Just the opposite: "whatever burdens are imposed on the Federal Government by a neutral state law regulating its suppliers 'are but normal incidents of the organization within the same territory of two governments.'" *N. Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality).

The challengers' responses fall short. CoreCivic and the United States cannot find such a freestanding immunity for federal contractors in the Supremacy Clause's text and precedent. To the contrary, their view would both upset Congress's role in overseeing the federal-state balance and undermine federalism. And the challengers' inability to agree on a test to identify burdens that go too far confirms that their view is inadministrable and lacks limits. Nor is their approach necessary: where state laws

1

unduly burden private contractors, the Supremacy Clause empowers Congress to supersede them. That leaves the claims that AB 5207 is a "direct" regulation of the United States or "discriminatory." But a regulation imposed on a contractor is inherently not direct regulation of the United States, and CoreCivic and the United States never identify similarly situated private detention that New Jersey permits.

CoreCivic's and the United States' preemption arguments also fail. Although Congress unquestionably could supersede AB 5207, it has not done so. A federal law can have preemptive effect only where it expressly or impliedly grants rights or obligations to private parties. But the provisions of the Immigration and Nationality Act (INA) at issue, particularly 8 U.S.C. § 1231(g), merely require federal officials to choose from available facilities—they do not grant private parties any rights or obligations to provide such private detention. And the INA's text and structure does not conflict with AB 5207. The INA tells federal immigration officials to consider available private facilities before constructing their own; it does not dictate whether private detention must be available in the first place.

If private contractors wish to obtain immunity from AB 5207, the Supremacy Clause requires they direct their pleas to Congress. To date, Congress has not granted their demand. The district court erred in concluding otherwise.

**ARGUMENT**

## I.    CORECIVIC IS NOT IMMUNE FROM AB 5207.

### A.    The Supremacy Clause Does Not Grant Private Federal Contractors A Freestanding Immunity From Nondiscriminatory State Laws.

Private companies cannot claim immunity from nondiscriminatory state laws simply by claiming that these laws "unduly interfere with the Federal Government's operations," CoreCivic Br. 29, or "impede the implementation of federal programs," U.S. Br. 14. The challengers' arguments are inconsistent with precedent, undermine Congress's primary role under the Supremacy Clause, flout federalist principles, are inadministrable, and lack clear limiting principles. Nor can CoreCivic and the United States repackage these laws as "direct" regulation of the United States.

1. While the Supreme Court long ago "struck down" nondiscriminatory state laws that regulated private actors "on the theory that they interfered" too much with federal activities, it has "decisively" and "thoroughly repudiated" that approach for eighty years. *N. Dakota*, 495 U.S. at 434-35 (plurality); *accord Penn Dairies v. Milk Control Comm'n of Penn.*, 318 U.S. 261, 270-71 (1943) (detailing same "trend" and rejecting broader formulations of immunity); *United States v. Washington*, 596 U.S. 832, 838 (2022) (confirming doctrine "evolved" and no longer "bar[s] any state law whose 'effect … was or might be to increase the cost to the Federal Government of performing its functions,' including laws that imposed costs on federal contractors").

3

Rather, a law "is invalid only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *N. Dakota*, 495 U.S. at 435 (plurality); *accord Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir. 2012); *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991).

CoreCivic's and the United States' responses are unavailing. Primarily, both argue that the alcohol regulation in *North Dakota* had a less significant impact on federal operations than AB 5207. *See* CoreCivic Br. 30-31; U.S. Br. 13-14. But that purported factual distinction is nonresponsive to the legal holding, which described the limited scope of intergovernmental immunity overall, and Congress's—not the courts'—central role in determining when private federal contractors and suppliers should be free from nondiscriminatory state laws. *See* 495 U.S. at 435-39, 444. CoreCivic—though not the United States—also attacks the *North Dakota* plurality because some cases on which it relied involved state taxation, not regulation. Br. 26. Yet CoreCivic provides no support for that distinction, which is foreclosed by precedent. *See Penn Dairies*, 318 U.S. at 270 (applying same rule to "immunity from state taxation and regulation"); U.S. Br. 14 (discussing taxation cases).

Moreover, while both CoreCivic and the United States emphasize that *North Dakota* was a four-justice plurality, decisions before and after adopt the same test. As to prior cases, *Penn Dairies*—on which *North Dakota* relies—is clear: because

4

"the Constitution has left Congress free to set aside local taxation and regulation of government contractors which burden the national government," there is "no basis for implying from the Constitution alone a restriction upon such regulations which Congress has not seen fit to impose." 318 U.S. at 271. Neither CoreCivic nor the United States offer meaningful responses: CoreCivic again rests entirely on factual distinctions, *see* Br. 26-27, while the United States does not mention this case. And as to later decisions, *Washington*—which relies on *North Dakota*—recognizes that intergovernmental immunity today covers direct and discriminatory regulation. 596 U.S. at 838; *see Treasurer*, 684 F.3d at 406. The challengers reply that *Washington* did not work "a sea change in intergovernmental-immunity analysis" or "redefine [its] parameters," U.S. Br. 14-15; CoreCivic Br. 19, but that is the State's precise point: *Washington* identified the same trends and adopted the same approach the Court's plurality and majority decisions had advanced for decades.

Nor do the precedents on which CoreCivic and the United States rely endorse any self-executing immunity for private contractors. CoreCivic and the United States primarily rest on *Leslie Miller v. Arkansas*, 352 U.S. 187 (1956), and *Public Utilities Commission of Cal. v. United States*, 355 U.S. 534 (1958) (*PUC*), and portray the State as challenging their "continuing vitality." U.S. Br. 14. But the State's argument is not that these decisions lack vitality; it is that they are *preemption* rulings. *See N.*

*Dakota*, 495 U.S. at 435 & n.7 (plurality); N.J. Br. 28-29. Although CoreCivic, the United States, and the district court blur this line, *see, e.g.*, U.S. Br. 11 n.1 (quoting *GEO Grp. v. Newsom*, 50 F.4th 745, 760 (9th Cir. 2022) (en banc)), the difference is crucial: intergovernmental immunity offers an implied, self-executing constitutional protection, whereas preemption comes from a conflict with a particular federal law. *See N. Dakota*, 495 U.S. at 434 (plurality). Preemption describes *Leslie Miller* and *PUC* perfectly: they identified a "clear" and "direct conflict" between state law and reticulated federal statutes and rules, none of which would be relevant to immunity. *Id.* at 435 & n.7; *see Leslie Miller*, 352 U.S. at 189-90 (detailing "conflict" between "enumerat[ed]" state licensing requirements and contractor qualifications "under the federal statute and regulations"); *PUC*, 355 U.S. at 542-44 (conflict between state common-carrier regulations and the "numerous and extensive" military procurement regulations that "have the force of law"). Both are thus inapposite.

Although CoreCivic and the United States try to close that gap by relying on *United States v. City of Philadelphia*, 798 F.2d 81 (3rd Cir. 1986), *see* CoreCivic Br. 22, 27-28; U.S. Br. 11 n.1, that case supports New Jersey. That case asked whether a local antidiscrimination ordinance could bar a university from welcoming military recruiters on its campus. 798 F.2d at 85. While the lawsuit presented "ostensibly a question of governmental immunity," this Court found it "perhaps 'best understood

as posing an issue essentially of federal preemption,'" because the lawsuit squarely concerned the conflict between a local law and federal military-recruitment laws—and relied on *Penn Dairies* for this distinction. *Id.* at 85-86. And in briefly discussing *Leslie Miller* and *PUC*, this Court understood both to involve questions regarding the challengers' ability "to comply with both the state and federal policies involved." *Id.* at 89. That *Philadelphia* found preemption because it was impossible to comply with federal and local law says nothing about finding immunity when it is not.[1]

CoreCivic and the United States' remaining cases fail because they involve direct regulation of the United States or an outdated approach to intergovernmental immunity. *See* CoreCivic Br. 20, 23; U.S. Br. 10-11. *Johnson v. Maryland* held that Maryland could not require a postal worker to obtain a state license because the regulation of a federal "employee" is direct regulation "of the general government itself." 254 U.S. 51, 55 (1920). *Goodyear Atomic Corp. v. Miller* involved "a federally owned facility." 486 U.S. 174, 181 (1988). And *Department of Homeland Security v. Texas*, 144 S.Ct. 715 (2024), involved an order "directly prohibit[ing]

---

[1] The United States (but not CoreCivic) cites *United States v. Virginia*, 139 F.3d 984 (4th Cir. 1998), to support its view that companies have intergovernmental immunity under *Leslie Miller*. Br. 14. But *Virginia* acknowledged the "disagreement" in *North Dakota* itself "over whether *Leslie Miller* was a preemption or an intergovernmental immunity case" and did not resolve that debate. 139 F.3d at 989 n.7.

Border Patrol itself from taking steps integral to carrying out its federal statutory responsibilities." Reply Brief of DHS at 12-13, *DHS v. Texas*, No. 23A607 (U.S. Jan. 10, 2024) (contrasting such an order with a law "indirectly affect[ing] Border Patrol through measures directed at third parties with whom it deals"). Finally, the United States relies on *McCulloch v. Maryland*, 17 U.S. 316 (1819), and *Osborn v. Bank of the United States*, 22 U.S. 738 (1824), *see* Br. 8-12, but these are the very cases from which intergovernmental immunity doctrine has "evolved." *Washington*, 596 U.S. at 838. Instead, the modern way to identify improper "interference" with federal acts, *McCulloch*, 17 U.S. at 329, *is* to look for direct or discriminatory burdens, *N. Dakota*, 495 U.S. at 434-35 (plurality); *Penn Dairies*, 318 U.S. at 270-71. Any additional protection for private contractors is for Congress to confer.

2. CoreCivic and the United States identify even less grounding for their rule in constitutional first principles.

CoreCivic and the United States' main such argument clashes with bedrock separation-of-powers principles. They argue private contractors must have immunity to prevent the States from "interfer[ing] with" or "obstruct[ing]" federal operations. CoreCivic Br. 10, 13, 18, 20-22; U.S. Br. 9-10. But the Supremacy Clause provides a different solution: it grants to Congress alone the "power to confer immunity from state regulation on Government suppliers beyond that conferred by the Constitution

alone" and thus gives Congress "the primary role … in resolving conflicts between the National and State Governments." *N. Dakota,* 495 U.S. at 439 (plurality); *see Penn Dairies*, 318 U.S. at 269 (holding "no clause of the Constitution … purports, unaided by Congressional enactment, to prohibit such regulations"); *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (confirming primary role for Congress); *United States v. New Mexico*, 455 U.S. 720, 744 (1982) (noting contractor immunity is a "complex problem" that "Congress is best qualified to resolve"). CoreCivic and the United States neither deny that the Supremacy Clause assigns this power to Congress nor that Congress could preempt AB 5207, nor do they establish that this policy-infused task belongs in the courts. Far from "turn[ing] the Supremacy Clause on its head," U.S. Br. 15, New Jersey's position flows from Article I.

The challengers' theories are also inconsistent with federalism, which affords the States wide regulatory latitude. As the Supreme Court has held, requiring private contractors or suppliers to comply with their State's nondiscriminatory health-and-safety laws properly "accommodat[es] the full range of each sovereign's legislative authority." *N. Dakota*, 495 U.S. at 435 (plurality); *see Penn Dairies*, 318 U.S. at 270-71 (approach protects "authority in the states to … regulate their internal affairs and policy"). CoreCivic vaguely states that federalism already "informed the case law relied on by the district court," Br. 32, but never explains how according private

contractors immunity from nondiscriminatory state laws actually advances federalist principles. And the United States offers no response whatsoever.

Moreover, the briefs on CoreCivic's side confirm—and even exacerbate—the administrability problems. These briefs and the case law on which they rely advance a cacophony of different legal standards for identifying "too much" indirect burden. *See* CoreCivic Br. 12 ("substantial interference with federal operations"); *id.* at 33 ("unprecedented degree of state control over federal operations in an area of core federal concern"); U.S. Br. 14 ("impede the implementation of federal programs"); IRLI Br. 6 ("right … to conduct operations … without interference from the states"); *N. Dakota*, 495 U.S. at 452 (Brennan, J., concurring and dissenting) ("actually and substantially interferes with specific federal programs"); *GEO Grp.*, 50 F.4th at 757 (a "level of control over federal operations that the Supremacy Clause does not tolerate"); JA21 ("dictate how the federal government carries out its functions"); JA31 ("naked interference with the federal function"). This collection of approaches, however, raises grave workability concerns: it would leave the States, the Federal Government, contractors, and courts guessing as to the precise test.

CoreCivic and the United States have no response. The United States does not mention or address these administrability concerns, while CoreCivic urges the Court to declare immunity for federal contractors but leave all "difficult line-drawing" to

10

"future cases." Br. 34. Their inability to settle on a test or address these concerns is unsurprising: because their view of immunity lacks grounding in the Constitution's text or in specific statutes, there is "no standard by which 'burdensomeness' may be measured." *N. Dakota*, 495 U.S. at 437 n.8 (plurality) (contrasting approach to tests that ask whether a burden is imposed directly on United States or in discriminatory fashion). But the invitation to judges to set the federal-state balance for contractors, unmoored from the Supremacy Clause, has no limiting principle and risks extending immunity to myriad inapposite contexts, such as state minimum-wage laws. *See* N.J. Br. 25. Neither CoreCivic nor the United States show otherwise.

3. While CoreCivic and the United States spill considerable ink arguing laws imposed on federal contractors are prohibited as "direct" regulations of the United States, *see* CoreCivic Br. 11, 16-18, 27-28; U.S. Br. 9, 14, this repackaged effort to obtain freestanding immunity for private contractors is a non-starter.

Precedent establishes that direct regulation is only "an implied constitutional immunity of the national government from state taxation and from state regulation of the performance, *by federal officers and agencies*, of governmental functions." *Penn Dairies*, 318 U.S. at 269 (emphasis added); *see N. Dakota*, 495 U.S. at 436-37 (plurality) (there can be "no claim" of direct regulation if the law "operate[s] against" private contractors and "not the Government"); *McHenry County v. Raoul*, 44 F.4th

11

581, 593 n.6 (7th Cir. 2022) (agreeing that state law "does not directly regulate the federal government by applying non-discriminatory regulations to private entities or local governments … that contract with the government"). The United States itself recognizes this distinction. *See* DHS Reply Br. 12-13 (discussing *Washington* and contrasting a law that "indirectly affect[s] Border Patrol through measures directed at third parties with whom it deals" with one that "*directly* prohibits Border Patrol itself from taking steps integral to carrying out its federal statutory responsibilities"). Indeed, the entire dispute in *North Dakota* regarded whether intergovernmental immunity bars direct and discriminatory regulation or whether it also immunizes private contractors. *Compare* 495 U.S. at 436-37 & n.8 (plurality), *with id.* at 452-54 (Brennan, J., dissenting). If "direct" regulation already encompassed private contractors, no dissent would have been necessary.

Merely repackaging this argument as "direct" regulation is also nonresponsive to the constitutional defects identified above. No matter how it is labeled—whether a "third category" of intergovernmental immunity, or a kind of "direct" regulation—granting freestanding immunity to private federal contractors has no textual support in the Supremacy Clause. *N. Dakota,* 495 U.S. at 434-35 (plurality); *Penn Dairies*, 318 U.S. at 269. Similarly, no matter the label, this form of immunity would supplant Congress's primary role in resolving federal-state conflicts and deprive States of the

power to enforce health-and-safety laws against private contractors. *N. Dakota*, 495 U.S. at 435 (plurality); *Penn Dairies*, 318 U.S. at 270-71. And a claim that a law imposed on private contractors becomes "direct" regulation when it "goes too far," CoreCivic Br. 22, again is inadministrable and lacks limits, *N. Dakota*, 495 U.S. at 437 n.8 (plurality). Calling this "direct" regulation is a red herring.

Nor is the position espoused by New Jersey, *North Dakota*, *Penn Dairies*, and *McHenry* mere "form rather than substance." CoreCivic Br. 16. CoreCivic and the United States complain that New Jersey cannot directly bar ICE from contracting for private detention, but nevertheless achieves the same result by prohibiting private companies from providing immigration detention. *See* U.S. Br. 7-8, 13. But a constitutionally-significant difference exists between regulating the United States, over whom States lack control, and regulating private companies, which are subject to regulation "within the same territory of two governments." *N. Dakota*, 495 U.S. at 435 (plurality); *see id.* at 436-37 (collecting cases); *New Mexico*, 455 U.S. at 734-35; *United States v. Boyd*, 378 U.S. 39, 44 (1964); *Penn Dairies*, 318 U.S. at 270-71. And the challengers' logic has no stopping point: because States cannot require ICE to hire only contractors who pay the minimum wage, it would follow private contractors have freestanding immunity from wage laws too. That is incorrect.

13

Finally, adhering to this longstanding meaning of "direct" regulation would hardly deprive the test of "vitality." *Contra* U.S. Br. 13. Rather, the direct-regulation prong meaningfully protects the United States itself from state control. That includes protecting federal property interests and federally-owned facilities from a wide range of state regulations. *See, e.g.*, *Treasurer*, 684 F.3d at 411-12 (U.S. savings bonds from escheat laws); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (federal energy plants from environmental laws). It includes protections for U.S. employees from a range of licensing mandates. *See, e.g.*, *Johnson*, 254 U.S. at 55. And it protects the United States from laws that would otherwise prevent its agencies from enforcing their mandates. *See United States v. Missouri*, 660 F. Supp. 3d 791, 808 (W.D. Mo. 2023) (law "declaring federal firearms regulations invalid as to the state"); DHS Reply Br. 12-13 (regulation of Border Patrol). The United States thus remains free to detain immigrants in New Jersey in its own facilities, and take over facilities like the Elizabeth Detention Center (EDC). *See* N.J. Br. 33-34. All it cannot claim is an immunity for its private contractors from nondiscriminatory state laws—unless and until Congress expressly or impliedly grants them that right.

B.    <u>New Jersey Law Is Nondiscriminatory</u>.

CoreCivic and the United States then pivot to arguing that New Jersey law is discriminatory—an issue not reached below, *see* JA31 n.13—but misapprehend state

law. To establish discrimination, a challenger must both identify an entity "similarly situated" to for-profit immigration-detention contractors that the State nevertheless allows to provide services, and show that this differential treatment is not explained by "significant differences between the two." *Davis v. Mich. Dep't of the Treas.*, 489 U.S. 803, 816 (1989); *see Washington*, 596 U.S. at 839. In conducting this analysis, courts do not look at a state law in isolation; they consider the "broader regulatory context." *N. Dakota*, 495 U.S. at 438 (plurality). That is dispositive, since AB 5207 merely extends a preexisting New Jersey prohibition on private companies providing general criminal detention to immigration detention. The state Legislature has never authorized—which thereby prevents—the state Department of Corrections (DOC) from hiring private, for-profit companies like CoreCivic to provide general criminal detention. *See* JA110 ¶¶ 8-10. In passing AB 5207, the Legislature reasoned that the same "history of poor conditions" is present in the immigration context as well, N.J. Stat. Ann. § 30:4-8.15(c)-(d), and thus treated like for-profit detention alike.

If this Court reaches the issue, it must reject CoreCivic and the United States' three claims that New Jersey nonetheless treats similarly situated entities differently. First, the United States errs in claiming AB 5207 inherently discriminates because the Federal Government exclusively "engage[s] in [immigration] detention." Br. 16. Instead, because the touchstone of a discrimination analysis requires "[d]ifferential

treatment" across similarly situated entities, the "mere fact that [state law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cty.*, 44 F.4th at 594; *cf. also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 244 (3d Cir. 2008) (holding a "class of one" equal-protection claim "still must" show "that a plaintiff has been treated differently from others who are similarly situated"). Were the rule otherwise, *any* burden on a private contractor that provides immigration services would inherently be discriminatory—from minimum wages to workplace-safety laws. *See supra* at 11. In immigration as elsewhere, however, the same test applies: the parties must engage with the closest comparators—here, the for-profit general criminal detention New Jersey likewise disallows.

Second, when the challengers do try to engage in a comparative analysis, they miss the mark. Although CoreCivic and the United States emphasize that New Jersey permits certain nonprofit halfway houses and therapeutic facilities to operate, those are hardly similarly situated—significant differences are readily apparent. *Compare* N.J. Br. 31-33, *with* CoreCivic Br. 36-37 & U.S. Br. 17. Indeed, N.J. Stat. Ann. §§ 30:4-91.9 to -91.10 only permits DOC to transfer a limited number of low-security prisoners to "nonprofit" "residential center[s]"—typically called "halfway houses," JA110 ¶ 8—to finish their sentences. And N.J. Stat. Ann. § 30:4-27.2 allows only specialized psychiatric facilities to provide involuntary mental-health services.

16

Neither is remotely like EDC, which is a general immigration-detention facility, akin to a standard prison. That matters: residential environments and psychiatric facilities that exist to provide health care do not implicate the Legislature's concerns regarding the troubling health conditions associated with for-profit congregate detention, and neither CoreCivic nor the United States offer record evidence that they do.

Third, the United States wrongly says that New Jersey allows its subdivisions to use private general detention.[2] Relying on *Essex County Corrections Officers PBA Local No. 382 v. County of Essex*, 106 A.3d 1238, 1248 (N.J. Super. Ct. App. Div. 2014), the United States claims that one county contracted with two such facilities. Br. 17-18. But that case undermines the United States' position, because it confirms that state law does not permit private companies to perform the "core governmental function" of "confining … inmates." 106 A.3d at 1250. Instead, the state court there explained that such facilities were permissible only to the extent that they served the "purposes of providing substance abuse, rehabilitative, and similar services to inmates," and not simply as "alternative jail facilities" for "incarceration." *Id.*; *see*

---

[2] The United States chides New Jersey for "fail[ing] to acknowledge" these facilities. Br. 17. But neither the parties nor the United States raised them below, and CoreCivic did not on appeal either. And both below and before this Court, the State discussed and distinguished the overall category of facilities offering specialized, therapeutic care—which covers the facilities at issue. *See* N.J. Br. 32-33; D.N.J. Dkt. 41 at 28.

*also Essex Cty. Corr. Officers PBA Loc. No. 382 v. Cty. of Essex*, No. A-3806-15T2, 2016 WL 7369046, at *8 (N.J. Super. Ct. App. Div. Dec. 20, 2016) (after additional fact proceedings on remand, confirming the two facilities are used for "substance abuse, rehabilitative, and similar services," not for general criminal detention, and cataloging undisputed evidence to that effect).

EDC is not similarly situated to those specific rehabilitative facilities, just as it is not similarly situated to a psychiatric hospital or halfway house. Such facilities specialize in therapeutic or rehabilitative services, in contrast to the purpose and operations of a standard prison, jail, or immigration detention center. *Cf. GEO Grp, Inc. v. Inslee*, No. 23-5626, 2024 WL 1012888, at *16-17 (W.D. Wash. Mar. 8, 2024) (finding "residential treatment facilities are not similarly situated to immigration detention," as the two "serve entirely different purposes"). CoreCivic does not claim (let alone establish) that it seeks to provide drug-treatment or therapeutic services to detainees, any more than CoreCivic intends to operate a psychiatric hospital or halfway house for EDC's general population. And the United States does not claim it seeks to purchase those services in New Jersey, let alone from CoreCivic. But that is dispositive: the Legislature's health-and-safety-driven concerns apply completely differently to those private facilities that themselves focus on specialized therapeutic

18

or rehabilitative services. New Jersey is therefore treating like facilities alike, and its restriction on general, for-profit detention is nondiscriminatory.

## II.    THE INA DOES NOT IMPLIEDLY PREEMPT AB 5207.

### A.    The Relevant Provisions Of The INA Neither Impose Obligations Nor Confer Rights On Private Parties.

The Supreme Court and this Court have thrice established that a federal statute has preemptive effect only where it "imposes restrictions or confers rights on private actors." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2022); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 476-77, 1479 (2018); *Ocean Cty. Bd. of Comm'rs v. Attorney General of N.J.*, 8 F.4th 176, 181 (3d Cir. 2021). That is dispositive—the federal laws on which CoreCivic and the United States rely permit federal officials to use private facilities if they are "available," 8 U.S.C. § 1231(g), but neither require nor grant any private right to make such services available in the first place.

CoreCivic and the United States respond (like the district court) that this rule applies only where federal law impermissibly "regulate[s] *state* action," U.S. Br. 22, as did the federal laws in *Ocean County* and *NCAA*, but their argument fails for four reasons. First, "a good rule of thumb for reading [court] decisions is that what they say and what they mean are one and the same," *McHenry Cty.*, 44 F.4th at 588, and *Ocean County* and *NCAA* held expressly that to have preemptive effect a law "must be best read as one that regulates private actors." *Ocean Cty.*, 8 F.4th at 181. Second,

while *Ocean County* and *NCAA* involved federal laws that imposed direct burdens on the States, *Garcia* did not—yet it invoked and applied the same requirement. 140 S.Ct. at 801-02. Third, this approach fits with the rule for impossibility preemption, which likewise evaluates if "it is impossible for a *private party* to comply with both state and federal requirements." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (emphasis added). And fourth, a federal law that neither grants nor imposes rights or obligations on private parties and yet prevents the States from regulating the same *is*, by definition, one that operates on the States alone—whether it achieves that goal expressly or impliedly.

The other cases on which CoreCivic (though not the United States) relies are inapposite. As New Jersey has already explained, a federal law can impliedly impose obligations on or grant rights to private actors and preempt contrary laws. Indeed, in *Arizona v. United States,* 567 U.S. 387 (2012), the Court scrutinized comprehensive federal immigration laws regulating employment and identified an implied right to be free of criminal penalties for violating them. *Garcia*, 140 S.Ct. at 806-07. *Morales v. Trans World Airlines*, 504 U.S. 374 (1992), involved a federal statute shielding airlines from certain laws that "clear[ly] … confer[red]" on the airlines an implied "federal right" to act "subject only" to federal—not state—"constraints." *NCAA*, 584 U.S. at 478. And the same was true in *Maine Forest Production Council v. Cormier*,

51 F.4th 1, 10 (1st Cir. 2022), as CoreCivic admits. *See* Br. 45. These cases thus do not suggest the mere "grant of discretion" to a federal official implies a private right to provide the services the official wishes to procure, U.S. Br. 21; the implied rights and obligations were all based on close readings of text and structure instead. Nor are these statutes similar to Section 1231(g), which only instructs federal officials to consider whether appropriate private facilities are available on the market, but does not imply a private contractor's independent right to provide such services.

CoreCivic's resort to *Leslie Miller* and *PUC* fails for the same reason—those comprehensive schemes implied the right to provide services, in contrast to Section 1231(g). *See* Br. 44-45. In *Leslie Miller*, the military procurement scheme specified awards "*shall be made*" to "the responsible bidder," as defined by detailed criteria. 352 U.S. at 188-89 (emphasis added). That mandatory language—which entitled the private, responsible bidder to receive a contract award—logically implies a federal right to receive it. In *PUC*, a similar "comprehensive" military procurement scheme instructed that the lowest-cost bids be prioritized or "selected." 355 U.S. at 540-42. That express command likewise implies a right by the bidder to receive the award. Section 1231(g) is entirely dissimilar. It provides no company a right to be selected for any contract; all Section 1231(g) says is that federal officials should "consider" private facilities for purchase or lease if they are "available" in the first place.

21

B.    <u>The Relevant Federal Laws Do Not Impliedly Preempt AB 5207</u>.

Even assuming these statutes have some preemptive effect, CoreCivic and the United States fail to show they preempt AB 5207. Neither CoreCivic nor the United States dispute that preemption must "be grounded" in a federal statute's "text and structure," *Garcia*, 140 S.Ct. at 801, 804, but fail to demonstrate a conflict between the INA and AB 5207. Section 1231(g) "demonstrates at most a general preference to use existing facilities when they are available," *McHenry Cty*., 44 F.4th at 591; the statute says nothing about what must *be* available, and acknowledges that federal officials might have to acquire, rent, or construct and operate federal facilities, N.J. Br. 42-45. Laws that render private facilities unavailable—no less than the economic factors that do so—thus present no obstacle to Congress's statutory scheme.

The challengers offer a strained interpretation of Section 1231(g). Initially, the United States emphasizes that ICE is empowered to "arrange for appropriate places of detention for aliens," 8 U.S.C. § 1231(g)(1), and argues that ICE has exercised its discretion by hiring private contractors instead of "own[ing] or solely operat[ing] its own detention facilities," Br. 20. But the INA lays out precisely how officials must "arrange" for "appropriate" facilities: ICE must consider if any federal facilities or facilities "suitabl[e] … for rental" are available, and if not, ICE can spend funds "to acquire, build, remodel, repair, and operate facilities." 8 U.S.C. § 1231(g)(1). Section

22

1231(g) only even mentions private entities in adding that before ICE "construct[s]" a new facility, it "shall consider the availability for purchase or lease of any existing … detention center." *Id.* § 1231(g)(2). Nothing in AB 5207 obstructs federal officials from fulfilling any aspect of that law. ICE can still consider whether a federal facility is available for use. ICE can still consider whether a detention center is "available" for purchase or lease; it could purchase the EDC tomorrow. And ICE can otherwise acquire, build, remodel, repair, and operate any facility that it wishes.

That leaves the United States' misinterpretation of which facilities qualify as "available" under Section 1231(g). Br. 24-26. The United States reads "available" to mean available *regardless of state law*—that no State can "render privately owned-and-operated facilities unavailable." Br. 25. But it offers no definition of "available" that would exclude state laws, and none is readily apparent. After all, as a linguistic matter, the availability of goods or services turns on legality and economics alike. Self-service gas is not "available" in New Jersey even though gas stations are built the same here as in 49 other states. The United States has no textual response, but contends that "available" here must exclude state laws because "state regulation … would otherwise violate intergovernmental immunity." Br. 24. That counter fails, however, because it again blurs intergovernmental immunity with preemption, and

because—as explained above—contractors enjoy no self-executing immunity from nondiscriminatory laws. *See supra* at 3-14.[3]

Although the United States claims a subsequent appropriations law impliedly grants private contractors the missing right to provide detention with which AB 5207 conflicts, *see* Br. 22, that is wrong. That appropriations law funds ICE's "operations and support," and establishes the amounts for "maintenance, minor construction, and minor leasehold improvements at owned and leased facilities," and "procurement, construction, and improvements." Consolidated Appropriations Act, P.L. No. 117-328, §214(a), 136 Stat. 4459, at 4730-31. In other words, the law provides ICE the funding that it needs to fulfill its Section 1231(g) mandate to "arrange for appropriate places of detention" subject to their "availability." While the Federal Government emphasizes that this law instructs federal officials *not* to use funding to "continue any contract for the provision of detention services" if the provider's "performance evaluations" were inadequate, P.L. No. 117-328, §214(a), 136 Stat. at 4736, that is of no moment. An instruction that some companies will be ineligible to have their contracts continued does not establish that all remaining private detention companies

---

[3] Notably, although the district court cited a series of other federal statutes to support its conflict-preemption holding, *see* JA38-39, none of them mandate that any private services be available, which may explain why the United States does not cite them for its obstacle-preemption analysis, *see* Br. 19-26.

must be eligible to receive contracts in the first place.[4] Instead, a private detention

company must be "available" (which turns on economic factors and state law) and

satisfy their "performance evaluations" (an ICE determination). Appropriations law

thus provides that *if* private options are otherwise available, the contractors must also

satisfy certain performance ratings before being paid. Because AB 5207 affects only

that initial availability inquiry, the conflict with appropriations laws is illusory.

Nor can the challengers overcome the lack of conflict between AB 5207 and

the INA's text by baldly arguing that a "grant of discretion" to federal officials must

always "impliedly preempt[] state law that would interfere with the exercise of that

discretion." U.S. Br. 21; *see* CoreCivic Br. 56-57. After all, this operates at much too

high a level of abstraction: preemption "cannot be based on 'a freewheeling judicial

inquiry into whether a state statute is in tension with federal objectives,'" but on the

close reading of Congress's instructions for achieving those goals. *Garcia*, 140 S.Ct.

at 801 (cleaned up). Here, ICE can comply with those instructions regardless of AB

5207; it can consider whether private facilities are available, and can acquire, build,

remodel, repair, and operate federal facilities if not. All ICE cannot do is use a private

---

[4] Nor does the appropriations act regulate any private parties within the meaning of *NCAA* and *Ocean County*, as the United States briefly suggests. Br. 22. As before, the mandates are imposed solely on federal officials.

operator whose services are barred by state law—an action the INA neither expressly nor impliedly contemplates. Although ICE might prefer to manage "operations" by hiring CoreCivic to run EDC, the "Supremacy Clause gives priority to 'the Laws of the United States,' not the … preferences of federal officers." *Id.*

The cases on which CoreCivic and the United States primarily rely are not to the contrary. *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013), confirms that States may not interfere with the Federal Government's exclusive power to "decide whether an alien should be detained," *id.* at 318, while *Arizona*, 724 F.3d 297, confirms that States cannot "attach additional consequences" to violations of federal immigration laws, *Lozano*, 724 F.3d at 318. *Fidelity Federal Saving and Loan Association v. de la Cuesta*, 458 U.S. 141, 154 (1982), stands for the undisputed proposition that federal regulations, as much as statutes, can have "pre-emptive … force." JA37. Most of the other cases on which CoreCivic relies involved state standards of care inconsistent with federal law. *See Farina v. Nokia*, 625 F.3d 97, 123 (3d Cir. 2010) (state measure "impose[d] a different standard" for radiation than federal law); *Fasano v. Fed. Rsrv. Bank of New York*, 457 F.3d 274, 284-88 (3d Cir. 2006) (employee protections inconsistent with Federal Reserve's statutory authority to "dismiss" employees "at pleasure"); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 864-65 (2000) (defective-design claim conflicted with federal airbag rule); *Rowe v.*

*N.H. Motor Transp.* Ass'n, 552 U.S. 364, 367-69 (2008) (express preemption). And

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), involved a carefully

calibrated federal law that had given the President the comprehensive and exclusive

power to set sanctions and a state statute that clashed with it. *Id.* at 374-78.  None

involved provisions similar to the statutes at bar, in which officials are merely told

to "consider" whether any private facility is "available," and if not, to undertake a

range of other congressionally-approved actions instead.

Finally, to the degree the preemption question remains close (though it is not),

the presumption against preemption resolves the case. CoreCivic concedes that not

every state law connected to immigration trenches on an area of significant federal

presence. *See* Br. 46 (discussing employment provisions in *Lozano*, 724 F.3d at 314

n.23). Yet it incorrectly insists that only regulation of the State's own facilities—not

private ones—warrants the presumption. Br. 47-48. CoreCivic's distinction fails: the

presumption has never been cabined to a State's regulation of its own facilities or

subdivisions, but regularly attaches to health-and-safety statutes concerning private

activity. *See, e.g.*, *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016)

(aviation); *Holk v. Snapple Beverage Corp.*, 575 F.3d 329 (3d Cir. 2009) (food

labeling). As for the United States, it disputes that AB 5207 is actually a health-and-

safety law—arguing the Legislature was concerned with immigration, not private

detention. Br. 25 n.4. But nothing in AB 5207 stops ICE from detaining immigrants at federal facilities; it just bars companies like CoreCivic from doing so in private ones. That is consistent with the legislative judgment and record evidence regarding conditions at such facilities, and warrants a presumption against preemption.[5]

## CONCLUSION

This Court should reverse the decision below.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:    /s/ Nathaniel Levy
Nathaniel Levy
Deputy Attorney General
Office of the New Jersey Attorney General

Dated: April 17, 2024

---

[5] CoreCivic's contention that AB 5207 is field preempted—which the United States does not endorse, and the district court did not rely on—also fails. The smattering of federal statutes authorizing federal agencies to detain immigrants under particular circumstances, *see* CoreCivic Br. 58, is far from a "comprehensive[]" scheme that leaves "no room for supplementary state legislation." *Garcia*, 140 S.Ct. at 804.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c), I certify that:

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because the brief contains 6,479 words, excluding sections exempted by Fed. R. App. P. 32(f), and thus does not exceed the 6,500-word limit.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

3.     This brief complies with L.A.R. 31.1(c) in that prior to being electronically mailed to the Court today, it was scanned by the following virus detection software and found to be free from computer viruses:

> Company: McAfee, Inc.
> Product:  McAfee Endpoint Security, version 10.7.0.2687

4.     This brief complies with L.A.R. 31.1(c) in that the text of the electronic brief is identical to the text of the paper copies.

Dated: April 17, 2024

> /s/ Nathaniel I. Levy
> Nathaniel Levy
> Deputy Attorney General
> Office of the New Jersey Attorney General

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

I certify that I am a member in good standing of the bar of the United States

Court of Appeals for the Third Circuit.

Dated: April 17, 2024

/s/ Nathaniel I. Levy
Nathaniel I. Levy
Deputy Attorney General
Office of the New Jersey Attorney General

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

            /s/ Nathaniel I. Levy
            Nathaniel I. Levy
            Deputy Attorney General
            Office of the New Jersey Attorney General