Page 1

```
1
2    UNITED STATES COURT OF APPEALS
3    FOR THE THIRD CIRCUIT
4    - - - - - - - - - - - - - - - - - - - -x
5    In the Matter of:
6    CORECIVIC, INC.,
7          Plaintiff-Appellee,          Case No. 23-2598
8    v.
9    GOVERNOR OF NEW JERSEY,
     ATTORNEY GENERAL OF NEW JERSEY,
10
11         Defendants-Appellants.
12   - - - - - - - - - - - - - - - - - - - -x
13                              Thursday, May 1, 2025
14                              Philadelphia, PA
15         The above-entitled matter came on for oral argument
16   pursuant to notice.
17         BEFORE:
18         CIRCUIT JUDGES KRAUSE, BIBAS, AND AMBRO
19         APPEARANCES:
20         ON BEHALF OF THE PLAINTIFF-APPELLEE:
21         BRADLEY D. SIMON, ESQ.
22         ON BEHALF OF THE ATTORNEY GENERAL OF NEW JERSEY:
23         JEREMY M. FEIGENBAUM, ESQ.
24         ON BEHALF OF THE UNITED STATES:
25         MCKAYE K. NEUMEISTER, ESQ
```

1

2   Transcribed by:  Kristin Gambel

3   eScribers, LLC

4   7227 North 16th Street, Suite #207

5   Phoenix, AZ 85020

6   (800) 257-0885

7   operations@escribers.net

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2          THE COURT:  (Indiscernible) counsel, and I have full

3    courtroom in attendance.  We will be hearing one case this

4    morning, CoreCivic Inc. v. Governor of New Jersey, Attorney

5    General of New Jersey, No. 23-2598.

6          And we'll begin with you, Mr. Feigenbaum.

7          MR. FEIGENBAUM:  Jeremy Feigenbaum for the State.  I'd

8    like to reserve four minutes for rebuttal.

9          JUDGE KRAUSE:  Granted.

10         MR. FEIGENBAUM:  May it please the Court, the

11   Supremacy Clause puts Congress in the driver's seat.  And if it

12   wanted, Congress could preempt AB 5207 tomorrow.  But because

13   the text and structure of Section 1231(g) provides unusually

14   weak support for traditional preemption, CoreCivic is forced to

15   first contend that it has a free-standing immunity from the

16   Constitution itself.  But there are only two forms of

17   intergovernmental immunity; direct regulation of the United

18   States and discrimination against the United States and its

19   contractors.  The District Court relied on the direct

20   regulation prong.  But as the North Dakota plurality explained,

21   direct immunity only forbids application of laws to the United

22   States itself.

23         JUDGE BIBAS:  That's a plurality.  It's not a

24   majority.  It doesn't bind us.

25         JUDGE KRAUSE:  That's exactly right.

Page 4

1        JUDGE BIBAS:  Why should we be persuaded by it?

2        MR. FEIGENBAUM:  So I have two reasons.  First, I

3   think it has the better reading of the precedent.  I think Penn

4   Dairies -- which is a majority opinion that it quotes from

5   heavily in the plurality -- says all the same things the

6   plurality opinion does.  And I think it's a better reading of

7   the opinions, like Washington and Treasurer, that talk about

8   direct or discriminatory.  But I also find it much more

9   persuasive than the 4/4 disagreement that the courts have.

10       JUDGE KRAUSE:  But Penn Dairies observed that there

11  was no prohibition that was placed on the federal government.

12  And here that the words of the United States or federal

13  government or even DHS aren't appearing in the statute.  But

14  this is a marketplace where there is now reduced to a single

15  seller of the commodity in question, and it is a single buyer.

16  So by prohibiting that seller from entering into contracts, how

17  is this in effect any different than a direct regulation?

18       MR. FEIGENBAUM:  So it's obviously an extremely

19  important question.  I want to talk about it both as direct and

20  as discrimination for a second, because I think there's an

21  element of both in the briefing from, especially, the United

22  States.  So on the direct question, this was actually true in

23  North Dakota as well.  And I realize the plurality opinion, so

24  I'll talk about why I think it's right.  But in North Dakota,

25  that was a law only about alcohol sales to a federal enclave.

Page 5

1    That was the only possible buyer because there were separate

2    laws for nonfederal enclaves.  And that's our submission for

3    what we have here, too.  It's true this law talks about

4    immigration detention in particular.  But the backdrop, as we

5    understand -- and we can get into the state law questions at

6    the podium today -- but the backdrop is we read our law, is

7    that we'd already disallowed it for all state criminal

8    detention. And so it was just extending that prohibition to

9    another context.

10           So in North Dakota, the court says, okay, sure.  These

11   are only about sales to a federal enclave.  But we have to

12   decide, does it fit in any bucket; direct regulation or

13   discrimination?  On direct regulation, it said, this is

14   regulating the suppliers, not the United States.  And because

15   the subject is the suppliers, that's the Constitutionally

16   relevant difference.  And I think --

17           JUDGE BIBAS:  Okay.  That accounts for the Seventh

18   Circuit's decision.  Fine.  A limitation on the state.  And

19   part of this bill says, okay, New Jersey chooses not to in its

20   subordinate entities.  That's fine.  But then you turn around

21   and say, oh, but this is really just a regulation of private

22   entities.  If it really -- because of our concern about private

23   prison conditions, we can't credit that because the bill does

24   more than that.  The bill says also, the state is not going to

25   contract with them.  So isn't it evident?  Unless you unless

Page 6

1   you think the law is we have to be completely formalist,

2   functionally isn't it evident that what they're really trying

3   to do is to shut down immigration detention in New Jersey?

4           MR. FEIGENBAUM:  So I have two responses to that, both

5   on a formal answer and on a functional answer.  So I can give

6   the functional answer first, although I don't want to lose the

7   importance of the formalisms in this space.

8           JUDGE AMBRO:  Deal with the formal, because I want to

9   come back to the functional.

10          MR. FEIGENBAUM:  Start with the formal?

11          JUDGE AMBRO:  Yeah.

12          MR. FEIGENBAUM:  Great.  Happy to.  So for the formal

13   answer, I think it's important to note two things.  One, it

14   would be a very strange result if the presence of Subsection 1

15   meant that Subsection 2 was invalid even if it survived a

16   traditional comparator analysis.  Because that would suggest we

17   could repass the private subsection as distinct from the county

18   subsection the next day in its own law, and that would be

19   valid.  I think that would be a sort of strange result for

20   intergovernmental immunity, which is why intergovernmental

21   immunity has never been the sort of undifferentiated, what do

22   we think the legislature really meant to be doing here, and is

23   instead -- as Dawson v. Steager explains -- a specific

24   comparator analysis.  You look at what's regulated, you look at

25   the nonfederal comparators, and you decide if the federal

Page 7

1    contractors are being treated worse-off.  And our submission

2    here is that when you do a traditional comparator analysis --

3    and the closest thing you'd find, I think, is state criminal

4    detention -- we don't allow that either.  And so CoreCivic is

5    no worse off in providing federal immigration detention in New

6    Jersey than it is state criminal.  And so discrimination as an

7    argument collapses.

8          JUDGE KRAUSE:  Isn't that fundamentally different than

9    all of the comparator kind of cases we look at?  I mean, this

10   isn't a general commodity like liquor or milk.  This is a

11   federal function.  And here, the State has the right, arguably,

12   to opt out, essentially disqualifying itself as a comparator.

13   So how does this really map on to the other comparator cases to

14   which you're directing us?

15         MR. FEIGENBAUM:  I should have been clear.  That's not

16   actually the -- I don't mean the comparator as whether our

17   county facilities do immigration detention.  I mean, the

18   comparator whether the State allows private detention for State

19   criminal detention.  And that comparator works because the

20   United States and CoreCivic want to define immigration

21   detention as the market.  But private detention is a market

22   that goes well beyond immigration.  And there are states that

23   use private detention contracts.  But New Jersey doesn't use it

24   for itself.  And the basic idea of the discrimination analysis

25   is that the State's going to have to eat its own medicine if

Page 8

1    the federal government's contractors are going to have a

2    certain kind of burden.  And that's how you protect the federal

3    government.  But the State is doing that.

4         JUDGE KRAUSE:  But that's New Jersey's prerogative as

5    a separate sovereign, right?  I mean, New Jersey can make that

6    choice.  But that choice is being taken away from the federal

7    government.

8         MR. FEIGENBAUM:  So I take the point.  I'll say two

9    things about that, and I'd point to the plurality opinion's

10   footnote 8 In North Dakota.  When figuring out what choices can

11   or cannot be taken away from the federal government in that

12   way -- the sort of burdens that the law disallows -- the

13   plurality explains that there are two different ways to assess

14   burden.  Because otherwise, you're going to have this kind of

15   undifferentiated, unadministrable, does a court think it's too

16   much.  One is you look for discrimination, which is the

17   comparator analysis we're talking about.  And one is whatever

18   burdens Congress thinks is too much.  What's weird about, I

19   think, a lot in this case, is that Congress could just step in

20   and say, these burdens are too much.  It is important that DHS

21   be able to make this choice.  And when it makes that choice,

22   that contractor is free from any burdens under state law.

23        But what's strange here is in intergovernmental

24   immunity, we're saying even if Congress didn't make that

25   choice, even if they don't have a good preemption argument, we

Page 9

1   are going to imply it directly from the Constitution itself.

2   That's a pretty strange way to think about how to deal with

3   competing burdens on private and state, which really is the

4   classic stuff of preemption.

5        JUDGE AMBRO:  If we could go back to Judge Bibas'

6   question about the function here; as I understand it, there's

7   four detention facilities prior to this law, 5207, in New

8   Jersey.  You had service -- well, you could have service

9   processing centers owned by ICE.  I don't think there are any.

10  There are contract detention facilities owned by private

11  entities; CoreCivic, that's one.  There's intergovernmental

12  service agreements between ICE and state and local governments.

13  I think there were two counties, Essex and Hudson.  And then

14  you had the interagency agreements between ICE and federal

15  detention facilities.  And I think that U.S. Marshals had some

16  type of agreement with one of the counties.  Is that correct?

17       MR. FEIGENBAUM:  That's my understanding.

18       JUDGE AMBRO:  Bergen County?

19       MR. FEIGENBAUM:  Yeah, that's my understanding.  I do

20  think that --

21       JUDGE AMBRO:  Now, so after this law, the counties are

22  out.  So that loses you two.  CoreCivic private detention

23  facility is out.  That loses you three.  And did Bergen County

24  terminate its contract with the U.S. Marshal Service?

25       MR. FEIGENBAUM:  My understanding -- the United States

Page 10

1   obviously can correct me -- is that CoreCivic is the only

2   remaining immigration detention facility in New Jersey right

3   now.

4           JUDGE AMBRO:  So we're down to -- basically without

5   CoreCivic, you're down to zero.

6           JUDGE BIBAS:  And the next closest -- there's one in

7   Orange County that's inadequate more than an hour away, sixty,

8   seventy miles from Newark Airport.  So then you have to go out

9   to Moshannon, which is 4 hours and 17 minutes away.  It's out

10  by Altoona.  Now, you can't deny that's a substantial

11  interference with the federal government.  Are you, in essence,

12  reading the substantial interference prong out of

13  intergovernmental immunity here?

14          MR. FEIGENBAUM:  I don't think so.  So I want to be

15  clear about substantial interference with what for a second,

16  because I think that really matters.  There's two ways to think

17  about substantial interference; substantial interference with

18  how the executive has been running its program, and substantial

19  interference with the choices that Congress has made in the

20  text and structure of the law that it's adopted.  And what

21  North Dakota says -- and I think Washington and Penn Dairies

22  and other cases reflect this -- is the way we identify

23  substantial interference is we look for direct regulation or

24  discrimination.  Or we look at the kind of burdens Congress

25  found intolerable because it's going --

1     JUDGE BIBAS:  Okay.  So McCulloch has no independent

2  role.  It's just it's a historical relic that we teach to law

3  students, but isn't good law anymore.

4     MR. FEIGENBAUM:  I don't think so at all, Your Honor.

5  I think McCulloch is truly the touchstone in this space.  And I

6  think that Washington -- and I think that North Dakota --

7  explained McCulloch quite well, which is what the interference

8  was.  The power to tax is the power to destroy.  Very famous.

9  The point of what they were saying there is, federal law is

10  supreme.  Federal law created this agency.  You can't destroy

11  the agency, because then federal law wouldn't be supreme.

12     JUDGE AMBRO:  Right.

13     MR. FEIGENBAUM:  That's really important here.

14  Federal law is supreme, which means preemption.  Or it means

15  agencies created by federal law.  I don't know where in the

16  text of the Constitution a private party gets a free-standing

17  immunity from neutral state laws.  That's where I have such a

18  hard time.  Preemption is the way federal law is supreme,

19  preemption.  Preemption is the way you decide what burdens are

20  intolerable.  And there's no statute that we were talking about

21  here that says there has to be private detention in New Jersey.

22  New Jersey law can't apply to it.  Going to the Monahan (sic)

23  Servicing Processing Center is too difficult.

24     JUDGE BIBAS:  Well, what about -- so Fresno extends

25  the power to tax idea of McCulloch.  And Fresno upholds a tax,

Page 12

1    but it upholds it -- footnote 11 stresses the neutral tax --

2    neutral, not just the federal government -- does not threaten

3    to obstruct or burden the federal function, such as by making

4    the federal government unable to hire anyone.  That sounds like

5    this case.

6             MR. FEIGENBAUM:  Sort of.  So I would say a couple of

7    things to that, Your Honor.  The first thing I would say about

8    Fresno and kind of that way of thinking generally is, I think

9    it's actually quite helpful to my side of the V in this case

10   because it shows very clearly that although this case is about

11   a contracting partner, direct regulation and who gets covered

12   and who doesn't get covered has implications for regulatory

13   laws, has implications for tax laws, has implications for the

14   minimum wage laws, use of solitary confinement.  And so I

15   wonder if CoreCivic in a future case is going to say, you're

16   taxing us too high as a federal contractor.  And it would now

17   be direct regulation.  And that's how we'd have to test

18   burdens.

19            The way our law has decided to look for that

20   substantial interference, given the nature of the Supremacy

21   Clause itself -- which again, talks about federal laws being

22   supreme -- is to look at what is an obstacle to Congress' laws.

23   So what we're talking about in colloquies this morning is what

24   has been an obstacle, as it were, to the way ICE has been

25   running itself for some time in New Jersey.  There's no reason

Page 13

1    ICE couldn't buy the Elizabeth Detention Center or lease the

2    Elizabeth Detention Center and run immigration detention

3    itself.  There's no reason it couldn't work with BOP, whether

4    to do training, or as Judge Ambro noted, other forms of

5    arrangements they have.

6           JUDGE BIBAS:  Okay.  So in essence, what you're saying

7    is there used to be four ways they could run an immigration

8    facility.  We've closed off two of them, but there are still

9    two other ways they can do it.  They can --

10          JUDGE AMBRO:  Build.

11          JUDGE BIBAS:  -- buy and build it themselves, or they

12   can lease the facility and then do it themselves.  But it's

13   okay to close off these other two.  That's not substantial

14   interference.  Even if your friends on the other side are going

15   to stand up and say, we don't want to, we need the flexibility

16   of private providers and leased facilities, et cetera.  But we

17   still shouldn't view that as substantial interference.

18          MR. FEIGENBAUM:  Yeah.  So we keep saying the federal

19   government.  And I want to tease that out for a second, because

20   I think it matters here.  Federal government is obviously the

21   courts, but as relevant here, Congress and the executive.  And

22   what we keep talking about is the executive's detention

23   preferences.  If Congress had said there's a private right to

24   provide detention for a company like CoreCivic, this is an easy

25   case.  And they could go to Congress and ask for that sort of

1    thing.  Because the way our law handles competing burdens on

2    private interests is by letting Congress make that choice.  And

3    what's missing here in all of these colloquies is a discussion

4    of executive preferences.  We haven't even talked about 1231(g)

5    because I think it's such a weak form of preemption; go look

6    for what's available.  And if nothing's available, go build

7    your own facility.  And so when -- I don't think because

8    preemption is so weak, we need to find it in the Constitution.

9    The answer is to go back to Congress and ask for a stronger

10   form of preemption if Congress thinks there's substantial

11   interference.  And that's sort of the through-line of cases; I

12   think, like, New Mexico and Penn Dairies and the North Dakota

13   plurality.  And I think that's a good rule for the reasons New

14   Mexico gives, which is that Congress has, like, institutionally

15   superior capacity to make policy calls about competing burdens

16   between state laws on its view on what private detention is

17   appropriate in its borders, and federal policy views on what's

18   appropriate for immigration detention.

19          JUDGE BIBAS:  All right.  Let me ask you some hypos.

20   Your position, are you implying that the U.S. Mint could ban a

21   private contractor from setting up a printing press for dollar

22   bills or a mint for quarters in New Jersey because the

23   incidence is not direct regulation of the U.S.; it's just a

24   mint contractor?

25          MR. FEIGENBAUM:  Sorry.  If a state could do it?

Page 15

1          JUDGE BIBAS:  A state could do that.

2          MR. FEIGENBAUM:  I don't how to start that, though.

3          JUDGE BIBAS:  Yes.

4          MR. FEIGENBAUM:  A State could ban someone from

5     printing a form of money?

6          JUDGE BIBAS:  Isn't that an implication of your

7     position?  If the feds wanted to contract this out, New Jersey

8     said, not in new Jersey, you don't?

9          MR. FEIGENBAUM:  Yeah.  I mean, it would depend on

10    what the law -- one of the tricky things with some of these

11    hypos, just to warn you in advance, is I would need to know

12    what the statutes say about money-printing and the U.S. Mint

13    and things like that, because it's very easy to get preemption

14    for federal contractors.  That's one of the things that's kind

15    of funny in this case.  I think Leslie Miller and PUC are

16    really good examples.  I think a lot of these examples will

17    ultimately be knocked out by preemption, but I don't really

18    know what the laws say.  So it's a little hard to answer that

19    part.

20         JUDGE BIBAS:  All right.  But you would say

21    intergovernmental immunity does not reach that law.  This is a

22    preemption situation?

23         MR. FEIGENBAUM:  Yeah.  I would say direct regulation

24    doesn't reach that law.  If the way the law is written is just,

25    no one can print currency --

1

2          JUDGE BIBAS:  Yes.

3          MR. FEIGENBAUM:  -- yes?  No one can print currency

4   for anyone at any time?  Then yeah, I think it would be

5   preemption.

6          JUDGE BIBAS:  And the same thing for building

7   munitions during peacetime?  Again, if they hired a private

8   defense contractor, that would not be intergovernmental

9   immunity?

10         MR. FEIGENBAUM:  Yeah.  My understanding of cases that

11  they sprouted in the military space is there really is quite

12  often preemption.  So there isn't a lot of testing in this

13  space.

14         JUDGE BIBAS:  Okay.  All right.

15         MR. FEIGENBAUM:  But I will say just really quickly on

16  that, Judge Bibas, because I think it goes to IGI, is I think

17  you could easily find a world in which some of these actions

18  are going to be discriminatory.  You need to do a comparator

19  analysis and decide what you do or don't disallow.

20         JUDGE BIBAS:  Except if it's a market like this one,

21  or printing currency, or building federal defense weapons, no

22  one else is allowed to have nuclear warheads or something like

23  that.

24         MR. FEIGENBAUM:  That's definitely right.

25         JUDGE BIBAS:  Your vision of discrimination is because

Page 17

1    there can't be a comparator, it can't flunk the discrimination

2    prong.

3          MR. FEIGENBAUM:  No, no, no, no.  That's not what I'm

4    saying.  I think that's actually weirdly what the United States

5    is saying here, that because they alone do immigration, it's

6    necessarily discriminatory.  That's not what we're saying at

7    all.  We're saying it's like a class-of-one equal protection.

8    It might be harder, but it's harder to make a case when you

9    have a class-of-one equal protection.  It's definitely not

10   easier when you say you have a class-of-one equal protection,

11   but you do your best effort at finding a comparator.  We don't

12   think immigration detention is a relevant market.  We think

13   detention services are a relevant market, private detention

14   services.  We've done our comparator analysis and New Jersey

15   disallows it.  It's the Essex County case that my friends on

16   the other side brought up in their briefing that I think is

17   quite helpful.  It says -- this is our appellate division, our

18   intermediate appellate court -- it says, We think detention is

19   a core government function that locals cannot delegate to

20   private companies absent authorization from the legislature.

21   And we don't see authorization from the legislature here.

22          I think it's pretty clear from the sort of halfway

23   house laws, as I'll call them, 91.9 and 91.10, where they're

24   specifically allowing specialized community residential halfway

25   houses.  And in that setting, both as a matter of surplusage

Page 18

1   and as a matter of expressio unius, it's pretty clear that by

2   having special laws allowing halfway houses, there wasn't a

3   backdrop of allowing general criminal detention credit.

4        JUDGE BIBAS:  Let's talk about -- it seems like you

5   want to push all of this over into preemption now.  I don't

6   know if my colleagues --

7        MR. FEIGENBAUM:  And discrimination.

8        JUDGE BIBAS:  -- want to talk about -- okay, but if

9   we're in preemption land, why is this case not like Leslie

10  Miller, PUC, and especially Crosby?  I mean, these are cases

11  where they're barring some kinds of contracting.  So why is

12  this case distinguishable from all of those?

13       MR. FEIGENBAUM:  Yeah.  It's a level of generality

14  problem.  You could just -- like the Ninth Circuit did, you

15  could sort of look at them and say these are contractor cases.

16  And so any (indiscernible).

17       JUDGE BIBAS:  You agree you're asking us to split from

18  the Ninth Circuit?

19       MR. FEIGENBAUM:  I do.  I definitely think this Court

20  should diverge from the Ninth Circuit.  I will say on

21  methodology, I think the Seventh Circuit has already done a

22  fair bit of work.  McHenry is different.  I'm not saying it's

23  identical.  There are key differences between McHenry and this.

24  But in its statutory analysis of 1231(g), I think its reasoning

25  is quite helpful for us in what it says there is and isn't

```
1    coming out of that federal statute.  And so I'd say the most
2    obvious difference, Judge Bibas, is that I think there are
3    cases like Arizona, like Crosby, like Leslie Miller, and like
4    PUC, where there's such an obvious, like, comprehensive
5    reticulated scheme that it implies you don't have to be subject
6    to any other rights or burdens.  And that's how Garcia has
7    construed Arizona and talked about it that way.  I think Crosby
8    makes sense in the same vein, Leslie Miller, PUC.  So you're
9    going to have cases like that which takes care -- this is why I
10   bring up preemption -- it takes care of a number of the burdens
11   we're worried about.
12             JUDGE BIBAS:  So you want to say there's not enough in
13   the INA.  But under the INA without this law -- this law does
14   not affect the federal government's ability to say, hey,
15   CoreCivic, we'd like to contract with you.  Okay?  Cleverly
16   written not to say that.  But it does say okay, the federal
17   government is making this offer.  We could have accepted it
18   before this law.  We had a right to accept it before this law.
19   We can no longer accept the federal government's offer.  So
20   there was a right.  And this is a disability that takes away
21   that right or abridges that right.  Why is that not enough for
22   obstacle preemption?
23             MR. FEIGENBAUM:  Yeah.  Let me do that as preemption.
24   And I think a bit of that had IGI again, that I think is worth
25   joining issue on if you'll indulge me.  On preemption, I think
```

Page 20

```
 1   it's not enough because the recent number of years -- five, ten
 2   years from the U.S. Supreme Court -- make very clear when we're
 3   doing preemption, we're looking for the actual text and
 4   structure of the laws that Congress passed.  And when you look
 5   at 1231(g), which is the core statute that talks about how to
 6   find detention, and the only one that really references private
 7   detention -- we can talk about the regs and the appropriations
 8   laws in a second -- it is, I think, a particularly weak version
 9   of preemption because the instruction to the federal officials
10   here is, go look for what's available.  And if something is
11   unavailable, construct it.  And it says look for what's
12   available, buying or leasing private facilities, and then go
13   construct.
14          It's very hard to say that a law that makes something
15   unavailable interferes with the statutory duty to look for
16   what's available and build if nothing is.  There's no
17   requirement or right that something be available in the first
18   place.  That's always a question of state law and economics
19   alike.  And there's also no, in this case, preemption.
20   Congress says maybe they'll be unavailable.  It doesn't say
21   we'll preempt anything at that point.  It says go construct if
22   you can't find anything, including if you can't find to buy and
23   lease.
24          JUDGE KRAUSE:  Doesn't 1231(g) give to the federal
25   government the discretion to make a judgment call as to what is
```

Page 21

1   appropriate?  And we have a number of cases, some of which

2   you're putting in the preemption column like Leslie Miller, but

3   arguably -- or in your intergovernmental immunity column --

4   where that type of constraint on the discretion of the federal

5   government even in the case of the President -- where we're

6   dealing with sanctions with Burma, for example -- is considered

7   to be substantial interference.  When we have that backdrop of

8   this discretion being given to make choices about detention,

9   why shouldn't we look at that as substantial interference back

10   to your intergovernmental immunity?

11           MR. FEIGENBAUM:  Yeah.  I think it's an important

12   question.  Let me start with the preemption part.  And then I

13   appreciate you letting me take it back to immunity as well.  On

14   the preemption part, there are three different things that

15   Congress could choose in a space like this.  One, federal

16   officials may not use private detention.  Two, federal

17   officials may use private detention.  Three, federal officials

18   may use private detention, irrespective of any state law

19   disabilities on the private companies.  And we're deciding

20   between two and three.  I do not dispute that federal officials

21   have that discretion.  What I do dispute is the idea that the

22   fact of discretion automatically tells you if Congress chose

23   that middle bucket or that last bucket on whether or not it's

24   something you can do or something you can do regardless of

25   state law.  And I'll spot you the word "appropriate" itself is

Page 22

1    kind of a little mushy in this space.

2         But 1231(g) doesn't just say find appropriate places

3    of retention.  It says find appropriate places of retention.

4    And here's our scheme for how to do it; go look for what's

5    available, including to look for federal facilities if they're

6    available, look to buy or lease private facilities if they're

7    available.  If unavailable, construct your own facilities.  So

8    it's sort of like how we're supposed to spend money.  So

9    they've said how they think you should go about doing the

10   appropriate analysis.  And it just really screams to me like

11   that middle bucket.  You're free to do this kind of

12   contracting, but not in a way that preempts state laws on

13   what's available in the first place, just given the text and

14   structure of 1231 itself.

15        But to your point about immunity -- which I appreciate

16   you letting me respond to -- I guess I just wanted to say both

17   as sort of legal formal and a functional set of reasons for why

18   it doesn't make sense that we would be implying just when you

19   have government discretion to contract, that any limit on those

20   contracts would be sort of void on its own from the

21   Constitution.  The first is -- I mentioned this earlier in a

22   colloquy with Judge Bibas, but I think it bears repeating --

23   there's nothing in the text or logic of the Constitution itself

24   that would make that kind of immunity make any sense.  So the

25   reason McCulloch gives for direct regulation of the United

Page 23

1    States being a problem is two-fold.  One is federal law created

2    these federal offices.  So if you're able to destroy these

3    federal offices, federal law is no longer supreme.  That logic

4    doesn't hold to private parties at all.  Federal law didn't

5    create those private parties at all.  They are private parties

6    as Penn Dairies and North Dakota put it.  They are just subject

7    to two sets of regulations by two different sovereigns in the

8    same territory; the U.S. and New Jersey.  And Congress did

9    realize that there might -- the framers did realize that there

10   might be conflicts and said Congress is the one to resolve

11   them.  It made federal law supreme.  This is Whiting, this is

12   Garcia, this is the recent number of cases from the Supreme

13   Court.  And so it said private parties exist either way.

14   Preemption is the answer when you don't have discrimination.

15          The second thing I'll say is this formalism matters to

16   the logic of the Constitution, not just the text of the

17   Supremacy Clause, because it's the inverse of Tenth Amendment

18   anti-commandeering.  The Tenth Amendment anti-commandeering

19   doctrine very much cares if the United States has operated

20   directly on a state, or operates on a private party in a way

21   that might interfere with what a state wants to do.  The

22   federal government can operate on private parties, even if New

23   Jersey doesn't like that.  That's classic preemption.  So

24   sovereigns just don't get to regulate each other directly, the

25   (indiscernible).

1          JUDGE BIBAS:  But you're also -- the inverse, I look

2     at -- I run that argument the other way.  The inverse of this

3     is you are disabling the federal government from doing this.

4     Now, your response repeatedly has been -- it is a clever

5     response -- well, Congress could say that.  But does Congress

6     have to say that?  Can the states throw up these roadblocks

7     unless there's a specific authorization in each time?  There's

8     some magic words they have to use.

9          MR. FEIGENBAUM:  I appreciate the credit for the

10    response.  I will just say it comes from a number of cases.  So

11    I don't think I've invented it at the podium today.  It comes

12    from North Dakota, it comes from Penn Dairies.  And I think it

13    works.  I think it works -- the reason it has to be that way is

14    because that's what the Constitution shows in the text of the

15    Supremacy Clause.  And for four reasons, I think it makes sense

16    as the right choice.  The first is, as I noted, I think

17    Congress has superior expertise on what burdens are appropriate

18    and what burdens aren't.  The second is that this fits with

19    traditional federalism, which generally has powers.  Again, I'm

20    defining the market as private detention if we're accepting

21    neutrality for the directness part of the analysis.  States

22    have power over private detention within their borders, so it's

23    more respectful of states.  There's also a risk of category

24    error.  If this Court says there's no immunity, Congress can

25    step in and fix that through preemption.  If this Court says

Page 25

1   there is immunity, there's nothing we can do.  We can never

2   regulate this product.  Even if we had the most neutral law in

3   the world, even if we had the strongest health and safety

4   justifications, we could never regulate CoreCivic's decision

5   once DHS offers to hire it to work with federal contracts.

6           Judge Krause, I see my time is expiring.  If I could

7   finish the two other parts of that.

8           JUDGE KRAUSE:  You can.

9           JUDGE AMBRO:  And I accept that.

10          JUDGE KRAUSE:  And you'll be on our time with

11  questions that my colleagues and I may still have.

12          MR. FEIGENBAUM:  Fair enough, Your Honor.

13          So then the other two points I just wanted to make

14  quickly is, I genuinely don't see how the contrary rule is

15  ultimately administrable.  This was footnote 8 of North Dakota

16  I was mentioning before.  I get how you do discrimination

17  analysis with comparators.  I get how you do what burdens did

18  Congress allow or disallow.  I don't get how you do what

19  burdens did the Constitution allow or disallow.  My point is

20  not that there are edge cases.  I realize the other side says,

21  sure, there's always edge cases in any doctrine.  I spot them.

22  I'm saying I don't know how you pick a standard or what the

23  standard should be, because you don't have a statute, you don't

24  have discrimination.  You're just implying it from the

25  Constitution.

1      JUDGE BIBAS:  I don't buy the disabling states from

2  doing anything because neutral health and safety -- the neutral

3  taxes that aren't confiscatory, et cetera, still remain on the

4  table.  A ruling for CoreCivic wouldn't prevent minimum wage,

5  maximum hour, workplace conditions, those kinds of laws.

6      MR. FEIGENBAUM:  So I agree with that.  But I agree

7  with that because I don't think it's direct regulation.  This

8  is a really important part of their argument that the district

9  court correctly understood.  But I know it can get a little

10  lost in the way AB 5207 is written.  A holding on direct very

11  much applies to neutral laws; direct regulation's an exemption

12  from neutral laws.  If the law is not neutral, you're asking

13  whether it's discriminatory.  But direct absolutely gets

14  exemptions from neutral law.  So if we said no one may buy

15  private detention, right -- that side of the contract -- the

16  United States would absolutely have a winning claim that it is

17  exempt from that law because we cannot apply a neutral state

18  law to the United States directly.  My submission is if you

19  imagine that neutral law, and we say no one may sell private

20  detention to anyone -- that's how we're defining the market --

21  CoreCivic doesn't get that sort of exemption because directness

22  really does apply just as strongly to neutral laws as not

23  neutral laws.  And if we're bothered by something about

24  immigration specifically, we have to fit that in the

25  discrimination framework.  And there, I would just go back to

Page 27

1  North Dakota, which says you don't look at laws in isolation

2  for figuring out the discrimination question.  You look at laws

3  in the corpus of state law.  And seen that way, we are

4  regulating detention as a market, not just immigration

5  detention.

6         JUDGE KRAUSE:  But the case before us is immigration

7  detention with that single buyer.  It's not a criminal

8  detention case in front of us.  So we do have that market.  And

9  you're saying that we should revert to being sort of

10 hyper—formalist about it because, as you point out, with the

11 parties that are on either side of that transaction, the effect

12 is identical to the state telling the federal government as to

13 immigration facilities that it can't buy this commodity.  It

14 can't contract for private detention facilities.

15        MR. FEIGENBAUM:  So if I could take a run at that

16 premise for a second, I actually do think it matters to look at

17 the law holistically and not just the law in front of you.  And

18 let me just give a hypothetical that explains this on two

19 things I think have to be the same.  If we passed a law that

20 just said no state criminal detention and no federal

21 immigration detention can involve private -- like, no private

22 company can provide those things -- all in one law.  My

23 submission is that is what we have.  I mean, imagine you had a

24 law -- this is actually basically North Dakota in the way it

25 did alcohol.  Imagine you have a law that says no private

Page 28

1   detention unless you're selling to federal immigration, and

2   then the second law was AB 5201.  The legislature came back and

3   said, man, this exception really is a health and safety

4   problem.  We should have just done the whole market the first

5   time, versus a law that did it all at once together.  I don't

6   really see how those laws can come out differently when it

7   comes to discrimination.  And this is the point of a comparator

8   analysis in a holistic interpretive exercise.  Doing what I

9   call Law 1 and Law 2 two different times together -- you've

10  given the U.S. an exemption and you take it away -- can't

11  really be different than regulating everyone all at once at the

12  end of the day.

13          And that's North Dakota.  North Dakota was a law only

14  about alcohol sales to a federal enclave.  Now, it was because

15  North Dakota had given a broad exemption to that federal

16  enclave from its pre-existing state laws and ultimately carved

17  back a bit on that exception with labeling requirements, et

18  cetera.  But that's our submission for what state law is.  And

19  then we have to get into a question of what state law is.  But

20  our submission is state law is a pre-existing disallowance of

21  private detention for anything analogous, except it's had

22  exceptions for the federal government.  And what we're doing in

23  AB 5207 is cutting back on those exemptions from the federal

24  government.  And it would make sense that AB 5207 would only

25  focus on that.  Because if you're concerned about the

1    implications of entities like CoreCivic having custody over

2    individuals' liberties despite having their private motive --

3    their lack of small D democratic accountability -- if you're

4    concerned about that, that is the context in which it's

5    happening in New Jersey.  It's not happening with DOC.  It's

6    not happening with our counties because we don't allow it.

7    That's Essex County, that's our statutes.  That's the Haley

8    declaration at JA 110.  We don't allow any of that.  So if

9    you're nervous about it, this is what you'd have to go after.

10            JUDGE AMBRO:  Let's go back to almost the dugout here.

11    Use a hypothetical of criminal detention.  And a state does not

12    have any federal facility that's owned by the government.  And

13    then state passes a law similar to what you have here that no

14    one can contract for a criminal detention facility.  So you're

15    going to have nothing in your state.  How would you go about

16    analyzing that from the get-go?  In other words, let's say

17    you're the judge.  They're bringing it to you.  How would you

18    prefer or suggest that a court go about it?  I'll just give you

19    an example.  In Geo, the Ninth Circuit starts with -- it's all

20    the Supremacy Clause -- it starts with intergovernmental

21    immunity, then goes to preemption.  Whereas the county

22    situation that you had in McHenry County, it starts with

23    preemption and goes to intergovernmental immunity.  How would

24    you analyze it?

25            MR. FEIGENBAUM:  Yeah.  So we obviously briefed it

Page 30

1  first as immunity and then preemption because you're figuring

2  out, do you have to figure out what the statutes were?

3          JUDGE AMBRO:  But the district court didn't decide

4  preemption here.

5          MR. FEIGENBAUM:  Oh no, I take the district court to

6  have disagreed -- not on discrimination, but to have

7  disagreed -- I think the district court kind of, like, merges

8  the two a little bit.  I think that's one of one of the errors

9  the Ninth Circuit makes and the district court makes is to draw

10  a little from one and a little from other.

11          JUDGE AMBRO:  I know what you're saying.  That gets

12  into the nuance.  But how would you go about it, doing it?

13          MR. FEIGENBAUM:  Yeah.  So I tend to think preemption

14  is the easiest way to think about competing burdens on private

15  parties.  So I'd probably start with preemption is well-

16  established.  It's a classic area of law.  We definitely agree

17  preemption exists.  We definitely agree Congress could preempt

18  this law.  Let's see if Congress did.  If I come to the

19  conclusion that Congress did not preempt the law, I'm going to

20  have to ask, well, does the Constitution do that work for it?

21  And then I think that's, from our submission, you have to ask

22  the direct and discrimination.  Because the basic submission is

23  it's a big deal to say the Supremacy Clause of its own force

24  knocks out a state law that Congress hasn't passed a law to

25  knock out.  It's a big deal to say immunity blocks it,

Page 31

1    notwithstanding the lack of preemption from the INA.  And so

2    that's one way I think about it.

3           Now, to your example about for-profit detention in New

4    Jersey, if we're hypothesizing that the United States has some

5    interstate commerce-based ban on restricting private detention

6    services generally, I wouldn't think that's an

7    anti-commandeering problem.  It might be quite burdensome on

8    the State of New Jersey if we lose access to private detention

9    if we were using it again in the hypothetical.  Obviously, we

10   aren't in New Jersey.  But if we're using private detention and

11   they -- you might have a Commerce Clause challenge, but I think

12   it's a marketplace -- so they do Commerce Clause.  They say no

13   private detention.  I don't think the fact it burdens us is an

14   anti-commandeering problem.

15          And so I just don't see why the inverse would be true

16   on intergovernmental immunity.  We're not regulating them.

17   We're not discriminating against them.  And yet it's so

18   burdensome that it knocks out the law anyway.  And so I think

19   it's a fraught exercise in either direction of the V -- State

20   to federal or federal to state -- to start asking -- demanding

21   courts say, you figure out what the standard is, and you start

22   drawing the lines between what's too much of a burden on the

23   executive of the federal government rather than a burden that

24   Congress itself saw fit to disallow.

25          JUDGE KRAUSE:  In some cases, like PUC, the Court has

Page 32

1   taken account of the consequences of generalizing.  So what

2   happens here if every state does this?  I mean, and is that an

3   appropriate thing for us to take into account in viewing the

4   level of interference with the Court and exclusive federal

5   function of housing noncitizens?

6           MR. FEIGENBAUM:  I know judges -- can I say yes and no

7   but explain the yes part and the no part to your question?  So

8   on the yes part, I think it's fine to imagine all fifty did

9   this.  I'm not saying New Jersey has a special right to do this

10  that New York doesn't have or Pennsylvania doesn't have.  The

11  no part I'm going to say is, I still don't think the actual

12  question is how much it's going to interfere on a day-to-day

13  basis with the way the executive currently chooses to run

14  immigration.  It would be a weird result for Constitutional law

15  if ICE's choice to have three ICE facilities in New Jersey

16  versus zero made a difference to our regulation of a private

17  party.  It would make a huge practical difference to how much

18  ICE would be affected in this case.  I will spot you that.  If

19  ICE had three, if ICE had zero, it had zero here.  But I don't

20  understand how a state's authority to regulate a private party

21  could rise or fall with how many public or private facilities

22  ICE has chosen to use.

23          JUDGE AMBRO:  But that's actually the function here.

24  Doesn't the law also affect the counties that have now backed

25  out?

Page 33

1      MR. FEIGENBAUM:  Absolutely.  I don't mean to fight

2   that at all.  I was making a different point, which is the law

3   would certainly allow ICE to have its own facilities.  1231(g)

4   says it could have them.  And what a practical impact this law

5   will have on federal executive operations really rises or falls

6   with ICE's own choice to do that or not.  I mean, all over

7   their obstacle preemption argument, they're saying it's an

8   obstacle because we choose not to do that, and we haven't done

9   it for years.  But executive policy choices or financial

10  management choices just don't seem the sort of stuff that

11  builds obstacle preemption to congressional laws.  If they need

12  this, if they don't have --

13      JUDGE AMBRO:  Let me take you back, if I may, on Judge

14  Krause's question.  If you're dealing with preemption, we have

15  a case from 1986 called United States v. City of Philadelphia.

16  It was a preemption case dealing with military recruiters on

17  campus, can Temple Law School do that?  Later, that type of

18  issue went before the Supreme Court in FAIR v. Rumsfeld.  And

19  our court said that we reject the suggestion by the commission

20  here that was set up -- the ACLU and the task force -- that we

21  should not consider the effect of the order on military

22  recruiting.  We believe that it is appropriate to consider the

23  order's effect on military recruiting on Temple's campus

24  generally, as well as its impact on military recruiting on

25  other college and university campuses throughout the city, and

Page 34

1    the possibility that other jurisdictions may adopt a similar

2    interpretation of their anti-discrimination ordinances.  So

3    isn't Judge Krause exactly right that at some point -- if

4    functionally, states follow the leader here of -- well, follow

5    New Jersey and Illinois -- and you are left with the federal

6    government only being able to buy and build, isn't that a major

7    preemption problem?

8        MR. FEIGENBAUM:  So this is more of the yes and no

9    with apologies.  So I think much of what you said fits in my

10   yes part.  I think it's fine for this Court to imagine fifty

11   states are doing this.  I don't have an objection to that and

12   to think about the effects.  My main submission, depending on

13   what we're talking about immunity or whether we're talking

14   about preemption, is that its effects on what.  And I think the

15   U.S. Supreme Court's been really clear.

16       JUDGE AMBRO:  Well, effect on a core function of the

17   government having detention facilities for criminals or

18   immigration detention.

19       MR. FEIGENBAUM:  So I don't think that Congress has

20   ever said a core function of the government is private

21   detention for immigration.  They've certainly said it's

22   allowed.  I'm not fighting the idea they can use it.  I just

23   don't see anything that says you can use it, and that must

24   therefore trump any state restrictions on private entities.

25       JUDGE AMBRO:  So you're saying that every state could

1    say, not in my back yard?

2          MR. FEIGENBAUM:  I'm saying that they can say that for

3    private parties, and they can say it for their own facilities.

4    And I'm saying Congress can say yes in your back yard in ten

5    seconds if Congress wants to say that, because that's the

6    classic way we deal with problematic competing burdens on

7    private parties.  Congress is always free to make the choice.

8    I think this is an important part of this case.  Congress is

9    totally free, instead of 1231, to say, go look for what's

10   available.  And any private company that wishes may make it

11   available if the economics work out or whatever.  You don't

12   even need that part of the phrase.  Preemption, no problem.

13   You don't even need the exact words, "we hereby preempt state

14   laws that restrict."  I don't fight the idea there can be

15   implied preemption.  But it needs to be based on some sort of

16   private right or some sort of private obligation, either

17   express or implied from the text of the statute.

18          And Judge Ambro, that's where I'm really struggling.

19   Because I think 1231 is such a weak form of preemption because

20   it contemplates that there might be unavailable facilities, and

21   it doesn't say you have a right to make them available.  It

22   doesn't say you get to use preemption.  It says you use

23   construction at that point.  So it might be a real problem for

24   Congress.  Or Congress might say, honestly, we're a little

25   sketchy about private companies doing this now that we realize

Page 36

```
1    so many states have concerns.

2         JUDGE AMBRO:  Then turn it around and make it --

3    instead of preemption, if you make it intergovernmental

4    immunity and you focus on the direct regulation of the

5    government, in effect, functionally isn't what's happening if

6    all these states do this not in my back yard, it's directly

7    telling the government, you can only have a criminal or

8    immigration detention facility in my state if you own the

9    property and you build the darn thing, and staff it yourself?

10        MR. FEIGENBAUM:  Yes.  Buy or build.  Yeah.  I don't

11   want to quibble too much on the facts.  Yes.  You were taking

12   out various pathways that ICE wants to use.  So I don't want to

13   quibble on the exact things there.  What I would say to that is

14   two-fold.  First is, I still think there's a huge difference

15   between direct regulation, as I see it, and the sort of

16   burdensome regulation that we're talking about here.  Direct

17   regulation would let us actually formally stop immigration

18   detention in the State of New Jersey.  We can't do that.  All

19   we can do is take out -- subject to Congress' choice -- take

20   out private parties from the marketplace of detention from

21   doing that.  And I think that's a big difference.

22        I'll meet your 1980's case from the Third Circuit with

23   a 1970's case from the Third Circuit.  It's the Pennsylvania

24   Hearing Board case from 1978.  And it basically says federal

25   government, when you choose to work with private contractors,
```

Page 37

1    you take the good with the bad.  The good is you might get some

2    cost savings.  The bad is they're subject to state regulation

3    unless Congress steps in.  So I don't think that really is the

4    same kind of burden intergovernmental immunity is talking

5    about.  And that's why in North Dakota, we could never have

6    said -- North Dakota could never have said, you, military base,

7    can only buy alcohol with certain kinds of labeling.  But they

8    very much could say, you, sellers to the military base --

9    again, where the only counter-party is the United States --

10   you, sellers to the military base, need to satisfy our labeling

11   requirements.

12          JUDGE KRAUSE:  I'm hearing your answers and thinking

13   back to your response to Judge Bibas as to any role for

14   substantial interference.  And if you're essentially reading

15   that out of intergovernmental immunity -- in a sense, asking

16   the federal courts to step away from any interpretation that

17   would bring intergovernmental immunity as the basis for

18   overturning a statute as opposed to something clearly stated by

19   Congress, where we have the backdrop of preemption being a

20   higher and higher bar in the last decade of Supreme Court

21   cases.  Isn't it particularly important for the federal courts

22   to play a role in policing the Supremacy Clause?

23          MR. FEIGENBAUM:  So two thoughts on that.  First is, I

24   just want to hug footnote 8 again for a second from North

25   Dakota, which I think is directly responsive to your concern.

Page 38

1   It says we realize Justice Brennan in dissent.  And it's 4/4.

2   So the fact it's a dissent doesn't take it out of the equation.

3   But Justice Brennan in dissent says, oh, there's all these

4   burdens that are going to follow.  This is a real problem.  And

5   Justice Stevens says, no, the way we decide burdens, the way we

6   assess substantial interference is what's right on the United

7   States, what's discriminatory, or what did Congress disallow?

8   And anything else puts federal courts in a terrible

9   institutional spot where they don't have the sort of practical

10  and policy roles that Congress has in making those decisions.

11  So footnote 8 joins issue and says substantial interference, we

12  get it.  But this is how you find substantial interference.

13          And to your point about preemption becoming a higher

14  bar, I obviously agree.  We've cited those cases in our brief.

15  I do think it's a higher bar.  I think it would be an odd

16  response to, because the Court has said the Supremacy Clause

17  really makes federal law supreme, so you really need to find it

18  from Congress' laws, not from free-floating, brooding federal

19  interests, as McHenry puts it in the Seventh Circuit.  Because

20  we have a higher bar for what Congress did to preempt, super

21  strange to therefore say the Court actually has extra authority

22  to block state laws when Congress didn't do it.  So I actually

23  think they should kind of go together.  The tightening of

24  preemption, all about Congress' authority, Congress' law, the

25  text of the Supremacy Clause, it's a pretty good sign in my

Page 39

1    favor about intergovernmental immunity.

2         JUDGE AMBRO:  Footnote 8 talks about the word

3    "burdensome", and it's tough to measure it.  But every now and

4    then -- reverting back to the 50's in another context -- I know

5    it when I see it.  And if you are in effect, having no facility

6    in New Jersey that is useful for -- can be used for immigration

7    detention, and you only have the possibility of a long-term

8    construction project, you are in effect burdening the

9    government directly and forcing its hand to spend the moneys,

10   build the facility, and staff it.  And so can't you say there,

11   I know it when I see it?

12        MR. FEIGENBAUM:  So let me give a quick factual

13   response, and then let me go to the heart of your question.  On

14   the factual response, I just want to reiterate very much we

15   think DHS could buy any facility or lease any facility and

16   operate it.  It doesn't have to build.  I think that's a

17   mistake the district court misunderstood about our law in the

18   record below.  So we could just buy Elizabeth Detention Center

19   tomorrow.  CoreCivic operates it.  It could operate it instead.

20   I'm not saying that's not burdensome.  I'm just saying I want

21   to be precise about the facts here.  On your, I know it when I

22   see it, I think that was kind of a tough experience for the

23   court for some number of years to go through all of those cases

24   and do the, I know it when I see it.

25        JUDGE AMBRO:  It's why they gave up in the 70's.

Page 40

1          MR. FEIGENBAUM:  They gave up.

2          JUDGE AMBRO:  I get it.

3          MR. FEIGENBAUM:  I mean, they gave up.  So I think

4     it's like a pretty good lesson that I know.

5          JUDGE AMBRO:  But every now and then, it's, like,

6     functionally it's got to be, one could argue, that they've

7     crossed the line.

8          MR. FEIGENBAUM:  So I guess I would just meet the,

9     it's got to be, with -- anything that's got to be is something

10     Congress can say got to be, because it's just a little fraught

11     for the Court to dive in on the, I know it when I see it, line

12     of reasoning, when there's an obvious answer to all of this,

13     which was different, actually, than the First Amendment

14     context, where Congress couldn't just step in and solve some of

15     those problems around obscenity.  Here, the Supremacy Clause

16     has a tailor-made solution.  It's okay for Congress to say I

17     know it when I see it.  It's okay for them to make policy

18     calls.  It's okay for them to make practical judgments of

19     what's too far.  I know it when I see it, for the federal

20     courts, is a really tough enterprise in a space that's so

21     practical.  So I know how this case might feel from some of the

22     questions that have come up today, but I don't think it's that

23     easy to draw that line.

24          JUDGE AMBRO:  But what you end up with is it is

25     directly regulating the government by forcing it to do it

Page 41

1   itself by billed staff.  So isn't that regulating the

2   government?

3          MR. FEIGENBAUM:  I will just say I don't quite think

4   that works.  And this gets back to North Dakota again.  I know

5   that law feels different.  It's labeling instead of a ban on

6   private detention.  I get it.  But the record evidence there

7   was that the company stopped selling to the base.  And there

8   was record evidence that the base was going to have to make its

9   own alcohol if it wanted alcohol because they thought the

10  labeling regulations were too burdensome.  So the idea that

11  someone coming out of the market because something's too

12  burdensome -- whether that's a ban or just a heavy regulation

13  or a heavy tax -- and they come out of the market, and

14  therefore the U.S. lost them as a partner, that's a pretty

15  tough way to try to draw lines at the end of the day.

16         And it gets back to the broader point I was making

17  earlier to our colloquies, Judge Ambro, which is, this Court

18  said in 1978, sometimes you take the good with the bad when you

19  go to private contracting.  And one of the bad for private

20  contracting is they're subject to state laws.  But that's

21  federalism.  We all know that private parties in New Jersey or

22  New York, or whatever state you want to say, are subject to

23  state laws, and they're subject to federal laws.  And the way

24  you reconcile those burdens, as long as they're not

25  discriminatory, is you reconcile them by ultimately saying,

1    what is Congress preempting, even if it's a high bar.

2         JUDGE KRAUSE:  So to be perfectly clear, if a statute

3    does not meet the high threshold for obstacle preemption, your

4    position is that the federal courts have no business doing an

5    analysis of substantial interference with a federal function?

6         MR. FEIGENBAUM:  I would quibble slightly with the

7    framing.  The business of identifying substantial interference

8    is, as their director, discriminatory regulation.  I just hug

9    the way Justice Stevens said it, which is what it means to

10   substantially interfere is to directly regulate, because direct

11   regulation is really different.  If we could directly regulate

12   the United States, we could just say, no immigration detention

13   in our borders.  Like, ICE couldn't do it itself, couldn't

14   contract with BOP, couldn't buy the Elizabeth detention

15   facility.  I mean, it is much further along, even if this

16   one -- because what they want to do is private detention --

17   feels different.  And then discrimination, which I think is an

18   important limit.  The state has to take its own medicine on the

19   marketplace.

20        JUDGE KRAUSE:  So to qualify my question, other than

21   meeting the bar for preemption and actually naming the federal

22   government or agency, the federal courts should not be doing

23   any substantial interference analysis for purposes of

24   intergovernmental immunity?

25        MR. FEIGENBAUM:  I'm going to say yes, other than

Page 43

```
 1   discrimination, which the law has always defined discrimination
 2   to be a way to suss out substantial interference.  And North
 3   Dakota expresses this.  But yes, other than direct
 4   discrimination and preemption, there isn't a separate
 5   free-floating interference.
 6            JUDGE KRAUSE:  And if there was going to be that sea
 7   change in Supreme Court case law, wouldn't we expect Congress
 8   to -- I'm sorry, wouldn't we expect the Supreme Court to have
 9   been more clear that it was making it?  When we have -- back to
10   McCulloch, courts engaged in that analysis looking at
11   substantial interference with federal functions.  Are you
12   pinning everything on North Dakota?
13            MR. FEIGENBAUM:  No.  So I'm pinning it on three
14   cases, maybe; maybe a few others.  So I think North Dakota just
15   does a really nice job -- which is why I hug it so much -- of
16   explaining the two perspectives on which tests to ultimately
17   use.  And so when you have a 4/4 split with a Ninth justice
18   just talking about alcohol regulation and the Twenty-First
19   Amendment, anyone's going to accuse the other of a sea change
20   because they're going to say the four properly understood the
21   law as it is.  I will say I find North Dakota's pluralities
22   read quite persuasive because they cite a series of cases, some
23   regulation, some tax -- Penn Dairies a great example -- where
24   multiple majority opinions made clear substantial interference
25   equals direct or discriminatory, or what burdens Congress said
```

Page 44

1    is too much.  And I think Penn Dairies has all of that.

2         The other thing I'll say is the Washington case

3    itself -- I realize it has that language about this is the part

4    we all agree -- but it is canvasing the history and saying

5    there's been a lot of change as the years go on in the

6    intergovernmental immunity doctrine.  They use the word

7    evolved.  And so I think there were cases, not McCulloch

8    itself, which is totally easy to square with my view.  I mean,

9    it is a regulation of the Bank of the United States.  Power to

10   create can't be destroyed, et cetera.  But what I would say

11   there is there was an era that Washington acknowledges of

12   saying, okay, well, too much interference, it's a problem.  But

13   that era -- I mean, Penn Dairies is 1943.  And it's saying what

14   I'm saying at the podium today.  And so I would just note

15   that's eighty years.  My math is not -- eighty-two years -- not

16   perfect.  Eighty-two years.  Yeah.

17        So thank you, Judge Ambro.  So I think that's not such

18   a sea change.

19        JUDGE AMBRO:  -- that I was born so I know I'm not

20   eighty yet.

21        MR. FEIGENBAUM:  Touche.

22        JUDGE AMBRO:  No further questions.

23        MR. FEIGENBAUM:  Thank you.

24        JUDGE KRAUSE:  Okay.  We'll hear in rebuttal.

25        Mr. Simon?

1          MR. SIMON:  Thank you, Your Honor.  May it please the

2     Court, my name is Bradley Simon.  I'm here on behalf of

3     CoreCivic.  Your Honors, it is our position that the lower

4     court decision -- the district court decision by Judge Kirsch,

5     should be upheld by this Court as New Jersey statute AB 5207 is

6     in violation of the Supremacy Clause of the U.S. Constitution.

7     I want to jump in on -- I think it was Judge Bibas' points --

8     about the actual havoc that will be created if AB 5207 is

9     allowed to stand.  Right now, the Elizabeth Detention Center is

10    the only immigration facility in the State of New Jersey that

11    houses federal detainees.  As the affidavits submitted in

12    conjunction with our brief from the various officials from the

13    Department of Homeland Security said, that New Jersey and EDC

14    is mission-critical to U.S. immigration enforcement in the

15    state.  Without EDC, as Judge Bibas mentioned, ICE will be

16    forced to bring detainees hundreds of miles away to smaller

17    facilities, away from their families, away from their

18    attorneys, and wreak havoc on the administration of immigration

19    detention.  It will result in overcrowding.  It will be, as the

20    officials said in their affidavits, a complete mess.

21          And what's worse, if AD 5207 is allowed to stand,

22    other states could join in the fray, also pass similar statutes

23    preventing private detention facilities.  And then what

24    happens?  It's just an unspeakable havoc and a mess.  So I'm

25    focusing on some of the practical aspects.  But from a legal

```
                                                         Page 46
 1   perspective, it is we believe, a clear violation of --

 2           JUDGE AMBRO:  When you look at the statute, 1231(g)(1)

 3   and (g)(2), 1231(g)(1) says Congress -- that the secretary --

 4   this is DHS -- shall arrange for appropriate places of

 5   detention.  And then (g)(2) says, Before initiating any project

 6   for the construction of any new detention facility, DHS and ICE

 7   shall consider the availability for purchase or lease of any

 8   existing prisons, et cetera.

 9           MR. SIMON:  Yes.

10           JUDGE AMBRO:  So shall arrange, you can build; shall

11   consider the availability before you build of anything else;

12   that's not a very strong statute, is it?

13           MR. SIMON:  Well, as you pointed out when you read

14   that, Judge Ambro, it mentioned the option of leasing.  And it

15   gives the Department of Homeland Security the option of leasing

16   facilities.  When one thinks of leasing, we think of leasing

17   with a private party, contracting with a private party.

18           JUDGE AMBRO:  Well, there's four ways you can do it.

19   They can have their own processing center, which they don't

20   have.

21           MR. SIMON:  Right.

22           JUDGE AMBRO:  They can lease from a private party.

23   They can cut a deal with the instrumentalities of the state,

24   like the counties.  Or they can cut some type of deal with the

25   federal detention facilities that are already in that state.
```

Page 47

1    Or in this case, I guess it was the U.S. Marshals leasing from

2    Bergen County.

3            MR. SIMON:  Correct.

4            JUDGE AMBRO:  So there are options.  There's at least

5    four that we know of.

6            MR. SIMON:  Right.  But one of those options

7    includes -- empowers the secretary of the Department of

8    Homeland Security to lease with a private party.  And that's

9    exactly what they've done in this case.  So to say that the INA

10   doesn't allow for private contracting, I think is not true.

11   There are provisions in there which do permit ICE in the

12   Department of Homeland Security to so privately contract.

13           JUDGE AMBRO:  But if (g)(2) says that they shall

14   consider the availability of the facility for purchase or lease

15   of any other existing facility, and the answer is,

16   they ain't none --

17           MR. SIMON:  Correct.

18           JUDGE AMBRO:  -- then they've considered it.  And that

19   means in the end, they've got to go build their own facility.

20           MR. SIMON:  Well, they've considered it, but among the

21   options is to lease.  Right now, the Department of Homeland

22   Security does not own any facilities.  And the notion that they

23   would now -- if this statute is allowed to go into effect, they

24   would have to go out and construct new facilities from scratch,

25   would be quite a burdensome and impractical --

Page 48

1          JUDGE AMBRO:  Is the facility -- just a factual

2    question -- is the facility that's being -- the federal

3    facility through the U.S. Marshal Service, is that no longer in

4    play at all here?

5          MR. SIMON:  A federal facility?

6          JUDGE AMBRO:  In other words, one of the things is

7    that there were detentions for immigrants in Bergen County at a

8    facility that the U.S. Marshals was leasing from Bergen County.

9          MR. SIMON:  My understanding, that's no longer

10   operating.

11         JUDGE AMBRO:  Okay.  How many facilities in the U.S.

12   are there that are owned and operated by the government?  Do

13   you know?

14         MR. SIMON:  I do not know how many they own or

15   operate.  But I know that in the area of immigration

16   enforcement, they have relied on private facilities, private

17   companies like CoreCivic, like Geo.  And that is a -- they play

18   a major part in immigration detention on the federal level.

19         JUDGE AMBRO:  I mean, I guess maybe it's not today's

20   issue, but isn't the easiest thing just to get Congress to

21   draft something that supports -- hook, line, and sinker -- your

22   position?

23         MR. SIMON:  Well, I think there's enough in the

24   statute already that authorizes the federal government to

25   contract with private parties.  In fact, the INA has a specific

Page 49

1   provision in there that says the Secretary of Homeland Security

2   shall -- is permitted to enter into contracts.  And then there

3   have been the regulations of the CFRs that have been adopted,

4   which expressly state that contracts can be entered into for a

5   fifteen-year period.

6           JUDGE AMBRO:  Right.

7           JUDGE BIBAS:  So those authorize the leasing to you.

8   These are regulations?

9           MR. SIMON:  Yes.

10          JUDGE BIBAS:  And so you had contracts pursuant to

11  those?

12          MR. SIMON:  I'm sorry?

13          JUDGE BIBAS:  You had contracts pursuant to them, and

14  you'd continue to have them but for this state law, correct?

15          MR. SIMON:  Yes.  CoreCivic has been operating the

16  Elizabeth Detention Center, the EDC, since 1986 with successive

17  contracts.

18          JUDGE BIBAS:  All right.

19          MR. SIMON:  So they've had a long -- they've been in

20  operation working with the Department of Homeland Security for

21  decades now.

22          JUDGE BIBAS:  All right.  So your response -- Mr.

23  Feigenbaum was saying, well, Congress needs to go pass a law.

24  But those regulations can also have preemptive effect.

25          MR. SIMON:  Yes, I think the regulations.  And then

Page 50

1   there are different provisions within the statute that allow

2   for private contracting.

3          JUDGE KRAUSE:  But those are general contracting

4   authorizations?

5          MR. SIMON:  Yes.

6          JUDGE KRAUSE:  Right?  And you're not arguing that you

7   have a right to a contract for private detention facilities,

8   are you?

9          MR. SIMON:  Right to a private contract?  Yes.

10  They've had that for decades.  They've had a contractual --

11  they've had contracts.

12         JUDGE BIBAS:  But I think our point is, you don't have

13  a right to sue Homeland Security if they don't award you a

14  contract?

15         MR. SIMON:  No, no.  The contracts are offered with

16  competitive bidding.

17         JUDGE BIBAS:  You're going to have to refine what's

18  the right here.

19         MR. SIMON:  Well, the right is that they won the

20  contract.  There were competitive bids that were issued by the

21  Department of Homeland Security.  They won the bid.  They were

22  awarded the contract.  And they now have a contractual

23  relationship with the Department of Homeland Security.  They're

24  not in a position to wanting to be in an adversarial

25  relationship with them, but they have a contractual

Page 51

1   relationship.

2        JUDGE BIBAS:  Then there isn't already a contract.  Or

3   when a contract comes up for renewal, what is the nature of the

4   right under the INA?

5        MR. SIMON:  The nature of the right?  Well, they have

6   the right to operate that facility.

7        JUDGE BIBAS:  But let's say the contract is coming up

8   for renewal and New Jersey has passed AB 5207.  Like, okay,

9   we're not impairing the contract with the federal government

10  now.  We're just saying you can't do this again.

11       MR. SIMON:  Right.

12       JUDGE BIBAS:  So then how would you define the nature

13  of the right that you have at that point where they're not

14  saying, okay, the contract runs through December 31st, 2024 or

15  whatever, but you can't enter into a new one for 2025?

16       MR. SIMON:  Well, it's been CoreCivic's position that

17  they have that right.  And when this statute was passed, that

18  was the reason why CoreCivic brought a --

19       JUDGE KRAUSE:  But we're looking -- if we're looking

20  to statutory language and you're resting on 1231(g), we have

21  the very next subsection of (h) that says that the statute does

22  not create any substantive or procedural right of enforcement.

23  So how can you argue that there is a private right?  And

24  without that, is there any argument for preemption?

25       MR. SIMON:  That they have a private right?  I mean,

Page 52

1   they have the right to contract as the statute -- the INA gives

2   them that right to contract.

3           JUDGE KRAUSE:  But for preemption, don't you need to

4   have the right?  Doesn't it need to be --

5           MR. SIMON:  Yes.

6           JUDGE KRAUSE:  -- the right of (indiscernible)?

7           MR. SIMON:  I see where you're going.

8           JUDGE KRAUSE:  Okay.

9           MR. SIMON:  I think you're arguing that for purposes

10  of -- they have to have a contract for purposes of preemption.

11          JUDGE KRAUSE:  I'm asking, not arguing.  But we have

12  this -- the statutory language saying that there isn't a right

13  on the part of any entity that would be otherwise the subject

14  of an award, right?  And if preemption, as we're told by the

15  Supreme Court, requires that there be that right of a private

16  party, then are we even in the realm of talking about obstacle

17  preemption?

18          MR. SIMON:  Well, I think we are, because it's

19  interfering -- the statute interferes with the government's

20  discretion and --

21          JUDGE BIBAS:  Right.  So it's not that you have a

22  right against the federal government.  It's that you have a

23  right that if the federal government chooses to offer you this

24  contract, you can accept it.

25          MR. SIMON:  Correct.

Page 53

1          JUDGE BIBAS:  Okay.

2          MR. SIMON:  I agree with that.

3          JUDGE BIBAS:  So we have to read 1231(h), because

4    1231(h) is careful to say we're not opening ourselves up to

5    suits, the federal government by CoreCivic.

6          MR. SIMON:  I know that.  I agree with that.  And

7    that's obstacle preemption.  But I don't even think you have

8    to -- if the Court is troubled by the obstacle preemption

9    analysis, the statute is clearly unconstitutional under

10   intergovernmental immunity because it's directly interfering

11   with the government's ability to conduct its business.  And the

12   law is clear.  And I would point out that this statute is

13   different from just about every other statute that's been

14   analyzed in Supreme Court and Third Circuit jurisprudence,

15   Ninth Circuit jurisprudence in that -- well, it's similar to

16   the one, the Geo case.  But in every other case, including

17   North Dakota and Leslie Miller, the states were trying to

18   impose a regulation on a federal statute.  Here, it's an

19   outright ban.  It goes further than any other case.  They want

20   to prohibit completely private detention.  It takes it to a

21   whole other realm in the area of intergovernmental --

22         JUDGE BIBAS:  Well, your friend, Mr. Feigenbaum,

23   characterizes it, we're not forbidding immigration detention.

24   We're leaving open the possibility that the federal government

25   can do it itself, or it can lease the facility.

Page 54

1          MR. SIMON:  But the federal government has opted not

2     to do that.  And I think they have the right to pursue the

3     options that they want to pursue.  And I think the INA gives

4     them that right.  They have the right to consider leased

5     facilities.  They have the right to enter into contracts.  So I

6     think any way you slice it, this is an absolute -- a

7     obstruction or interference with the ability of federal

8     government to conduct their business.  And the federal

9     government has exclusive jurisdiction over immigration

10    enforcement.  And this is putting a major, major roadblock in

11    their efforts to do their job in the State of New Jersey, and

12    will have a absolutely catastrophic effect on the whole area if

13    they are forced to not use New Jersey as a place to detain

14    detainees and have to rely on other states and send them

15    hundreds of miles away.

16          One of the prime benefits of New Jersey is that it's

17    in close proximity to the two major airports; Newark Airport

18    and JFK.  And having to send detainees into the hinterlands

19    will make it -- well, as the ICE officials said in their

20    affidavits, it'll just turn it into a nightmare and will make

21    the whole realm of immigration detention enforcement

22    unmanageable.

23          JUDGE KRAUSE:  One of the concerns that your colleague

24    on the other side of the aisle has raised is how we go about

25    evaluating when that substantial interference crosses the line

Page 55

1    from permissible to impermissible if we take that upon

2    ourselves instead of leaving it to Congress.  And we have many

3    cases -- North Dakota, City of Detroit, Penn Dairies -- that

4    are saying this is a decision that Congress can make.  And

5    there's this judgment call to be made about when there -- that

6    that burden, that interference crosses that threshold.  Why

7    isn't that right?  Why shouldn't it be left to Congress?  And

8    what would be the test?  How would you articulate when it does

9    cross the line?

10        MR. SIMON:  Well, I think my colleague, Mr. Feigenbaum

11   on behalf of the State of New Jersey, is trying to argue that

12   because the statute doesn't expressly mention the federal

13   government, that somehow there isn't direct regulation.  But as

14   Judge Kirsch said in his decision below, you got to put aside

15   labels for a minute.  The fact that the government is not

16   mentioned in the statute does not mean that it doesn't have a

17   direct impact and doesn't directly regulate.

18        JUDGE AMBRO:  Well, starting from the beginning, a

19   private party -- or you're not -- I come back to, what right do

20   you think you were given by this statute?

21        MR. SIMON:  By the --

22        JUDGE AMBRO:  By 32 -- what was it -- the 1231(g)(1),

23   (g)(2).  And then, of course, (h) kind of takes it off the

24   field.  But what right do you think that statute gave you?

25        MR. SIMON:  Well, that statute gives us a right to --

Page 56

1   gives the federal government a right to consider leasing to

2   private parties.

3            JUDGE AMBRO:  Well, I mean, if you look at a case --

4   Boyd from the Supreme Court back in the 60's -- you could have

5   the Atomic Energy Commission building or operating a plant, or

6   leasing a plant.  And one of those was taken away.  And the

7   court concluded that the contractors -- both cost, plus

8   contractors for profit -- had not been incorporated into the

9   government structure as to become instrumentalities.  You're

10  not saying that you're an instrumentality of the federal

11  government, are you?

12           MR. SIMON:  No, no.  But I think in that case, there

13  were consideration of costs.  I think this is not one of those

14  cases where the Court has said, well, increased costs is not

15  going to be a factor on whether we impose intergovernmental

16  immunity.  This goes far beyond that, or cases like that, where

17  it came down to the issue of cost.  This is a case -- a statute

18  in New Jersey which will have a drastic impact, and basically

19  shut down federal operations in a particular state.  And so

20  that it is --

21           JUDGE KRAUSE:  Well, doesn't it just make it cost a

22  whole lot more in that particular state?

23           MR. SIMON:  I'm sorry, Your Honor?

24           JUDGE KRAUSE:  Doesn't it make it just cost a whole

25  lot more if the federal government wants to have a detention

facility in that particular state?

MR. SIMON: Yeah, it will cost a whole lot more. But it goes way beyond cost. It goes beyond absolutely putting roadblocks into the government's enforcement of the immigration laws, which they have exclusive jurisdiction. The state does not. It's strictly within the federal province. So yes, you're right. If the New Jersey statute went into effect, it would have enormous costs. But it goes way beyond cost, the whole analysis with the impact that this will have.

JUDGE AMBRO: Thank you.

MR. SIMON: If there are no more questions, half of my time will go to the Department of Justice. Thank you, Your Honors.

JUDGE KRAUSE: Understood. Thank you.

Ms. Neumeister?

MS. NEUMEISTER: Good morning, Your Honors. May it please the Court, McKaye Neumeister on behalf of the United States. On its face, AB 5207 outright prohibits contracts for private immigration detention facilities that the federal government not only would like to enter into, but already has entered into in the State of New Jersey. Under principles of intergovernmental immunity, however, states cannot regulate the relationship between the federal government and the personnel with whom the government contracts to operate federal programs. Because AB 5207 does precisely that, it violates the Supremacy

Page 58

1    Clause.  Now, the en banc Ninth Circuit in Geo Group struck

2    down a similar state law on the same ground, concluding that a

3    ban on the use of private contractors for immigration detention

4    impermissibly controls federal operations.

5         JUDGE AMBRO:  Can I just ask you the same question I

6    started off with your co-counsel?  If 1231 talks about the

7    government shall arrange -- or DHS shall arrange -- for

8    appropriate places, and 1231(g)(2) says they shall consider

9    what's available out there before they go building, doesn't the

10   text have to be a lot more strong in your favor in order to say

11   that your rights are being taken away?  Because you can

12   always -- you could build.  It's going to be more costly,

13   obviously.  But Congress hasn't really jumped into this fray as

14   strongly as it could.

15        MS. NEUMEISTER:  Yes, Your Honor.  We disagree that

16   the statute's not sufficient.  And I just want to bracket.

17   Congress doesn't have to speak any more clearly, and the Court

18   doesn't need to reach preemption because the state is not

19   allowed to control federal operations by telling the federal

20   government that it can't work with contractors for these

21   facilities under intergovernmental immunity.  So whatever the

22   statute says, and whether it's sufficient for preemption, it

23   doesn't matter under the other doctrine.  But I'm happy to

24   answer your other question.

25        JUDGE AMBRO:  And I guess we come back to the argument

Page 59

1    from North Dakota, which appears to have been resolved by the

2    Supreme Court.  Do you look at direct effect on the federal

3    government -- forgetting discrimination for the moment --

4    versus indirect effect, which is what I perceive Justice

5    Brennan was arguing, that there can be interference that causes

6    burdens on the government that indirectly affect it?  That

7    seems to have been read out of the analysis of

8    intergovernmental immunity.  And so what is the direct effect

9    in terms of SB (sic) 5207?

10        MS. NEUMEISTER:  Yes, Your Honor.  So we think that

11   the State is misreading the Supreme Court's precedents in this

12   space, and that the cases before North Dakota and what the

13   Supreme Court did in Washington don't have the effect of

14   prohibiting any laws that obstruct federal programs from

15   falling within the --

16        JUDGE AMBRO:  What language in Washington supports

17   you?

18        MS. NEUMEISTER:  Yes, Your Honor.  And to be clear, I

19   do want to answer Your Honor's questions about preemption as

20   well.  But we'll start with this, and then we'll get there.

21        JUDGE AMBRO:  Yeah, we'll get to that.

22        MS. NEUMEISTER:  Okay.

23        JUDGE AMBRO:  I promise.

24        MS. NEUMEISTER:  So looking at the cases that preceded

25   North Dakota, I think it's helpful to start there to sort of

Page 60

1   set up the framework of how this doctrine has developed.

2   Before North Dakota, there were a number of cases explaining

3   that intergovernmental immunity used to be satisfied by a law

4   imposed on federal contractors that merely increased costs to

5   the federal government by passing through the cost of

6   nondiscriminatory taxes or price controls.  And cases before

7   North Dakota said that's actually not right.  If it's actually

8   a law that is falling on federal contractors, and it only has

9   the effect of incidentally, possibly increasing the

10  government's cost by some pass-through costs, that's actually

11  not a problem under intergovernmental immunity principles.  And

12  that's clear from the court's decisions in the New Mexico case,

13  Fresno County, as Judge Bibas flagged, as well as the Penn

14  Dairies case itself, Public Utilities Commission, City of

15  Detroit v. Murray Corporation.  All of those cases recognized

16  that just because there's an incidental increase in cost, it

17  doesn't violate intergovernmental immunity.

18          But those cases specifically noted that where those

19  taxes were permissible, they did not obstruct or control

20  federal operations.  So the Court specifically reserved the

21  possibility that things that fell into that other category that

22  actually control or obstruct or interfere with federal

23  operations would not be valid exercises of state law.

24          JUDGE AMBRO:  What case says that states can never

25  regulate contractors who work with the federal government?

Page 61

1       MS. NEUMEISTER:  I don't have a case that stands for

2   that proposition, Your Honor.  But I don't think it's disputed

3   that intergovernmental immunity was a very broad doctrine and

4   even taxes on contractors --

5       JUDGE AMBRO:  Yeah, but it's been cut back.

6       MS. NEUMEISTER:  It has, Your Honor, but it's only

7   been cut back with respect to laws that incidentally could pass

8   on costs to the federal government, like taxes or price

9   controls that are really things that apply to a contractor as a

10  private business and ultimately won't have any effect on how

11  the federal program is run.  It just might pass through some

12  costs.

13      JUDGE BIBAS:  So there are two ways you could be

14  understanding this.  One could be, yes, there's really just two

15  prongs here for intergovernmental immunity.  But we mustn't

16  exalt form over function.  And functionally, this is on the

17  federal government, even though nominally it's applying to the

18  contractor.  The other could be, okay, we'll take the name, but

19  we'll understand substantial interference to be a background

20  principle that most of the time will show up in those two

21  prongs, but they're not exclusive.  And McCulloch still has

22  some independent vitality.  And you can't evade the two prongs

23  by writing a law that's just shy of that.  So which way does

24  the government ask us to understand intergovernmental immunity?

25  Is it really just those two prongs, or are those two prongs

Page 62

 1   kind of -- the situations have come up before, and no state has

 2   ever tried to do something like this before, and we shouldn't

 3   feel bound to have to shoehorn it in to one of those two

 4   categories?

 5           MS. NEUMEISTER:  So we think it is best understood as

 6   two prongs to this doctrine, Your Honor.  First, whether a

 7   state law is impermissibly regulating federal operations; and

 8   second, whether it's not a neutral, generally applicable law,

 9   but it actually is discriminating.  And under the first prong,

10   the plurality in North Dakota did try to cut that back and say,

11   regulation doesn't occur when a law is actually acting against

12   a against a supplier and not the federal government itself.

13           JUDGE BIBAS:  Right.

14           MS. NEUMEISTER:  But the cases preceding that didn't

15   draw that line.  And the Supreme Court in Washington also

16   didn't draw that line.

17           JUDGE BIBAS:  Washington's a discrimination case.

18   It's not a direct regulation case.

19           MS. NEUMEISTER:  I agree, Your Honor.  And so we don't

20   think that the Supreme Court in Washington meant to adopt a

21   position on this contested principle from North Dakota and

22   enact a sea change in the cases in this area.  And if you look

23   at what the Court actually said in Washington, it's consistent

24   that it wasn't actually trying to do that.  It specifically

25   recognized that the Constitution prohibits states from

Page 63

1    interfering with or controlling the operations of the federal

2    government, and that intergovernmental immunity has changed

3    over time, such that, a state law is no longer unconstitutional

4    just because it indirectly increases costs for the federal

5    government.  And so it's reflecting the trend in earlier case

6    law that increased costs alone are not a problem under the

7    doctrine.  But beyond that, when you have circumstances where

8    federal operations are being regulated, the statute itself

9    might not say the United States, but the effect of that statute

10   is exactly the same.  It's regulating federal operations by

11   controlling the relationship between the federal government and

12   its contractor, regulating that contractual relationship itself

13   with -- it would protect the AB 5207.

14          JUDGE AMBRO:  Isn't the test -- you keep saying

15   impermissible regulation -- but isn't the test direct

16   regulation?

17          MS. NEUMEISTER:  So that's the shorthand that the

18   plurality used in North Dakota.  And other cases have sort of

19   said that as the same shorthand.  But they're not taking a

20   position on whether direct regulation can never involve a

21   regulation that acts upon a contractor.  I think the better way

22   to understand this is the framing that this Court used in the

23   Treasurer of New Jersey v. U.S. Department of Treasury case.

24   And there, the Court did parrot that language from North

25   Dakota.  But then it went on to explain that it's looking for

Page 64

1   direct regulation of federal operations.  The federal

2   operations are ultimately the question that you look at here,

3   not just whether the U.S. is named in the statute, but whether

4   the effect of this law is to regulate federal operations

5   themselves.  And that's clear from the face of AB 5207.

6        JUDGE AMBRO:  But even when you were saying you get

7   more support pre-North Dakota with respect to the type of test

8   that you want.  But when you even go back to 1943 to Penn

9   Dairies, the Supreme Court says, "We see no basis for implying

10  from the Constitution alone a restriction upon such regulation,

11  which Congress has not seen fit to impose, unless the

12  regulations are shown to be inconsistent with congressional

13  policy."  And I think that's what your solace here has to be.

14  Somehow, this is so inconsistent with federal policy that it

15  must be direct.  But when do you cross the line from

16  permissible to impermissible?

17        MS. NEUMEISTER:  I definitely want to get to the

18  question of line-drawing, Your Honor.  I think it's important.

19  But I just also want to start with the text of Penn Dairies,

20  because we don't think that it supports the state in the way

21  the state claims.  If you look at the discussion in this case,

22  the court explains that intergovernmental immunity applies when

23  there's regulation of the performance by federal officers and

24  agencies of governmental functions.  And then it explains that

25  those who contract to furnish supplies or render services to

Page 65

1    the government are not such agencies, and -- this is

2    important -- do not perform governmental functions.  So Penn

3    Dairies was looking at milk suppliers.  And milk suppliers

4    clearly are providing a good to the federal government.

5    They're not providing governmental functions themselves.  And

6    so the court said, if you can have price controls on those

7    kinds of supplies because those suppliers aren't performing

8    governmental functions.  And the only effect might be to

9    increase the prices to the federal government, but that's not a

10   problem.  What we have here are governmental functions, federal

11   operations that are being performed by a federal contractor at

12   the direction of Immigration and Customs Enforcement.  So Penn

13   Dairies is talking about suppliers that don't do governmental

14   operations, very different than federal contractors who operate

15   immigration detention facilities.

16        JUDGE AMBRO:  And so in terms of what the effect is,

17   how would you distinguish footnote 8 that your opposing counsel

18   refers to in North Dakota?

19        MS. NEUMEISTER:  Yes, Your Honor.  And I do want to

20   get to the line-drawing question as well.  But I can --

21        JUDGE AMBRO:  I'll come back to that.  I'm sorry.

22        MS. NEUMEISTER:  Okay.

23        JUDGE AMBRO:  If you want to do the line-drawing

24   first, then we'll come back to that.

25        MS. NEUMEISTER:  Sure, great.  So we agree that there

Page 66

1    are circumstances where there will be hard questions and

2    difficult line-drawing considerations in this space.  But the

3    Court simply doesn't have to get into any of that right now

4    because the case that we have before the Court falls into a

5    very specific category where what the law is doing is

6    regulating that relationship between the federal government and

7    its contractor.  It is prohibiting that contractual

8    relationship.  And so on its face, it's the federal operations

9    and that federal relationship that is being prohibited.  And so

10   the Court can say that categorically, when we're talking about

11   this kind of case where the regulation is on that relationship

12   between the federal government and its contractor, has the

13   effect of regulating that relationship, imposing additional

14   requirements -- or here, prohibiting it at all -- that is

15   categorically not permitted under intergovernmental immunity.

16        JUDGE KRAUSE:  But you're saying categorically only

17   where that contractor is performing a federal function, right?

18        MS. NEUMEISTER:  We think that the Court can say that

19   for purposes of this case, and that resolves the question here.

20   Now, we do think that there are other cases that will be a more

21   difficult line-drawing consideration.  And those sort of fall

22   in the middle.  And first, I'd like to just sort of delineate

23   what we think are the easy cases on the other side of the

24   spectrum.  And those are the incidental property or income

25   taxes that apply to federal contractors and their employees, or

Page 67

1    wage-and-hour laws, for instance, that are regulating a federal

2    contractor in its capacity as a private employer.  Those are

3    the kind of things that incidentally might raise some costs for

4    the federal government, but really themselves shouldn't be

5    considered a regulation of federal operations.  So we think the

6    Court can also sort of recognize, consistent with the tax cases

7    that are being cited throughout these cases.  But that is still

8    perfectly permissible with respect to, like, normal taxes on

9    federal contractors.

10            In the middle, there's a category of other kinds of

11   questions where it's not necessarily directly calling out that

12   federal contractual relationship.  But it's also regulating in

13   a way that is relevant to federal operations.  And so the

14   question there will be much more difficult in terms of, is this

15   actually a regulation of federal operations?  And is this the

16   kind of obstruction of federal operations that is

17   impermissible?  But the Court doesn't have --

18            JUDGE KRAUSE:  Takes you back to the line-drawing,

19   so --

20            MS. NEUMEISTER:  Yes, Your Honor.  But those are the

21   kind of fact-specific questions that we really can't answer in

22   the abstract here.  For the purposes of this case, it is very

23   clear that this kind of regulation is not permitted.  Whatever

24   other kinds of cases might arise in this space, the Court

25   should reserve its opinion for those cases when the facts are

Page 68

1    actually presented, and the questions can be grappled with in

2    that concrete factual context.

3              JUDGE AMBRO:  But didn't New Mexico -- and I keep

4    thinking I'll come back to footnote 8 later in this --

5              MS. NEUMEISTER:  Oh, yes.  Sorry.

6              JUDGE AMBRO:  Didn't New Mexico say the contractors

7    and even agents only count as the government itself if they

8    stand literally in the government's shoes?  In other words,

9    it's not an agency concept.

10             MS. NEUMEISTER:  So there's a difference, Your Honor,

11   I think when you're talking about federal employees or federal

12   instrumentalities or federal property.  Those are the kinds of

13   cases that are very, very easy, because that's clearly a

14   regulation that falls on the federal government itself.  When

15   you're dealing with contractors, we don't dispute that they're

16   not federal employees.  They're not necessarily a federal

17   instrumentality, which is why there are these more difficult

18   questions.  It's why taxes are permitted, for instance.  But

19   those are still entities that are carrying out federal

20   operations for the federal government.  And so when it is those

21   regulations themselves that are being -- sorry, those

22   operations themselves that are being regulated, it's exactly

23   the same as that the United States was called out expressly in

24   the statute.

25             And as the Supreme Court recognized in City of Detroit

Page 69

1   v. Murray Corporation, you don't look at the words of a

2   statute.  You look through the form to the substance to

3   determine what the actual practical effect is of a state

4   regulation.  Here, it's clear the effect is to prohibit the

5   United States from working with its chosen contractor to

6   operate these facilities.

7           Now, with respect to footnote 8, Judge Ambro, I

8   believe -- and you can correct me if I'm wrong -- that's the

9   footnote that explains --

10          JUDGE AMBRO:  The difference between Justice Brennan

11  and Justice Stevens.

12          MS. NEUMEISTER:  Sure.  And with respect, it says that

13  Congress should be the one that is sort of policing these

14  lines.  So the problem --

15          JUDGE AMBRO:  It basically was saying that Justice

16  Brennan's approach of what burden -- being the burden on

17  government -- the federal government, how do you measure that?

18  And it gave some examples.  It was too amorphous, according to

19  Justice Stevens' footnote.

20          MS. NEUMEISTER:  Yes.  And we agree there will be

21  difficult line-drawing problems.  But courts are used to doing

22  those difficult analyses of fact-based questions and trying to

23  police those lines in the circumstances where they arise.  But

24  it's really difficult for the Court to sort of pre-determine

25  all of those answers in advance here when those are factual

Page 70

1    questions that are only presented in the abstract.  And we

2    don't need to reach them because these circumstances present a

3    very clear categorical circumstance on the other side of the

4    spectrum.

5         Now, with respect to -- I believe Judge Krause asked

6    this question -- I think it's related, about why not leaving

7    these determinations to Congress.  And the problem with

8    thinking about the doctrine that way is that it permits states

9    to do precisely the same thing, in effect, that they are not

10   allowed to do directly just by creatively drafting a statute.

11   As the plurality in North Dakota recognized, the discrimination

12   prong exists because even if it's not directly targeting

13   federal employees themselves, federal officials, it can be just

14   as obstructive to federal operations as it would be if it was a

15   direct regulation.

16        JUDGE KRAUSE:  But isn't that the risk that the

17   federal government takes on when it decides to privatize a

18   federal function?  And I mean, that's what we were dealing with

19   in the Pennsylvania Hearing Board case, right?  And if the

20   government is choosing to take on the genius of a private

21   contractor, then it's got to take on the price that goes with

22   that.  I mean, here that would translate into the federal

23   government either not having that sort of immunity on the

24   restraint on private contractors or doing it itself, right;

25   owning it and running immigration detention as a federal

Page 71

1     function that the government is not privatizing.

2          MS. NEUMEISTER:  Yes, Your Honor.  But the problem

3     with that is the government uses federal contractors all the

4     time for all sorts of things; munitions, war planes, trips to

5     the International Space Station.  There are all sorts of

6     functions that the government relies on contractors for various

7     reasons.  The reasons here are in order to ensure flexibility

8     and for cost savings.  And when the government chooses to work

9     with its desired personnel for carrying out federal operations,

10    it's not consenting to state regulation in doing that.  It

11    recognizes that private contractors are subject to some

12    different rules.  They can be taxed.  They generally will

13    follow state wage-and-hour laws, things like that.  There are

14    some things that might be applied to them that wouldn't apply

15    to the federal government.  But as the case is recognized,

16    those are all incidental things.  Those are things that might

17    affect the cost of a contract on the margins, but aren't

18    actually regulating the federal operations themselves.  States

19    don't have the authority to do that, and --

20          JUDGE BIBAS:  How important is it that we define the

21    market?  Mr. Feigenbaum, your friend wants to define the

22    relevant market as detention, okay?  But you want us to

23    understand this in terms of immigration detention.  And the

24    case for this being a regulation of the federal government is a

25    lot stronger if we understand it as immigration detention than

Page 72

1    if we understand it just as detention.  But is there a neutral

2    way to pick between those two framings?

3              MS. NEUMEISTER:  Your Honor, I don't understand that

4    framing to be very important when we're talking about the

5    regulation prong.  Because at the end of the day, the question

6    is, is the State actually regulating federal operations -- this

7    federal relationship -- or not?  And it doesn't really matter

8    how you define the market.  The state can pass a general law

9    banning immigration detention, banning all detention, banning

10   private detention.  It can pass any of those laws.  But that

11   doesn't matter for purposes of regulation.  It matters for

12   just --

13             JUDGE BIBAS:  It does bear on how much we look through

14   form to substance, right?  Because if they impose a fifty

15   percent tax on milk transactions, right -- well, lots of

16   private people buy milk.  If they impose a fifty percent tax on

17   detention, well, that might be different.  If they impose a

18   substantial tax on immigration detention, we can see through

19   that they really are trying to get at a federal behavior.

20             MS. NEUMEISTER:  Yes, Your Honor.  And I think when

21   you're asking the question, what are they really trying to get

22   at, it's definitely relevant, I think, for the discrimination

23   prong.  But when you're talking about the regulation prong, you

24   are considering the practical effect.  And I'm not sure that I

25   would agree that those are definitely different.

Page 73

1        JUDGE BIBAS:  All right.  But you think we should take

2    a functional analysis of what is direct regulation and not be

3    bound by the label that this -- the incidence falls on

4    CoreCivic?

5        MS. NEUMEISTER:  I think that's correct, Your Honor.

6    I think that's consistent with how the Supreme Court has looked

7    at these cases, asking -- again, it's the City of Detroit

8    case -- asking about what the practical effect is and not just

9    the definition or the words being used.  And there's no reason

10   to import a magic-words test into the intergovernmental

11   immunity.  Another related point I'd just like to flag, Your

12   Honor --

13       JUDGE AMBRO:  If we come back full-circle, how do I

14   know when something goes from incidental to impermissible,

15   functionally or otherwise?

16       MS. NEUMEISTER:  I think that that will be a difficult

17   question in some circumstances for the courts to consider.  We

18   know that courts think that normal taxes are incidental, that

19   price regulations that will only have the effect of maybe

20   passing along some pass-through costs are incidental.  But all

21   those cases sort of in-between are going to be very, very

22   fact-specific inquiries that it's impossible to pre-determine

23   in advance.

24       JUDGE KRAUSE:  But don't you need to give us some

25   standard, some definition of that line?  Because if you can't,

Page 74

1  then no date is right, right?  If you can't, then this is just

2  not administrable.  And perhaps it should be left to Congress.

3        MS. NEUMEISTER:  Well, Your Honor, there are plenty of

4  inquiries that courts undertake that are fact-specific and

5  really do proceed on a case-by-case basis.  And I think that

6  particularly makes sense in this space -- when we're talking

7  about federalism concerns and the relationship between the

8  states and federal governments -- that we wait for

9  circumstances to arise in which there actually is a conflict,

10  and then adjudicate that conflict based on the facts presented.

11  And I'll just note that as a practical matter here, those

12  questions don't really arise with respect to immigration

13  detention because ICE generally includes in its contracts with

14  contractors clauses that tell them that they should be

15  following generally applicable state and local laws.  ICE is

16  cooperating with federal governments when it is -- sorry, with

17  state governments -- when it's having its contractor facilities

18  operate within their jurisdictions.  And so as a practical

19  matter, a lot of those difficult questions might not arise at

20  all.  And so for the Court to sort of try to reach out and

21  decide them in advance, it's presupposing conflicts that the

22  sovereigns might work together and might never actually arise.

23        I'd just also like to note that my friend on the other

24  side is saying that if it were a direct regulation, that would

25  mean New Jersey is directly prohibiting ICE from doing any

1  immigration detention in the state.  And so the implication is

2  he thinks this is not direct regulation because it's a more

3  modest regulation in only prohibiting one form of immigration

4  detention.  But the fact that it's not a more extreme and

5  obvious violation of intergovernmental immunity doesn't make it

6  any less impermissible under the Supremacy Clause.

7         JUDGE BIBAS:  The precedents that are being cited, is

8  this the first case involving a ban?  I mean, set aside Geo

9  Group in the Ninth Circuit, et cetera.  But we have a ban.  And

10 so they're -- as you say, there are going to be some hard

11 cases.  But what we have to decide today is, can they ban

12 someone entirely from providing something?

13        MS. NEUMEISTER:  Yes, Your Honor.  And I think that

14 makes it a very easy case.  I'm not aware of any other cases

15 that involve this kind of ban.  But you can still think about

16 the case through the lens of Leslie Miller and the licensing

17 cases, and cases like Public Utilities Commission, Sperry v.

18 Florida, which is cited in the Geo Group decision.  And in

19 those cases, there was a licensing scheme in the state that had

20 requirements on entities before they could engage in certain

21 conduct.  And there was also a federal determination that the

22 federal government, specifically with respect to Leslie Miller,

23 wanted to work with these contractors to carry out federal

24 programs.  And the Supreme Court said that of course a state

25 cannot impose additional requirements on top of the

Page 76

1    requirements that the federal government has deemed sufficient.

2    And in doing that, it cited and relied on Johnson v. Maryland,

3    which is a case in which the Supreme Court said states can't

4    make postal workers get a driver's license.  Because the

5    federal government has determined that this is the person who

6    will be carrying out federal functions, has determined this

7    person is eligible to do that work, and a state can't come in

8    imposing a new requirement, a new hoop to jump through that is

9    in addition to what the federal government has already

10   determined to be sufficient.

11        JUDGE KRAUSE:  Is that intergovernmental immunity,

12   where we're looking at a curtailing of discretion of the

13   government?  Or is that preemption, where there are specific

14   licensing requirements that have been laid out by the

15   government that conflict with the state law?

16        MS. NEUMEISTER:  So Leslie Miller and Public Utilities

17   Commission definitely demonstrate that those doctrines are sort

18   of overlapping and mutually reinforcing in this space.  I'll

19   note that this court in the City of Philadelphia decision

20   already construed those cases as intergovernmental immunity

21   cases.  And we think that that's the right analysis, because

22   they're relying on Johnson v. Maryland, which is clearly an

23   intergovernmental immunity case.  And if imposing those kind of

24   licensing requirements is impermissible in Leslie Miller, then

25   it is certainly impermissible for the state to say that

1    categorically, no private facility is eligible to operate any

2    of these federal programs.  That goes way beyond just imposing

3    new requirements and imposes an outright prohibition that the

4    government cannot work with its chosen personnel to carry out

5    these programs.  And that's not something the Supremacy Clause

6    has ever permitted a state to do.

7             JUDGE AMBRO:  The City of Philadelphia was, what,

8    1986?

9             MS. NEUMEISTER:  Yes, I believe that's correct, Your

10   Honor.

11            JUDGE AMBRO:  That would be -- Dakota was 1990.

12            MS. NEUMEISTER:  Sorry, Your Honor?

13            JUDGE AMBRO:  North Dakota was 1990, so --

14            MS. NEUMEISTER:  Yes, Your Honor.  And there wasn't a

15   definitive determination in that case of how to construe those

16   cases.  The four justices disagreed on either side.  I think

17   the proper reading of them, though, is that they are drawing on

18   principles from both doctrines.  The citation to Johnson

19   clearly invokes intergovernmental immunity.  The discussion of

20   licensing schemes falls more within what you would consider

21   from a preemption analysis.  And if you look at the beginning

22   of the discussion in Leslie Miller, the court specifically says

23   that the question is whether applying the statute to this

24   contractor, interferes with the federal government's power to

25   select contractors and schedule construction, and is in

Page 78

1    conflict with the federal law regulating procurement.  Those

2    two things are the first clause -- intergovernmental

3    immunity -- and the second, preemption.  These doctrines are --

4                JUDGE AMBRO:  I often think, and maybe incorrectly, I

5    often think Leslie Miller is primarily a preemption case.

6                MS. NEUMEISTER:  And that's what some courts have read

7    it to be, Your Honor.  This court in City of Philadelphia

8    disagreed with that.  But even if it is, it doesn't help the

9    state here because under preemption principles, the same thing

10   is happening.  The federal government has determined that it

11   can contract with these individuals, that they're eligible to

12   contract.  There's various eligibility requirements that you

13   can find, for instance, in the appropriations acts and in the

14   various regulations at issue that determine whether a facility

15   can operate in this space.  The government said not only can

16   they operate, but that this specific facility meets those

17   requirements and is an appropriate place to house detainees

18   under the statute.  That determination has already been made.

19   Now, the state seeks to come in and say, actually, no; the

20   federal government thinks that these entities are eligible to

21   do this work.  But we're going to say that no private entity at

22   all is possibly eligible to carry out these programs.  That's

23   exactly what happened.  That's not just what happened in Leslie

24   Miller.  It goes beyond Leslie Miller, and is even more

25   obviously a violation of the Supremacy Clause.

Page 79

1          Now, I'm happy to talk more in-depth about the

2     preemption issue.  We sort of skipped that at the beginning,

3     Your Honor.

4          JUDGE AMBRO:  I guess, maybe we -- what right does

5     this statute confer on a private actor, CoreCivic?

6          MS. NEUMEISTER:  Yes, Your Honor.  So in reading the

7     statute -- and we sort of talked about this in the colloquies

8     earlier -- that the statute isn't conferring a right on

9     contractors against the federal government.  But it is

10    recognizing that they have a right to compete for these

11    contracts, to enter into these contracts if selected, and that

12    when the government puts out a call for potential facilities --

13    a request for proposals, for instance -- a facility has the

14    right to choose to make itself -- to offer itself up and to be

15    voluntarily offering to engage in this process of providing

16    these services.  And if you look at the text of 1231, that's

17    clearly what Congress intended in this space.

18         So starting with the beginning of that section,

19    1231(g)(1) -- if I can find the statutes -- 1231(g)(1) says

20    that the attorney general -- really the Secretary of DHS --

21    shall arrange for appropriate places of detention for aliens

22    detained pending removal or a decision on removal.

23         Appropriate places of detention:  It's conferring

24    discretion and authority on the agency to determine what places

25    are appropriate, and to use those places to house these

Page 80

1    individuals.

2        The statute then goes on to create an order of

3    operations, where Congress expects that the agency is going to

4    do certain things in order to conserve resources and ensure

5    flexibility.  And that is to look for certain options first.

6    If the United States government facilities are available, or if

7    facilities adapted or suitably located for detention are

8    available, then the agency is required to use those facilities

9    for housing, provided those facilities are appropriate in the

10   agency's termination.

11       JUDGE AMBRO:  Well, under (g)(2), provided that

12   they're available.

13       MS. NEUMEISTER:  Yes, Your Honor.  But there's no

14   reason to read availability in the statute in an unnatural way

15   to sort of import the ability of states to regulate.  Available

16   in this context means Congress fully intended that these

17   options are part of the scheme, are available.  The design is

18   that these options are preferred.  And for them to be available

19   means that as a practical matter, there physically is a

20   facility, it's suitably adapted to do this work.  And the owner

21   or entity that is going to contract for a lease for the

22   facility, that they are going to voluntarily enter into this

23   contract with the United States.  It's a practical, physical

24   sense of what it means to be available.  Because that's what

25   Congress intended when it was setting up this design, that if

Page 81

1   these facilities are there, then ICE is supposed to try to use

2   them before it then expends funds to purchase or construct its

3   own facilities in this space.

4          JUDGE AMBRO:  If DHS or ICE decided as a matter of

5   policy that we're just going to construct our own facilities

6   despite the fact they have every option -- forgetting this

7   particular case -- there's nothing wrong with that, is there?

8          JUDGE BIBAS:  (g)(2) seems to say they can't do that

9   until they go through the -- considering the availability for

10  purchase or lease.

11         MS. NEUMEISTER:  Yes, Your Honor.  It sets up an order

12  of operations that in order to then expend that money and

13  operate a much more expensive, inflexible program, they have to

14  first determine whether the preferred facilities can be -- yes.

15         JUDGE AMBRO:  It does say before initiating a project

16  for the construction.  You're right.

17         MS. NEUMEISTER:  Yes, Your Honor.  And so that's

18  consistent then with the appropriations provisions, that

19  appropriate funds for this and say that it can be expended for

20  these contracts provided that the facilities get adequate

21  ratings.  And then all of the regulations that talk about these

22  private facilities and what requirements they have to meet in

23  order to satisfy the statute, and the fact that they are

24  determined to be eligible by the relevant offices.  This space

25  is designed essentially by Congress, with some delegated

1  discretion to the agency that has promulgated these

2  regulations, that contemplates that these facilities are

3  available and preferred.

4       JUDGE AMBRO:  But my question is, it does say, before

5  initiating, does shall consider.  But what happens if they say,

6  okay, I have considered, so what?  I'm going to build my own

7  facility because I think long-term that's the best option?

8       MS. NEUMEISTER:  I think that would be a difficult

9  question, Your Honor, with respect to the statute.  There is

10  discretion in the statute so that the Secretary has to

11  determine that these places are appropriate.  But here, that's

12  not what happened.  We know that ICE thinks this is an

13  appropriate facility, wants to continue to work with this

14  facility, and it's only the state law that's interfering and

15  preventing ICE from doing that, potentially going forward if

16  the law is upheld and the contract needs to be renewed.  States

17  simply have no authority to disrupt the congressional design

18  and impede the fulfillment of Congress' objectives and intent

19  in this space.  Congress wanted a flexible, cost-effective

20  program, and so gave ICE a lot of discretion, but required it

21  to consider certain options that are preferred in this space.

22  The agency has been doing that by using these private

23  contractor facilities.  The state can't come in and say,

24  actually, we know better.  We're going to take the preferred

25  option off the table and require the agency to abide by a

1   scheme that is completely different than the one that Congress

2   intended.  That is a classic case of obstacle preemption.

3        JUDGE AMBRO:  I guess what I'm saying is, (g)(2), if

4   it had a tail on it that before initiating, you shall consider

5   the availability of other options; and the tail would be, you

6   can't build your own facility until you have not just

7   considered them, but for whatever reason decided that you had

8   to opt out of those other considerations.  And obviously, it

9   would have to be put into more clean language.  But the point

10  is, it seems like there's total discretion at the DHS/ICE

11  level.  And the statute doesn't really fully answer what you

12  must do other than consider the options.

13       MS. NEUMEISTER:  I think I read the statute slightly

14  different, Your Honor.  I think it is Congress sort of setting

15  up this order of preferred options and giving us discretion to

16  use the options it determines to be appropriate, but to

17  consider the options in a particular order that best serves

18  Congress' objectives of cost savings and flexibility.  I don't

19  think Congress had to spell that out any more clearly in the

20  statute for those to be the statutory goals that Congress meant

21  to accomplish by this.  By removing private facilities from the

22  list of possible facilities to use, it contemplates a

23  completely different scheme of detention than the one that

24  Congress set up and expected that the agency would be able to

25  use.  We know that Congress understands that the agency uses

Page 84

1    these private contract facilities.  It's been happening for

2    decades.  Congress has these appropriations where it talks

3    about paying for facilities under the contract.  There is a

4    statutory provision that specifically recognizes that there are

5    privately owned and operated facilities.  That's not cited in

6    the briefs, but it's 6 U.S.C. Section 205(b)(3).  Congress

7    specifically recognizes these facilities exist, that ICE uses

8    them, and that they are a preferred option because they would

9    prevent ICE from needing to purchase and construct and operate

10   its own facilities.  The state can't take away Congress'

11   preferred option in this overall statutory design without

12   impeding the objectives of the statute.

13           JUDGE AMBRO:  So is this coming back -- is your theme

14   that prohibiting private contracting, as was done here,

15   regulates the federal government when that contractor is

16   performing a federal government function?

17           MS. NEUMEISTER:  Yes, Your Honor.  I think that that

18   is the easy case that we have before us, that the statute is

19   trying to prohibit ICE from working with a contractor to carry

20   out federal operations.  And so whatever difficult line-drawing

21   there might be in other cases, this is a clear case where the

22   Supremacy Clause does not permit that kind of obstruction.

23           JUDGE AMBRO:  And you're saying that is a direct

24   regulation?

25           MS. NEUMEISTER:  Yes, Your Honor.  We think that that

Page 85

1    is a -- if Your Honor wants to call it a direct regulation of

2    federal operations, that's essentially what's happening.  It is

3    a direct regulation on the contract between the federal

4    government and this party and on detention operations

5    themselves.  We think the word "direct" is a bit of a red

6    herring in this case.  We think the real question is sort of

7    about the effect of the statute and the effect of the

8    regulation.  If it has the effect of regulating federal

9    operations -- and here, placing a prohibition on the federal

10   government -- then it clearly can't survive intergovernmental

11   immunity.

12           JUDGE AMBRO:  Usually when we read statutes, at least

13   in the last fifty years, we look at the text first.  And if

14   it's ambiguous, the effect later.

15           MS. NEUMEISTER:  Well, Your Honor, in this space,

16   intergovernmental immunity and preemption are overlapping and

17   mutually reinforcing.  And so the Court really can sort of

18   consider them together or rule on either of those doctrines.

19   Obviously, the statutory text with respect to the federal

20   statute is very relevant to the preemption inquiry.  But the

21   Court doesn't even really need to go there because under

22   intergovernmental immunity principles, this is clearly

23   prohibited.  My friend on the other side is essentially trying

24   to collapse the regulation prong with obstacle preemption in

25   this space.  There's simply no reason to do that.  Those are

Page 86

1    different doctrines.  Intergovernmental immunity has been

2    established since McCulloch v. Maryland, and that's what the

3    Supreme Court recently reaffirmed in the Washington case.

4    There's simply no reason to now try to limit that doctrine in a

5    way that other courts haven't seen fit to do.  And the Ninth

6    Circuit, specifically in the Geo Group case, addressed all of

7    these issues and concluded that this is an impermissible

8    regulation of the federal government under intergovernmental

9    immunity, and it is preempted by federal laws in this space.

10   There is no reason to create a circuit split with that case, or

11   to disregard the numerous Supreme Court precedents in this

12   space.

13             JUDGE KRAUSE:  The effects on the federal government

14   and the prohibition to which you keep referring, it's really

15   just a curtailing of discretion, right?

16             MS. NEUMEISTER:  It can be framed that way, Your

17   Honor, but it is a direct prohibition on a contract that we

18   know the federal government has already entered into and wants

19   to continue to enter into within the state.

20             JUDGE KRAUSE:  But that contract is just one way that

21   the federal government can have an immigration detention

22   facility in the state, right?

23             MS. NEUMEISTER:  It is, Your Honor.  But that's

24   essentially -- to say that that's fine would be to permit the

25   state to control how the federal government carries out federal

```
1   relations.

2        JUDGE KRAUSE:  Exactly.  Exactly.  That seems to seems

3   to be a limitation on what would otherwise be less-fettered

4   discretion, right?

5        MS. NEUMEISTER:  I think it's possible to frame it

6   that way, Your Honor.  And with respect to our preemption

7   argument, we do rely on the discretion in the statute and a

8   number of cases where courts explain that states can't impose

9   additional conditions on top of a congressional directive that

10  does grant discretion.

11       JUDGE KRAUSE:  So in those cases -- like Crosby, like

12  Arizona -- there's a far more detailed scheme, right, that's in

13  place that creates a conflict?  I mean, here, you're asking us

14  to read a whole lot into that 1231(g).  And to the extent

15  you're analogizing to the licensing cases and what we have in

16  Section 235.3 in the CFR, the requirements for a private

17  contractor are just very few and very basic.  So is there

18  enough here in terms of the level of detail in the regulatory

19  scheme to say that this equates to those cases where sufficient

20  interference was found or where there was a sufficient conflict

21  for preemption purposes?

22       MS. NEUMEISTER:  We think that there definitely is,

23  Your Honor.  Now, we're talking about preemption.  So I'm going

24  to focus on that.  But also, if you look at Leslie Miller,

25  Public Utilities Commission, those also were framed as
```

Page 88

1    intergovernmental immunity decisions.  And that focus at a high

2    level on, there is a federal contractor, the federal government

3    has determined that they want to work with this contractor,

4    that the contractor is eligible, and the state tries to impose

5    requirements on that.  And under Johnson v. Maryland, that's

6    not permissible under intergovernmental immunity.  So we think

7    that's certainly enough.

8         With respect to preemption, we think that the statute

9    does enough here for the Court to be able to discern, what were

10   Congress' objectives in this space?  What did Congress intend

11   with respect to how this would work?  Congress intended that

12   the agency would be able to look to suitably adapted or located

13   facilities -- those are contract facilities -- and be able to

14   use those when the agency determined that those were

15   appropriate places of detention.  So framed in terms of the

16   actual specific question that we're focused on, we know

17   Congress thought that these facilities should be used for this

18   purpose if ICE determines they're appropriate to be used.  And

19   ICE has made that determination here.  The State is trying to

20   come in and say, even though ICE thinks this is an appropriate

21   facility, or that sometimes these are appropriate facilities,

22   New Jersey is going to say that they are never appropriate

23   under any circumstance within their state.  That is a clear

24   conflict with what Congress intended in setting up this scheme

25   for the agency.

Page 89

```
 1              So we think it's clearly sufficient under those cases.
 2      The contractor requirements and Leslie Miller, for instance,
 3      maybe were framed slightly differently.  They talked about --
 4      you could say that there was sort of like a direct right at
 5      issue.  But there are rights at issue in the statutory scheme;
 6      the right to contract, the right to make a facility -- to
 7      volunteer a facility for use for this purpose, the right to
 8      enter that contract when it's been a mutually agreed-upon by
 9      the parties.  New Jersey is coming in and taking away all those
10      rights from the contractor in this case, notwithstanding the
11      fact that the federal government has determined that they're
12      eligible to operate these federal operations.
13              Fundamentally, New Jersey agrees that if ICE were
14      operating this facility itself, that the state couldn't
15      regulate the facility.  If ICE owns it and operates it, the
16      state has nothing to say.  Just because ICE chooses to work
17      with a federal contractor to carry out these federal
18      operations, that shouldn't change anything about this inquiry.
19      It's the operations themselves and that federal relationship
20      between the parties that's being targeted and regulated by the
21      state statute in this case.  And that's not permissible under
22      the Supreme Court's intergovernmental immunity cases, and also
23      the preemption cases; for instance, Leslie Miller, Public
24      Utilities Commission, and any number of others.
25              JUDGE KRAUSE:  I think we understand the argument
```

Page 90

1   unless my colleagues have further questions.

2           JUDGE AMBRO:  No, thank you.

3           MS. NEUMEISTER:  Thank you.

4           JUDGE KRAUSE:  Thank you.

5           Mr. Feigenbaum, can you begin with the sort of oddity

6   that the federal government couldn't impose an additional

7   requirement on a contractor in terms of, like, a licensing

8   scheme?  But as you would have it, could entirely prohibit that

9   contractor that otherwise would be qualified in the view of the

10  federal government.

11          JUDGE BIBAS:  You mean the state government couldn't

12  do that?

13          MR. FEIGENBAUM:  I understood the question that way.

14  Yeah, yeah, yeah.

15          JUDGE KRAUSE:  Sorry, I missed -- okay.

16          MR. FEIGENBAUM:  For the Leslie Miller, PUC kind of

17  question.

18          JUDGE KRAUSE:  Yes, right.

19          MR. FEIGENBAUM:  So that's actually not the line we've

20  ever drawn in this case.  I just think they're not reading

21  Leslie Miller and PUC correctly.  I think the problem in those

22  cases was, as you put it, Your Honor, there's a reticulated or

23  detailed or whatever you want to call it, comprehensive scheme

24  in Leslie Miller and PUC that implied a right to provide that

25  service irrespective of any other state law restrictions or

Page 91

1    disabilities.  And --

2          I'm sorry, Judge Ambro.

3          JUDGE AMBRO:  No.  Why don't you finish, and then I'll

4    pick up on that.

5          MR. FEIGENBAUM:  And I accept that that kind of

6    preemption could exist.  I think it's a high bar -- especially

7    after the last few years of Supreme Court precedent -- to find

8    that kind of implication from a statute.  But I think 1231(g)

9    is a really hard place to find it.  And this goes to a colloquy

10   with Judge Ambro earlier, and maybe back and forth between

11   Judges Bibas and Ambro.  The law says, consider what's

12   available, and including to buy or lease private facilities.

13   That's the preference.  They can buy or lease facilities today

14   and operate it themselves.  They can buy or lease the Elizabeth

15   Detention Center itself.  And then if it's not there, go build

16   your own.  So I think you could have a world in which you have

17   such reticulated requirements on federal licensing set by

18   statute or regulation that it implicitly preempts the ability

19   to have any additional state ones.  I just don't think we have

20   it here.

21         JUDGE KRAUSE:  Why is it sufficient?  We've got a

22   regulation, albeit very basic.  But isn't that to say that the

23   federal government has decided it's pretty minimal requirements

24   for at least the baseline of what is permissible in terms of

25   the private contractor that would be hired?

Page 92

1           MR. FEIGENBAUM:  So I think regulations can have

2      preemptive effect.  I would just note as a threshold point, I

3      think it's a kind of higher bar because of all of the Supreme

4      Court precedents making clear it's federal law that's supreme.

5      So it has to be the regulation implementing the law.  And I

6      think it's tough when you pair the regulations with 1231(g).

7      What I understand the pair to be is to say, you, federal

8      officials, go out to the marketplace, see what's available.

9      Regulation comes in and says, from what's available, here's

10     what we'll work with.  And if nothing is available, go

11     construct your own.  So it fits together, whereas saying the

12     regulations gave you a right not just to see what's available,

13     but to force things to be available that state law doesn't make

14     available, would make the regs have preemptive force.  That

15     just doesn't work with the statute.

16           JUDGE BIBAS:  Mr. Feigenbaum, when asking about

17     intergovernmental immunity, you kept deflecting things over to

18     preemption.  And then you stress that there's a high standard

19     of preemption.  I don't see what's left of the first direct

20     regulation prong.  You can see that's there in theory.  And yet

21     when I give you hypos in practice -- I gave you one about a

22     private contractor for the mint, I gave you one about

23     munitions -- you wouldn't give me a straight answer.  Is there

24     any reg that doesn't name the federal government that will

25     flunk the direct regulation prong, or is that a dead letter

Page 93

1    under your reading?

2         MR. FEIGENBAUM:  I'm so sorry.  I just want to

3    separate things.  You don't need regs for intergovernmental

4    immunity.  That's preemption.

5         JUDGE BIBAS:  Not a regulation, a statute.

6         MR. FEIGENBAUM:  Oh, like a state law?

7         JUDGE BIBAS:  A state statute.  Is there any state

8    statute that does not name the United States federal

9    government, governmental entity, et cetera, that would

10   nevertheless flunk the first one?  Or is yours a formalistic,

11   if the government isn't named, then we are in nondiscrimination

12   land or else preemption land?

13        MR. FEIGENBAUM:  So I want to answer this correctly in

14   a way that doesn't at all feel misleading.  It doesn't have to

15   name the United States.  It has to apply directly to the United

16   States.  And I think Ms. Neumeister agrees, which is why there

17   was some difficulty in some of the colloquies earlier.

18        JUDGE BIBAS:  Then answer my mint and munitions hypos.

19   Give me a yes or no.  Would a contract --

20        MR. FEIGENBAUM:  I thought I said no.  I'm sorry.  I

21   don't think those are direct regulation.  I was saying I'm

22   struggling because preemption might kick in in a lot of those

23   cases, and I don't know the statutes or rules.

24        JUDGE BIBAS:  Preemption might kick in in those two.

25   But you could ban all federal military contractors -- defense

Page 94

1    contractors -- from making missiles, et cetera, and say, you

2    are not allowed to make missiles anywhere within -- the U.S.

3    has to build its own munitions factory if it wants to do it

4    within the boundaries of New Jersey?

5            MR. FEIGENBAUM:  So two things; one, it would have to

6    be a ban on making that product in the borders.  It can't be a

7    ban on making it only for the federal government.

8            JUDGE BIBAS:  Right.

9            MR. FEIGENBAUM:  That would be a discrimination

10   problem.

11           JUDGE BIBAS:  Okay.  So Sidewinder missiles --

12   nominally, we're not mentioning the federal government, but

13   it's illegal for anyone other than the federal government to

14   buy a Sidewinder missile.  Okay?  But because it's a market of

15   one, you say that's okay.  And then you came back to that.

16   Well, in theory, there's the equal protection class-of-one.  We

17   could be in discrimination territory there, but it wouldn't

18   flunk direct regulation.

19           MR. FEIGENBAUM:  So I know you're going to feel this

20   is formal, but I do think it's important to just explain

21   something.  You're asking about buying.  And what Ms.

22   Neumeister and I would be in vigorous agreement about is that

23   even a neutral law about buying couldn't be applied to the

24   federal government --

25           JUDGE BIBAS:  Okay.

1          MR. FEIGENBAUM:  -- because the federal government is

2     the buyer.

3          JUDGE BIBAS:  The federal government contracts for

4     somebody else to make Sidewinder missiles.

5          MR. FEIGENBAUM:  Yes.  I'm not trying to hide here.  I

6     think if we are regulating the seller of the product neutrally,

7     intergovernmental immunity does not step in the way.  Not

8     trying to run away from that.  But let me just read from Penn

9     Dairies, which I think says the same thing and does some quick

10    work of some of the points the United States was making.  "The

11    trend in our decisions is not to extend governmental immunity

12    from state taxation and regulation beyond the national

13    government itself" -- and this is important -- "and

14    governmental functions performed by its officers and agents."

15    This is so important.  And I think that's really what's missing

16    in the colloquies.  It's not about what the function is.  It is

17    who's performing them.

18          JUDGE BIBAS:  Agency -- you don't think that these

19    count as agents within that?

20          MR. FEIGENBAUM:  No.  The United States has never made

21    that argument, and I don't think it would hold here.  I don't

22    know any case that does sort of common law of agency that gets

23    you there.  They haven't presented it here.  I think it would

24    be a kind of weird and separate question.  But no case goes

25    that way.  And I'll just note a couple examples that I think do

Page 96

1    some quick work here.  In Penn Dairies itself -- and this is a

2    majority opinion, not the North Dakota split -- "in this

3    burden, if Congress has not acted to forbid it, we can find no

4    different or greater impairment of federal authority than

5    in" -- and then it gives examples -- "a regulation on

6    transporting workers", which is obviously a government

7    function, transporting your own employees -- "or in building

8    regulations implied to a contractor engaged in constructing a

9    post office building."  That is an obvious government function.

10   That is a service you are providing.  State law can still apply

11   to that entity.  So let me maybe go to the 30,000-foot level

12   and talk about this.  Because I think this gets to one of the

13   biggest problems I'm having today, which is I just don't

14   understand what the lines being proposed are, or how they would

15   work in future cases.  So there have been four lines, as I see

16   it, that have been offered.

17          JUDGE KRAUSE:  But before you go there --

18          MR. FEIGENBAUM:  Of course.

19          JUDGE KRAUSE:  -- I'm not sure I clearly understand

20   your answer to Judge Bibas' question, or the similar question I

21   had asked earlier.  What is the difference between applying to

22   the federal government and naming the federal government, given

23   that you don't acknowledge indirect prohibitions on the federal

24   government's conduct as applying to the federal government?

25          MR. FEIGENBAUM:  Let me just use a made-up

Page 97

1   hypothetical that will show the different parts here.  No one

2   may make missiles.  We don't name the United States or anything

3   like that.  It doesn't name the U.S.  But Ms. Neumeister and I

4   fully agree -- and this was, I think, some of the confusion in

5   some of the earlier colloquies -- we can't apply that to the

6   United States because intergovernmental immunity blocks

7   applications of neutral laws to the United States, regardless

8   of whether it's named in them.  So we certainly couldn't say

9   the U.S. may not make missiles, but we also just couldn't say

10  no one may make missiles.  The question becomes, can we apply

11  that law to a private party?  And there I say, the answer is

12  yes.  And that's Pennsylvania Hearing Board.  If the federal

13  government wants to privatize and work with a private party,

14  Congress can free them of any state law disabilities to that

15  work.  Or they take the good with the bad, as long as it's a

16  neutral law.  And so that's where I think it's really helpful

17  to just think of a neutral law, because direct assumes

18  nondiscriminatory for all of these cases.

19        So that's why I wanted to be really clear.  You don't

20  have to name the federal government, but you have to have the

21  federal government, not as an affected party, but as the

22  subject of the law.  Maybe that's the easiest way to think

23  about it; directly applied the subject of the law, named or not

24  named.  And I think that's what North Dakota is getting at in

25  that case.  And that gets, I think, to the broader point I want

Page 98

1    to make about how the administrability challenges that we're

2    facing today.  I realize there aren't a lot of

3    intergovernmental immunity cases, so it's kind of an odd area.

4    But there's been four tests that I've heard at from the podium

5    or the bench today that I want to talk about.

6           One is, I'll know it when I see it, or, don't decide

7    it here.  Two is government functions.  Three is U.S. as the

8    only counter-party to this law.  And four is, it's a ban.  And

9    I think if I've left any out, please let me know if there are

10   other ones I should talk about at the end.  But those are the

11   four I see.  So I want to talk about first, don't decide, I

12   know it when I see it.  I don't think, don't decide, I know it

13   when I see it works for the reasons North Dakota gave in

14   footnote 8.  And more generally, I think it is unsatisfying, I

15   think it is a fraught enterprise, and I don't know what the

16   baseline standard would be to figure out that administrability

17   question.  Again, it's not just that there will be edge cases.

18   It's that I don't know what the test would be for figuring out

19   where the edge is if it's just about a level of burden that's

20   intolerable.  So I don't think, I don't decide, or, I know it

21   when I see it's going to work.

22          Second, on government functions, I just read from Penn

23   Dairies talking about transporting workers, post offices, and

24   about government functions performed by its agents and

25   officers.  So I don't think it's consistent with majority

Page 99

1   decisions from the United States Supreme Court.  I also don't

2   really think it's workable, because I don't know why

3   constructing a post office and having regulations apply to them

4   or not would or would not make a difference.  And again, if

5   you're doing government functions as a test, that's not the

6   same thing as ban.  So that would need to involve regulations,

7   that would need to involve taxation.  That's just a different

8   line that you're drawing along the way.  So I don't think

9   government functions works with the precedent or with

10  workability.  Then you get to what I know a number of

11  colloquies this morning have come up with on what about when

12  the United States is the only counter-party?

13          And Judge Bibas, I think Ms. Neumeister was right not

14  to give the answers you were looking for to those questions,

15  because those answers wouldn't work.  So there are two main

16  problems.  The first is how to define the market.  I think the

17  only truly fair way to define a market is to figure out

18  comparators, because whether we're only going after immigration

19  detention or whether we're going after all detention depends on

20  what we do.  This law talks about immigration detention, but

21  our submission is we'd already restricted and disallowed

22  private general criminal detention.  And if we're right about

23  that premise, then the market looks really different than if

24  I'm wrong about that premise.  And that gets to my broader

25  point.

1          The U.S. being the only counter-party or not is a

2    discrimination question.  It's not really a direct regulation

3    question.  Because as the colloquies with the United States

4    showed today, all of their arguments apply with equal force to

5    neutral state laws, and have to apply with equal force to

6    neutral state laws, because that's the whole point of having a

7    direct prong that's separate from a discrimination prong.  And

8    so a law that says no detention is allowed for direct

9    regulation -- no private detention is allowed for direct

10   regulation -- the U.S. would make all the same arguments and

11   has to make all the same arguments because it would be just as

12   direct on the United States when they want to hire an

13   immigration contractor as when they don't.

14          And then that leaves, it's a ban.  So don't decide

15   government functions.  U.S. is the only counter-party.  It's a

16   ban.  And I think Judge Krause, some of the colloquies you've

17   brought up today show that the, it's a ban, doesn't quite work

18   for two reasons.  One, you can call something a ban.  But as

19   you've noted, it's also just calling it curtailing discretion.

20   One option that DHS would use to detain immigrants is off the

21   table, that you can define it as particularly a ban.  But we

22   didn't ban immigration detention, so you could redefine it as

23   affecting the options available to the United States.  You also

24   noted it's very hard to draw the line between what's a ban and

25   what's just incredibly expensive.  The United States could

1    continue with immigration detention.  I am not disagreeing it

2    would be very expensive.  Buy the facility, lease the facility,

3    or they included record evidence on how long it would take to

4    build a new facility.  So I don't want to fight any of that.

5    But the point is, if everyone says costs are not enough but a

6    ban is enough, the problem with a ban is how expensive it is to

7    get around the ban for the United States.  So I think it again,

8    sort of collapses at the end of the day.  This ban isn't really

9    a coherent legal line.

10          The way to suss out bans that don't work is to make

11    sure that the states are willing to take their own medicine and

12    actually restrict it for everyone.  Our submission is we are

13    here.  There's a fight about whether we're discriminating or

14    not.  It was obviously assumed we're not in the district court.

15    But for direct regulation, we're assuming that we acted

16    neutrally and took our own medicine.  And so that's a way to

17    protect against this ban problem.  And I would say the inverse

18    point on anti-commandeering I think is a meaningful one here,

19    which is if the United States banned all private detention

20    neutrally, I don't think we would get to say that's

21    anti-commandeering.  Or if they passed a law that said, states,

22    you may not procure private detention, we would have a huge

23    problem.

24          And Judge Bibas, you might call that formal.  But that

25    is what our law develops in dealing with these problems, that

Page 102

1    sovereigns can't regulate each other.  This is our

2    Constitutional order.  They share jurisdiction over private

3    parties, and preemption reconciles the two.  So I don't think

4    ban holds on the Tenth Amendment side.  I don't know why it

5    would hold on the intergovernmental immunity side.

6            And that brings me to the final two points, with

7    thanks especially to Judge Krause for being so indulgent of my

8    time today.  First is to say, it's true that preemption is

9    becoming a higher bar.  That's come up from questions from all

10   of the panelists today.  And I will spot you that.  I think it

11   is.  And I think that matters to this case.  But the reason

12   it's becoming a higher bar is because the Supreme Court has put

13   a premium on the choices Congress is making.  Federal laws are

14   supreme, and so you need to make sure this was really Congress'

15   choice that the State is being an obstacle to.  But if we're

16   raising the bar on one side to what is Congress' choice, it

17   seems very weird to lower the bar on the other side to make

18   sure there's still space for executive preferences that weren't

19   Congress' explicit choice to trump state laws.

20           And so it just seems to me that it's not like a gas

21   where it has to move from one to the other.  The point of what

22   happened in preemption is directly applicable to the arguments

23   today in intergovernmental immunity, and to the who decides

24   question.  Congress can deal with all of these line-drawing

25   problems through policy and practical determinations that don't

1   require legal tests to resolve all of them for all times.

2   That's not how Congress has to decide.  But this Court would be

3   in a terrible position.

4          And I close where the United States did, which is the

5   United States does get to work with private parties in some

6   instances.  But when it does, it takes the good with the bad.

7   And the good are the benefits of privatization.  But the costs

8   are very much that they're hiring private parties in our states

9   who are subject to our laws.  And if those private parties are

10  going to get around our laws that are nondiscriminatory and

11  that are applied directly to the private party, what they need

12  to do is go to Congress and have that preempted, 1231(g).  And

13  their implementing regulations doesn't do it.  And we don't

14  just move that energy into immunity when they don't have it

15  from Congress.

16         JUDGE KRAUSE:  Thank you.

17         MR. FEIGENBAUM:  Thank you.

18         JUDGE KRAUSE:  We thank all parties for excellent

19  argument today.  In this complex, very interesting case, it's a

20  pleasure to have everyone so prepared and very helpful to the

21  Court.  So we've requested a transcript.  And the cost can be

22  split between the parties.  And we will be adjourned for today.

23  Thank you.

24         (Whereupon these proceedings were concluded at 10:42 AM)

25

1

2                    C E R T I F I C A T I O N

3

4    I, Kristin Gambel, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

     /s/ Kristin Gambel

9    _____

10   Kristin Gambel

11

12   eScribers

13   7227 North 16th Street, Suite #207

14   Phoenix, AZ 85020

15

16   Date:  May 7, 2025

17

18

19

20

21

22

23

24

25

**[1 - actual]**                                                                 Page 1

**1**

**1** 1:13 6:14
28:9 46:2,3
55:22 79:19,19
**10:42** 103:24
**11** 12:1
**110** 29:8
**1231** 3:13 14:4
18:24 20:5,24
22:2,14 33:3
35:9,19 46:2,3
51:20 53:3,4
55:22 58:6,8
79:16,19,19
87:14 91:8
92:6 103:12
**16th** 2:4 104:13
**17** 10:9
**1943** 44:13
64:8
**1970's** 36:23
**1978** 36:24
41:18
**1980's** 36:22
**1986** 33:15
49:16 77:8
**1990** 77:11,13

**2**

**2** 6:15 28:9
46:3,5 47:13
55:23 58:8
80:11 81:8
83:3

**2024** 51:14
**2025** 1:13
51:15 104:16
**205** 84:6
**207** 2:4 104:13
**23-2598** 1:7 3:5
**235.3** 87:16
**257-0885** 2:6

**3**

**3** 84:6
**30,000** 96:11
**31st** 51:14
**32** 55:22

**4**

**4** 10:9
**4/4** 4:9 38:1
43:17

**5**

**50's** 39:4
**5201** 28:2
**5207** 3:12 9:7
26:10 28:23,24
45:5,8,21 51:8
57:18,25 59:9
63:13 64:5

**6**

**6** 84:6
**60's** 56:4

**7**

**7** 104:16
**70's** 39:25

**7227** 2:4
104:13

**8**

**8** 8:10 25:15
37:24 38:11
39:2 65:17
68:4 69:7
98:14
**800** 2:6
**85020** 2:5
104:14

**9**

**91.10** 17:23
**91.9** 17:23

**a**

**ab** 3:12 26:10
28:2,23,24
45:5,8 51:8
57:18,25 63:13
64:5
**abide** 82:25
**ability** 19:14
53:11 54:7
80:15 91:18
**able** 8:21 23:2
34:6 83:24
88:9,12,13
**above** 1:15
**abridges** 19:21
**absent** 17:20
**absolute** 54:6

**absolutely**
26:13,16 33:1
54:12 57:3
**abstract** 67:22
70:1
**accept** 19:18,19
25:9 52:24
91:5
**accepted** 19:17
**accepting**
24:20
**access** 31:8
**accomplish**
83:21
**account** 32:1,3
**accountability**
29:3
**accounts** 5:17
**accurate** 104:5
**accuse** 43:19
**acknowledge**
96:23
**acknowledges**
44:11
**aclu** 33:20
**acted** 96:3
101:15
**acting** 62:11
**actions** 16:17
**actor** 79:5
**acts** 63:21
78:13
**actual** 20:3
32:11 45:8

69:3 88:16
**actually** 4:22
7:16 12:9 17:4
27:16,24 32:23
36:17 38:21,22
40:13 42:21
60:7,7,10,22
62:9,11,23,24
67:15 68:1
71:18 72:6
74:9,22 78:19
82:24 90:19
101:12
**ad** 45:21
**adapted** 80:7
80:20 88:12
**addition** 76:9
**additional**
66:13 75:25
87:9 90:6
91:19
**addressed** 86:6
**adequate** 81:20
**adjourned**
103:22
**adjudicate**
74:10
**administrabil...**
98:1,16
**administrable**
25:15 74:2
**administration**
45:18

**adopt** 34:1
62:20
**adopted** 10:20
49:3
**advance** 15:11
69:25 73:23
74:21
**adversarial**
50:24
**affect** 19:14
32:24 59:6
71:17
**affected** 32:18
97:21
**affecting**
100:23
**affidavits** 45:11
45:20 54:20
**agencies** 11:15
64:24 65:1
**agency** 11:10
11:11 42:22
68:9 79:24
80:3,8 82:1,22
82:25 83:24,25
88:12,14,25
95:18,22
**agency's** 80:10
**agents** 68:7
95:14,19 98:24
**agree** 18:17
26:6,6 30:16
30:17 38:14
44:4 53:2,6

62:19 65:25
69:20 72:25
97:4
**agreed** 89:8
**agreement** 9:16
94:22
**agreements**
9:12,14
**agrees** 89:13
93:16
**ain't** 47:16
**airport** 10:8
54:17
**airports** 54:17
**aisle** 54:24
**albeit** 91:22
**alcohol** 4:25
27:25 28:14
37:7 41:9,9
43:18
**aliens** 79:21
**alike** 20:19
**allow** 7:4 25:18
25:19 29:6,8
33:3 47:10
50:1
**allowed** 16:22
34:22 45:9,21
47:23 58:19
70:10 94:2
100:8,9
**allowing** 17:24
18:2,3

**allows** 7:18
**altoona** 10:10
**ambiguous**
85:14
**ambro** 1:18 6:8
6:11 9:5,18,21
10:4 11:12
13:4,10 25:9
29:10 30:3,11
32:23 33:13
34:16,25 35:18
36:2 39:2,25
40:2,5,24
41:17 44:17,19
44:22 46:2,10
46:14,18,22
47:4,13,18
48:1,6,11,19
49:6 55:18,22
56:3 57:10
58:5,25 59:16
59:21,23 60:24
61:5 63:14
64:6 65:16,21
65:23 68:3,6
69:7,10,15
73:13 77:7,11
77:13 78:4
79:4 80:11
81:4,15 82:4
83:3 84:13,23
85:12 90:2
91:2,3,10,11

**amendment**
23:17,18 40:13
43:19 102:4
**amorphous**
69:18
**analogizing**
87:15
**analogous**
28:21
**analyses** 69:22
**analysis** 6:16
6:24 7:2,24
8:17 16:19
17:14 18:24
22:10 24:21
25:17 28:8
42:5,23 43:10
53:9 57:9 59:7
73:2 76:21
77:21
**analyze** 29:24
**analyzed** 53:14
**analyzing**
29:16
**answer** 6:5,5,6
6:13 14:9
15:18 23:14
40:12 47:15
58:24 59:19
67:21 83:11
92:23 93:13,18
96:20 97:11
**answers** 37:12
69:25 99:14,15

**anti** 23:18,18
31:7,14 34:2
101:18,21
**anymore** 11:3
**anyone's** 43:19
**anyway** 31:18
**apologies** 34:9
**appeals** 1:2
**appearances**
1:19
**appearing** 4:13
**appears** 59:1
**appellants** 1:11
**appellate** 17:17
17:18
**appellee** 1:7,20
**applicable** 62:8
74:15 102:22
**application**
3:21
**applications**
97:7
**applied** 71:14
94:23 97:23
103:11
**applies** 26:11
64:22
**apply** 11:22
26:17,22 61:9
66:25 71:14
93:15 96:10
97:5,10 99:3
100:4,5

**applying** 61:17
77:23 96:21,24
**appreciate**
21:13 22:15
24:9
**approach**
69:16
**appropriate**
14:17,18 21:1
21:25 22:2,3
22:10 24:17
32:3 33:22
46:4 58:8
78:17 79:21,23
79:25 80:9
81:19 82:11,13
83:16 88:15,18
88:20,21,22
**appropriations**
20:7 78:13
81:18 84:2
**area** 30:16
48:15 53:21
54:12 62:22
98:3
**arguably** 7:11
21:3
**argue** 40:6
51:23 55:11
**arguing** 50:6
52:9,11 59:5
**argument** 1:15
7:7 8:25 24:2
26:8 33:7

51:24 58:25
87:7 89:25
95:21 103:19
**arguments**
100:4,10,11
102:22
**arizona** 19:3,7
87:12
**arrange** 46:4
46:10 58:7,7
79:21
**arrangements**
13:5
**articulate** 55:8
**aside** 55:14
75:8
**asked** 70:5
96:21
**asking** 18:17
26:12 31:20
37:15 52:11
72:21 73:7,8
87:13 92:16
94:21
**aspects** 45:25
**assess** 8:13
38:6
**assumed**
101:14
**assumes** 97:17
**assuming**
101:15
**atomic** 56:5

**attendance** 3:3
**attorney** 1:9,22
  3:4 79:20
**attorneys** 45:18
**authority** 32:20
  38:21,24 71:19
  79:24 82:17
  96:4
**authorization**
  17:20,21 24:7
**authorizations**
  50:4
**authorize** 49:7
**authorizes**
  48:24
**automatically**
  21:22
**availability**
  46:7,11 47:14
  80:14 81:9
  83:5
**available** 14:6
  14:6 20:10,12
  20:16,17 22:5
  22:6,7,13
  35:10,11,21
  58:9 80:6,8,12
  80:15,17,18,24
  82:3 91:12
  92:8,9,10,12,13
  92:14 100:23
**award** 50:13
  52:14

**awarded** 50:22
**aware** 75:14
**az** 2:5 104:14

**b**

**b** 84:6
**back** 6:9 9:5
  14:9 21:9,13
  26:25 28:2,17
  28:23 29:10
  33:13 35:1,4
  36:6 37:13
  39:4 41:4,16
  43:9 55:19
  56:4 58:25
  61:5,7 62:10
  64:8 65:21,24
  67:18 68:4
  73:13 84:13
  91:10 94:15
**backdrop** 5:4,6
  18:3 21:7
  37:19
**backed** 32:24
**background**
  61:19
**bad** 37:1,2
  41:18,19 97:15
  103:6
**ban** 14:20 15:4
  31:5 41:5,12
  53:19 58:3
  75:8,9,11,15
  93:25 94:6,7

98:8 99:6
100:14,16,17
100:18,21,22
100:24 101:6,6
101:7,8,17
102:4
**banc** 58:1
**bank** 44:9
**banned** 101:19
**banning** 72:9,9
  72:9
**bans** 101:10
**bar** 37:20
  38:14,15,20
  42:1,21 91:6
  92:3 102:9,12
  102:16,17
**barring** 18:11
**base** 37:6,8,10
  41:7,8
**based** 31:5
  35:15 69:22
  74:10
**baseline** 91:24
  98:16
**basic** 7:24
  30:22 87:17
  91:22
**basically** 10:4
  27:24 36:24
  56:18 69:15
**basis** 32:13
  37:17 64:9
  74:5

**bear** 72:13
**bears** 22:22
**becoming**
  38:13 102:9,12
**beginning**
  55:18 77:21
  79:2,18
**behalf** 1:20,22
  1:24 45:2
  55:11 57:17
**behavior** 72:19
**believe** 33:22
  46:1 69:8 70:5
  77:9
**bench** 98:5
**benefits** 54:16
  103:7
**bergen** 9:18,23
  47:2 48:7,8
**best** 17:11 62:5
  82:7 83:17
**better** 4:3,6
  63:21 82:24
**beyond** 7:22
  56:16 57:3,3,8
  63:7 77:2
  78:24 95:12
**bibas** 1:18 3:23
  4:1 5:17 9:5
  10:6 11:1,24
  13:6,11 14:19
  15:1,3,6,20
  16:2,6,14,16,20
  16:25 18:4,8

18:17 19:2,12
22:22 24:1
26:1 37:13
45:7,15 49:7
49:10,13,18,22
50:12,17 51:2
51:7,12 52:21
53:1,3,22
60:13 61:13
62:13,17 71:20
72:13 73:1
75:7 81:8
90:11 91:11
92:16 93:5,7
93:18,24 94:8
94:11,25 95:3
95:18 96:20
99:13 101:24
**bid** 50:21
**bidding** 50:16
**bids** 50:20
**big** 30:23,25
36:21
**biggest** 96:13
**bill** 5:19,23,24
**billed** 41:1
**bills** 14:22
**bind** 3:24
**bit** 18:22 19:24
28:17 30:8
85:5
**block** 38:22
**blocks** 30:25
97:6

**board** 36:24
70:19 97:12
**bop** 13:3 42:14
**borders** 14:17
24:22 42:13
94:6
**born** 44:19
**bothered** 26:23
**bound** 62:3
73:3
**boundaries**
94:4
**boyd** 56:4
**bracket** 58:16
**bradley** 1:21
45:2
**brennan** 38:1,3
59:5 69:10
**brennan's**
69:16
**brief** 38:14
45:12
**briefed** 29:25
**briefing** 4:21
17:16
**briefs** 84:6
**bring** 19:10
37:17 45:16
**bringing** 29:17
**brings** 102:6
**broad** 28:15
61:3
**broader** 41:16
97:25 99:24

**brooding** 38:18
**brought** 17:16
51:18 100:17
**bucket** 5:12
21:23,23 22:11
**build** 13:10,11
14:6 20:16
34:6 36:9,10
39:10,16 46:10
46:11 47:19
58:12 82:6
83:6 91:15
94:3 101:4
**building** 16:6
16:21 56:5
58:9 96:7,9
**builds** 33:11
**burden** 8:2,14
12:3 31:22,23
37:4 55:6
69:16,16 96:3
98:19
**burdening** 39:8
**burdens** 8:12
8:18,20,22 9:3
10:24 11:19
12:18 14:1,15
19:6,10 24:17
24:18 25:17,19
30:14 31:13
35:6 38:4,5
41:24 43:25
59:6

**burdensome**
31:7,18 36:16
39:3,20 41:10
41:12 47:25
**burma** 21:6
**business** 42:4,7
53:11 54:8
61:10
**buy** 13:1,11
20:22 22:6
26:1,14 27:13
34:6 36:10
37:7 39:15,18
42:14 72:16
91:12,13,14
94:14 101:2
**buyer** 4:15 5:1
27:7 95:2
**buying** 20:12
94:21,23

## c

**c** 3:1 104:2,2
**call** 17:23
20:25 28:9
55:5 79:12
85:1 90:23
100:18 101:24
**called** 33:15
68:23
**calling** 67:11
100:19
**calls** 14:15
40:18

**campus** 33:17
  33:23
**campuses**
  33:25
**canvasing** 44:4
**capacity** 14:15
  67:2
**care** 19:9,10
**careful** 53:4
**cares** 23:19
**carries** 86:25
**carry** 75:23
  77:4 78:22
  84:19 89:17
**carrying** 68:19
  71:9 76:6
**carved** 28:16
**case** 1:7 3:3
  8:19 12:5,9,10
  12:15 13:25
  15:15 17:8,15
  18:9,12 20:19
  21:5 27:6,8
  32:18 33:15,16
  35:8 36:22,23
  36:24 40:21
  43:7 44:2 47:1
  47:9 53:16,16
  53:19 56:3,12
  56:17 60:12,14
  60:24 61:1
  62:17,18 63:5
  63:23 64:21
  66:4,11,19

67:22 70:19
71:15,24 73:8
74:5,5 75:8,14
75:16 76:3,23
77:15 78:5
81:7 83:2
84:18,21 85:6
86:3,6,10
89:10,21 90:20
95:22,24 97:25
102:11 103:19
**cases** 7:9,13
  10:22 14:11
  16:10 18:10,15
  19:3,9 21:1
  23:12 24:10
  25:20,21 31:25
  37:21 38:14
  39:23 43:14,22
  44:7 55:3
  56:14,16 59:12
  59:24 60:2,6
  60:15,18 62:14
  62:22 63:18
  66:20,23 67:6
  67:7,24,25
  68:13 73:7,21
  75:11,14,17,17
  75:19 76:20,21
  77:16 84:21
  87:8,11,15,19
  89:1,22,23
  90:22 93:23
  96:15 97:18

98:3,17
**catastrophic**
  54:12
**categorical**
  70:3
**categorically**
  66:10,15,16
  77:1
**categories** 62:4
**category** 24:23
  60:21 66:5
  67:10
**causes** 59:5
**center** 11:23
  13:1,2 39:18
  45:9 46:19
  49:16 91:15
**centers** 9:9
**certain** 8:2 37:7
  75:20 80:4,5
  82:21
**certainly** 33:3
  34:21 76:25
  88:7 97:8
**certify** 104:4
**cetera** 13:16
  26:3 28:18
  44:10 46:8
  75:9 93:9 94:1
**cfr** 87:16
**cfrs** 49:3
**challenge** 31:11
**challenges** 98:1

**change** 43:7,19
  44:5,18 62:22
  89:18
**changed** 63:2
**characterizes**
  53:23
**choice** 8:6,6,21
  8:21,25 14:2
  24:16 32:15
  33:6 35:7
  36:19 102:15
  102:16,19
**choices** 8:10
  10:19 21:8
  33:9,10 102:13
**choose** 21:15
  33:8 36:25
  79:14
**chooses** 5:19
  32:13 52:23
  71:8 89:16
**choosing** 70:20
**chose** 21:22
**chosen** 32:22
  69:5 77:4
**circle** 73:13
**circuit** 1:3,18
  18:14,18,20,21
  29:19 30:9
  36:22,23 38:19
  53:14,15 58:1
  75:9 86:6,10
**circuit's** 5:18

**circumstance**
70:3 88:23
**circumstances**
63:7 66:1
69:23 70:2
73:17 74:9
**citation** 77:18
**cite** 43:22
**cited** 38:14
67:7 75:7,18
76:2 84:5
**city** 33:15,25
55:3 60:14
68:25 73:7
76:19 77:7
78:7
**claim** 26:16
**claims** 64:21
**class** 17:7,9,10
94:16
**classic** 9:4
23:23 30:16
35:6 83:2
**clause** 3:11
12:21 23:17
24:15 29:20
30:23 31:11,12
37:22 38:16,25
40:15 45:6
58:1 75:6 77:5
78:2,25 84:22
**clauses** 74:14
**clean** 83:9

**clear** 7:15
10:15 17:22
18:1 20:2
34:15 42:2
43:9,24 46:1
53:12 59:18
60:12 64:5
67:23 69:4
70:3 84:21
88:23 92:4
97:19
**clearly** 12:10
37:18 53:9
58:17 65:4
68:13 76:22
77:19 79:17
83:19 85:10,22
89:1 96:19
**clever** 24:4
**cleverly** 19:15
**close** 13:13
54:17 103:4
**closed** 13:8
**closest** 7:3 10:6
**coherent** 101:9
**collapse** 85:24
**collapses** 7:7
101:8
**colleague** 54:23
55:10
**colleagues** 18:6
25:11 90:1
**college** 33:25

**colloquies**
12:23 14:3
41:17 79:7
93:17 95:16
97:5 99:11
100:3,16
**colloquy** 22:22
91:9
**column** 21:2,3
**come** 6:9 28:6
30:18 40:22
41:13 55:19
58:25 62:1
65:21,24 68:4
73:13 76:7
78:19 82:23
88:20 99:11
102:9
**comes** 24:10,11
24:12 28:7
51:3 92:9
**coming** 19:1
41:11 51:7
84:13 89:9
**commandeeri...**
23:18,18 31:7
31:14 101:18
101:21
**commerce** 31:5
31:11,12
**commission**
33:19 56:5
60:14 75:17
76:17 87:25

89:24
**commodity**
4:15 7:10
27:13
**common** 95:22
**community**
17:24
**companies**
17:20 21:19
35:25 48:17
**company** 13:24
27:22 35:10
41:7
**comparator**
6:16,24 7:2,9
7:12,13,16,18
7:19 8:17
16:18 17:1,11
17:14 28:7
**comparators**
6:25 25:17
99:18
**compete** 79:10
**competing** 9:3
14:1,15 30:14
35:6
**competitive**
50:16,20
**complete** 45:20
**completely** 6:1
53:20 83:1,23
**complex**
103:19

| | | | |
|---|---|---|---|
| **comprehensive** | **confusion** 97:4 | 103:12,15 | 14:8 22:21,23 |
| 19:4 90:23 | **congress** 3:11 | **congressional** | 23:16 24:14 |
| **concept** 68:9 | 3:12 8:18,19 | 33:11 64:12 | 25:19,25 30:20 |
| **concern** 5:22 | 8:24 10:19,24 | 82:17 87:9 | 45:6 62:25 |
| 37:25 | 12:22 13:21,23 | **conjunction** | 64:10 |
| **concerned** | 13:25 14:2,9 | 45:12 | **constitutional** |
| 28:25 29:4 | 14:10,14 20:4 | **consenting** | 32:14 102:2 |
| **concerns** 36:1 | 20:20 21:15,22 | 71:10 | **constitutional...** |
| 54:23 74:7 | 23:8,10 24:5,5 | **consequences** | 5:15 |
| **concluded** 56:7 | 24:17,24 25:18 | 32:1 | **constraint** 21:4 |
| 86:7 103:24 | 30:17,18,19,24 | **conserve** 80:4 | **construct** 20:11 |
| **concluding** | 31:24 34:19 | **consider** 33:21 | 20:13,21 22:7 |
| 58:2 | 35:4,5,7,8,24 | 33:22 46:7,11 | 47:24 81:2,5 |
| **conclusion** | 35:24 36:19 | 47:14 54:4 | 84:9 92:11 |
| 30:19 | 37:3,19 38:7 | 56:1 58:8 | **constructing** |
| **concrete** 68:2 | 38:10,18,20,22 | 73:17 77:20 | 96:8 99:3 |
| **conditions** 5:23 | 38:24,24 40:10 | 82:5,21 83:4 | **construction** |
| 26:5 87:9 | 40:14,16 42:1 | 83:12,17 85:18 | 35:23 39:8 |
| **conduct** 53:11 | 43:7,25 46:3 | 91:11 | 46:6 77:25 |
| 54:8 75:21 | 48:20 49:23 | **consideration** | 81:16 |
| 96:24 | 55:2,4,7 58:13 | 56:13 66:21 | **construe** 77:15 |
| **confer** 79:5 | 58:17 64:11 | **considerations** | **construed** 19:7 |
| **conferring** 79:8 | 69:13 70:7 | 66:2 83:8 | 76:20 |
| 79:23 | 74:2 79:17 | **considered** | **contemplates** |
| **confinement** | 80:3,16,25 | 21:6 47:18,20 | 35:20 82:2 |
| 12:14 | 81:25 82:18,19 | 67:5 82:6 83:7 | 83:22 |
| **confiscatory** | 83:1,14,18,19 | **considering** | **contend** 3:15 |
| 26:3 | 83:20,24,25 | 72:24 81:9 | **contested** 62:21 |
| **conflict** 74:9,10 | 84:2,6,10 | **consistent** | **context** 5:9 |
| 76:15 78:1 | 88:10,10,11,17 | 62:23 67:6 | 29:4 39:4 |
| 87:13,20 88:24 | 88:24 96:3 | 73:6 81:18 | 40:14 68:2 |
| **conflicts** 23:10 | 97:14 102:13 | 98:25 | 80:16 |
| 74:21 | 102:14,16,19 | **constitution** | **continue** 49:14 |
| | 102:24 103:2 | 3:16 9:1 11:16 | 82:13 86:19 |

101:1
**contract** 5:25
9:10,24 15:7
19:15 22:19
26:15 27:14
29:14 42:14
47:12 48:25
50:7,9,14,20,22
51:2,3,7,9,14
52:1,2,10,24
64:25 71:17
78:11,12 80:21
80:23 82:16
84:1,3 85:3
86:17,20 88:13
89:6,8 93:19
**contracting**
12:11 18:11
22:12 41:19,20
46:17 47:10
50:2,3 84:14
**contractor** 8:22
12:16 14:21,24
16:8 18:15
61:9,18 63:12
63:21 65:11
66:7,12,17
67:2 69:5
70:21 74:17
77:24 82:23
84:15,19 87:17
88:2,3,4 89:2
89:10,17 90:7
90:9 91:25

92:22 96:8
100:13
**contractors**
3:19 7:1 8:1
15:14 36:25
56:7,8 58:3,20
60:4,8,25 61:4
65:14 66:25
67:9 68:6,15
70:24 71:3,6
71:11 74:14
75:23 77:25
79:9 93:25
94:1
**contracts** 4:16
7:23 22:20
25:5 49:2,4,10
49:13,17 50:11
50:15 54:5
57:18,24 74:13
79:11,11 81:20
95:3
**contractual**
50:10,22,25
63:12 66:7
67:12
**contrary** 25:14
**control** 58:19
60:19,22 86:25
**controlling**
63:1,11
**controls** 58:4
60:6 61:9 65:6

**cooperating**
74:16
**core** 17:19 20:5
34:16,20
**corecivic** 1:6
3:4,14 7:4,20
9:11,22 10:1,5
12:15 13:24
19:15 26:4,21
29:1 39:19
45:3 48:17
49:15 51:18
53:5 73:4 79:5
**corecivic's** 25:4
51:16
**corporation**
60:15 69:1
**corpus** 27:3
**correct** 9:16
10:1 47:3,17
49:14 52:25
69:8 73:5 77:9
**correctly** 26:9
90:21 93:13
**cost** 37:2 56:7
56:17,21,24
57:2,3,8 60:5
60:10,16 71:8
71:17 82:19
83:18 103:21
**costly** 58:12
**costs** 56:13,14
57:8 60:4,10
61:8,12 63:4,6

67:3 73:20
101:5 103:7
**counsel** 3:2
58:6 65:17
**count** 68:7
95:19
**counter** 37:9
98:8 99:12
100:1,15
**counties** 9:13
9:16,21 29:6
32:24 46:24
**county** 6:17
7:17 9:18,23
10:7 17:15
29:7,21,22
47:2 48:7,8
60:13
**couple** 12:6
95:25
**course** 55:23
75:24 96:18
**court** 1:2 3:2
3:10,19 5:10
8:15 17:18
18:19 20:2
23:13 24:24,25
26:9 29:18
30:3,5,7,9
31:25 32:4
33:18,19 34:10
37:20 38:16,21
39:17,23 40:11
41:17 43:7,8

45:2,4,4,5
52:15 53:8,14
56:4,7,14
57:17 58:17
59:2,13 60:20
62:15,20,23
63:22,24 64:9
64:22 65:6
66:3,4,10,18
67:6,17,24
68:25 69:24
73:6 74:20
75:24 76:3,19
77:22 78:7
85:17,21 86:3
86:11 88:9
91:7 92:4 99:1
101:14 102:12
103:2,21
**court's** 34:15
59:11 60:12
89:22
**courtroom** 3:3
**courts** 4:9
13:21 31:21
37:16,21 38:8
40:20 42:4,22
43:10 69:21
73:17,18 74:4
78:6 86:5 87:8
**covered** 12:11
12:12
**create** 23:5
44:10 51:22

80:2 86:10
**created** 11:10
11:15 23:1
45:8
**creates** 87:13
**creatively**
70:10
**credit** 5:23 18:3
24:9
**criminal** 5:7
7:3,6,19 18:3
27:7,20 29:11
29:14 36:7
99:22
**criminals** 34:17
**critical** 45:14
**crosby** 18:10
19:3,7 87:11
**cross** 55:9
64:15
**crossed** 40:7
**crosses** 54:25
55:6
**currency** 15:25
16:3,21
**currently** 32:13
**curtailing**
76:12 86:15
100:19
**custody** 29:1
**customs** 65:12
**cut** 46:23,24
61:5,7 62:10

**cutting** 28:23

**d**

**d** 1:21 3:1 29:3
**dairies** 4:4,10
10:21 14:12
23:6 24:12
43:23 44:1,13
55:3 60:14
64:9,19 65:3
65:13 95:9
96:1 98:23
**dakota** 3:20
4:23,24 5:10
8:10 10:21
11:6 14:12
23:6 24:12
25:15 27:1,24
28:13,13,15
37:5,6,25 41:4
43:3,12,14
53:17 55:3
59:1,12,25
60:2,7 62:10
62:21 63:18,25
64:7 65:18
70:11 77:11,13
96:2 97:24
98:13
**dakota's** 43:21
**darn** 36:9
**date** 74:1
104:16

**dawson** 6:23
**day** 6:18 28:12
32:12,12 41:15
72:5 101:8
**dead** 92:25
**deal** 6:8 9:2
30:23,25 35:6
46:23,24
102:24
**dealing** 21:6
33:14,16 68:15
70:18 101:25
**decade** 37:20
**decades** 49:21
50:10 84:2
**december**
51:14
**decide** 5:12
6:25 11:19
16:19 30:3
38:5 74:21
75:11 98:6,11
98:12,20
100:14 103:2
**decided** 12:19
81:4 83:7
91:23
**decides** 70:17
102:23
**deciding** 21:19
**decision** 5:18
25:4 45:4,4
55:4,14 75:18
76:19 79:22

| | | | |
|---|---|---|---|
| **decisions** 38:10 60:12 88:1 95:11 99:1 | **democratic** 29:3 | **detention** 5:4,8 6:3 7:4,5,17,18 | 91:15 99:19,19 99:20,22 100:8 |
| **declaration** 29:8 | **demonstrate** 76:17 | 7:19,21,21,23 9:7,10,15,22 | 100:9,22 101:1 101:19,22 |
| **deemed** 76:1 | **deny** 10:10 | 10:2 11:21 | **detentions** 48:7 |
| **defendants** 1:11 | **department** 45:13 46:15 | 13:1,2,2,22,24 14:16,18 17:12 | **determination** 75:21 77:15 |
| **defense** 16:8,21 93:25 | 47:7,12,21 49:20 50:21,23 | 17:13,13,18 18:3 20:6,7 | 78:18 88:19 |
| **define** 7:20 51:12 71:20,21 | 57:12 63:23 | 21:8,16,17,18 24:20,22 26:15 | **determinations** 70:7 102:25 |
| 72:8 99:16,17 100:21 | **depend** 15:9 **depending** 34:12 | 26:20 27:4,5,7 27:8,14,20,21 | **determine** 69:3 69:24 73:22 |
| **defined** 43:1 | **depends** 99:19 | 28:1,21 29:11 29:14 31:3,5,8 | 78:14 79:24 81:14 82:11 |
| **defining** 24:20 26:20 | **depth** 79:1 **design** 80:17,25 | 31:10,13 34:17 34:18,21 36:8 | **determined** 76:5,6,10 |
| **definitely** 16:24 17:9 18:19 | 82:17 84:11 **designed** 81:25 | 36:18,20 39:7 39:18 41:6 | 78:10 81:24 88:3,14 89:11 |
| 30:16,17 64:17 72:22,25 76:17 | **desired** 71:9 **despite** 29:2 | 42:12,14,16 45:9,19,23 | **determines** 83:16 88:18 |
| 87:22 | 81:6 | 46:5,6,25 48:18 49:16 | **detroit** 55:3 60:15 68:25 |
| **definition** 73:9 73:25 | **destroy** 11:8,10 23:2 | 50:7 53:20,23 54:21 56:25 | 73:7 |
| **definitive** 77:15 | **destroyed** 44:10 | 57:19 58:3 65:15 70:25 | **developed** 60:1 **develops** 101:25 |
| **deflecting** 92:17 | **detail** 87:18 **detailed** 87:12 | 71:22,23,25 72:1,9,9,10,17 | **dhs** 4:13 8:20 25:5 39:15 |
| **delegate** 17:19 **delegated** 81:25 | 90:23 **detain** 54:13 | 72:18 74:13 75:1,4 79:21 | 46:4,6 58:7 79:20 81:4 |
| **delineate** 66:22 **demanding** 31:20 | 100:20 **detained** 79:22 **detainees** 45:11 45:16 54:14,18 78:17 | 79:23 80:7 83:23 85:4 86:21 88:15 | 83:10 100:20 **difference** 5:16 19:2 32:16,17 36:14,21 68:10 |

69:10 96:21 99:4

**differences** 18:23

**different** 4:17 7:8 8:13 18:22 21:14 23:7 28:9,11 33:2 40:13 41:5 42:11,17 50:1 53:13 65:14 71:12 72:17,25 83:1,14,23 86:1 96:4 97:1 99:7,23

**differently** 28:6 89:3

**difficult** 11:23 66:2,21 67:14 68:17 69:21,22 69:24 73:16 74:19 82:8 84:20

**difficulty** 93:17

**direct** 3:17,19 3:21 4:8,17,19 4:22 5:12,13 10:23 12:11,17 14:23 15:23 22:25 26:7,10 26:11,13 30:22 36:4,15,16 42:10 43:3,25 55:13,17 59:2

59:8 62:18 63:15,20 64:1 64:15 70:15 73:2 74:24 75:2 84:23 85:1,3,5 86:17 89:4 92:19,25 93:21 94:18 97:17 100:2,7 100:8,9,12 101:15

**directing** 7:14
**direction** 31:19 65:12
**directive** 87:9
**directly** 9:1 23:20,24 26:18 36:6 37:25 39:9 40:25 42:10,11 53:10 55:17 67:11 70:10,12 74:25 93:15 97:23 102:22 103:11
**directness** 24:21 26:21
**director** 42:8
**disabilities** 21:19 91:1 97:14
**disability** 19:20
**disabling** 24:3 26:1

**disagree** 58:15
**disagreed** 30:6 30:7 77:16 78:8
**disagreeing** 101:1
**disagreement** 4:9
**disallow** 16:19 25:18,19 31:24 38:7
**disallowance** 28:20
**disallowed** 5:7 99:21
**disallows** 8:12 17:15
**discern** 88:9
**discretion** 20:25 21:4,8 21:21,22 22:19 52:20 76:12 79:24 82:1,10 82:20 83:10,15 86:15 87:4,7 87:10 100:19
**discriminating** 31:17 62:9 101:13
**discrimination** 3:18 4:20 5:13 7:6,24 8:16 10:24 16:25 17:1 18:7

23:14 25:16,24 26:25 27:2 28:7 30:6,22 34:2 42:17 43:1,1,4 59:3 62:17 70:11 72:22 94:9,17 100:2,7

**discriminatory** 4:8 16:18 17:6 26:13 38:7 41:25 42:8 43:25

**discussion** 14:3 64:21 77:19,22

**dispute** 21:20 21:21 68:15

**disputed** 61:2

**disqualifying** 7:12

**disregard** 86:11

**disrupt** 82:17

**dissent** 38:1,2,3

**distinct** 6:17

**distinguish** 65:17

**distinguishable** 18:12

**district** 3:19 26:8 30:3,5,7,9 39:17 45:4 101:14

dive 40:11
diverge 18:20
division 17:17
doc 29:5
doctrine 23:19
25:21 44:6
58:23 60:1
61:3 62:6 63:7
70:8 86:4
doctrines 76:17
77:18 78:3
85:18 86:1
doing 6:22 8:3
20:3 22:9 24:3
26:2 28:8,22
30:12 34:11
35:25 36:21
42:4,22 66:5
69:21 70:24
71:10 74:25
76:2 82:15,22
99:5
dollar 14:21
draft 48:21
drafting 70:10
drastic 56:18
draw 30:9
40:23 41:15
62:15,16
100:24
drawing 31:22
64:18 65:20,23
66:2,21 67:18
69:21 77:17

84:20 99:8
102:24
drawn 90:20
driver's 3:11
76:4
dugout 29:10
duty 20:15

**e**

e 3:1,1 104:2
earlier 22:21
41:17 63:5
79:8 91:10
93:17 96:21
97:5
easier 17:10
easiest 30:14
48:20 97:22
easily 16:17
easy 13:24
15:13 40:23
44:8 66:23
68:13 75:14
84:18
eat 7:25
economics
20:18 35:11
edc 45:13,15
49:16
edge 25:20,21
98:17,19
effect 4:17
27:11 33:21,23
34:16 36:5

39:5,8 47:23
49:24 54:12
57:7 59:2,4,8
59:13 60:9
61:10 63:9
64:4 65:8,16
66:13 69:3,4
70:9 72:24
73:8,19 85:7,7
85:8,14 92:2
effective 82:19
effects 34:12,14
86:13
effort 17:11
efforts 54:11
eighty 44:15,15
44:16,20
either 7:4 23:13
27:11 31:19
35:16 70:23
77:16 85:18
element 4:21
eligibility 78:12
eligible 76:7
77:1 78:11,20
78:22 81:24
88:4 89:12
elizabeth 13:1
13:2 39:18
42:14 45:9
49:16 91:14
employees
66:25 68:11,16
70:13 96:7

employer 67:2
empowers 47:7
en 58:1
enact 62:22
enclave 4:25
5:11 28:14,16
enclaves 5:2
energy 56:5
103:14
enforcement
45:14 48:16
51:22 54:10,21
57:4 65:12
engage 75:20
79:15
engaged 43:10
96:8
enormous 57:8
ensure 71:7
80:4
enter 49:2
51:15 54:5
57:20 79:11
80:22 86:19
89:8
entered 49:4
57:21 86:18
entering 4:16
enterprise
40:20 98:15
entirely 75:12
90:8
entities 5:20,22
9:11 29:1

34:24 68:19
75:20 78:20
**entitled** 1:15
**entity** 52:13
78:21 80:21
93:9 96:11
**equal** 17:7,9,10
94:16 100:4,5
**equals** 43:25
**equates** 87:19
**equation** 38:2
**era** 44:11,13
**error** 24:24
**errors** 30:8
**escribers** 2:3
104:12
**escribers.net**
2:7
**especially** 4:21
18:10 91:6
102:7
**esq** 1:21,23,25
**essence** 10:11
13:6
**essentially** 7:12
37:14 81:25
85:2,23 86:24
**essex** 9:13
17:15 29:7
**established**
30:16 86:2
**et** 13:16 26:3
28:17 44:10
46:8 75:9 93:9

94:1
**evade** 61:22
**evaluating**
54:25
**evidence** 41:6,8
101:3
**evident** 5:25
6:2
**evolved** 44:7
**exact** 35:13
36:13
**exactly** 3:25
34:3 47:9
63:10 68:22
78:23 87:2,2
**exalt** 61:16
**example** 21:6
29:19 31:3
43:23
**examples** 15:16
15:16 69:18
95:25 96:5
**excellent**
103:18
**except** 16:20
28:21
**exception** 28:3
28:17
**exceptions**
28:22
**exclusive** 32:4
54:9 57:5
61:21

**executive** 10:18
13:21 14:4
31:23 32:13
33:5,9 102:18
**executive's**
13:22
**exempt** 26:17
**exemption**
26:11,21 28:10
28:15
**exemptions**
26:14 28:23
**exercise** 28:8
31:19
**exercises** 60:23
**exist** 23:13 84:7
91:6
**existing** 28:16
28:20 46:8
47:15
**exists** 30:17
70:12
**expect** 43:7,8
**expected** 83:24
**expects** 80:3
**expend** 81:12
**expended**
81:19
**expends** 81:2
**expensive**
81:13 100:25
101:2,6
**experience**
39:22

**expertise** 24:17
**expiring** 25:6
**explain** 32:7
63:25 87:8
94:20
**explained** 3:20
11:7
**explaining**
43:16 60:2
**explains** 6:23
8:13 27:18
64:22,24 69:9
**explicit** 102:19
**express** 35:17
**expresses** 43:3
**expressio** 18:1
**expressly** 49:4
55:12 68:23
**extend** 95:11
**extending** 5:8
**extends** 11:24
**extent** 87:14
**extra** 38:21
**extreme** 75:4
**extremely** 4:18

**f**

**f** 104:2
**face** 57:18 64:5
66:8
**facilities** 7:17
9:7,10,15
13:16 20:12
22:5,6,7 27:13

27:14 32:15,21
33:3 34:17
35:3,20 45:17
45:23 46:16,25
47:22,24 48:11
48:16 50:7
54:5 57:19
58:21 65:15
69:6 74:17
79:12 80:6,7,8
80:9 81:1,3,5
81:14,20,22
82:2,23 83:21
83:22 84:1,3,5
84:7,10 88:13
88:13,17,21
91:12,13
**facility** 9:23
10:2 13:8,12
14:7 29:12,14
36:8 39:5,10
39:15,15 42:15
45:10 46:6
47:14,15,19
48:1,2,3,5,8
51:6 53:25
57:1 77:1
78:14,16 79:13
80:20,22 82:7
82:13,14 83:6
86:22 88:21
89:6,7,14,15
101:2,2,4

**facing** 98:2
**fact** 21:22
31:13 38:2
48:25 55:15
67:21 69:22
73:22 74:4
75:4 81:6,23
89:11
**factor** 56:15
**factory** 94:3
**facts** 36:11
39:21 67:25
74:10
**factual** 39:12
39:14 48:1
68:2 69:25
**fair** 18:22
25:12 33:18
99:17
**fall** 32:21 66:21
**falling** 59:15
60:8
**falls** 33:5 66:4
68:14 73:3
77:20
**families** 45:17
**famous** 11:8
**far** 40:19 56:16
87:12
**favor** 39:1
58:10
**federal** 4:11,12
4:25 5:11 6:25
7:5,11 8:1,2,6

8:11 9:14
10:11 11:9,10
11:11,14,15,18
12:2,3,4,16,21
13:18,20 14:17
15:14 16:21
19:1,14,16,19
20:9,24 21:4
21:15,16,17,20
22:5 23:1,2,3,3
23:4,11,22
24:3 25:5
27:12,20 28:1
28:14,15,22,23
29:12 31:20,20
31:23 32:4
33:5 34:5
36:24 37:16,21
38:8,17,18
40:19 41:23
42:4,5,21,22
43:11 45:11
46:25 48:2,5
48:18,24 51:9
52:22,23 53:5
53:18,24 54:1
54:7,8 55:12
56:1,10,19,25
57:6,19,23,24
58:4,19,19
59:2,14 60:4,5
60:8,20,22,25
61:8,11,17
62:7,12 63:1,4

63:8,10,11
64:1,1,4,14,23
65:4,9,10,11,14
66:6,8,9,12,17
66:25 67:1,4,5
67:9,12,13,15
67:16 68:11,11
68:12,14,16,16
68:19,20 69:17
70:13,13,14,17
70:18,22,25
71:3,9,15,18,24
72:6,7,19 74:8
74:16 75:21,22
75:23 76:1,5,6
76:9 77:2,24
78:1,10,20
79:9 84:15,16
84:20 85:2,3,8
85:9,19 86:8,9
86:13,18,21,25
86:25 88:2,2
89:11,12,17,17
89:19 90:6,10
91:17,23 92:4
92:7,24 93:8
93:25 94:7,12
94:13,24 95:1
95:3 96:4,22
96:22,23,24
97:12,20,21
102:13
**federalism**
24:19 41:21

74:7
**feds** 15:7
**feel** 40:21 62:3
93:14 94:19
**feels** 41:5 42:17
**feigenbaum**
1:23 3:6,7,7,10
4:2,18 6:4,10
6:12 7:15 8:8
9:17,19,25
10:14 11:4,13
12:6 13:18
14:25 15:2,4,9
15:23 16:3,10
16:15,24 17:3
18:7,13,19
19:23 21:11
24:9 25:12
26:6 27:15
29:25 30:5,13
32:6 33:1 34:8
34:19 35:2
36:10 37:23
39:12 40:1,3,8
41:3 42:6,25
43:13 44:21,23
49:23 53:22
55:10 71:21
90:5,13,16,19
91:5 92:1,16
93:2,6,13,20
94:5,9,19 95:1
95:5,20 96:18
96:25 103:17

**fell** 60:21
**fettered** 87:3
**field** 55:24
**fifteen** 49:5
**fifty** 32:8 34:10
72:14,16 85:13
**fight** 33:1
35:14 101:4,13
**fighting** 34:22
**figure** 30:2
31:21 98:16
99:17
**figuring** 8:10
27:2 30:1
98:18
**final** 102:6
**financial** 33:9
**find** 4:8 7:3
14:8 16:17
20:6,22,22
22:2,3 38:12
38:17 43:21
78:13 79:19
91:7,9 96:3
**finding** 17:11
**fine** 5:18,20
32:8 34:10
86:24
**finish** 25:7 91:3
**first** 3:15 4:2
6:6 12:7 20:17
22:13,21 24:16
28:4 30:1
36:14 37:23

40:13 43:18
62:6,9 65:24
66:22 75:8
78:2 80:5
81:14 85:13
92:19 93:10
98:11 99:16
102:8
**fit** 5:12 26:24
31:24 64:11
86:5
**fits** 24:18 34:9
92:11
**five** 20:1
**fix** 24:25
**flag** 73:11
**flagged** 60:13
**flexibility**
13:15 71:7
80:5 83:18
**flexible** 82:19
**floating** 38:18
43:5
**florida** 75:18
**flunk** 17:1
92:25 93:10
94:18
**focus** 28:25
36:4 87:24
88:1
**focused** 88:16
**focusing** 45:25
**fold** 23:1 36:14

**follow** 34:4,4
38:4 71:13
**following** 74:15
**foot** 96:11
**footnote** 8:10
12:1 25:15
37:24 38:11
39:2 65:17
68:4 69:7,9,19
98:14
**forbid** 96:3
**forbidding**
53:23
**forbids** 3:21
**force** 30:23
33:20 92:13,14
100:4,5
**forced** 3:14
45:16 54:13
**forcing** 39:9
40:25
**foregoing**
104:4
**forgetting** 59:3
81:6
**form** 14:5,10
15:5 35:19
61:16 69:2
72:14 75:3
**formal** 6:5,8,10
6:12 22:17
94:20 101:24
**formalism**
23:15

formalisms  6:7
formalist  6:1
  27:10
formalistic
  93:10
formally  36:17
forms  3:16 13:4
forth  91:10
forward  82:15
found  10:25
  87:20
four  3:8 9:7
  13:7 24:15
  43:20 46:18
  47:5 77:16
  96:15 98:4,8
  98:11
frame  87:5
framed  86:16
  87:25 88:15
  89:3
framers  23:9
framework
  26:25 60:1
framing  42:7
  63:22 72:4
framings  72:2
fraught  31:19
  40:10 98:15
fray  45:22
  58:13
free  3:15 8:22
  11:16 22:11
  35:7,9 38:18

43:5 97:14
fresno  11:24,25
  12:8 60:13
friend  53:22
  71:21 74:23
  85:23
friends  13:14
  17:15
front  27:8,17
fulfillment
  82:18
full  3:2 73:13
fully  80:16
  83:11 97:4
function  7:11
  9:6 12:3 17:19
  32:5,23 34:16
  34:20 42:5
  61:16 66:17
  70:18 71:1
  84:16 95:16
  96:7,9
functional  6:5
  6:6,9 22:17
  73:2
functionally
  6:2 34:4 36:5
  40:6 61:16
  73:15
functions  43:11
  64:24 65:2,5,8
  65:10 71:6
  76:6 95:14
  98:7,22,24

99:5,9 100:15
fundamentally
  7:8 89:13
funds  81:2,19
funny  15:15
furnish  64:25
further  42:15
  44:22 53:19
  90:1
future  12:15
  96:15

**g**

g  3:1,13 14:4
  18:24 20:5,24
  22:2 33:3 46:2
  46:3,3,5 47:13
  51:20 55:22,23
  58:8 79:19,19
  80:11 81:8
  83:3 87:14
  91:8 92:6
  103:12
gambel  2:2
  104:4,8,10
garcia  19:6
  23:12
gas  102:20
general  1:9,22
  3:5 7:10 18:3
  50:3 72:8
  79:20 99:22
generality
  18:13

generalizing
  32:1
generally  12:8
  24:19 31:6
  33:24 62:8
  71:12 74:13,15
  98:14
genius  70:20
genuinely
  25:14
geo  29:19 48:17
  53:16 58:1
  75:8,18 86:6
getting  97:24
give  6:5 20:24
  27:18 29:18
  39:12 73:24
  92:21,23 93:19
  99:14
given  12:20
  21:8 22:13
  28:10,15 55:20
  96:22
gives  14:14
  22:25 46:15
  52:1 54:3
  55:25 56:1
  96:5
giving  83:15
go  9:5 10:8
  13:25 14:5,6,9
  20:10,12,21
  22:4,9 26:25
  29:9,10,15,16

29:18 30:12
35:9 38:23
39:13,23 41:19
44:5 47:19,23
47:24 49:23
54:24 57:12
58:9 64:8 81:9
85:21 91:15
92:8,10 96:11
96:17 103:12
**goals** 83:20
**goes** 7:22 16:16
29:21,23 53:19
56:16 57:3,3,8
70:21 73:14
77:2 78:24
80:2 91:9
95:24
**going** 5:24 7:25
8:1,14 9:1
10:25 11:22
12:15 13:14
16:18 19:9
29:15 30:19
32:11,12 38:4
41:8 42:25
43:6,19,20
50:17 52:7
56:15 58:12
73:21 75:10
78:21 80:3,21
80:22 81:5
82:6,15,24
87:23 88:22

94:19 98:21
99:18,19
103:10
**good** 8:25 11:3
14:13 15:16
37:1,1 38:25
40:4 41:18
57:16 65:4
97:15 103:6,7
**government**
4:11,13 8:3,7
8:11 10:11
12:2,4 13:19
13:20 17:19
19:17 20:25
21:5 22:19
23:22 24:3
27:12 28:22,24
29:12 31:23
34:6,17,20
36:5,7,25 39:9
40:25 41:2
42:22 48:12,24
51:9 52:22,23
53:5,24 54:1,8
54:9 55:13,15
56:1,9,11,25
57:20,23,24
58:7,20 59:3,6
60:5,25 61:8
61:17,24 62:12
63:2,5,11 65:1
65:4,9 66:6,12
67:4 68:7,14

68:20 69:17,17
70:17,20,23
71:1,3,6,8,15
71:24 75:22
76:1,5,9,13,15
77:4 78:10,15
78:20 79:9,12
80:6 84:15,16
85:4,10 86:8
86:13,18,21,25
88:2 89:11
90:6,10,11
91:23 92:24
93:9,11 94:7
94:12,13,24
95:1,3,13 96:6
96:9,22,22,24
97:13,20,21
98:7,22,24
99:5,9 100:15
**government's**
8:1 19:14,19
52:19 53:11
57:4 60:10
68:8 77:24
96:24
**governmental**
64:24 65:2,5,8
65:10,13 93:9
95:11,14
**governments**
9:12 74:8,16
74:17

**governor** 1:9
3:4
**grant** 87:10
**granted** 3:9
**grappled** 68:1
**great** 6:12
43:23 65:25
**greater** 96:4
**ground** 58:2
**group** 58:1
75:9,18 86:6
**guess** 22:16
40:8 47:1
48:19 58:25
79:4 83:3

**h**

**h** 51:21 53:3,4
55:23
**haley** 29:7
**half** 57:11
**halfway** 17:22
17:24 18:2
**hand** 39:9
**handles** 14:1
**happened**
78:23,23 82:12
102:22
**happening** 29:5
29:5,6 36:5
78:10 84:1
85:2
**happens** 32:2
45:24 82:5

**[happy - immigrants]**                                    Page 19

**happy** 6:12
58:23 79:1
**hard** 11:18
15:18 20:14
66:1 75:10
91:9 100:24
**harder** 17:8,8
**havoc** 45:8,18
45:24
**health** 25:3
26:2 28:3
**hear** 44:24
**heard** 98:4
**hearing** 3:3
36:24 37:12
70:19 97:12
**heart** 39:13
**heavily** 4:5
**heavy** 41:12,13
**help** 78:8
**helpful** 12:9
17:17 18:25
59:25 97:16
103:20
**herring** 85:6
**hey** 19:14
**hide** 95:5
**high** 12:16 42:1
42:3 88:1 91:6
92:18
**higher** 37:20,20
38:13,15,20
92:3 102:9,12

**hinterlands**
54:18
**hire** 12:4 25:5
100:12
**hired** 16:7
91:25
**hiring** 103:8
**historical** 11:2
**history** 44:4
**hold** 23:4 95:21
102:5
**holding** 26:10
**holds** 102:4
**holistic** 28:8
**holistically**
27:17
**homeland**
45:13 46:15
47:8,12,21
49:1,20 50:13
50:21,23
**honestly** 35:24
**honor** 11:4
12:7 25:12
45:1 56:23
58:15 59:10,18
61:2,6 62:6,19
64:18 65:19
67:20 68:10
71:2 72:3,20
73:5,12 74:3
75:13 77:10,12
77:14 78:7
79:3,6 80:13

81:11,17 82:9
83:14 84:17,25
85:1,15 86:17
86:23 87:6,23
90:22
**honor's** 59:19
**honors** 45:3
57:13,16
**hook** 48:21
**hoop** 76:8
**hour** 10:7 26:5
67:1 71:13
**hours** 10:9
**house** 17:23
78:17 79:25
**houses** 17:25
18:2 45:11
**housing** 32:5
80:9
**hudson** 9:13
**hug** 37:24 42:8
43:15
**huge** 32:17
36:14 101:22
**hundreds**
45:16 54:15
**hyper** 27:10
**hypos** 14:19
15:11 92:21
93:18
**hypothesizing**
31:4
**hypothetical**
27:18 29:11

31:9 97:1

**i**

**ice** 9:9,12,14
12:24 13:1
32:15,18,19,19
32:22 33:3
36:12 42:13
45:15 46:6
47:11 54:19
74:13,15,25
81:1,4 82:12
82:15,20 83:10
84:7,9,19
88:18,19,20
89:13,15,16
**ice's** 32:15 33:6
**idea** 7:24 11:25
21:21 34:22
35:14 41:10
**identical** 18:23
27:12
**identify** 10:22
**identifying**
42:7
**igi** 16:16 19:24
**illegal** 94:13
**illinois** 34:5
**imagine** 26:19
27:23,25 32:8
34:10
**immigrants**
48:7 100:20

| | | | |
|---|---|---|---|
| **immigration** | 58:21 59:8 | **implications** | **impossible** |
| 5:4 6:3 7:5,17 | 60:3,11,17 | 12:12,13,13 | 73:22 |
| 7:20,22 10:2 | 61:3,15,24 | 29:1 | **impractical** |
| 13:2,7 14:18 | 63:2 64:22 | **implicitly** | 47:25 |
| 17:5,12 26:24 | 66:15 70:23 | 91:18 | **ina** 19:13,13 |
| 27:4,6,13,21 | 73:11 75:5 | **implied** 35:15 | 31:1 47:9 |
| 28:1 32:14 | 76:11,20,23 | 35:17 90:24 | 48:25 51:4 |
| 34:18,21 36:8 | 77:19 78:3 | 96:8 | 52:1 54:3 |
| 36:17 39:6 | 85:11,16,22 | **implies** 19:5 | **inadequate** |
| 42:12 45:10,14 | 86:1,9 88:1,6 | **imply** 9:1 | 10:7 |
| 45:18 48:15,18 | 89:22 92:17 | **implying** 14:20 | **incidence** 14:23 |
| 53:23 54:9,21 | 93:4 95:7,11 | 22:18 25:24 | 73:3 |
| 57:4,19 58:3 | 97:6 98:3 | 64:9 | **incidental** |
| 65:12,15 70:25 | 102:5,23 | **import** 73:10 | 60:16 66:24 |
| 71:23,25 72:9 | 103:14 | 80:15 | 71:16 73:14,18 |
| 72:18 74:12 | **impact** 33:4,24 | **importance** 6:7 | 73:20 |
| 75:1,3 86:21 | 55:17 56:18 | **important** 4:19 | **incidentally** |
| 99:18,20 | 57:9 | 6:13 8:20 | 60:9 61:7 67:3 |
| 100:13,22 | **impairing** 51:9 | 11:13 21:11 | **included** 101:3 |
| 101:1 | **impairment** | 26:8 35:8 | **includes** 47:7 |
| **immunity** 3:15 | 96:4 | 37:21 42:18 | 74:13 |
| 3:17,21 6:20 | **impede** 82:18 | 64:18 65:2 | **including** 20:22 |
| 6:21 8:24 | **impeding** 84:12 | 71:20 72:4 | 22:5 53:16 |
| 10:13 11:17 | **impermissible** | 94:20 95:13,15 | 91:12 |
| 15:21 16:9 | 55:1 63:15 | **impose** 53:18 | **income** 66:24 |
| 21:3,10,13 | 64:16 67:17 | 56:15 64:11 | **inconsistent** |
| 22:15,24 24:24 | 73:14 75:6 | 72:14,16,17 | 64:12,14 |
| 25:1 29:21,23 | 76:24,25 86:7 | 75:25 87:8 | **incorporated** |
| 30:1,25 31:16 | **impermissibly** | 88:4 90:6 | 56:8 |
| 34:13 36:4 | 58:4 62:7 | **imposed** 60:4 | **incorrectly** |
| 37:4,15,17 | **implementing** | **imposes** 77:3 | 78:4 |
| 39:1 42:24 | 92:5 103:13 | **imposing** 66:13 | **increase** 60:16 |
| 44:6 53:10 | **implication** | 76:8,23 77:2 | 65:9 |
| 56:16 57:22 | 15:6 75:1 91:8 | | |

increased
  56:14 60:4
  63:6
increases  63:4
increasing  60:9
incredibly
  100:25
independent
  11:1 61:22
indirect  59:4
  96:23
indirectly  59:6
  63:4
indiscernible
  3:2 18:16
  23:25 52:6
individuals
  29:2 78:11
  80:1
indulge  19:25
indulgent
  102:7
inflexible  81:13
initiating  46:5
  81:15 82:5
  83:4
inquiries  73:22
  74:4
inquiry  85:20
  89:18
instance  67:1
  68:18 78:13
  79:13 89:2,23

instances  103:6
institutional
  38:9
institutionally
  14:14
instruction
  20:9
instrumentali...
  46:23 56:9
  68:12
instrumentality
  56:10 68:17
intend  88:10
intended  79:17
  80:16,25 83:2
  88:11,24
intent  82:18
interagency
  9:14
interesting
  103:19
interests  14:2
  38:19
interfere  23:21
  32:12 42:10
  60:22
interference
  10:11,12,15,17
  10:17,19,23
  11:7 12:20
  13:14,17 14:11
  21:7,9 32:4
  37:14 38:6,11
  38:12 42:5,7

42:23 43:2,5
  43:11,24 44:12
  54:7,25 55:6
  59:5 61:19
  87:20
interferes
  20:15 52:19
  77:24
interfering
  52:19 53:10
  63:1 82:14
intergovernm...
  3:17 6:20,20
  8:23 9:11
  10:13 15:21
  16:8 21:3,10
  29:20,23 31:16
  36:3 37:4,15
  37:17 39:1
  42:24 44:6
  53:10,21 56:15
  57:22 58:21
  59:8 60:3,11
  60:17 61:3,15
  61:24 63:2
  64:22 66:15
  73:10 75:5
  76:11,20,23
  77:19 78:2
  85:10,16,22
  86:1,8 88:1,6
  89:22 92:17
  93:3 95:7 97:6
  98:3 102:5,23

intermediate
  17:18
international
  71:5
interpretation
  34:2 37:16
interpretive
  28:8
interstate  31:5
intolerable
  10:25 11:20
  98:20
invalid  6:15
invented  24:11
inverse  23:17
  24:1,2 31:15
  101:17
invokes  77:19
involve  27:21
  63:20 75:15
  99:6,7
involving  75:8
irrespective
  21:18 90:25
isolation  27:1
issue  19:25
  33:18 38:11
  48:20 56:17
  78:14 79:2
  89:5,5
issued  50:20
issues  86:7
it'll  54:20

| j | | | jump 45:7 76:8 |
|---|---|---|---|

**j**

**ja** 29:8
**jeremy** 1:23 3:7
**jersey** 1:9,9,22
3:4,5 5:19 6:3
7:6,23 8:5 9:8
10:2 11:21,22
12:25 14:22
15:7,8 17:14
23:8,23 29:5
31:4,8,10 32:9
32:15 34:5
36:18 39:6
41:21 45:5,10
45:13 51:8
54:11,13,16
55:11 56:18
57:7,21 63:23
74:25 88:22
89:9,13 94:4
**jersey's** 8:4
**jfk** 54:18
**job** 43:15 54:11
**johnson** 76:2
76:22 77:18
88:5
**join** 45:22
**joining** 19:25
**joins** 38:11
**judge** 3:9,23,25
4:1,10 5:17 6:8
6:11 7:8 8:4
9:5,5,18,21

10:4,6 11:1,12
11:24 13:4,6
13:10,11 14:19
15:1,3,6,20
16:2,6,14,16,20
16:25 18:4,8
18:17 19:2,12
20:24 22:22
24:1 25:6,8,9
25:10 26:1
27:6 29:10,17
30:3,11 31:25
32:23 33:13,13
34:3,16,25
35:18 36:2
37:12,13 39:2
39:25 40:2,5
40:24 41:17
42:2,20 43:6
44:17,19,22,24
45:4,7,15 46:2
46:10,14,18,22
47:4,13,18
48:1,6,11,19
49:6,7,10,13,18
49:22 50:3,6
50:12,17 51:2
51:7,12,19
52:3,6,8,11,21
53:1,3,22
54:23 55:14,18
55:22 56:3,21
56:24 57:10,14
58:5,25 59:16

59:21,23 60:13
60:24 61:5,13
62:13,17 63:14
64:6 65:16,21
65:23 66:16
67:18 68:3,6
69:7,10,15
70:5,16 71:20
72:13 73:1,13
73:24 75:7
76:11 77:7,11
77:13 78:4
79:4 80:11
81:4,8,15 82:4
83:3 84:13,23
85:12 86:13,20
87:2,11 89:25
90:2,4,11,15,18
91:2,3,10,21
92:16 93:5,7
93:18,24 94:8
94:11,25 95:3
95:18 96:17,19
96:20 99:13
100:16 101:24
102:7 103:16
103:18
**judges** 1:18
32:6 91:11
**judgment**
20:25 55:5
**judgments**
40:18

**jump** 45:7 76:8
**jumped** 58:13
**jurisdiction**
54:9 57:5
102:2
**jurisdictions**
34:1 74:18
**jurisprudence**
53:14,15
**justice** 38:1,3,5
42:9 43:17
57:12 59:4
69:10,11,15,19
**justices** 77:16
**justifications**
25:4

**k**

**k** 1:25
**keep** 13:18,22
63:14 68:3
86:14
**kept** 92:17
**key** 18:23
**kick** 93:22,24
**kind** 7:9 8:2,14
10:24 12:8
15:14 22:1,11
22:24 30:7
37:4 38:23
39:22 55:23
62:1 66:11
67:3,16,21,23
75:15 76:23

**[kind - leasing]** Page 23

84:22 90:16
91:5,8 92:3
95:24 98:3
**kinds** 18:11
26:5 37:7 65:7
67:10,24 68:12
**kirsch** 45:4
55:14
**knock** 30:25
**knocked** 15:17
**knocks** 30:24
31:18
**know** 11:15
15:11,18 18:6
25:22 26:9
30:11 32:6
39:4,11,21,24
40:4,11,17,19
40:21 41:4,21
44:19 47:5
48:13,14,15
53:6 73:14,18
82:12,24 83:25
86:18 88:16
93:23 94:19
95:22 98:6,9
98:12,12,15,18
98:20 99:2,10
102:4
**krause** 1:18 3:9
3:25 4:10 7:8
8:4 20:24 25:6
25:8,10 27:6
31:25 34:3

37:12 42:2,20
43:6 44:24
50:3,6 51:19
52:3,6,8,11
54:23 56:21,24
57:14 66:16
67:18 70:5,16
73:24 76:11
86:13,20 87:2
87:11 89:25
90:4,15,18
91:21 96:17,19
100:16 102:7
103:16,18
**krause's** 33:14
**kristin** 2:2
104:4,8,10

**l**

**label** 73:3
**labeling** 28:17
37:7,10 41:5
41:10
**labels** 55:15
**lack** 29:3 31:1
**laid** 76:14
**land** 18:9 93:12
93:12
**language** 44:3
51:20 52:12
59:16 63:24
83:9
**law** 4:25 5:3,5
5:6 6:1,18 8:12

8:22 9:7,21
10:20 11:2,3,9
11:10,11,14,15
11:18,22 12:19
14:1 15:10,21
15:24,24 19:13
19:13,18,18
20:14,18 21:18
21:25 23:1,3,4
23:11 25:2
26:12,14,17,18
26:19 27:3,17
27:17,19,22,24
27:25 28:2,5,9
28:9,13,18,19
28:20 29:13
30:16,18,19,24
30:24 31:18
32:14,24 33:2
33:4,17 38:17
38:24 39:17
41:5 43:1,7,21
49:14,23 53:12
58:2 60:3,8,23
61:23 62:7,8
62:11 63:3,6
64:4 66:5 72:8
76:15 78:1
82:14,16 90:25
91:11 92:4,5
92:13 93:6
94:23 95:22
96:10 97:11,14
97:16,17,22,23

98:8 99:20
100:8 101:21
101:25
**laws** 3:21 5:2
11:17 12:13,13
12:14,21,22
14:16 15:18
17:23 18:2
20:4,8 22:12
26:5,11,12,22
26:23 27:1,2
28:6,16 33:11
35:14 38:18,22
41:20,23,23
57:5 59:14
61:7 67:1
71:13 72:10
74:15 86:9
97:7 100:5,6
102:13,19
103:9,10
**leader** 34:4
**lease** 13:1,12
20:23 22:6
39:15 46:7,22
47:8,14,21
53:25 80:21
81:10 91:12,13
91:14 101:2
**leased** 13:16
54:4
**leasing** 20:12
46:14,15,16,16
47:1 48:8 49:7

56:1,6
**leaves** 100:14
**leaving** 53:24
  55:2 70:6
**left** 34:5 55:7
  74:2 92:19
  98:9
**legal** 22:17
  45:25 101:9
  103:1
**legislature** 6:22
  17:20,21 28:2
**lens** 75:16
**leslie** 15:15
  18:9 19:3,8
  21:2 53:17
  75:16,22 76:16
  76:24 77:22
  78:5,23,24
  87:24 89:2,23
  90:16,21,24
**lesson** 40:4
**letter** 92:25
**letting** 14:2
  21:13 22:16
**level** 18:13 32:4
  48:18 83:11
  87:18 88:2
  96:11 98:19
**liberties** 29:2
**license** 76:4
**licensing** 75:16
  75:19 76:14,24
  77:20 87:15

90:7 91:17
**limit** 22:19
  42:18 86:4
**limitation** 5:18
  87:3
**line** 14:11 40:7
  40:11,23 48:21
  54:25 55:9
  62:15,16 64:15
  64:18 65:20,23
  66:2,21 67:18
  69:21 73:25
  84:20 90:19
  99:8 100:24
  101:9 102:24
**lines** 31:22
  41:15 69:14,23
  96:14,15
**liquor** 7:10
**list** 83:22
**literally** 68:8
**little** 15:18 22:1
  26:9 30:8,10
  30:10 35:24
  40:10
**llc** 2:3
**local** 9:12
  74:15
**locals** 17:19
**located** 80:7
  88:12
**logic** 22:23
  23:3,16

**long** 39:7 41:24
  49:19 82:7
  97:15 101:3
**longer** 19:19
  23:3 48:3,9
  63:3
**look** 6:24,24
  7:9 8:16 10:23
  10:24 12:19,22
  14:5 18:15
  20:4,10,11,15
  21:9 22:4,5,6
  24:1 27:1,2,16
  35:9 46:2 56:3
  59:2 62:22
  64:2,21 69:1,2
  72:13 77:21
  79:16 80:5
  85:13 87:24
  88:12
**looked** 73:6
**looking** 20:3
  43:10 51:19,19
  59:24 63:25
  65:3 76:12
  99:14
**looks** 99:23
**lose** 6:6 31:8
**loses** 9:22,23
**lost** 26:10
  41:14
**lot** 8:19 15:16
  16:12 44:5
  56:22,25 57:2

58:10 71:25
  74:19 82:20
  87:14 93:22
  98:2
**lots** 72:15
**lower** 45:3
  102:17

**m**

**m** 1:23
**made** 10:19
  23:11 32:16
  40:16 43:24
  55:5 78:18
  88:19 95:20
  96:25
**magic** 24:8
  73:10
**main** 34:12
  99:15
**major** 34:6
  48:18 54:10,10
  54:17
**majority** 3:24
  4:4 43:24 96:2
  98:25
**make** 8:5,21,24
  14:2,15 17:8
  20:2,25 21:8
  22:18,24,24
  25:13 28:24
  32:17 35:7,10
  35:21 36:2,3
  40:17,18 41:8

54:19,20 55:4
56:21,24 75:5
76:4 79:14
89:6 92:13,14
94:2 95:4 97:2
97:9,10 98:1
99:4 100:10,11
101:10 102:14
102:17
**makes** 8:21
19:8 20:14
24:15 30:9,9
38:17 74:6
75:14
**making** 12:3
19:17 33:2
38:10 41:16
43:9 92:4 94:1
94:6,7 95:10
102:13
**man** 28:3
**management**
33:10
**map** 7:13
**margins** 71:17
**market** 7:21,21
16:20 17:12,13
24:20 26:20
27:4,8 28:4
41:11,13 71:21
71:22 72:8
94:14 99:16,17
99:23

**marketplace**
4:14 31:12
36:20 42:19
92:8
**marshal** 9:24
48:3
**marshals** 9:15
47:1 48:8
**maryland** 76:2
76:22 86:2
88:5
**math** 44:15
**matter** 1:5,15
17:25 18:1
58:23 72:7,11
74:11,19 80:19
81:4
**matters** 10:16
13:20 23:15
27:16 72:11
102:11
**maximum** 26:5
**mcculloch** 11:1
11:5,7,25
22:25 43:10
44:7 61:21
86:2
**mchenry** 18:22
18:23 29:22
38:19
**mckaye** 1:25
57:17
**mean** 7:9,16,17
8:5 15:9 18:10

27:23 32:2
33:1,6 40:3
42:15 44:8,13
48:19 51:25
55:16 56:3
70:18,22 74:25
75:8 87:13
90:11
**meaningful**
101:18
**means** 11:14,14
42:9 47:19
80:16,19,24
**meant** 6:15,22
62:20 83:20
**measure** 39:3
69:17
**medicine** 7:25
42:18 101:11
101:16
**meet** 36:22
40:8 42:3
81:22
**meeting** 42:21
**meets** 78:16
**mention** 55:12
**mentioned**
22:21 45:15
46:14 55:16
**mentioning**
25:16 94:12
**merely** 60:4
**merges** 30:7

**mess** 45:20,24
**methodology**
18:21
**mexico** 14:12
14:14 60:12
68:3,6
**middle** 21:23
22:11 66:22
67:10
**miles** 10:8
45:16 54:15
**military** 16:11
33:16,21,23,24
37:6,8,10
93:25
**milk** 7:10 65:3
65:3 72:15,16
**miller** 15:15
18:10 19:3,8
21:2 53:17
75:16,22 76:16
76:24 77:22
78:5,24,24
87:24 89:2,23
90:16,21,24
**minimal** 91:23
**minimum**
12:14 26:4
**mint** 14:20,22
14:24 15:12
92:22 93:18
**minute** 55:15
**minutes** 3:8
10:9

**misleading**
93:14
**misreading**
59:11
**missed** 90:15
**missile** 94:14
**missiles** 94:1,2
94:11 95:4
97:2,9,10
**missing** 14:3
95:15
**mission** 45:14
**mistake** 39:17
**misunderstood**
39:17
**modest** 75:3
**moment** 59:3
**monahan** 11:22
**money** 15:5,12
22:8 81:12
**moneys** 39:9
**morning** 3:4
12:23 57:16
99:11
**moshannon**
10:9
**motive** 29:2
**move** 102:21
103:14
**multiple** 43:24
**munitions** 16:7
71:4 92:23
93:18 94:3

**murray** 60:15
69:1
**mushy** 22:1
**mustn't** 61:15
**mutually** 76:18
85:17 89:8

**n**

**n** 3:1 104:2
**name** 45:2
61:18 92:24
93:8,15 97:2,3
97:20
**named** 64:3
93:11 97:8,23
97:24
**naming** 42:21
96:22
**national** 95:12
**nature** 12:20
51:3,5,12
**necessarily**
17:6 67:11
68:16
**need** 13:15 14:8
15:11 16:18
33:11 35:12,13
37:10 38:17
52:3,4 58:18
70:2 73:24
85:21 93:3
99:6,7 102:14
103:11

**needing** 84:9
**needs** 35:15
49:23 82:16
**nervous** 29:9
**neumeister**
1:25 57:15,16
57:17 58:15
59:10,18,22,24
61:1,6 62:5,14
62:19 63:17
64:17 65:19,22
65:25 66:18
67:20 68:5,10
69:12,20 71:2
72:3,20 73:5
73:16 74:3
75:13 76:16
77:9,12,14
78:6 79:6
80:13 81:11,17
82:8 83:13
84:17,25 85:15
86:16,23 87:5
87:22 90:3
93:16 94:22
97:3 99:13
**neutral** 11:17
12:1,2 25:2
26:2,2,11,12,12
26:14,17,19,22
26:23 62:8
72:1 94:23
97:7,16,17
100:5,6

**neutrality**
24:21
**neutrally** 95:6
101:16,20
**never** 6:21 25:1
25:4 37:5,6
60:24 63:20
74:22 88:22
95:20
**nevertheless**
93:10
**new** 1:9,9,22
3:4,5 5:19 6:3
7:5,23 8:4,5
9:7 10:2 11:21
11:22 12:25
14:12,13,22
15:7,8 17:14
23:8,22 29:5
31:3,8,10 32:9
32:10,15 34:5
36:18 39:6
41:21,22 45:5
45:10,13 46:6
47:24 51:8,15
54:11,13,16
55:11 56:18
57:7,21 60:12
63:23 68:3,6
74:25 76:8,8
77:3 88:22
89:9,13 94:4
101:4

**newark** 10:8
54:17
**nice** 43:15
**nightmare**
54:20
**ninth** 18:14,18
18:20 29:19
30:9 43:17
53:15 58:1
75:9 86:5
**nominally**
61:17 94:12
**noncitizens**
32:5
**nondiscrimin...**
93:11
**nondiscrimin...**
60:6 97:18
103:10
**nonfederal** 5:2
6:25
**normal** 67:8
73:18
**north** 2:4 3:20
4:23,24 5:10
8:10 10:21
11:6 14:12
23:6 24:12
25:15 27:1,24
28:13,13,15
37:5,6,24 41:4
43:2,12,14,21
53:17 55:3
59:1,12,25

60:2,7 62:10
62:21 63:18,24
64:7 65:18
70:11 77:13
96:2 97:24
98:13 104:13
**note** 6:13 44:14
74:11,23 76:19
92:2 95:25
**noted** 13:4
24:16 60:18
100:19,24
**nothing's** 14:6
**notice** 1:16
**notion** 47:22
**notwithstandi...**
31:1 89:10
**nuance** 30:12
**nuclear** 16:22
**number** 19:10
20:1 21:1
23:12 24:10
39:23 60:2
87:8 89:24
99:10
**numerous**
86:11

**o**

**o** 3:1 104:2
**objection** 34:11
**objectives**
82:18 83:18
84:12 88:10

**obligation**
35:16
**obscenity** 40:15
**observed** 4:10
**obstacle** 12:22
12:24 19:22
33:7,8,11 42:3
52:16 53:7,8
83:2 85:24
102:15
**obstruct** 12:3
59:14 60:19,22
**obstruction**
54:7 67:16
84:22
**obstructive**
70:14
**obvious** 19:2,4
40:12 75:5
96:9
**obviously** 4:18
10:1 13:20
29:25 31:9
38:14 58:13
78:25 83:8
85:19 96:6
101:14
**occur** 62:11
**odd** 38:15 98:3
**oddity** 90:5
**offer** 19:17,19
52:23 79:14
**offered** 50:15
96:16

**offering** 79:15
**offers** 25:5
**office** 96:9 99:3
**officers** 64:23
95:14 98:25
**offices** 23:2,3
81:24 98:23
**officials** 20:9
21:16,17,17,20
45:12,20 54:19
70:13 92:8
**oh** 5:21 30:5
38:3 68:5 93:6
**okay** 5:10,17
5:19 11:1 13:6
13:13 16:14
18:8 19:15,16
40:16,17,18
44:12,24 48:11
51:8,14 52:8
53:1 59:22
61:18 65:22
71:22 82:6
90:15 94:11,14
94:15,25
**once** 25:5 28:5
28:11
**ones** 91:19
98:10
**open** 53:24
**opening** 53:4
**operate** 23:22
39:16,19 48:15
51:6 57:24

65:14 69:6
74:18 77:1
78:15,16 81:13
84:9 89:12
91:14
**operated** 23:19
48:12 84:5
**operates** 23:20
39:19 89:15
**operating**
48:10 49:15
56:5 89:14
**operation**
49:20
**operations** 2:7
33:5 56:19
58:4,19 60:20
60:23 62:7
63:1,8,10 64:1
64:2,4 65:11
65:14 66:8
67:5,13,15,16
68:20,22 70:14
71:9,18 72:6
80:3 81:12
84:20 85:2,4,9
89:12,18,19
**opinion** 4:4,6
4:23 67:25
96:2
**opinion's** 8:9
**opinions** 4:7
43:24

**opposed** 37:18
**opposing** 65:17
**opt** 7:12 83:8
**opted** 54:1
**option** 46:14,15
81:6 82:7,25
84:8,11 100:20
**options** 47:4,6
47:21 54:3
80:5,17,18
82:21 83:5,12
83:15,16,17
100:23
**oral** 1:15
**orange** 10:7
**order** 33:21
58:10 71:7
80:2,4 81:11
81:12,23 83:15
83:17 102:2
**order's** 33:23
**ordinances**
34:2
**outright** 53:19
57:18 77:3
**overall** 84:11
**overcrowding**
45:19
**overlapping**
76:18 85:16
**overturning**
37:18
**own** 6:18 7:25
14:7 22:7,20

30:23 33:3,6
35:3 36:8 41:9
42:18 46:19
47:19,22 48:14
81:3,5 82:6
83:6 84:10
91:16 92:11
94:3 96:7
101:11,16
**owned** 9:9,10
29:12 48:12
84:5
**owner** 80:20
**owning** 70:25
**owns** 89:15

| p |
| --- |

**p** 3:1
**pa** 1:14
**pair** 92:6,7
**panelists**
102:10
**parrot** 63:24
**part** 5:19 15:19
21:12,14 24:21
26:8 32:7,7,8
32:11 34:10
35:8,12 44:3
48:18 52:13
80:17
**particular** 5:4
56:19,22 57:1
81:7 83:17

**particularly**
20:8 37:21
74:6 100:21
**parties** 23:4,5,5
23:13,22 27:11
30:15 35:3,7
36:20 41:21
48:25 56:2
89:9,20 102:3
103:5,8,9,18,22
**partner** 12:11
41:14
**parts** 25:7 97:1
**party** 11:16
23:20 32:17,20
37:9 46:17,17
46:22 47:8
52:16 55:19
85:4 97:11,13
97:21 98:8
99:12 100:1,15
103:11
**pass** 45:22
49:23 60:10
61:7,11 72:8
72:10 73:20
**passed** 20:4
27:19 30:24
51:8,17 101:21
**passes** 29:13
**passing** 60:5
73:20
**pathways**
36:12

| | | | |
|---|---|---|---|
| **paying** 84:3 | 88:6 89:21 | **place** 20:18 | 25:19 27:10 |
| **peacetime** 16:7 | 91:24 | 22:13 54:13 | 28:7 33:2 34:3 |
| **pending** 79:22 | **permit** 47:11 | 78:17 87:13 | 35:23 38:13 |
| **penn** 4:3,10 | 84:22 86:24 | 91:9 | 41:16 50:12 |
| 10:21 14:12 | **permits** 70:8 | **placed** 4:11 | 51:13 53:12 |
| 23:6 24:12 | **permitted** 49:2 | **places** 22:2,3 | 73:11 83:9 |
| 43:23 44:1,13 | 66:15 67:23 | 46:4 58:8 | 92:2 97:25 |
| 55:3 60:13 | 68:18 77:6 | 79:21,23,24,25 | 99:25 100:6 |
| 64:8,19 65:2 | **person** 76:5,7 | 82:11 88:15 | 101:5,18 |
| 65:12 95:8 | **personnel** | **placing** 85:9 | 102:21 |
| 96:1 98:22 | 57:23 71:9 | **plaintiff** 1:7,20 | **pointed** 46:13 |
| **pennsylvania** | 77:4 | **planes** 71:4 | **points** 25:13 |
| 32:10 36:23 | **perspective** | **plant** 56:5,6 | 45:7 95:10 |
| 70:19 97:12 | 46:1 | **play** 37:22 48:4 | 102:6 |
| **people** 72:16 | **perspectives** | 48:17 | **police** 69:23 |
| **perceive** 59:4 | 43:16 | **please** 3:10 | **policing** 37:22 |
| **percent** 72:15 | **persuaded** 4:1 | 45:1 57:17 | 69:13 |
| 72:16 | **persuasive** 4:9 | 98:9 | **policy** 14:15,17 |
| **perfect** 44:16 | 43:22 | **pleasure** | 33:9 38:10 |
| **perfectly** 42:2 | **philadelphia** | 103:20 | 40:17 64:13,14 |
| 67:8 | 1:14 33:15 | **plenty** 74:3 | 81:5 102:25 |
| **perform** 65:2 | 76:19 77:7 | **pluralities** | **position** 14:20 |
| **performance** | 78:7 | 43:21 | 15:7 42:4 45:3 |
| 64:23 | **phoenix** 2:5 | **plurality** 3:20 | 48:22 50:24 |
| **performed** | 104:14 | 3:23 4:5,6,23 | 51:16 62:21 |
| 65:11 95:14 | **phrase** 35:12 | 8:9,13 14:13 | 63:20 103:3 |
| 98:24 | **physical** 80:23 | 62:10 63:18 | **possibility** 34:1 |
| **performing** | **physically** | 70:11 | 39:7 53:24 |
| 65:7 66:17 | 80:19 | **plus** 56:7 | 60:21 |
| 84:16 95:17 | **pick** 25:22 72:2 | **podium** 5:6 | **possible** 5:1 |
| **period** 49:5 | 91:4 | 24:11 44:14 | 83:22 87:5 |
| **permissible** | **pinning** 43:12 | 98:4 | **possibly** 60:9 |
| 55:1 60:19 | 43:13 | **point** 8:8,9 11:9 | 78:22 |
| 64:16 67:8 | | 20:21 22:15 | |

post   96:9 98:23
  99:3
postal   76:4
potential   79:12
potentially
  82:15
power   11:8,8
  11:25 24:22
  44:9 77:24
powers   24:19
practical   32:17
  33:4 38:9
  40:18,21 45:25
  69:3 72:24
  73:8 74:11,18
  80:19,23
  102:25
practice   92:21
pre   28:16,20
  64:7 69:24
  73:22
preceded   59:24
precedent   4:3
  91:7 99:9
precedents
  59:11 75:7
  86:11 92:4
preceding
  62:14
precise   39:21
precisely   57:25
  70:9
preempt   3:12
  20:21 30:17,19

35:13 38:20
preempted
  86:9 103:12
preempting
  42:1
preemption
  3:14 8:25 9:4
  11:14,18,19,19
  14:5,8,10
  15:13,17,22
  16:5,12 18:5,9
  19:10,22,23,25
  20:3,9,19 21:2
  21:12,14 23:14
  23:23 24:25
  29:21,23 30:1
  30:4,13,15,17
  31:1 33:7,11
  33:14,16 34:7
  34:14 35:12,15
  35:19,22 36:3
  37:19 38:13,24
  42:3,21 43:4
  51:24 52:3,10
  52:14,17 53:7
  53:8 58:18,22
  59:19 76:13
  77:21 78:3,5,9
  79:2 83:2
  85:16,20,24
  87:6,21,23
  88:8 89:23
  91:6 92:18,19
  93:4,12,22,24

102:3,8,22
preemptive
  49:24 92:2,14
preempts   22:12
  91:18
prefer   29:18
preference
  91:13
preferences
  13:23 14:4
  102:18
preferred
  80:18 81:14
  82:3,21,24
  83:15 84:8,11
premise   27:16
  99:23,24
premium
  102:13
prepared
  103:20
prerogative   8:4
presence   6:14
present   70:2
presented   68:1
  70:1 74:10
  95:23
president   21:5
press   14:21
presupposing
  74:21
pretty   9:2
  17:22 18:1
  38:25 40:4

41:14 91:23
prevent   26:4
  84:9
preventing
  45:23 82:15
price   60:6 61:8
  65:6 70:21
  73:19
prices   65:9
primarily   78:5
prime   54:16
principle   61:20
  62:21
principles
  57:21 60:11
  77:18 78:9
  85:22
print   15:25
  16:3
printing   14:21
  15:5,12 16:21
prior   9:7
prison   5:23
prisons   46:8
private   5:21,22
  6:17 7:18,21
  7:23 9:3,10,22
  11:16,21 13:16
  13:23 14:2,16
  14:21 16:7
  17:13,20 20:6
  20:12 21:16,17
  21:18,19 22:6
  23:4,5,5,13,20

23:22 24:20,22
26:15,19 27:14
27:21,21,25
28:21 29:2
30:14 31:5,8
31:10,13 32:16
32:20,21 34:20
34:24 35:3,7
35:10,16,16,25
36:20,25 41:6
41:19,19,21
42:16 45:23
46:17,17,22
47:8,10 48:16
48:16,25 50:2
50:7,9 51:23
51:25 52:15
53:20 55:19
56:2 57:19
58:3 61:10
67:2 70:20,24
71:11 72:10,16
77:1 78:21
79:5 81:22
82:22 83:21
84:1,14 87:16
91:12,25 92:22
97:11,13 99:22
100:9 101:19
101:22 102:2
103:5,8,9,11
**privately**   47:12
84:5

**privatization**
  103:7
**privatize**   70:17
  97:13
**privatizing**
  71:1
**probably**   30:15
**problem**   18:14
  23:1 28:4 31:7
  31:14 34:7
  35:12,23 38:4
  44:12 60:11
  63:6 65:10
  69:14 70:7
  71:2 90:21
  94:10 101:6,17
  101:23
**problematic**
  35:6
**problems**   40:15
  69:21 96:13
  99:16 101:25
  102:25
**procedural**
  51:22
**proceed**   74:5
**proceedings**
  103:24 104:5
**process**   79:15
**processing**   9:9
  11:23 46:19
**procure**   101:22
**procurement**
  78:1

**product**   25:2
  94:6 95:6
**profit**   31:3 56:8
**program**   10:18
  61:11 81:13
  82:20
**programs**
  57:24 59:14
  75:24 77:2,5
  78:22
**prohibit**   53:20
  69:4 84:19
  90:8
**prohibited**   66:9
  85:23
**prohibiting**
  4:16 59:14
  66:7,14 74:25
  75:3 84:14
**prohibition**
  4:11 5:8 77:3
  85:9 86:14,17
**prohibitions**
  96:23
**prohibits**   57:18
  62:25
**project**   39:8
  46:5 81:15
**promise**   59:23
**promulgated**
  82:1
**prong**   3:20
  10:12 17:2
  62:9 70:12

72:5,23,23
  85:24 92:20,25
  100:7,7
**prongs**   61:15
  61:21,22,25,25
  62:6
**proper**   77:17
**properly**   43:20
**property**   36:9
  66:24 68:12
**proposals**
  79:13
**proposed**   96:14
**proposition**
  61:2
**protect**   8:2
  63:13 101:17
**protection**   17:7
  17:9,10 94:16
**provide**   13:24
  27:22 90:24
**provided**   80:9
  80:11 81:20
**providers**
  13:16
**provides**   3:13
**providing**   7:5
  65:4,5 75:12
  79:15 96:10
**province**   57:6
**provision**   49:1
  84:4
**provisions**
  47:11 50:1

81:18

**proximity** 54:17

**public** 32:21 60:14 75:17 76:16 87:25 89:23

**puc** 15:15 18:10 19:4,8 31:25 90:16,21 90:24

**purchase** 46:7 47:14 81:2,10 84:9

**purpose** 88:18 89:7

**purposes** 42:23 52:9,10 66:19 67:22 72:11 87:21

**pursuant** 1:16 49:10,13

**pursue** 54:2,3

**push** 18:5

**put** 23:6 55:14 83:9 90:22 102:12

**puts** 3:11 38:8 38:19 79:12

**putting** 21:2 54:10 57:3

**q**

**qualified** 90:9

**qualify** 42:20

**quarters** 14:22

**question** 4:15 4:19,22 9:6 20:18 21:12 27:2 28:19 32:7,12 33:14 39:13 42:20 48:2 58:5,24 64:2,18 65:20 66:19 67:14 70:6 72:5,21 73:17 77:23 82:4,9 85:6 88:16 90:13,17 95:24 96:20,20 97:10 98:17 100:2,3 102:24

**questions** 5:5 25:11 40:22 44:22 57:11 59:19 66:1 67:11,21 68:1 68:18 69:22 70:1 74:12,19 90:1 99:14 102:9

**quibble** 36:11 36:13 42:6

**quick** 39:12 95:9 96:1

**quickly** 16:15 25:14

**quite** 11:7 12:9 16:11 17:17 18:25 31:7 41:3 43:22 47:25 100:17

**quotes** 4:4

**r**

**r** 3:1 104:2

**raise** 67:3

**raised** 54:24

**raising** 102:16

**rather** 31:23

**ratings** 81:21

**reach** 15:21,24 58:18 70:2 74:20

**read** 5:6 43:22 46:13 53:3 59:7 78:6 80:14 83:13 85:12 87:14 95:8 98:22

**reading** 4:3,6 10:12 37:14 77:17 79:6 90:20 93:1

**reaffirmed** 86:3

**real** 35:23 38:4 85:6

**realize** 4:23 23:9,9 25:20 35:25 38:1 44:3 98:2

**really** 5:21,22 6:2,22 7:13 9:3 10:16 11:13 15:16,17 16:11 16:15 20:6 22:10 26:8,22 28:3,6,11 33:5 34:15 35:18 37:3 38:17,17 40:20 42:11 43:15 58:13 61:9,14,25 67:4,21 69:24 72:7,19,21 74:5,12 79:20 83:11 85:17,21 86:14 91:9 95:15 97:16,19 99:2,23 100:2 101:8 102:14

**realm** 52:16 53:21 54:21

**reason** 12:25 13:3 22:25 24:13 51:18 73:9 80:14 83:7 85:25 86:4,10 102:11

**reasoning** 18:24 40:12

**reasons** 4:2
14:13 22:17
24:15 71:7,7
98:13 100:18
**rebuttal** 3:8
44:24
**recent** 20:1
23:12
**recently** 86:3
**recognize** 67:6
**recognized**
60:15 62:25
68:25 70:11
71:15
**recognizes**
71:11 84:4,7
**recognizing**
79:10
**reconcile** 41:24
41:25
**reconciles**
102:3
**record** 39:18
41:6,8 101:3
104:5
**recruiters**
33:16
**recruiting**
33:22,23,24
**red** 85:5
**redefine** 100:22
**reduced** 4:14
**references** 20:6

**referring** 86:14
**refers** 65:18
**refine** 50:17
**reflect** 10:22
**reflecting** 63:5
**reg** 92:24
**regardless**
21:24 97:7
**regs** 20:7 92:14
93:3
**regulate** 23:24
25:2,4 32:20
42:10,11 55:17
57:22 60:25
64:4 80:15
89:15 102:1
**regulated** 6:24
63:8 68:22
89:20
**regulates** 84:15
**regulating** 5:14
27:4 28:11
31:16 40:25
41:1 62:7
63:10,12 66:6
66:13 67:1,12
71:18 72:6
78:1 85:8 95:6
**regulation** 3:17
3:20 4:17 5:12
5:13,21 10:23
12:11,17 14:23
15:23 22:25
26:7 32:16

36:4,15,16,17
37:2 41:12
42:8,11 43:18
43:23 44:9
53:18 55:13
62:11,18 63:15
63:16,20,21
64:1,10,23
66:11 67:5,15
67:23 68:14
69:4 70:15
71:10,24 72:5
72:11,23 73:2
74:24 75:2,3
84:24 85:1,3,8
85:24 86:8
91:18,22 92:5
92:9,20,25
93:5,21 94:18
95:12 96:5
100:2,9,10
101:15
**regulation's**
26:11
**regulations**
23:7 41:10
49:3,8,24,25
64:12 68:21
73:19 78:14
81:21 82:2
92:1,6,12 96:8
99:3,6 103:13
**regulatory**
12:12 87:18

**reinforcing**
76:18 85:17
**reiterate** 39:14
**reject** 33:19
**related** 70:6
73:11
**relations** 87:1
**relationship**
50:23,25 51:1
57:23 63:11,12
66:6,8,9,11,13
67:12 72:7
74:7 89:19
**relevant** 5:16
13:21 17:12,13
67:13 71:22
72:22 81:24
85:20
**relic** 11:2
**relied** 3:19
48:16 76:2
**relies** 71:6
**rely** 54:14 87:7
**relying** 76:22
**remain** 26:3
**remaining** 10:2
**removal** 79:22
79:22
**removing**
83:21
**render** 64:25
**renewal** 51:3,8
**renewed** 82:16

| | | | |
|---|---|---|---|
| **repass** 6:17 | **respect** 61:7 | **revert** 27:9 | **rights** 19:6 |
| **repeatedly** 24:4 | 64:7 67:8 69:7 | **reverting** 39:4 | 58:11 89:5,10 |
| **repeating** | 69:12 70:5 | **right** 3:25 4:24 | **rise** 32:21 |
| 22:22 | 74:12 75:22 | 7:11 8:5 10:2 | **rises** 33:5 |
| **request** 79:13 | 82:9 85:19 | 11:12 13:23 | **risk** 24:23 |
| **requested** | 87:6 88:8,11 | 14:19 15:20 | 70:16 |
| 103:21 | **respectful** | 16:14,24 19:18 | **roadblock** |
| **require** 82:25 | 24:23 | 19:20,21,21 | 54:10 |
| 103:1 | **respond** 22:16 | 20:17 24:16 | **roadblocks** |
| **required** 80:8 | **response** 24:4,5 | 26:15 32:9 | 24:6 57:4 |
| 82:20 | 24:10 37:13 | 34:3 35:16,21 | **role** 11:2 37:13 |
| **requirement** | 38:16 39:13,14 | 38:6 45:9 | 37:22 |
| 20:17 76:8 | 49:22 | 46:21 47:6,21 | **roles** 38:10 |
| 90:7 | **responses** 6:4 | 49:6,18,22 | **rule** 14:13 |
| **requirements** | **responsive** | 50:6,7,9,13,18 | 25:14 85:18 |
| 28:17 37:11 | 37:25 | 50:19 51:4,5,6 | **rules** 71:12 |
| 66:14 75:20,25 | **resting** 51:20 | 51:11,13,17,22 | 93:23 |
| 76:1,14,24 | **restraint** 70:24 | 51:23,25 52:1 | **ruling** 26:4 |
| 77:3 78:12,17 | **restrict** 35:14 | 52:2,4,6,12,14 | **rumsfeld** 33:18 |
| 81:22 87:16 | 101:12 | 52:15,21,22,23 | **run** 13:2,7 24:2 |
| 88:5 89:2 | **restricted** | 54:2,4,4,5 55:7 | 27:15 32:13 |
| 91:17,23 | 99:21 | 55:19,24,25 | 61:11 95:8 |
| **requires** 52:15 | **restricting** 31:5 | 56:1 57:7 60:7 | **running** 10:18 |
| **reserve** 3:8 | **restriction** | 62:13 66:3,17 | 12:25 70:25 |
| 67:25 | 64:10 | 70:19,24 72:14 | **runs** 51:14 |
| **reserved** 60:20 | **restrictions** | 72:15 73:1 | |
| **residential** | 34:24 90:25 | 74:1,1 76:21 | **s** |
| 17:24 | **result** 6:14,19 | 79:4,8,10,14 | **s** 3:1 104:8 |
| **resolve** 23:10 | 32:14 45:19 | 81:16 86:15,22 | **safety** 25:3 |
| 103:1 | **retention** 22:3 | 87:4,12 89:4,6 | 26:2 28:3 |
| **resolved** 59:1 | 22:3 | 89:6,7 90:18 | **sales** 4:25 5:11 |
| **resolves** 66:19 | **reticulated** | 90:24 92:12 | 28:14 |
| **resources** 80:4 | 19:5 90:22 | 94:8 99:13,22 | **sanctions** 21:6 |
| | 91:17 | | |

satisfied  60:3
satisfy  37:10
  81:23
savings  37:2
  71:8 83:18
saw  31:24
saying  8:24
  11:9 13:6,18
  17:4,5,6,7
  18:22 25:22
  27:9 30:11
  32:9 33:7
  34:25 35:2,4
  39:20,20 41:25
  44:4,12,13,14
  49:23 51:10,14
  52:12 55:4
  56:10 63:14
  64:6 66:16
  69:15 74:24
  83:3 84:23
  92:11 93:21
says  4:5 5:10
  5:19,24 10:21
  11:21 17:17,18
  18:25 20:11,20
  20:21 22:3
  24:24,25 25:20
  27:1,25 33:4
  34:23 35:22
  36:24 38:1,3,5
  38:11 46:3,5
  47:13 49:1
  51:21 58:8,22

60:24 64:9
69:12 77:22
79:19 91:11
92:9 95:9
100:8 101:5
sb  59:9
schedule  77:25
scheme  19:5
  22:4 75:19
  80:17 83:1,23
  87:12,19 88:24
  89:5 90:8,23
schemes  77:20
school  33:17
scratch  47:24
screams  22:10
sea  43:6,19
  44:18 62:22
seat  3:11
second  4:20
  10:15 13:19
  20:8 23:15
  24:18 27:16
  28:2 37:24
  62:8 78:3
  98:22
seconds  35:5
secretary  46:3
  47:7 49:1
  79:20 82:10
section  3:13
  79:18 84:6
  87:16

security  45:13
  46:15 47:8,12
  47:22 49:1,20
  50:13,21,23
see  17:21 25:6
  25:14 28:6
  30:18 31:15
  34:23 36:15
  39:5,11,22,24
  40:11,17,19
  52:7 64:9
  72:18 92:8,12
  92:19,20 96:15
  98:6,11,12,13
  98:21
seeks  78:19
seem  33:10
seems  18:4 59:7
  81:8 83:10
  87:2,2 102:17
  102:20
seen  27:3 64:11
  86:5
select  77:25
selected  79:11
sell  26:19
seller  4:15,16
  95:6
sellers  37:8,10
selling  28:1
  41:7
send  54:14,18
sense  19:8
  22:18,24 24:15

28:24 37:15
74:6 80:24
separate  5:1
  8:5 43:4 93:3
  95:24 100:7
series  43:22
serves  83:17
service  9:8,8,12
  9:24 48:3
  90:25 96:10
services  17:13
  17:14 31:6
  64:25 79:16
servicing  11:23
set  22:17 33:20
  60:1 75:8
  83:24 91:17
sets  23:7 81:11
setting  14:21
  17:25 80:25
  83:14 88:24
seventh  5:17
  18:21 38:19
seventy  10:8
share  102:2
shoehorn  62:3
shoes  68:8
shorthand
  63:17,19
show  61:20
  97:1 100:17
showed  100:4
shown  64:12

| | | | |
|---|---|---|---|
| **shows** 12:10 | **simply** 66:3 | 22:8,17,20 | **specialized** |
| 24:14 | 82:17 85:25 | 26:21 27:9 | 17:24 |
| **shut** 6:3 56:19 | 86:4 | 33:10 35:15,16 | **specific** 6:23 |
| **shy** 61:23 | **single** 4:14,15 | 36:15 38:9 | 24:7 48:25 |
| **sic** 11:22 59:9 | 27:7 | 59:25 63:18 | 66:5 67:21 |
| **side** 12:9 13:14 | **sinker** 48:21 | 66:21,22 67:6 | 73:22 74:4 |
| 17:16 25:20 | **situation** 15:22 | 69:13,24 70:23 | 76:13 78:16 |
| 26:15 27:11 | 29:22 | 73:21 74:20 | 88:16 |
| 54:24 66:23 | **situations** 62:1 | 76:17 79:2,7 | **specifically** |
| 70:3 74:24 | **sixty** 10:7 | 80:15 83:14 | 17:24 26:24 |
| 77:16 85:23 | **sketchy** 35:25 | 85:6,17 89:4 | 60:18,20 62:24 |
| 102:4,5,16,17 | **skipped** 79:2 | 90:5 95:22 | 75:22 77:22 |
| **sidewinder** | **slice** 54:6 | 101:8 | 84:4,7 86:6 |
| 94:11,14 95:4 | **slightly** 42:6 | **sorts** 71:4,5 | **spectrum** 66:24 |
| **sign** 38:25 | 83:13 89:3 | **sounds** 12:4 | 70:4 |
| **similar** 29:13 | **small** 29:3 | **sovereign** 8:5 | **spell** 83:19 |
| 34:1 45:22 | **smaller** 45:16 | **sovereigns** 23:7 | **spend** 22:8 |
| 53:15 58:2 | **solace** 64:13 | 23:24 74:22 | 39:9 |
| 96:20 | **solitary** 12:14 | 102:1 | **sperry** 75:17 |
| **simon** 1:21 | **solution** 40:16 | **space** 6:7 11:5 | **split** 18:17 |
| 44:25 45:1,2 | **solve** 40:14 | 16:11,13 21:15 | 43:17 86:10 |
| 46:9,13,21 | **somebody** 95:4 | 22:1 40:20 | 96:2 103:22 |
| 47:3,6,17,20 | **something's** | 59:12 66:2 | **spot** 21:25 |
| 48:5,9,14,23 | 41:11 | 67:24 71:5 | 25:21 32:18 |
| 49:9,12,15,19 | **sorry** 14:25 | 74:6 76:18 | 38:9 102:10 |
| 49:25 50:5,9 | 43:8 49:12 | 78:15 79:17 | **sprouted** 16:11 |
| 50:15,19 51:5 | 56:23 65:21 | 81:3,24 82:19 | **square** 44:8 |
| 51:11,16,25 | 68:5,21 74:16 | 82:21 85:15,25 | **staff** 36:9 39:10 |
| 52:5,7,9,18,25 | 77:12 90:15 | 86:9,12 88:10 | 41:1 |
| 53:2,6 54:1 | 91:2 93:2,20 | 102:18 | **stand** 13:15 |
| 55:10,21,25 | **sort** 6:19,21 | **speak** 58:17 | 45:9,21 68:8 |
| 56:12,23 57:2 | 8:12 12:6 | **special** 18:2 | **standard** 25:22 |
| 57:11 | 13:25 14:11 | 32:9 | 25:23 31:21 |
| | 17:22 18:15 | | 73:25 92:18 |

| | | | |
|---|---|---|---|
| 98:16 | 57:5,21 58:2 | 54:14 57:18,22 | 83:13,20 84:12 |
| **standing** 3:15 | 58:18 59:11 | 60:24 62:25 | 84:18 85:7,20 |
| 11:16 | 60:23 62:1,7 | 63:9 68:23 | 87:7 88:8 |
| **stands** 61:1 | 63:3 64:20,21 | 69:5 70:8 | 89:21 91:8,18 |
| **start** 6:10 15:2 | 69:3 71:10,13 | 71:18 74:8 | 92:15 93:5,7,8 |
| 21:12 30:15 | 72:6,8 74:15 | 76:3 80:6,15 | **statute's** 58:16 |
| 31:20,21 59:20 | 74:17 75:1,19 | 80:23 82:16 | **statutes** 15:12 |
| 59:25 64:19 | 75:24 76:7,15 | 87:8 93:8,15 | 29:7 30:2 |
| **started** 58:6 | 76:25 77:6 | 93:16 95:10,20 | 45:22 79:19 |
| **starting** 55:18 | 78:9,19 82:14 | 97:2,6,7 99:1 | 85:12 93:23 |
| 79:18 | 82:23 84:10 | 99:12 100:3,12 | **statutory** 18:24 |
| **starts** 29:19,20 | 86:19,22,25 | 100:23,25 | 20:15 51:20 |
| 29:22 | 88:4,19,23 | 101:7,11,19,21 | 52:12 83:20 |
| **state** 3:7 5:5,7 | 89:14,16,21 | 103:4,5,8 | 84:4,11 85:19 |
| 5:18,24 7:3,6 | 90:11,25 91:19 | **station** 71:5 | 89:5 |
| 7:11,18,18 8:3 | 92:13 93:6,7,7 | **statute** 4:13 | **steager** 6:23 |
| 8:22 9:3,12 | 95:12 96:10 | 11:20 19:1 | **step** 8:19 24:25 |
| 11:17 14:16,25 | 97:14 100:5,6 | 20:5 25:23 | 37:16 40:14 |
| 15:1,4 20:18 | 102:15,19 | 35:17 37:18 | 95:7 |
| 21:18,25 22:12 | **state's** 7:25 | 42:2 45:5 46:2 | **steps** 37:3 |
| 23:20,21 26:17 | 32:20 | 46:12 47:23 | **stevens** 38:5 |
| 27:3,12,20 | **stated** 37:18 | 48:24 50:1 | 42:9 69:11,19 |
| 28:16,18,19,20 | **states** 1:2,24 | 51:17,21 52:1 | **stop** 36:17 |
| 29:11,13,15 | 3:18,18,22 | 52:19 53:9,12 | **stopped** 41:7 |
| 30:24 31:8,19 | 4:12,22 5:14 | 53:13,18 55:12 | **straight** 92:23 |
| 31:20 32:2 | 7:20,22 9:25 | 55:16,20,24,25 | **strange** 6:14,19 |
| 34:24,25 35:13 | 17:4 23:1,19 | 56:17 57:7 | 8:23 9:2 38:21 |
| 36:8,18 37:2 | 24:6,21,23 | 58:22 63:8,9 | **street** 2:4 |
| 38:22 41:20,22 | 26:1,16,18 | 64:3 68:24 | 104:13 |
| 41:23 42:18 | 31:4 33:15 | 69:2 70:10 | **stress** 92:18 |
| 45:10,15 46:23 | 34:4,11 36:1,6 | 77:23 78:18 | **stresses** 12:1 |
| 46:25 49:4,14 | 37:9 38:7 | 79:5,7,8 80:2 | **strictly** 57:6 |
| 54:11 55:11 | 42:12 44:9 | 80:14 81:23 | **strong** 46:12 |
| 56:19,22 57:1 | 45:22 53:17 | 82:9,10 83:11 | 58:10 |

**stronger** 14:9
  71:25
**strongest** 25:3
**strongly** 26:22
  58:14
**struck** 58:1
**structure** 3:13
  10:20 20:4
  22:14 56:9
**struggling**
  35:18 93:22
**students** 11:3
**stuff** 9:4 33:10
**subject** 5:15
  19:5 23:6
  36:19 37:2
  41:20,22,23
  52:13 71:11
  97:22,23 103:9
**submission** 5:2
  7:1 26:18
  27:23 28:18,20
  30:21,22 34:12
  99:21 101:12
**submitted**
  45:11
**subordinate**
  5:20
**subsection** 6:14
  6:15,17,18
  51:21
**substance** 69:2
  72:14

**substantial**
  10:10,12,15,17
  10:17,18,23
  12:20 13:13,17
  14:10 21:7,9
  37:14 38:6,11
  38:12 42:5,7
  42:23 43:2,11
  43:24 54:25
  61:19 72:18
**substantially**
  42:10
**substantive**
  51:22
**successive**
  49:16
**sue** 50:13
**sufficient** 58:16
  58:22 76:1,10
  87:19,20 89:1
  91:21
**suggest** 6:16
  29:18
**suggestion**
  33:19
**suitably** 80:7
  80:20 88:12
**suite** 2:4
  104:13
**suits** 53:5
**super** 38:20
**superior** 14:15
  24:17

**supplier** 62:12
**suppliers** 5:14
  5:15 65:3,3,7
  65:13
**supplies** 64:25
  65:7
**support** 3:14
  64:7
**supports** 48:21
  59:16 64:20
**supposed** 22:8
  81:1
**supremacy**
  3:11 12:20
  23:17 24:15
  29:20 30:23
  37:22 38:16,25
  40:15 45:6
  57:25 75:6
  77:5 78:25
  84:22
**supreme** 11:10
  11:11,14,18
  12:22 20:2
  23:3,11,12
  33:18 34:15
  37:20 38:17
  43:7,8 52:15
  53:14 56:4
  59:2,11,13
  62:15,20 64:9
  68:25 73:6
  75:24 76:3
  86:3,11 89:22

  91:7 92:3,4
  99:1 102:12,14
**sure** 5:10 25:21
  65:25 69:12
  72:24 96:19
  101:11 102:14
  102:18
**surplusage**
  17:25
**survive** 85:10
**survived** 6:15
**suss** 43:2
  101:10

---

**t**

**t** 104:2,2
**table** 26:4
  82:25 100:21
**tail** 83:4,5
**tailor** 40:16
**take** 8:8 21:13
  27:15 28:10
  30:5 32:3
  33:13 36:19,19
  37:1 38:2
  41:18 42:18
  55:1 61:18
  70:20,21 73:1
  82:24 84:10
  97:15 101:3,11
**taken** 8:6,11
  32:1 56:6
  58:11

| | | | |
|---|---|---|---|
| **takes** 19:9,10 | **taxes** 26:3 60:6 | **testing** 16:12 | 94:5 |
| 19:20 53:20 | 60:19 61:4,8 | **tests** 43:16 98:4 | **think** 4:3,3,6,20 |
| 55:23 67:18 | 66:25 67:8 | 103:1 | 4:24 5:16 6:1 |
| 70:17 103:6 | 68:18 73:18 | **text** 3:13 10:20 | 6:13,19,22 7:3 |
| **talk** 4:7,19,24 | **taxing** 12:16 | 11:16 20:3 | 8:15,19 9:2,9 |
| 18:4,8 20:7 | **teach** 11:2 | 22:13,23 23:16 | 9:13,15,20 |
| 79:1 81:21 | **tease** 13:19 | 24:14 35:17 | 10:14,16,16,21 |
| 96:12 98:5,10 | **tell** 74:14 | 38:25 58:10 | 11:4,5,6,6 12:8 |
| 98:11 | **telling** 27:12 | 64:19 79:16 | 13:20 14:5,7 |
| **talked** 14:4 | 36:7 58:19 | 85:13,19 | 14:12,13 15:15 |
| 19:7 79:7 89:3 | **tells** 21:22 | **thank** 44:17,23 | 15:16 16:4,16 |
| **talking** 8:17 | **temple** 33:17 | 45:1 57:10,12 | 16:16 17:4,12 |
| 11:20 12:23 | **temple's** 33:23 | 57:14 90:2,3,4 | 17:12,16,18,22 |
| 13:22 34:13,13 | **ten** 20:1 35:4 | 103:16,17,18 | 18:19,21,24 |
| 36:16 37:4 | **tend** 30:13 | 103:23 | 19:2,7,24,24,25 |
| 43:18 52:16 | **tenth** 23:17,18 | **thanks** 102:7 | 20:8 21:11 |
| 65:13 66:10 | 102:4 | **theme** 84:13 | 22:9,22 24:11 |
| 68:11 72:4,23 | **term** 39:7 82:7 | **theory** 92:20 | 24:12,13,15,16 |
| 74:6 87:23 | **terminate** 9:24 | 94:16 | 26:7 27:16,19 |
| 98:23 | **termination** | **thing** 7:3 12:7 | 30:7,8,13,14,21 |
| **talks** 5:3 12:21 | 80:10 | 14:1 16:6 | 31:2,6,11,13,18 |
| 20:5 39:2 58:6 | **terms** 59:9 | 23:15 32:3 | 32:8,11 34:9 |
| 84:2 99:20 | 65:16 67:14 | 36:9 44:2 | 34:10,12,14,19 |
| **targeted** 89:20 | 71:23 87:18 | 48:20 70:9 | 35:8,19 36:14 |
| **targeting** 70:12 | 88:15 90:7 | 78:9 95:9 99:6 | 36:21 37:3,25 |
| **task** 33:20 | 91:24 | **things** 4:5 6:13 | 38:15,15,23 |
| **tax** 11:8,25,25 | **terrible** 38:8 | 8:9 12:7 15:10 | 39:15,16,22 |
| 12:1,13 41:13 | 103:3 | 15:13,14 21:14 | 40:3,22 41:3 |
| 43:23 67:6 | **territory** 23:8 | 27:19,22 36:13 | 42:17 43:14 |
| 72:15,16,18 | 94:17 | 48:6 60:21 | 44:1,7,17 45:7 |
| **taxation** 95:12 | **test** 12:17 55:8 | 61:9 67:3 71:4 | 46:16 47:10 |
| 99:7 | 63:14,15 64:7 | 71:13,14,16,16 | 48:23 49:25 |
| **taxed** 71:12 | 73:10 98:18 | 78:2 80:4 | 50:12 52:9,18 |
| | 99:5 | 92:13,17 93:3 | 53:7 54:2,3,6 |

55:10,20,24
56:12,13 59:10
59:25 61:2
62:5,20 63:21
64:13,18,20
66:18,20,23
67:5 68:11
70:6 72:20,22
73:1,5,6,16,18
74:5 75:13,15
76:21 77:16
78:4,5 82:7,8
83:13,14,19
84:17,25 85:5
85:6 87:5,22
88:6,8 89:1,25
90:20,21 91:6
91:8,16,19
92:1,3,6 93:16
93:21 94:20
95:6,9,15,18,21
95:23,25 96:12
97:4,16,17,22
97:24,25 98:9
98:12,14,15,20
98:25 99:2,8
99:13,16
100:16 101:7
101:18,20
102:3,10,11
**thinking** 12:8
37:12 68:4
70:8

**thinks** 8:18
14:10 46:16
75:2 78:20
82:12 88:20
**third** 1:3 36:22
36:23 53:14
**thought** 41:9
88:17 93:20
**thoughts** 37:23
**threaten** 12:2
**three** 9:23
21:14,17,20
32:15,19 43:13
98:7
**threshold** 42:3
55:6 92:2
**throw** 24:6
**thursday** 1:13
**tightening**
38:23
**time** 11:18
12:25 16:4
24:7 25:6,10
28:5 57:12
61:20 63:3
71:4 102:8
**times** 28:9
103:1
**today** 5:6 24:11
40:22 44:14
75:11 91:13
96:13 98:2,5
100:4,17 102:8
102:10,23

103:19,22
**today's** 48:19
**together** 28:5,9
38:23 74:22
85:18 92:11
**told** 52:14
**tomorrow** 3:12
39:19
**took** 101:16
**top** 75:25 87:9
**total** 83:10
**totally** 35:9
44:8
**touche** 44:21
**touchstone**
11:5
**tough** 39:3,22
40:20 41:15
92:6
**traditional**
3:14 6:16 7:2
24:19
**training** 13:4
**transaction**
27:11
**transactions**
72:15
**transcribed** 2:2
**transcript**
103:21 104:4
**translate** 70:22
**transporting**
96:6,7 98:23

**treasurer** 4:7
63:23
**treasury** 63:23
**treated** 7:1
**trend** 63:5
95:11
**tricky** 15:10
**tried** 62:2
**tries** 88:4
**trips** 71:4
**troubled** 53:8
**true** 4:22 5:3
31:15 47:10
102:8 104:5
**truly** 11:5
99:17
**trump** 34:24
102:19
**try** 41:15 62:10
74:20 81:1
86:4
**trying** 6:2
53:17 55:11
62:24 69:22
72:19,21 84:19
85:23 88:19
95:5,8
**turn** 5:20 36:2
54:20
**twenty** 43:18
**two** 3:16 4:2
6:4,13 8:8,13
9:13,22 10:16
13:8,9,13

21:16,20 23:1
23:7,7 25:7,13
27:18 28:9
30:8 36:14
37:23 43:16
44:15,16 54:17
61:13,14,20,22
61:25,25 62:3
62:6 72:2 78:2
93:24 94:5
98:7 99:15
100:18 102:3,6
**type** 9:16 21:4
33:17 46:24
64:7

**u**

**u.s.** 9:15,24
14:20,23 15:12
20:2 23:8
28:10 34:15
41:14 45:6,14
47:1 48:3,8,11
63:23 64:3
94:2 97:3,9
98:7 100:1,10
100:15
**u.s.c.** 84:6
**ultimately**
15:17 25:15
28:16 41:25
43:16 61:10
64:2

**unable** 12:4
**unadministra...**
8:15
**unavailable**
20:11,15,20
22:7 35:20
**unconstitutio...**
53:9 63:3
**under** 8:22
19:13 51:4
53:9 57:21
58:21,23 60:11
62:9 63:6
66:15 75:6
78:9,18 80:11
84:3 85:21
86:8 88:5,6,23
89:1,21 93:1
**understand** 5:5
9:6 32:20
61:19,24 63:22
71:23,25 72:1
72:3 89:25
92:7 96:14,19
**understanding**
9:17,19,25
16:10 48:9
61:14
**understands**
83:25
**understood**
26:9 43:20
57:14 62:5
90:13

**undertake** 74:4
**undifferentiat...**
6:21 8:15
**united** 1:2,24
3:17,18,21
4:12,21 5:14
7:20 9:25 17:4
22:25 23:19
26:16,18 31:4
33:15 37:9
38:6 42:12
44:9 57:17
63:9 68:23
69:5 80:6,23
93:8,15,15
95:10,20 97:2
97:6,7 99:1,12
100:3,12,23,25
101:7,19 103:4
103:5
**unius** 18:1
**university**
33:25
**unmanageable**
54:22
**unnatural**
80:14
**unsatisfying**
98:14
**unspeakable**
45:24
**unusually** 3:13
**upheld** 45:5
82:16

**upholds** 11:25
12:1
**use** 7:23,23
12:14 21:16,17
21:18 24:8
29:11 32:22
34:22,23 35:22
35:22 36:12
43:17 44:6
54:13 58:3
79:25 80:8
81:1 83:16,22
83:25 88:14
89:7 96:25
100:20
**used** 13:7 39:6
60:3 63:18,22
69:21 73:9
88:17,18
**useful** 39:6
**uses** 71:3 83:25
84:7
**using** 31:9,10
82:22
**usually** 85:12
**utilities** 60:14
75:17 76:16
87:25 89:24

**v**

**v** 1:8 3:4 6:23
12:9 31:19
33:15,18 60:15
63:23 69:1

**[v - work]**                                                      Page 42

75:17 76:2,22
86:2 88:5
**valid**  6:19
  60:23
**various**  36:12
  45:12 71:6
  78:12,14
**vein**  19:8
**version**  20:8
**versus**  28:5
  32:16 59:4
**view**  13:17
  14:16 44:8
  90:9
**viewing**  32:3
**views**  14:17
**vigorous**  94:22
**violate**  60:17
**violates**  57:25
**violation**  45:6
  46:1 75:5
  78:25
**vision**  16:25
**vitality**  61:22
**void**  22:20
**voluntarily**
  79:15 80:22
**volunteer**  89:7

**w**

**wage**  12:14
  26:4 67:1
  71:13

**wait**  74:8
**want**  4:19 6:6,8
  7:20 10:14
  13:15,19 18:5
  18:8 19:12
  36:11,12 37:24
  39:14,20 41:22
  42:16 45:7
  53:19 54:3
  58:16 59:19
  64:8,17,19
  65:19,23 71:22
  88:3 90:23
  93:2,13 97:25
  98:5,11 100:12
  101:4
**wanted**  3:12
  15:7 22:16
  25:13 41:9
  75:23 82:19
  97:19
**wanting**  50:24
**wants**  23:21
  35:5 36:12
  56:25 71:21
  82:13 85:1
  86:18 94:3
  97:13
**war**  71:4
**warheads**
  16:22
**warn**  15:11
**washington**  4:7
  10:21 11:6

44:2,11 59:13
  59:16 62:15,20
  62:23 86:3
**washington's**
  62:17
**way**  8:12 9:2
  10:22 11:18,19
  12:8,19,24
  14:1 15:24
  19:7 22:12
  23:13,20 24:2
  24:13 26:10
  27:3,24 30:14
  31:2 32:13
  35:6 38:5,5
  41:15,23 42:9
  43:2 54:6 57:3
  57:8 61:23
  63:21 64:20
  67:13 70:8
  72:2 77:2
  80:14 86:5,16
  86:20 87:6
  90:13 93:14
  95:7,25 97:22
  99:8,17 101:10
  101:16
**ways**  8:13
  10:16 13:7,9
  46:18 61:13
**we've**  13:8
  17:14 38:14
  90:19 91:21
  103:21

**weak**  3:14 14:5
  14:8 20:8
  35:19
**weapons**  16:21
**weird**  8:18
  32:14 95:24
  102:17
**weirdly**  17:4
**went**  33:18
  57:7 63:25
**whiting**  23:11
**willing**  101:11
**winning**  26:16
**wishes**  35:10
**won**  50:19,21
**wonder**  12:15
**word**  21:25
  39:2 44:6 85:5
**words**  4:12
  24:8 29:16
  35:13 48:6
  68:8 69:1 73:9
  73:10
**work**  13:3
  18:22 25:5
  30:20 35:11
  36:25 58:20
  60:25 71:8
  74:22 75:23
  76:7 77:4
  78:21 80:20
  82:13 88:3,11
  89:16 92:10,15
  95:10 96:1,15

**[work - zero]**                                                Page 43

97:13,15 98:21
99:15 100:17
101:10 103:5
**workability**
99:10
**workable**  99:2
**workers**  76:4
96:6 98:23
**working**  49:20
69:5 84:19
**workplace**  26:5
**works**  7:19
24:13,13 41:4
98:13 99:9
**world**  16:17
25:3 91:16
**worried**  19:11
**worse**  7:1,5
45:21
**worth**  19:24
**wreak**  45:18
**writing**  61:23
**written**  15:24
19:16 26:10
**wrong**  69:8
81:7 99:24

|                **x**                |
| :---: |

**x**  1:4,12

|                **y**                |
| :---: |

**yard**  35:1,4
36:6
**yeah**  6:11 9:19
13:18 15:9,23

16:4,10 18:13
19:23 21:11
29:25 30:13
36:10 44:16
57:2 59:21
61:5 90:14,14
90:14
**year**  49:5
**years**  20:1,2
33:9 39:23
44:5,15,15,16
85:13 91:7
**york**  32:10
41:22

|                **z**                |
| :---: |

**zero**  10:5 32:16
32:19,19